## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BROOKSTONE HOLDINGS CORP., *et al.*,[1] | Case No. 18-_____ (___) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF GREG TRIBOU IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF

I, Greg Tribou, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.      I am the Vice President, Chief Financial Officer of Brookstone Company, Inc., a debtor and debtor in possession and the main operating company of the above-captioned debtors and debtors in possession (each, a "Debtor" and collectively, the "Debtors" or "Brookstone"). Prior to serving as the Chief Financial Officer, I served as the controller of Brookstone Company, Inc. since December 15, 2014.  In these capacities, I am familiar with the Debtors' business, financial affairs, and day-to-day operations.

2.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief (the "Petitions") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Court").

---

[1]  The Debtors, along with the last four digits of each Debtor's tax identification number, are: Brookstone Holdings Corp. (4638), Brookstone, Inc. (2895), Brookstone Company, Inc. (3478), Brookstone Retail Puerto Rico, Inc. (5552), Brookstone International Holdings, Inc. (8382), Brookstone Purchasing, Inc. (2514), Brookstone Stores, Inc. (2513), Big Blue Audio LLC (N/A), Brookstone Holdings, Inc. (2515); and, Brookstone Properties, Inc. (2517). The Debtors' corporate headquarters and the mailing address for each Debtor is One Innovation Way, Merrimack, NH 03054.

3.      I submit this declaration (this "First Day Declaration"), pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to provide an overview of the Debtors' business and these chapter 11 cases (the "Chapter 11 Cases") and to support the Debtors' applications and motions for "first day" relief (collectively, the "First Day Motions"). Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' professional advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. To the extent that any information provided herein is materially inaccurate, we will act promptly to notify the Court and other parties; however, I believe all information herein to be true to the best of my knowledge. I am authorized to submit this First Day Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## I.      Overview of the Chapter 11 Cases

4.      In addition to providing the factual support for the First Day Motions, the primary purpose of this First Day Declaration is to familiarize the Court with the Debtors, the Chapter 11 Cases and the relief sought in the First Day Motions. This First Day Declaration is organized as follows: Part I provides an overview of the Chapter 11 Cases; Part II describes the Debtors' business operations; Part III describes the Debtors' corporate structure; Part IV describes the Debtors' capital structure; Part V describes the events leading up to the commencement of the Chapter 11 Cases; Part VI summarizes the overall restructuring goals the Debtors hope to achieve by commencing these Chapter 11 Cases; and Part VII sets forth my basis for testifying to the facts underlying and described in each of the First Day Motions.

01:23475998.1

5.      The Debtors continue to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no committees have been appointed or designated.  As set forth in Part VII, concurrently herewith, the Debtors have filed a motion seeking joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

6.      Through these Chapter 11 Cases, the Debtors intend to undertake a store closing and sale process that will allow the Debtors to shed burdensome lease agreements, right-size their inventory, and sell a streamlined and healthy business to a bidder that can operate under the Brookstone brand into perpetuity.  To this end, the Debtors have entered into an agreement with Wells Fargo Bank, National Association ("Wells Fargo") and Gordon Brothers Finance Company ("Gordon Brothers," and together with Wells Fargo, in such capacity, the "DIP Lenders") pursuant to which the DIP Lenders will provide the Debtors with up to $30 million in the form of a post-petition DIP Credit Facility (the "DIP Facility") that will be secured by first priority priming liens on substantially all of the Debtors' assets.  The Debtors believe that the DIP Facility will provide the necessary flexibility to allow the Debtors to run a successful store closing and sale process, as well as to engage in an appropriate dialogue with their creditor constituencies.

7.      The Debtors' proposed path is designed to maximize the value of their businesses and assets and to provide the maximum recovery possible to the Debtors' creditors.  With a streamlined footprint and right-sized inventory, the Debtors will be poised to continue on as a profitable retail enterprise in the hands of the successful bidder at auction.  In order to satisfy the case milestones set forth in the Debtors' DIP Facility, as well as to prevent the deterioration in

value of Debtors' businesses attendant to a lengthy sale process, the Debtors seek to consummate a sale of their businesses before the end of September 2018.

## II.    The Debtors' Business and Operations

### A.    Overview of the Debtors' Business

8.      The Debtors are a product development company and multichannel retailer that offer a number of highly distinctive and uniquely designed products.  The Brookstone brand is strongly associated with cutting-edge innovation, superior quality, and sleek and elegant design.

9.      Brookstone began as a catalog company in the 1960s.  The Brookstone brand was introduced through a classified ad in Popular Mechanics Magazine featuring "hard-to-find tools." By the 1970s, Brookstone expanded its business operations, opening a retail store in Peterborough, New Hampshire.  Today, the Debtors remain headquartered in nearby Merrimack, New Hampshire.

10.      By the 1990s, Brookstone added internet sales and marketing through its website, www.brookstone.com. From there, Brookstone could offer thousands of products to its customers, including certain products that were not even available in stores.  To this day, Brookstone remains a highly recognizable brand name, associated with new and innovative products, including uniquely designed and engineered products not found in typical retail stores.

11.      As of the Petition Date, Brookstone operates 137 retail stores across 40 states and Puerto Rico.  In addition, the Debtors operate one liquidation center in North Conway, New Hampshire.  Of the 137 retail stores, 102 stores are located in malls and 35 stores are located at airports.  Certain airport stores are operated as a joint venture between one of the Debtors and one or more third parties.  These joint ventures are organized as limited liability companies. Mall stores vary in size from approximately 2,500 to 3,500 square feet and carry approximately

700 active stock keeping units ("SKUs").  Airport stores vary in size from approximately 75 to 2,300 square feet and carry approximately 375 active SKUs.  Prior to the Petition Date, the Debtors engaged in a number of customer related programs, including warranties, gift cards/certificates, private label credit cards and loyalty/reward point programs, all of which the Debtors are seeking authority to honor after the Petition Date.

12.    For the fiscal year ended 2017, net sales for the Debtors were $264 million and adjusted EBITDA was booked at negative $60 million. For the first half of 2018, net sales were $74 million and adjusted EBITDA was booked at negative $29 million.

**B.    Product Categories**

13.    The Debtors manufacture and sell products in three core categories: (i) "wellness" which is focused on products that improve consumers' health and well-being, such as massage and sleep improvement products, massage chairs, and exercise/fitness monitoring products, (ii) "entertainment" which is focused on audio, wine and barbeque, seasonal décor and toys, and (iii) "travel" which is focused on in-flight comfort (such as pillows), mobile solutions (chargers/headphones), and travel lifestyle products.

14.    The key to the Debtors' product offerings is Brookstone's unique "Plus One" model, which is woven throughout all three product categories.  Brookstone does not offer merely a weighted blanket (a product which helps relieve stress and enhances relaxation); rather, Brookstone offers a weighted blanket with Nap® fabric, a specially designed fabric that is softer than the weighted blankets offered by competitors.  Similarly, Brookstone does not offer merely Bluetooth headphones, they offer lighted Bluetooth headphones that also feature lighted cat ears that double as additional external speakers and allow the user to control and change the light

01:23475998.1

displayed thereon.  It is this "Plus One" doctrine, together with Brookstone's commitment to quality, which is the primary strength and value driver associated with the "Brookstone" brand.

15.     In addition to Brookstone branded products, Brookstone offers a number of unique and innovate products created by third parties who—prior to their relationship with Brookstone—do not have access to wide distribution channels.  Brookstone's partnerships with these third parties offers tremendous synergies, allowing Brookstone to supplement sales revenue with products that fall within the Brookstone model but that don't directly compete with Brookstone branded merchandise, and allowing the third party producer to access to a much more significant consumer base than would otherwise be available.  Past successful partnerships include Tempur-Pedic, iRobot and Parrot Drone.

## C.     Product Channels

16.     Brookstone markets its branded products, and those of its third party product partners, in four channels: (i) mall retail, (ii) airport retail, (iii) e-commerce through www.brookstone.com and certain other third party sites (including www.Amazon.com) and (iv) wholesale (including TV shopping).  In 2017, net sales by channel were approximately 53% mall/outlet, 21% e-commerce, 14% airport retail, and 12% wholesale.  Historical sales information by segment is detailed in the below chart:



### (i)    Mall Retail

17.    As of the Petition Date, Brookstone operated 101 stores in malls throughout the United States, and one store in Puerto Rico (the "Puerto Rico Store").  The products offered in mall stores span each of the Debtors' three product categories, and were the Debtors' primary sales platform for the majority of the Debtors' existence.  As described further below, the Debtors mall stores have operated at a loss each year consecutively since 2014 as a result of shift of consumer preferences away from brick and mortar retailers (and shopping malls in particular) and the attendant loss of foot traffic that is so critical to the successful operation of retail stores. For the year ended 2017, each of the Debtors' mall stores operated at a negative adjusted EBITDA, with an aggregate net sales of approximately $137.9 million, and adjusted EBITDA of negative $30 million.

### (ii)    Airport Retail

18.    As of the Petition Date, Brookstone operated 35 stores in airports throughout the United States.  Geared towards travelers, the airport stores carry less SKUs than the mall stores and the products offered are focused primarily in the Travel product category.  Unlike the mall stores, consistent foot traffic, a captive consumer audience and limited seasonality has allowed these stores to thrive (on an aggregate level) in comparison to the Debtors' mall stores.  For the year ended 2017, the majority of the Debtors' airport stores operated with positive adjusted EBITDA, with aggregate net sales of $37.7 million, and adjusted EBITDA of $1.4 million. Moreover, the net sales and adjusted EBITDA figures do not tell the whole story with respect to the productivity of the Airport retail outlets.  As described further below, supply chain issues have limited the sales potential that would otherwise be captured with a healthy network of

01:23475998.1

suppliers.  The Debtors believe that through the bankruptcy they can correct the supply chain issues and allow the airport stores to greatly increase their profitability.

**(iii)     E-Commerce Segment**

19.     Since 1996, the Debtors have operated an interactive website at www.brookstone.com.  In addition to offering products available in retail stores, the website contains thousands of additional items that are designed to broaden and deepen Brookstone's presence in key product categories.  The "web-only" assortment of products available on the e-commerce site accounted for approximately 30% of Brookstone's e-commerce sales for fiscal year 2017.

20.     The Debtors have continually sought to increase their web presence through marketing initiatives (such as outbound e-mails and placement of banner ads) as well as partnerships with third parties such as Google.com and Amazon.com which have the ability to directly place the Debtors' products on their online sites.

21.     For much of the Debtors' history they have supplemented their in-store and online sales with hard copy catalog mailings.  The catalogs, which were mailed predominantly to customers that matched Brookstone's key demographic profiles during the busiest sales periods of the year, had the added benefit of marketing the Brookstone brand name (indirectly enhancing in-store and online sales).  In 2018, due predominantly to liquidity constraints, Brookstone determined to cease its hard copy catalog mailings.  As described further below, this strategic decision negatively impacted both store retail and online sales in the years that followed.

22.     For the fiscal year ended 2017, the Debtors' e-commerce operations accounted for net sales of $55.2 million, and had a negative adjusted EBITDA of $1 million.  As with the airport retail segment, the net sales and adjusted EBITDA associated with the Debtors' e-

commerce segment is not reflective of its true potential due to supply chain difficulties. In addition, and as described further below, technology issues and a turnover of senior level management at the e-commerce segment led to underperformance at a segment that should be performing at a significantly higher level. The Debtors believe that the bankruptcy filing will afford the Debtors the opportunity to right the operational defects that have artificially stymied the overall profitability that should be incumbent to the Debtors' online presence.

### (iv)    Wholesale Segment

23.    Wholesale is undoubtedly the largest potential growth area of the Brookstone brand in the United States. While the Debtors have engaged in a wholesale business since 2007, this segment was largely neglected from a strategic standpoint until the downfall of the mall store model became apparent in recent years. Historically, the Debtors sought out resellers and corporate partners to include Brookstone branded products in their stores, media outlets and catalogs, but only allowed such vendors to select from a small assortment of products already sold in malls.

24.    More recently, Brookstone has focused significant energy (including through the onboarding of an experienced wholesale management team) to seek out wholesale partners to build this sales segment exponentially. The management team for this segment has been extremely successful, wooing partners such as Bed, Bath & Beyond, Costco and Home Shopping Network (among others) to carry significant amounts of the Debtors' products. The demand for the Debtors' products is high at these retailers as well as other potential partners.

25.    While the Debtors have had much success in creating new relationships with wholesale partners that have significant upside potential, they have unfortunately been unable to fully service these relationships. Wholesale partners have indicated that they would like to carry

01:23475998.1

large quantities of the Debtors' goods, but difficulties with the Debtors' supply chain have made filling orders of wholesale purchasers impossible.

26.     For the fiscal year ended 2017, the Debtors' wholesale operations accounted for net sales of $32.6 million, and had an adjusted EBITDA of $5 million, though the Debtors believe that if the current relationships with wholesale purchasers can be maintained, profitability would be much higher.  The Debtors believe that by fixing the supply chain issues and righting their liquidity through the bankruptcy proceeding, Brookstone will be well positioned to fully exploit this growth area in the near future.

**D.     Intellectual Property and Licensing**

27.     As discussed above, one of the Debtors' most valuable assets is the "Brookstone" brand name, which is recognizable by the Debtors' broad customer base both in the United States and abroad and is associated with premium quality and innovative products.  In addition, the Debtors are the owners of many prominent and recognizable "sub-brands" that are associated with their premium quality products.  Such sub-brands include "Big Blue Audio®", "Nap®", "Theraspa®", "BioSense®" and "Carry On®".  These sub-brands are owned by the Debtors in various trademark classes in both the U.S. and internationally.  In total, the Debtors (through Brookstone Company, Inc., Brookstone Purchasing, Inc., and Big Blue Audio LLC (collectively, the "IP Debtors")) own a portfolio of 169 trademarks, 191 patents and 980 copyrights.

28.     The IP Debtors license (the "License") certain of their patents and trademarks that are registered in China to Brookstone Electronics Co., Ltd. ("Brookstone China"), an entity that is 10% owned (indirectly) by the Debtors and 90% owned by Sanpower (Hong Kong) Company Limited ("Sanpower"), an indirect non-debtor parent of the Debtors.  In sum, the License permits Brookstone China to use the Brookstone name, and sell Brookstone branded products, in China.

Pursuant to this license, I understand that Brookstone China operates over 550 stores throughout China that are branded under the Brookstone name, or are co-branded with other retailers that sell similar products in China.

29.     Under the terms of the current License, the IP Debtors are entitled to receive royalties equal to three percent of the cost of Brookstone branded goods purchased for sale in stores operated by Brookstone China.  The Brookstone License expires by its terms on December 31, 2018.

**E.     Product Development and Sourcing**

30.     As discussed above, the products sold by the Debtors through their various sales channels consist of Brookstone branded products and, to a lesser extent, products designed and branded by third parties.  As of the Petition Date, Brookstone branded products accounted for nearly 70% of net sales across all channels, and accounted for a substantially higher profit margin on a gross basis (approximately 60-70% margins on proprietary products as opposed to 40-50% for third party merchandise).

31.     Certain of the Brookstone branded products are designed from the ground-up at the Debtors' Merrimack, New Hampshire headquarters, while others are sourced from concepts developed overseas that are brought to market in the U.S.  The Debtors' "Design Lab" oversees this creation of new products and the introduction of externally sourced items to market.  This design segment was first launched in 1999, with a view towards not only developing innovative "need to own" products, but also with an aggressive "freshness" goal of replacing one third of all branded inventory on an annual basis.

32.     The design team has historically consisted of approximately 30 experienced industrial designers and electrical and mechanical engineers (i.e. the teams that design new

products from ideas or significantly modify sourced products in partnership with vendors), and merchants (i.e. the teams that uncover or create new product opportunities, validate the business plan, manage the development timeline and direct product marketing for the newly designed products).  In addition, Brookstone has historically employed a team of QA/QC personnel in-house that conduct quality assurance, manage quality control and all necessary government compliance measures for each of Brookstone's product offerings.  As liquidity and profitability has flagged over recent years, the Debtors have been forced to make a number of cuts to the design, merchant and QA/QC teams.

33.    Once designed, products are sourced through various vendors in the United States and Asia.  Brookstone's largest sourcing partner is Shenzhen Yuanchuang International Trading Co. d/b/a Sanpower Sourcing Group ("SSG").  Pursuant to a supply agreement (the "Supply Agreement") between Brookstone Purchasing, Inc. and SSG, a significant majority of Brookstone's products that are sourced from Asia are provided through SSG's network of factories.  The terms of the Supply Agreement provide that Brookstone shall deliver purchase orders to SSG, who will in turn source the desired inventory from its network of factories.  Because Brookstone is in privity of contract with only SSG (and not the underlying suppliers covered by the Supply Contract), payables for products covered by the Supply Agreement are owed to SSG.  SSG is, in turn, solely responsible for compensating the underlying factories for their products.  Approximately 48% of Brookstone's products, as measured by net sales, are sourced by SSG.  As of the Petition Date, SSG was Brookstone's largest unsecured trade creditor with approximately $40 million due and owing to SSG under the Supply Contract.

**F.    Corporate Headquarters and Distribution Center**

01:23475998.1

34.     The Debtors own their corporate headquarters located in Merrimack, New Hampshire.  Brookstone also operates a single 400,000 square feet distribution center in Mexico, Missouri (the "Distribution Center") that is subject to a capital lease between Brookstone Stores, Inc. and the City of Mexico, Missouri.  The Debtors receive and distribute nearly all of their inventory through the Distribution Center, which supports the retail, e-commerce and wholesale segments.  Distributions to retail stores are made, at a minimum, on a weekly basis, predominantly through Federal Express ("FedEx").  Distributions to e-commerce customers are made daily, predominantly through FedEx.  Additionally, a number of products are "drop-shipped" or shipped directly to customers by vendors.

### III.     Organizational Structure

35.     Brookstone conducts its operations through a network of affiliated companies that own the various assets comprising its businesses.  These companies are all directly or indirectly owned by Sanpower Group Co., Ltd.  A copy of the Brookstone organizational chart (the "Organizational Chart") is attached as Exhibit A.

36.     Brookstone Holdings Corp. and Brookstone, Inc. are both incorporated in Delaware and are holding companies, the principal asset of which is the capital stock of Brookstone Company, Inc., a New Hampshire corporation that, along with its direct and indirect subsidiaries, operates the Debtors' businesses.

37.     The principal operations of Brookstone are contained in its operating companies. *First* is the cash management and receivable/payables operation.  Brookstone Company, Inc. has traditionally held the primary distributing bank account and has managed the contractual relationships with the Debtors' vendors, suppliers, and other contract counterparties.  Brookstone

Purchasing, Inc. is the counterparty to the SSG Supply Contract, and is responsible for the substantial majority of the purchase orders originating from the Debtors to suppliers.

38.     *Second* is the retail store leasing operation.  This is managed predominantly by Brookstone Stores, Inc. ("<u>Brookstone Stores</u>").  Brookstone Stores is the lessee on substantially all of the mall stores and 11 of the airport stores, while Brookstone Retail Puerto Rico, Inc. is the lessee on the Puerto Rico Store.  In addition, Brookstone Company, Inc. is the lessee on four airport stores, Brookstone Holdings, Inc. is the lessee on one airport store, and Brookstone Properties, Inc. is the lessee on one airport store.  The remaining 18 airport stores are operated by joint ventures where Brookstone Stores is a partial owner and an unaffiliated third party is the joint venture partner.  Brookstone Stores is the majority owner of all but two of the joint ventures (which two joint ventures collectively account for three of the airport stores).

39.     *Third* is ownership and licensing of the intellectual property portfolio which, as noted above, is held by Brookstone Company, Inc., Brookstone Purchasing, Inc., and Big Blue Audio LLC.  These three entities license key trademarks and patents to Brookstone China pursuant to the License.  As noted in the Organizational Chart, Brookstone China is 10% owned (indirectly) by Debtor Brookstone International Holdings, Inc.

## IV.     <u>Capital Structure</u>

40.     The chart below sets forth the Debtors' funded debt obligations as of the Petition Date:

| Debt Obligation | Original Principal Amount | Approximate Principal Amount Outstanding as of Petition Date | Maturity | Security Status |
|---|---|---|---|---|
| Prepetition ABL Facility | $70,000,000.00 (Revolver) | $13,513,758.59 (Revolver) | 7/7/19 | Secured |

|  | $15,000,000.00 (Term Loan) | $15,000,000.00 (Term Loan) |  |  |
|---|---|---|---|---|
| Prepetition Second Lien Notes | $10,000,000.00 | $14,870,087.41 | 7/7/21 | Secured |
| Sanpower Secured Notes | $39,490,281.05 | $39,490,281.05 | 7/8/19 | Secured |
| Sanpower Unsecured Notes | $46,625,906.44 | $46,625,906.44 | 7/8/19 | Unsecured |

## A.    Prepetition ABL Facility

41.    Brookstone Company, Inc. as successor borrower,[2] Wells Fargo, as Agent (as successor to General Electric Capital Corporation ("GECC")), and certain lenders are parties to a Credit Agreement, dated as of July 7, 2014 (as amended, modified, supplemented, or restated from time to time, the "Prepetition ABL Facility").  Each of the other Debtors guaranteed the obligations under the Prepetition ABL Facility.  The Prepetition ABL Facility is comprised of a $70.0 million revolving credit facility (the "Revolver") and a term loan with an initial principal amount of $15.0 million (the "Term Loan").  Gordon Brothers is the lender under the Term Loan.

42.    The Prepetition ABL Facility obligations are secured by first priority liens on substantially all of the Debtors' assets, including receivables, inventory, general intangibles, intellectual property, documents, deposit accounts, equipment, fixtures, and inventory, all as set forth in that certain Guaranty and Security Agreement, dated as of July 7, 2014 by and among Brookstone Company, Inc., as successor borrower, the guarantors party thereto, and GECC, as Agent, and the companion patent, trademark and copyright agreements entered into as of July 7,

---

[2]    Sailing Innovation (US) Inc. was the initial borrower, and was subsequently merged into Brookstone Holdings, Corp.

2014 and June 3, 3015.  The Prepetition ABL Facility is further secured by a first mortgage on

the Debtors' corporate headquarters property in Merrimack, New Hampshire.

**B.      Prepetition Second Lien Notes**

43.      Brookstone Holdings Corp. issued 10.00% Second Lien Subordinated Secured

Notes Due 2021 (the "Prepetition Second Lien Notes") pursuant to the Indenture, dated as of

July 7, 2014, by and among Brookstone Holding Corp. as issuer, the other Debtors as guarantors,

and Wilmington Trust, National Association ("Wilmington Trust") as Trustee.  The Prepetition

Second Lien Notes Indenture provided for the payment of interest either in cash or in kind ("PIK

Interest"), at the option of the issuer.  The Prepetition Second Lien Notes were originally issued

with a face value of $10.0 million; however, following the accrual of PIK Interest, the

Prepetition Second Lien Notes carried a face value of $14,870,087.41 as of the Petition Date.

The Prepetition Second Lien Notes are secured by second priority liens on substantially the same

assets as the Prepetition ABL Facility, however, the collateral securing the Prepetition Second

Lien Notes does not include the Debtors' interests in real estate.

**C.      Subordination Agreement**

44.      Brookstone Company, Inc., as successor borrower under the Prepetition ABL

Facility, Brookstone Holdings Corp., as issuer of the Prepetition Second Lien Notes, GECC as

Agent under the Prepetition ABL Facility and Wilmington Trust, as Trustee for the Prepetition

Second Lien Notes entered into a Subordination Agreement dated as of July 7, 2014 that, among

other things, governs the relative priorities of liens granted under the Prepetition ABL Facility

and Prepetition Second Lien Notes, respectively ("Subordination Agreement").  Pursuant to the

terms of the Subordination Agreement, the rights and remedies of Wilmington Trust and the

holders of the Prepetition Second Lien Notes are limited in any bankruptcy proceeding of the

Debtors, including in connection with any proposed DIP financing.  In pertinent part, the

Subordination Agreement provides that:

> **Section 2.3 Insolvency Proceedings**.  In the event of an Insolvency Proceeding:
>
> …
>
> (g)    <u>Post-Petition Financing</u>. If any Obligor or Obligors shall become subject to an Insolvency Proceeding and such Obligor or Obligors as debtor(s)-in-possession (or a trustee appointed on behalf of such Obligor or Obligors) shall move for either approval of financing to be provided by one or more of the Lenders and constituting Senior Indebtedness ("<u>DIP Financing</u>") under Section 364 of the Bankruptcy Code or the use of cash collateral with the consent of the Lenders under Section 363 of the Bankruptcy Code, the Second Lien Agent (on behalf of itself and the holders of the Subordinated Notes) agrees as follows: (A) the Second Lien Agent (on behalf of itself and the holders of the Subordinated Notes) hereby waives any notice requirement with respect to such DIP Financing or use of cash collateral, (B) such DIP Financing may be secured by Liens on all or a part of the assets of the Obligors which shall be superior in priority to the Liens on the assets of the Obligors held by any other Person (including, without limitation, the Second Lien Agent and the holders of the Subordinated Notes), (C) neither the Second Lien Agent nor the holders of the Subordinated Notes will request or accept adequate protection or any other relief in connection with the use of such cash collateral or such DIP Financing, (D) the Second Lien Agent and the holders of the Subordinated Notes will subordinate (and will be deemed hereunder to have subordinated) their Liens (i) to the Liens granted to the First Lien Agent and/or the Lenders securing such DIP Financing (the "<u>DIP Liens</u>") on the same terms (but on a basis junior to the Liens of the Lenders) as the Liens of the Lenders are subordinated thereto (and such subordination will not alter in any manner the terms of this Agreement), and (ii) to any "replacement Liens" granted to the Lenders as adequate protection of their Liens on the Collateral in respect of the Senior Indebtedness (the "<u>Senior Adequate Protection Liens</u>"), (E) the Second Lien Agent and the holders of the Subordinated Notes will consent to any "carve-out" agreed to by the First Lien Agent and/or the other Lenders and (F) neither the Second Lien Agent nor the holders of the Subordinated Notes will contest or otherwise object in any manner to any adequate protection provided to the Lenders as adequate protection of their interests in the Collateral, any DIP Financing or any cash collateral  use, in each case on terms provided herein and each shall be deemed to have waived any such objections to such adequate protection, DIP Financing or cash collateral use, including, without limitation, any objection alleging Obligors' failure to provide "adequate protection" of the interests of the Second Lien Agent and the holders of the Subordinated Notes in the Collateral (but excluding any objection alleging violation of the terms of this Agreement, as to which no waiver is provided).

(h)    Adequate Protection. Neither the Second Lien Agent nor the holders of the Subordinated Notes may seek post-petition interest and/or adequate protection (whether in the form of adequate protection liens or adequate protection payments) in any Insolvency Proceeding in connection with DIP Financing or use of cash collateral, and the Lenders may oppose any such liens and/or payments proposed to be granted and/or made, as applicable, by any Obligor to the Second Lien Agent or the holders of the Subordinated Notes. Furthermore, in the event that the Second Lien Agent or any holder of the Subordinated Notes actually receives any post-petition interest and/or adequate protection payments in any Insolvency Proceeding, the same shall be segregated and held in trust and promptly paid over to the First Lien Agent, for the benefit of the Lenders, in the same form as received, with any necessary endorsements, and the Second Lien Agent and each holder of the Subordinated Notes hereby authorizes the First Lien Agent to make any such endorsements as agent for the Second Lien Agent (which authorization, being coupled with an interest, is irrevocable) to be held and/or applied by the First Lien Agent in accordance with the terms of the Senior Indebtedness Documents until Payment in Full of all Senior Indebtedness before any of the same shall be made to the Second Lien Agent or one or more holders of the Subordinated Notes, and the Second Lien Agent and each holder of the Subordinated Notes irrevocably authorizes, empowers and directs any debtor, debtor in possession, receiver, trustee, liquidator, custodian, conservator, administrator or other Person having authority, to pay or otherwise deliver all  such payments to the First Lien Agent.

Subordination Agreement, § 2.3.

**D.    Sanpower Secured Notes**

45.    Beginning in January 2018 through to July 16, 2018, Sanpower, as lender, entered into 17 separate Secured Subordinated Promissory Notes (each a "Sanpower Secured Note," and collectively, the "Sanpower Secured Notes") with Brookstone Company, Inc., as borrower, each due July 8, 2019.  A listing of each of the Sanpower Secured Notes is below:

| No. | Date | Original Principal Amount |
|-----|------|---------------------------|
| 1. | 01/22/18 | $1,000,000.00 |
| 2. | 01/23/18 | $2,490,000.00 |
| 3. | 01/25/18 | $2,510,000.00 |
| 4. | 02/28/18 | $5,000,000.00 |
| 5. | 03/13/18 | $6,000,000.00 |

| No. | Date | Original Principal Amount |
|---|---|---|
| 6. | 04/04/18 | $4,000,000.00 |
| 7. | 04/13/18 | $2,000,000.00 |
| 8. | 04/18/18 | $1,500,000.00 |
| 9. | 04/20/18 | $500,000.00 |
| 10. | 05/02/18 | $1,000,000.00 |
| 11. | 05/04/18 | $1,999,985.00 |
| 12. | 05/07/18 | $1,799,985.00 |
| 13. | 05/24/18 | $690,336.05 |
| 14. | 06/06/18 | $2,499,975.00 |
| 15. | 06/20/18 | $1,500,000.00 |
| 16. | 07/06/18 | $2,000,000.00 |
| 17. | 07/16/18 | $3,000,000.00 |
| | **TOTAL** | **$39,490,281.05** |

46.     The Sanpower Secured Notes are guaranteed by Brookstone Purchasing, Inc. and

Big Blue Audio LLC pursuant to a Guaranty entered into as of June 29, 2018 (the "Sanpower

Guaranty"), and are not guaranteed by any of the other Debtors.  The Sanpower Secured Notes

are secured (i) by liens on all of the assets of Brookstone Company, Inc., and (ii) by certain

intellectual property assets of Brookstone Purchasing, Inc. and Big Blue Audio LLC pursuant to

an Intellectual Property Security Agreement entered into as of July 6, 2018.  The Sanpower

Secured Notes are not secured by assets of any of the other Debtors.  Pursuant to the terms of the

Sanpower Secured Notes, the obligations owed to Sanpower under the Sanpower Secured Notes

are contractually subordinated to the obligations underlying the Prepetition ABL Facility until

payment in full of such obligations.

01:23475998.1

E.      **Sanpower Unsecured Notes**

47.     Beginning in February 2016 through to September 2016, Sanpower, as lender, entered into 10 separate Unsecured Subordinated Promissory Notes (each a "Sanpower Unsecured Note," and collectively, the "Sanpower Unsecured Notes") with Brookstone Company, Inc., as borrower, each due July 8, 2019.  A listing of each of the Sanpower Secured Notes is below:

| No. | Date | Original Principal Amount |
|---|---|---|
| 1. | 02/04/16 | $5,000,000 |
| 2. | 09/07/16 | $5,000,000 |
| 3. | 10/12/16 | $5,000,000 |
| 4. | 04/18/17 | $3,000,000 |
| 5. | 05/15/17 | $6,000,000 |
| 6. | 06/02/17 | $3,000,000 |
| 7. | 07/05/17 | $15,000,000 |
| 8. | 08/30/17 | $2,125,906.44 |
| 9. | 09/11/17 | $1,300,000 |
| 10. | 09/15/17 | $1,200,000 |
| | **TOTAL** | **$46,625,906.44** |

48.     The Sanpower Unsecured Notes are guaranteed by Brookstone Purchasing, Inc. and Big Blue Audio LLC pursuant to the Sanpower Guaranty, and are not guaranteed by any of the other Debtors, and are not secured by any liens.  Pursuant to the terms of the Sanpower Unsecured Notes, the obligations owed to Sanpower under the Sanpower Unsecured Notes are contractually subordinated to the obligations underlying the Prepetition ABL Facility until payment in full of such obligations.

01:23475998.1

F.      **Trade Debt**

49.     As of the Petition Date, the Debtors estimate that their unsecured debt is between

$75 and $85 million, excluding the Sanpower Unsecured Notes and any potential deficiency

claims associated with the Prepetition Second Lien Notes and the Sanpower Secured Notes.

Approximately $50 million in unsecured trade debt is due to vendors, including approximately

$40 million owed to SSG.

G.      **Equity**

50.     As discussed above, the Debtors are 100% owned by Sanpower Group Co., Ltd.

through a series of wholly-owned intermediate holding companies.

## V.      Events Leading to the Chapter 11 Cases

A.      **Prior Bankruptcy**

51.     In 2007, Brookstone had reached its peak profitability, generating net sales of

$563 million and adjusted EBITDA of $59 million.  Following the great recession of 2008,

Brookstone struggled to perform anywhere near pre-recession levels.  In fiscal 2013,

Brookstone's adjusted EBITDA was a mere $10.7 million.

52.     During and after the economic downturn, Brookstone attempted to improve its

balance sheet by eliminating unprofitable stores, cutting staff, reducing overhead, streamlining

product development and cutting marketing efforts (including cutting catalog circulation by

50%).  At the same time, Brookstone attempted to de-lever its balance sheet through exchange

offers and repurchases of its then outstanding notes.  Despite these cost cutting efforts, a

disappointing holiday sales season in 2013 and a looming January 15, 2014 interest payment on

then outstanding second lien notes made it clear that a bankruptcy filing was inevitable.

53.     Following entry into a forbearance agreement, on April 3, 2014, the Debtors, together with certain affiliated entities, filed petitions for relief pursuant to chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware (the "2014 Bankruptcy"). Immediately prior to filing the 2014 Bankruptcy, Brookstone entered into a stalking horse agreement with an affiliate of Spencer Spirit Holdings, Inc. ("Spencer") to purchase newly issued shares of reorganized Brookstone Holdings Corp. pursuant to a to-be-filed plan of reorganization.  The plan sponsor stalking horse agreement, however, was subject to a competitive marketing and auction process.  Following a lengthy auction, affiliates of Sanpower Group Co., Ltd. were declared to be the successful bidder, and were substituted as plan sponsor for Spencer.

54.     On June 24, 2014, the plan of reorganization of the Debtors was confirmed by the Court, and on July 7, 2014 the plan was declared effective.

**B.      Events Following the 2014 Bankruptcy**

55.     Following the 2014 Bankruptcy, sales continued to lag almost immediately.  For the years ended 2014 and 2015, net sales were pegged at approximately $420 million and $389 million respectively, while adjusted EBITDA was booked at negative $38 million and negative $24 million respectively.  While a number of factors contributed to the underperformance, sourcing of products and supply chain difficulties were the major drivers.

56.     In 2016 and early 2017, Brookstone pressured vendors to change their payment terms from a standard 10 days to 60 days.  In addition, Brookstone sought out vendors who would accept Chinese Yuan (RMB) as opposed to U.S. Dollars.  These moves caused certain vendors to cease sales to Brookstone.

57.     The drop in net sales in 2016 and 2017 was further exacerbated by the decline in the mall model as a means for consumers to buy products of the type sold by Brookstone. During this time, foot traffic at mall locations decreased drastically, as consumers continued to seek out products online as a replacement for traditional brick and mortar shopping.  For the fiscal years ended 2016 and 2017, net sales were approximately $351 million and $264 million respectively, while adjusted EBITDA was negative $39 million and negative $60 million respectively.

58.     Brookstone was unable to compensate for the decline in mall shopping through its e-commerce platform.  Consistent leadership changes in the e-commerce segment led to a loss of institutional knowledge and significant junior associate turnover.  At the same time, the Debtors' changed the technology underlying the e-commerce platform, and in so doing lost a substantial amount of data and indexing, severely damaging Brookstone's web presence.  In 2018 the Debtors also made the strategic decision to eliminate the production and mailing of hard copy catalogs as a cost cutting measure.  Because the catalogs were directly responsible for a significant portion of the web traffic on the Debtors' e-commerce site, the negative impact on the Debtors' online sales was dramatic.

59.     During the years ended 2016 and 2017, the Debtors were able to survive only through continued investments of cash from Sanpower.  From February 2016 to September 2017 Sanpower provided approximately $47 million in subordinated unsecured loans to Brookstone. Further loans were provided, this time on a subordinated secured basis, in the aggregate amount of approximately $40 million throughout 2018.

60.     In June 2018, Brookstone was informed by Sanpower that it would only provide limited funding in July 2018, and that Brookstone would have to look elsewhere for financing

sources, or significantly reduce operating expenses.  Without the means to continue to operate absent funding from Sanpower, the Debtors hired restructuring professionals to prepare for a bankruptcy filing, secure DIP financing and market the Debtors' businesses for an in-court sale process.

**C.      Efforts to Secure Financing**

61.      One of the critical elements to the Debtors' restructuring efforts is the availability of financing to fund the Debtors' anticipated cash shortfalls during the bankruptcy case, as well as to bridge to a sale and fund an orderly wind-down.  With the assistance of their advisors, beginning in July 2018, the Debtors contacted approximately 40 potential lenders to inquire into their willingness to provide financing during the Chapter 11 Cases.  Of the potential lenders, the Debtors executed non-disclosure agreements with 22 financial institutions.  22 potential lenders were provided with diligence information and, of those potential lenders, 12 potential lenders were provided access to a data room to facilitate more detailed diligence.  Despite indications of interest from current creditors and various third parties, the Debtors were unable to find any lender that was willing to provide financing on a junior basis to the existing secured facilities or to refinance in full the existing secured debt.

62.      The Debtors believe that engaging in a priming fight with their existing first lien lenders at the outset of the Chapter 11 Cases would be extremely disruptive, even if successful, and would compromise the Debtors' chances of successfully executing their strategy of selling their businesses as a going concern, for the benefit of all stakeholders.  As such, the only serious contender for provision of post-petition financing was determined to be the existing lenders under the Debtors' Prepetition ABL Facility.

63.     Following negotiations with the DIP Lenders, the Debtors were able to negotiate the DIP Facility, which will provide the Debtors with up to $30 million in post-petition financing to fund the Debtors' costs and expenses during the Chapter 11 Cases.

64.     Accordingly, the Debtors are seeking an order through the DIP Motion (as defined below) authorizing the (a) incurrence of post-petition indebtedness through the DIP Facility, (b) granting of priming liens and super-priority administrative expenses, and (c) use of cash collateral.  I have reviewed the DIP Motion and the factual statements therein are true and correct.

65.     The DIP Facility gives the Debtors appropriate flexibility during the Chapter 11 Cases.  The Debtors need the cash available under the DIP Facility to fund ongoing operating expenses as well as to bridge to a sale of the Debtors' businesses.  The Debtors considered whether they could operate using only the cash generated from post-petition operations, and determined that they could only do so for a very limited period of time.  Without the DIP Facility, the Debtors would not be able to fund ongoing operating expenses, including payroll, on an ongoing basis, and bankruptcy-related expenses during these cases.  The Debtors' ability to remain a viable operating entity until the time of its sale depends on obtaining the interim and final relief requested in the DIP Motion.

## VI.     Expectations for Chapter 11 Case

66.     Through these Chapter 11 Cases, the Debtors plan to execute an orderly store closing process and continue a marketing and sale process that began prepetition.

67.     With respect to the store closings, the Debtors hired Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC (the "Liquidator Consultant") prior to the Petition Date to manage an orderly store closing process that will include certain "going out of

business" sales supervised by the Liquidator Consultant at substantially all of the mall stores. The airport stores will be unaffected by the store closing sales.

68.     With respect to the sale process, the Debtors (through their investment bankers), began testing the market for potential purchasers of substantially all of the Debtors' assets on a going concern basis in July 2018.  In so doing, the Debtors and their investment bankers cast a wide net in soliciting interest from potential purchasers.  As of the Petition Date, certain potential buyers have already signed non-disclosure agreements and begun due diligence in consideration of a potential acquisition of a material portion of the Debtors' business operations.  In addition, an electronic data room has been made available for potential bona fide bidders.  Despite strong interest, no party has yet submitted a final proposal for a sale transaction.

69.     Nevertheless, the Debtors have negotiated a timeline for the sale of their businesses that I believe is sufficient, under the circumstances, to continue and finalize a robust marketing and sale process that will maximize value for all stakeholders.  As set forth in a motion seeking authority to establish bidding procedures that is being filed contemporaneously herewith, the anticipated sale process will conclude at the end of September 2018, affording the Debtors two months to fully market their business post-petition.

## VII.     Evidentiary Support for First Day Motions[3]

70.     Concurrently with the filing of their chapter 11 petitions, the Debtors have filed certain First Day Motions seeking relief that the Debtors believe is necessary to enable them to operate in these Chapter 11 Cases with minimal disruption and loss of productivity.  The Debtors respectfully request that the relief requested in each of the First Day Motions be granted because such relief is a critical element in stabilizing and facilitating the Debtors' operations during the

---

[3]  Capitalized terms used but not otherwise defined in this Section VII shall have the meanings ascribed to such terms in the applicable First Day Motion.

pendency of the Chapter 11 Cases.  I have reviewed each of the First Day Motions.  All of the facts set forth in the First Day Motions are true and correct to the best of my knowledge and belief based upon (a) my personal knowledge of the Debtors' operations and finances, (b) information learned from my review of relevant documents, (c) information supplied to me by other members of the Debtors' management team and the Debtors' advisors, and/or (d) my opinion based upon my knowledge and experience or information I have reviewed concerning the Debtors' operations and financial condition.  A summary of the relief requested in each First Day Motion and the facts supporting each First Day Motion is set forth below.  The First Day Motions (each as described in more detail below) include:

1. *Debtors' Motion for Entry of an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases* (the "Joint Administration Motion");

2. *Debtors' Application for Appointment of Omni Management Group, Inc. as Claims and Noticing Agent* (the "156(c) Application");

3. *Debtors' Motion for Interim and Final Orders Authorizing (A) the Maintenance of the Cash  Management System; (B) Maintenance of Existing Bank Accounts; (C) Continued Use of Existing Business Forms; and (D) Continued Performance of Intercompany Transactions in the Ordinary Course of Business and Grant of Administrative Expense Status for Postpetition Intercompany Claims, and (E) Granting Related Relief* (the "Cash Management Motion");

4. *Debtors' Motion for Entry of an Order Authorizing Payment of (A) Certain Prepetition Wages, Salaries, and Other Compensation and (B) Certain Employee Benefits and Other Associated Obligations* (the "Employee Wage Motion");

5. *Debtors' Motion for Entry of Interim and Final Orders (A) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service; (B) Approving the Debtors' Proposed Adequate Assurance of Payment for Postpetition Services; and (C) Establishing Procedures for Resolving Requests for Additional Adequate Assurance of Payment* (the "Utilities Motion");

6. *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing, but not Directing, the Debtors to Pay Certain Prepetition Taxes and Obligations, and (B) Granting Related Relief* (the "Tax Motion");

01:23475998.1

7. *Debtors' Motion for Entry of Interim and Final Orders Authorizing (A) Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection With, Various Insurance Policies, Including Payment of Policy Premiums and Broker Fees, (B) Continuation of Insurance Premium Finance Agreements, and (C) Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto* (the "<u>Insurance Motion</u>");

8. *Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to Honor and Continue Certain Customer Programs and Customer Obligations in the Ordinary Course of Business* (the "<u>Customer Programs Motion</u>");

9. *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Claims for Prepetition Customs, Shipper, Warehousemen, and Common Carrier Obligations* (the "<u>Shippers Motion</u>");

10. *Debtors' Motion for Entry of Interim and Final Orders (A) Establishing Notice and Objection Procedures for Transfers of Equity Securities and Claims of Worthless Stock Deductions, and (B) Establishing a Record Date for Notice and Sell-Down Procedures for Trading in Claims Against the Debtors' Estates* (the "<u>NOL Motion</u>");

11. *Debtors' Motion for Interim and Final Orders (A) Authorizing the Debtors to Assume Closing Store Agreement; (B) Authorizing and Approving Closing Sales Free and Clear of All Liens, Claims and Encumbrances; (C) Authorizing the Implementation of Customary Employee Bonus Program and Payments to Non-Insiders Thereunder; (D) Approving Dispute Resolution Procedures; and (E) Approving the Debtors' Store Closing Plan* (the "<u>Store Closing Motion</u>"); and

12. *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing; (I) Authorizing the Debtors' Use of Cash Collateral; (III) Granting Adequate Protection to Prepetition ABL Parties; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "<u>Cash Collateral/DIP Motion</u>").

## A.   <u>Joint Administration Motion</u>

71.   In the Joint Administration Motion, the Debtors request entry of an order

providing for the joint administration of the Chapter 11 Cases for procedural purposes only.

Specifically, the Debtors request that the Court provide for joint administration by

(a) establishing a joint docket and file for the Chapter 11 Cases, (b) approving the filing of a joint

pleading caption, (c) approving certain procedures related to the filing of proofs of claim, and (d) directing an entry be made on the docket of each of the Debtors (other than Brookstone Holdings Corp.) to reflect the joint administration of the Chapter 11 Cases.

72.     Given the integrated nature of the Debtors' operations, joint administration of the Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders that will arise in the Chapter 11 Cases will jointly affect all Debtors.  The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the Office of the United States Trustee and all parties in interest to monitor the Chapter 11 Cases with greater ease and efficiency.

73.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**B.      The 156(c) Application**

74.     In the 156(c) Application, the Debtors seek entry of an order authorizing the Debtors to retain Omni Management Group, Inc. ("Omni") as their Claims and Noticing Agent in these Chapter 11 Cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in these Chapter 11 Cases.  It is my understanding that the Debtors' selection of Omni to act as the Claims and Noticing Agent has satisfied this Court's protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c), in that the Debtors, with the assistance of their advisors, have obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, I submit, based on

all engagement proposals obtained and reviewed, that Omni's rates are competitive and reasonable given Omni's quality of services and expertise.  Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be thousands of entities to be noticed.  In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a claims and noticing agent is required by Local Rule 2002-1(f) and is otherwise in the best interests of both the Debtors' estates and their creditors.

**C.**     **The Cash Management Motion**

75.     In the Cash Management Motion, the Debtors request entry of an order (a) authorizing the Debtors to (i) continue to use their Cash Management System (as defined below), (ii) maintain the existing Bank Accounts, (iii) continue to use existing Business Forms, (iv) continue to perform regarding the Intercompany Transactions, and related thereto granting administrative expense status for postpetition Intercompany Claims, (v) in their discretion, to (A) pay any Bank Account related fees and (B) to close or otherwise modify the terms of certain of the Bank Accounts and open new debtor in possession accounts as may be necessary to facilitate their Chapter 11 Cases and operations, or as may otherwise be necessary to comply with the requirements of any debtor in possession financing and/or cash collateral order entered in these cases, and (vi) deposit funds in and withdraw funds from all Bank Accounts, subject to the same access rights and limitations existing prior to the Petition Date, including, but not limited to, checks, wire transfers, automated clearinghouse transfers, electronic funds transfers, and other debits and to treat the Bank Accounts for all purposes as debtor in possession accounts and (b) granting an interim suspension of the deposit and investment requirements of section 345(b) of the Bankruptcy Code.

76.     As described in detail in the Cash Management Motion, the Debtors' business requires the collection, payment, and transfer of funds through numerous bank accounts.  In the ordinary course of business and prior to the Petition Date, the Debtors maintained a centralized cash management system (the "Cash Management System").  Like other large businesses, the Debtors designed their Cash Management System to efficiently collect, transfer, and disburse funds generated through the Debtors' operations and to accurately record such collections, transfers, and disbursements as they are made.  The Debtors' financial personnel manage the Cash Management System from the Debtors' headquarters in Merrimack, New Hampshire.  Each general category of account is described in the Cash Management Motion and a diagram of the Cash Management System is annexed as Exhibit B thereto.

77.     The relief requested in the Cash Management Motion is vital to ensuring the Debtors' seamless transition into bankruptcy.  I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in these Chapter 11 Cases with minimal disruption, thereby benefiting all parties in interest. Accordingly, for the reasons set forth herein and in the Cash Management Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion should be granted.

**D.     The Employee Wage Motion**

78.     In the Employee Wage Motion, the Debtors request entry of an order authorizing, but not directing, the Debtors, in their sole discretion, to (a) pay and/or remit, as applicable, (i) the Unpaid Wage Obligations, (ii) the Unremitted Withholdings and Deductions, (iii) the Unpaid PTO Obligations, (iv) the Unpaid Reimbursable Expense Obligations, (v) the Unpaid Employee Benefits Obligations, (vi) the Unpaid Employee Insurance Coverage, (vii) the Unpaid

Workers' Compensation Claims, and (viii) the Unremitted 401(k) Contributions (together with all costs and fees incident to the foregoing, collectively, the "Employee Obligations") and (b) continue to honor and/or collect, as applicable, (i) the Wage Obligations, (ii) the Withholding Obligations, (iii) the PTO Program, (iv) the Reimbursement Program, (v) the Health Plans, (vi) the Employee Insurance Program, (vi) the Workers' Compensation Program, (vii) the Unpaid Workers' Compensation Claims, and (viii) the 401(k) Plan (collectively, the "Employee Plans and Programs").

79.     The Employees and Independent Contractors are the lifeblood of the Debtors' business, and their value cannot be overstated.  The management, marketing, sales, and technical skills of the Employees and Independent Contractors are essential to the Debtors' ability to source and research high-quality, competitive products and services, bring those products and services to market in their retail locations and online, and timely deliver them to their customers. If the Debtors cannot assure their Employees and Independent Contractors that the Debtors will promptly pay Employee Obligations, as applicable, to the extent allowed under the Bankruptcy Code, and continue to honor, as applicable, the Employee Plans and Programs, the Debtors believe that certain Employees and Independent Contractors will likely seek employment elsewhere.  The loss of Employees and Independent Contractors at this juncture would have a material adverse impact on the Debtors' businesses and ability to maximize value through the administration of these Chapter 11 Cases.

80.     The relief requested in the Employee Wage Motion is necessary for the Debtors to be able to maintain morale, continue to service the needs of their customers, and preserve creditor confidence in the Debtors' continued operations.  Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be

a substantial and costly distraction at a time when the Debtors must focus on their restructuring efforts.  Accordingly, I believe that the Debtors must be able to pursue all reasonable measures to retain the Employees by, among other things, continuing to pay the Employee Obligations and to honor the Employee Plans and Programs as set forth in the Employee Wage Motion.

81.     Accordingly, for the reasons set forth herein and expanded on in the Employee Wage Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Employee Wage Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in these Chapter 11 Cases with minimal disruption, thereby maximizing value for the estates.

**E.     The Utilities Motion**

82.     In the Utilities Motion, the Debtors request entry of interim and final orders (a) prohibiting the Utility Providers from (i) altering, refusing, or discontinuing utility services to, or discriminating against, the Debtors on account of any outstanding amounts for services rendered prepetition or (ii) drawing upon any existing security deposit, surety bond, or other form of security to secure future payment for utility services, (b) determining that adequate assurance of payment for post-petition utility services has been furnished to the Utility Providers providing services to the Debtors, and (c) establishing procedures for resolving future requests by any Utility Provider for additional adequate assurance of payment.

83.     In conjunction with their day-to-day operations, the Debtors receive traditional utility services from various Utility Providers for, among other things, electricity, water, gas, sewer, telecommunications, and other similar services (collectively, the "Utility Services").  A non-exhaustive list of the Utility Providers is annexed to the Utilities Motion as Exhibit C thereto.  The Debtors paid an average of approximately $160,000 per month on account of all Utility Services for the period February 2018 through June 2018.

84.     I believe and am advised that the requested relief is necessary or else the Debtors could be forced to address numerous requests by the Utility Providers in a disorganized manner during the critical first few weeks of these Chapter 11 Cases.  Moreover, a termination of or disruption in Utility Services could significantly disrupt the Debtors' business operations and shrink their revenues, thereby jeopardizing the Debtors' chances to maximize recoveries for creditors.  It is, therefore, critical that Utility Services continue uninterrupted during the Chapter 11 Cases.

85.     Accordingly, for the reasons set forth herein and in the Utilities Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses during the course of these Chapter 11 Cases with minimal disruption.

## F.     The Tax Motion

86.     In the Tax Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors, in the exercise of their reasonable business judgment, to pay Taxes (as defined below) without regard to whether such obligations accrued or arose before or after the Petition Date.

87.     In the ordinary course of business, the Debtors (a) incur certain tax liabilities, including sales, use, income, trust fund, transfer, franchise, real property, and personal property taxes, as well as certain local taxes on gross receipts, business license fees, and other taxes and similar obligations (collectively, the "Taxes") necessary to operate their business and (b) remit such Taxes to applicable taxing and other regulatory authorities (collectively, the "Authorities"). The Taxes may, from time to time, be the subject of an audit by the applicable Authority, and the amounts estimated as due or already paid by the Debtors may be subject to upward or downward

01:23475998.1

adjustment based upon the amount that the applicable Taxing ultimately claims is due.  The

Debtors regularly pay the Taxes in a timely manner on a monthly, quarterly, or annual basis, in

each case as required by applicable laws and regulations, and none of the Taxes the Debtors are

seeking authority to pay pursuant to the Tax Motion are past-due or "catch up" Taxes.

88.     The Debtors must continue to pay the Taxes to continue operating in certain

jurisdictions and to avoid costly distractions during these Chapter 11 Cases.  Specifically, it is

my understanding that the Debtors' failure to pay the Taxes could adversely affect the Debtors'

business operations and the value of their assets because the Authorities could suspend the

Debtors' operations, file liens against the Debtors' assets, or seek to lift the automatic stay to

pursue remedies against the Debtors.  In addition, certain Authorities may take precipitous action

against the Debtors' directors and officers for unpaid Taxes, which undoubtedly would distract

those key individuals from their duties related to the Debtors' restructuring efforts during the

pendency of these Chapter 11 Cases.  The Debtors seek authority to pay the Taxes, if any, that

remain outstanding as of the Petition Date, and future Taxes that accrue in the ordinary course of

business as and when such obligations become due and owing.

89.     Accordingly, for the reasons set forth herein and in the Tax Motion, on behalf of

the Debtors, I respectfully submit that the relief requested in the Tax Motion is in the best

interest of the Debtors' estates and creditors because it will enable the Debtors to continue to

operate their businesses while these Chapter 11 Cases are pending.

**G.**     **The Insurance Motion**

90.     In the Insurance Motion, the Debtors request entry of an order authorizing, but not

directing, the Debtors to (a) continue and renew the Insurance Policies (as defined below), or

obtain new insurance policies, as needed in the ordinary course of business, (b) continue to

finance the Financed Insurance Policies and enter into new premium finance agreements, as

necessary or appropriate, under substantially similar terms, and (c) honor all of their prepetition and postpetition insurance obligations, under and in connection with the Insurance Policies on an uninterrupted basis and in the ordinary course of business during the administration of these Chapter 11 Cases.

91.     As described in the Insurance Motion, in the ordinary course of their businesses, the Debtors maintain numerous insurance policies with various Insurers that provide coverage for, among other things, U.S. customs bond, loss fund replenishment, auto liability, general liability, workers' compensation liability, business travel accidents, kidnapping and ransom, marine cargo, cyber liability, fiduciary liability, umbrella and excess liability, foreign liability, property and engineering liability (the "Insurance Policies"), as summarized in Exhibit B annexed to the Insurance Motion.  The Debtors incur a total of approximately $1.25 million in the aggregate in annual premiums to cover their Insurance Policies.  The Debtors also retain risk with respect to claims under their general liability insurance policy, up to a maximum of $350,000 per claim, with no maximum aggregate claims cap during the policy year (the "General Liability Claims").  As of the Petition Date, approximately $60,000 is owed in General Liability Claims.

92.     The Debtors employ AON Risk Services Northeast Inc. as their insurance broker (the "Broker") and provide compensation to the Broker through an annual compensation agreement dated December 6, 2017, pursuant to which the Debtors pay the Broker an annual service fee of $124,000.

93.     Additionally, the Debtors finance the premiums for certain of their Insurance Policies pursuant to premium financing agreements with AON Premium Finance, LLC.  The ability to finance certain Insurance Policies, and avoid paying a lump sum premium for such

Insurance Policies in advance, provides significant benefits to the Debtors' liquidity position. The Debtors incur a total of approximately $1.5 million in the aggregate annually to cover their obligations under the Insurance Policies, which includes the annual premiums, the Broker fees, self-insured and uninsured losses, the General Liability Claims and the premium finance charges.

94.     The Insurance Policies are essential to preserving the value of the Debtors' business operations and their assets.  In many cases, the insurance coverage provided by the Insurance Policies is required by various regulations, laws, and contracts that govern the Debtors' business and commercial activities.

95.     Accordingly, for the reasons set forth herein and in the Insurance Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in compliance with contractual and regulatory requirements and to safeguard the value of their estates.

**H.      The Customer Programs Motion**

96.     In the Customer Programs Motion, the Debtors request entry of an order authorizing the Debtors, in their sole discretion, to, among other things, maintain and administer certain Customer Programs (as defined below) and to honor prepetition obligations thereunder in the ordinary course of business and in a manner consistent with past practices.  The Debtors also seek authority for banks and other financial institutions to receive, process, honor, and pay checks or electronic transfers used by the Debtors to pay the foregoing and to rely on the representations of such Debtors as to which checks are issued and authorized to be paid in accordance with the Customer Programs Motion.

97.     As described in the Customer Programs Motion, prior to the Petition Date, both in the ordinary course of the Debtors' business and as is customary in the consumer retail industry,

the Debtors offered and engaged in certain customer and other programs and practices

(collectively, the "Customer Programs").  The Customer Programs include (a) warranties, (b) gift

cards/certificates, (c) customer loyalty/rewards program, (d) private label credit cards and credit

card processing, and (e) programs for returns, refunds, and adjustments.

98.    In order to effectuate a smooth transition into these Chapter 11 Cases, the Debtors

must maintain customer loyalty and goodwill through the Customer Programs.  Indeed, the

Debtors implemented the Customer Programs in the ordinary course of business prior to the

Petition Date as a means by which to maintain positive, productive, and profitable relationships

with their customers, encourage new purchases, enhance customer satisfaction and ensure that

the Debtors remain competitive in their industry.  All of the Customer Programs are designed

and implemented to encourage the Debtors' customers to increase their purchasing frequency

and volume, resulting in larger net revenues for the Debtors and, in return, greater satisfaction for

the customers.

99.    The Debtors' ability to honor their Customer Programs in the ordinary course of

business is necessary to retain their customer base and reputation within the industry at this

critical juncture of the restructuring process.  The Debtors' Customer Programs are critical, and

any delay in honoring the Debtors' obligations thereunder could severely and irreparably impair

customer relations.  Any failure to honor and pay prepetition obligations under the Customer

Programs is likely to drive away valuable customers, thereby harming the Debtors' efforts to

maximize value and reducing interest in the Debtors' assets.

100.    Accordingly, for the reasons set forth herein and in the Customer Programs

Motion, the Debtors seek authority, but not direction, to continue the Customer Programs,

including authority to honor the obligations arising therefrom.  On behalf of the Debtors, I

01:23475998.1

respectfully submit that the relief requested in the Customer Programs Motion is essential to the Debtors' continued operations and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

## I.      The Shippers Motion

101.     In the Shippers Motion, the Debtors seek entry of interim and final orders authorizing (a) the Debtors to pay certain customs charges and fees to the broker who processes these customs charges, (b) the Debtors to pay certain prepetition claims incurred for shipping and/or storing goods as necessary or appropriate to obtain the release of goods in the possession of third parties and to satisfy liens regarding amounts owed to such parties, and (c) the banks and other financial institutions at which the Debtors hold accounts to receive, process, honor, and pay checks or electronic transfers used by the Debtors to pay the foregoing and to rely on the representations of the Debtors as to which checks are issued and authorized to be paid.

102.     The Debtors depend on the services of numerous shippers, truckers, expediters, customs brokers, consolidators, and other carriers (collectively, the "Shippers") to ensure the timely shipping and delivery of merchandise in the ordinary course of the Debtors' business. The Debtors also transact with a number of other third parties that could potentially assert liens against the Debtors and their property for amounts the Debtors owe to those third parties (the "Lien Claimants," and together with the Shippers, the "Possessory Claimants").  If the Debtors do not pay the claims of the Possessory Claimants, they could assert possessory liens against the Debtors' property and refuse to deliver or release such property to the Debtors until they are paid.  Such an outcome could cause significant disruptions to the operation of the Debtors' businesses that would impede their ability to operate successfully during these Chapter 11 Cases. If the Debtors were required to switch to alternative vendors, they would incur significant operational disruption and likely increased costs.

103.    The Debtors propose that, as a condition of accepting payment, a Possessory

Claimant must agree to a set of conditions set forth in the Shippers Motion.  If any Possessory

Claimant accepts payment and, thereafter, does not continue to provide services to the Debtors

on Customary Trade Terms, then any payment of the Distribution Charges made under the relief

granted in connection with the Shippers Motion to such Possessory Claimant would be deemed

an unauthorized postpetition transfer under section 549 of the Bankruptcy Code and, therefore,

would be avoidable and recoverable by the Debtors in cash upon written request, subject to a

Possessory Claimant's right to contest such treatment and request that the Debtors schedule a

hearing on such matter.  Upon any recovery by the Debtors, the Possessory Claimant's claim

would be reinstated as a prepetition claim in the amount so recovered, less the Debtors'

reasonable costs in recovering such amounts.

104.    Additionally, in the ordinary course of their businesses, the Debtors receive a

variety of Imported Products from around the world.  Timely receipt of the Imported Products is

critical to the Debtors' business operations.  In connection with the Imported Products, the

Debtors may be required to pay certain charges, which include customs duties, detention and

demurrage fees, tariffs, excise taxes, and other similar obligations.  If the Debtors do not pay the

these charges, the flow of Imported Products would likely be interrupted, depriving the Debtors

of products they need to draw customers to their stores, and in some instances, complete orders

already placed by their customers.  Therefore, payment of these charges is critical to ensure the

uninterrupted flow of Imported Products.

105.    Accordingly, for the reasons set forth herein and further detailed in the Shippers

Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Shippers

Motion is in the best interest of the Debtors' estates and their creditors, and should therefore be

01:23475998.1

granted to enable the Debtors to retain access to critical sources of goods and avoid devastating disruption to their business operations.

**J.      The NOL Motion**

106.    In the NOL Motion, the Debtors request that the Court enter interim and final orders (a) establishing notice and objection procedures regarding certain transfers of beneficial interests in equity securities in Brookstone Holdings Corp. ("Equity Securities") and claims of worthless stock deductions with respect to the Equity Securities and (b) establishing a record date (the "Record Date") for notice and potential sell-down procedures for trading in claims against the Debtors ("Claims").  By the NOL Motion, the Debtors request that any purchase, sale, or other disposition of, or claim of worthless stock deduction with respect to, Equity Securities in violation of the procedures set forth in the NOL Motion shall be void *ab initio*.

107.    The Debtors have incurred significant net operating losses ("NOLs"), in the recent past.   The Debtors' NOLs are an extremely valuable asset because, under the Internal Revenue Code (the "IRC"), the Debtors can generally carry forward their NOLs to offset their future taxable income and thereby reduce their future aggregate tax obligations.

108.    The Debtors' NOLs are currently estimated to be $200 million as of the end of tax year 2017, plus a preliminarily estimated additional $62.4 million for 2018, which are collectively worth significant potential future income tax savings based on the Debtors' 21% federal corporate tax rate.

109.    These potential tax savings and the accompanying increase in the Debtors' cash flow are valuable assets of the Debtors' estates.  If the Debtors are unable to monitor and object to the above-referenced transactions, the Debtors' future use of their NOLs may be jeopardized. The Debtors have proposed notice and hearing procedures that impose minimal burdens on affected entities to achieve a substantial benefit to the Debtors' estates.

01:23475998.1

110.     Accordingly, for the reasons set forth herein and in the NOL Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the NOL Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest because, if granted, the relief requested therein will allow the Debtors to avoid unnecessary tax expense.

## K.     The Store Closing Motion

111.     In the Store Closing Motion, the Debtors are seeking authority to conduct a store closing process at all of their mall locations and its one liquidation center (collectively, the "Closing Stores") in accordance with certain proposed sale guidelines that are attached to the motion.  In addition, the Debtors are seeking authority to assume a prepetition agreement ("Closing Store Agreement") with the Liquidation Consultant, who will supervise and provide advice in connection with the sales at the Closing Stores (the "Closing Sales"), and to implement a customary bonus program for certain non-insider personnel with responsibilities related to the Closing Stores (the "Bonus Program").

112.     The Debtors, in consultation with their professionals, have determined that the Closing Sales represent the best alternative to maximize recoveries to the Debtors' estates with respect to the Closing Stores.  The Debtors believe that there are meaningful assets at the Closing Stores that will be monetized most efficiently and quickly through an orderly process conducted in consultation with an experienced liquidation firm.  Further, the Debtors believe that delaying the Closing Sales will diminish the recoveries on the store assets.

113.     The Debtors also believe that granting the Debtors the discretion to pay sales personnel the Closing Bonuses will provide much-needed motivation for key personnel who are critical to the success of the Closing Sales.  I believe that, absent the Bonus Program, the Debtors are likely to lose such key personnel at the Closing Stores at a time when the Debtors have few

01:23475998.1

resources available to search for new employees, which would unnecessarily delay or frustrate the Closing Sales and hamstring the Debtors' efforts to maximize value.

114.    Accordingly, for the reasons set forth herein and in the Store Closing Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Store Closing Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**L.    The Cash Collateral/DIP Motion**

115.    In the Cash Collateral/DIP Motion, the Debtors seek (a) approval, on an interim basis, of the DIP Facility in the form of a $15 million Revolving DIP Loan and a $15 million Term DIP Loan, (b) authorization to grant certain liens and super-priority administrative expense claims to the DIP administrative agent (the "DIP Administrative Agent"), the DIP term agent (the "DIP Term Agent"), and the Lenders, (c) authorization to use cash collateral, and (d) authorization to grant adequate protection to the agents under the Prepetition ABL Facility.

116.    The DIP Facility gives the Debtors appropriate flexibility during the Chapter 11 Cases.  The Debtors need the cash available under the DIP Facility to fund ongoing operating expenses as well as to bridge to a sale of the Debtors' businesses.  The Debtors considered whether they could operate using only the cash generated from post-petition operations, and determined that they could only do so for a very limited period of time.  Without the DIP Facility, the Debtors would not be able to fund ongoing operating expenses, including payroll, on an ongoing basis, and bankruptcy-related expenses during these cases.  The Debtors' ability to remain a viable operating entity until the time of its sale depends on obtaining the interim and final relief requested in the Cash Collateral/DIP Motion.

117.    The DIP Lenders have indicated that the DIP Facility (and the credit agreement and ancillary documents governing the facility) set forth the only terms under which they would agree to provide the Debtors with financing.

01:23475998.1

118.     The Debtors negotiated the terms of the DIP Facility at arms' length and in good faith, with all relevant parties represented by counsel.  I believe that the negotiated terms are the best available under the circumstances.

In conclusion, for the reasons stated herein and in each First Day Motion, I respectfully request that each First Day Motion be granted in its entirety, together with such other and further relief as the Court deems just and proper.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: August 2, 2018

*/s/ Greg Tribou*

Greg Tribou
Vice President, Chief Financial Officer
Brookstone Company, Inc.

01:23475998.1

**EXHIBIT A**

**Organizational Chart**

01:23475998.1



