<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3                                    .      Chapter 11
      IN RE:                          .
 4                                    .      Case No. 18-11780 (BLS)
      BROOKSTONE HOLDINGS CORP,       .
 5    et al.,                         .
                                      .      Courtroom No. 1
 6                                    .      824 N. Market St
                                      .      Wilmington, Delaware 19801
 7                                    .
                      Debtors.        .      Wednesday, August 29, 2018
 8    . . . . . . . . . . . . . . . . .      1:00 P.M.

 9                      TRANSCRIPT OF HEARING
               BEFORE HONORABLE BRENDAN L. SHANNON
10                UNITED STATES BANKRUPTCY JUDGE

11
      APPEARANCES:
12
      For the Debtors:               Matthew Kelsey, Esquire
13                                   David Feldman, Esquire
                                     Keith Martorana, Esquire
14                                   GIBSON DUNN & CRUTCHER LLP
                                     200 Park Avenue
15                                   New York, New York 10166

16                                   Andrew L. Magaziner, Esquire
                                     YOUNG CONAWAY STARGATT & TAYLOR
17                                   1000 North King Street
                                     Wilmington, Delaware 19801
18

19

20
      Audio Operator:               Dana Moore
21
      Transcription Service:        Reliable
22                                  1007 N. Orange Street
                                    Wilmington, Delaware 19801
23                                  Telephone: (302) 654-8080
                                    E-Mail: gmatthews@reliable-co.com
24
      Proceedings recorded by electronic sound recording:
25    transcript produced by transcription service.
</pre>

1   APPEARANCES (Continued):

2

    For U.S. Trustee:              Timothy Fox, Esquire
3                                  OFFICE OF U.S. TRUSTEE
                                   844 King Street
4                                  Wilmington, Delaware 19801

5   For the Committee:             Seth Van Aalten, Esquire
                                   COOLEY
6                                  1114 Avenue of the Americas
                                   New York, New York 10036
7
                                   - and -
8
                                   Justin Alberto, Esquire
9                                  BAYARD
                                   600 North King Street
10                                 Wilmington, Delaware 19801

11  For JJ, Brookfield             Robert LeHane, Esquire
    Properties, Turnberry          KELLY DRYE & WARREN
12  Associates:                    101 Park Avenue
                                   New York, New York 10178
13
    For Bluestar Alliance:         Arik Preis, Esquire
14                                 AKIN GUMP
                                   One Bryant Park
15                                 New York, New York 10036

16  For Authentic Brands:          Stuart Brown, Esquire
                                   DLA PIPER
17                                 1201 North Market Street
                                   Wilmington, Delaware 19801
18
    For Wells Fargo:               Cory Falgowski, Esquire
19                                 BURR & FORMAN
                                   1201 North Market Street
20                                 Suite 1407
                                   Wilmington, Delaware 19801
21
                                   - and -
22
                                   Mark Leduc, Esquire
23                                 MORGAN LEWIS
                                   One Federal Street
24                                 Boston, Massachusetts 02110

25

1  APPEARANCES (Cont'd)

2

3  For MarketPlace Philadelphia    Leslie Heilman, Esquire
   Dallas Mall Investors,         BALLARD SPAHR LLP
   Starwood Retail Partners,      919 N. Market Street
4  Forbes Company, Macerich:      Wilmington, Delaware 19801

5  For Gordon Brothers Retail     Doug Herrmann, Esquire
   Partners & Hilco Merchant:     PEPPER HAMILTON
6                                 1313 Market Street
                                  Wilmington, Delaware 19801
7
   For Cigna:                     Kelly Conlan, Esquire
8                                 CONNOLLY GALLAGHER
                                  1000 West Street, Suite 1400
9                                 Wilmington, Delaware 19801

10  TELEPHONIC APPEARANCES:

11  For Stroock & Stroock &        Erez Gilad, Esquire
    Lavan, LLP:                    STROOCK & STROOCK & LAVAN LLP
12                                 180 Maiden Lane
                                   New York, New York 10038
13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          INDEX

2
                                                      PAGE
3

4    #17) Debtors' Motion for Interim and Final Orders (I)
     Authorizing the Debtors to Obtain Postpetition Secured
5    Financing; (II) Authorizing the Debtors' Use of Cash
     Collateral; (III) Granting Adequate Protection To Prepetition
6    ABL Parties; (IV) Scheduling a Final Hearing; and (V)
     Granting Related Relief [D.I. 19; 8/2/18].

7    RULING:                                            126

8    #18) Debtors' Motion for Interim and Final Orders (A)
     Authorizing the Debtors to Assume the Closing Store
9    Agreement, (B) Authorizing and Approving Store Closing Sales
     Free and Clear of All Liens, Claims and Encumbrances, (C)
10   Authorizing the Implementation of Customary Employee Bonus
     Program and Payments to Non-Insiders Thereunder, (D)
11   Approving Dispute Resolution Procedures, and (E) Approving
     the Debtors' Store Closing Plan [D.I. 25; 8/2/18].
12

13   #19) Debtors' Motion, Pursuant to Sections 105, 363 and 365
     of the Bankruptcy Code, Fed. R. Bankr. P. 2002, 6003, 6004,
14   6006, 9007, 9008 and 9014 and Del. Bankr. L.R. 2002-1, 6004-1
     and 9006-1, for Entry of (A) an Order (I) Approving Bid
15   Procedures in Connection with the Sale of Substantially All
     of the Debtors' Assets, (II) Scheduling an Auction for and
16   Hearing to Approve Sale of Assets, (III) Approving Notice of
     Respective Date, Time and Place for Auction and for Hearing
17   on Approval of Sale, (IV) Approving Procedures for the
     Assumption and Assignment of Certain Executory Contracts and
18   Unexpired Leases, (V) Approving Form and Manner of Notice
     Thereof, and (VI) Granting Related Relief; and (B) an Order
19   Authorizing and Approving (I) the Sale of Substantially All
     of the Debtors' Assets Free and Clear of Liens, Claims,
20   Rights, Encumbrances, and Other Interests, (II) the
     Assumption and Assignment of Certain Executory Contracts and
21   Unexpired Leases and (III) Related Relief [D.I. 100; 8/8/18].

22   RULING:                                            46

23

24

25

1  #20) Debtors' Motion for Order, Pursuant to Sections 363(b)
   and 503(c) of the Bankruptcy Code, Approving Debtors' (I) Key
2  Employee Incentive Plan and (II) Key Employee Retention Plan
   [D.I. 102; 8/8/18] (Sealed Version).
3
   RULING:                                                    18
4
5  #21) Debtors' Motion for Order, Pursuant to Section 107(b) of
   the Bankruptcy Code, Bankruptcy Rule 9018 and Local Rule
6  9018-1(b), (I) Authorizing the Debtors to File (A) Debtors'
   Motion for Order, Pursuant to Sections 363(b) and 503(c) of
7  the Bankruptcy Code, Approving Debtors' (I) Key Employee
   Incentive Plan and (II) Key Employee Retention in Redacted
8  Form Publicly, and (B) Unredacted Version Under Seal, and
   (II) Directing Parties to Redact Confidential Information
9  [D.I. 104; 8/8/18]

10 #22)   Motion of the Official Committee of Unsecured
   Creditors to File Under Seal the Committee's Objection to
11 Debtors' Motion for Interim and Final Orders Authorizing the
   Debtors to Obtain Postpetition Secured Financing [D.I. 233;
12 8/24/18].

13

14 DEBTORS' WITNESS(s)

15      **IAN FREDERICKS**

16      Direct examination by Mr. Herrmann            135
17
        Cross-examination by Mr. Fox                  158
18
        Redirect examination by Mr. Herrmann         182
19

20 EXHIBITS:                                    ID    Rec'd

21 Declaration of Stephen Coulombe

22 U.S. Trustee Document                              183

23

24

25

1         (Proceedings commence at 1:11:33 p.m.)

2         (Call to order of the Court)

3              THE COURT:  Ready to proceed?

4              MR. KELSEY:  Thank you, Your Honor, good

5    afternoon.  For the record, this is Matthew Kelsey of Gibson

6    Dunn McCrutcher appearing on behalf of the Brookstone

7    debtors.

8              Your Honor, before we work through the agenda, I

9    thought we'd apprise the court of some key development in the

10   cases.  The most significant development was the entry into a

11   letter of intent of Authentic Brands Group to acquire

12   Brookstone's IP assets for $35 million dollars and

13   designating them as a stalking horse.

14             The debtors worked very closely with the creditors

15   committee and their professionals in developing and

16   negotiating this bid.

17             We disclosed publicly the letter of intent with

18   the consent of Authentic Brands Group and their counsel early

19   Monday afternoon in connection with the filing of our reply

20   to the United States Trustee's office objection our KEIP/KERP

21   and the related motion to seal parts of that program.

22             And, Your Honor, as you've probably seen last

23   night, a company called Bluestar filed a notice with the

24   court expressing an interest in entering into an NOL with

25   debtors --

1            THE COURT:  I saw.

2            MR. KELSEY:  You saw it?

3            THE COURT:  I saw the statement.

4            MR. KELSEY:  With the same assets.  Headline there

5    is Bids Substantial Similar, but the purchase price of $40

6    million dollars.

7            I would note that the bid was unsolicited and it

8    appears that Bluestar took the publicly filed ABG LOI and

9    marked it up.

10           THE COURT:  The proverbial high-class problem.

11           MR. KELSEY:  Yes, from our perspective, I couldn't

12   agree more, Your Honor.

13           But I would note we first saw the Bluestar

14   proposal late yesterday afternoon and the debtors have not

15   yet had time to convene a board meeting.  There were some

16   logistic issues including that three quarters of the board

17   are in China.  And so, there's a significant --

18           THE COURT:  Time issue.

19           MR. KELSEY:  -- time issue there.

20           But, of course, the debtors will consult the DIP

21   lenders and the creditor's committee and other consultation

22   parties before it makes a final decision on which direction

23   to go.

24           I would note under our DIP credit agreement, the

25   deadline for the debtors to designate a stalking horse bidder

1  is tomorrow.

2         One last thing I would note, is that the Authentic

3  Brands Group letter of intent has a fiduciary out for the

4  debtors which, in our view, the flexibility to consider the

5  Bluestar proposal in light of our fiduciary duties and our

6  duties to the estate.

7         I think Mr. Martorana, my colleague, will be

8  addressing the court with respect to the bid procedures.  But

9  I think the goal, one of the goals for today, is to obtain

10 from Your Honor authority to have an expedited hearing to

11 designate a stalking horse bidder which the bid procedures

12 that are under -- that are a portion of this hearing

13 contemplate.  And then establish bidding protections in

14 connection with that hearing.

15        And we understand that you may have time on

16 September 6th to hear us on that expedited basis.

17        THE COURT:  I do.

18        MR. KELSEY:  Okay, Your Honor.  And I had heard a

19 rumor that was at 11:00 a.m.?

20        THE COURT:  It would be.

21        MR. KELSEY:  Okay.

22        THE COURT:  Let me ask a question just so I

23 understand the mechanics of what's on my dance card for today

24 and then for the 6th, assuming that that hearing goes

25 forward.

1          I've seen the bid procedures motion.  I did see

2    the notice of the Authentic Brands proposal.  I saw the

3    response from -- is it Bluestar -- Blue?

4          MR. KELSEY:  Bluestar.

5          THE COURT:  Bluestar.  What am I being asked today

6    in the context of the bid procedures motion?  Am I being

7    asked to blessed a stalking horse today?  Am I being asked to

8    set a schedule which would include a hearing on the stalking

9    horse?  It wasn't entirely clear to me from the papers.

10          MR. KELSEY:  A fair question, Your Honor.  You are

11   not being asked to bless the stalking horse today.  You're

12   being asked to bless an expedited process, to bless a

13   stalking horse on September 6th.

14          THE COURT:  Okay.  Am I also being asked to

15   establish, otherwise, a bid procedures timeline that would

16   take us to a sale hearing at a particular date, because I

17   think that's in your motion?

18          MR. KELSEY:  That is, Your Honor.

19          THE COURT:  All right, so that's part of what's

20   today or is that something --

21          MR. KELSEY:  That's part of what's today.  What

22   would be on September 6th would be the stalking horse and

23   bidding protections.

24          THE COURT:  So then if I'm correct, and, again, I

25   just want to make sure because it's, obviously, a lot of

1   moving parts.  What was originally filed as was effectively

2   what we would call a naked auction?  Debtor was putting

3   assets up for a sale within a structure welcoming people to

4   serve as a stalking horse.  And, again, there seems to be

5   progress in that respect.

6           But what was originally filed and is on for today

7   is essentially that pure procedures issue.  And if there are

8   issues relating to stalking horse or stalking horses or which

9   one do you choose and all of that, then we'll deal with that

10  on the 6th or such other date as may be appropriate.  Do I

11  have that right?

12          MR. KELSEY:  You have that exactly right, Your

13  Honor.

14          THE COURT:  Very good.

15          MR. KELSEY:  Thanks very much.

16          THE COURT:  Sure.

17          MR. KELSEY:  Okay.  Your Honor, I guess, the next

18  big update is that we made tremendous progress in connection

19  with today's hearing despite the voluminous agenda that you

20  received that included originally 21 matters.  Sixteen of

21  those have been resolved.  And there's only five matters

22  pending before the court, namely the KEIP and its related

23  sealing motion, the bid procedures motion, the store closing

24  motion and the DIP financing.

25          And in respect of those motions going forward,

1  Your Honor, the debtors have worked very closely with various

2  parties to substantially narrow the open issues that the

3  court would need to resolve today.

4            So, with that, Your Honor, if it's okay with you,

5  I thought we could start today with the debtors' KEIP/KERP

6  motion which would be items, and the related sealing motion -

7  -

8            THE COURT:  Sure.

9            MR. KELSEY:  -- which would be items 20 and 21.

10  And then after that, I would propose if it's acceptable to

11  you, Your Honor, to handle bidding procedures which is agenda

12  number 19; the DIP which is agenda number 17; and then the

13  store closing motion which is agenda item number 21.

14            THE COURT:  That sounds fine.

15            MR. KELSEY:  Great.  Thank you, Your Honor.

16            THE COURT:  As to the store closing motion, I did

17  see that there are a number of objections, some, I think,

18  were from landlords.  But as I understand, the primary, at

19  least, for argument today is the trustee's concerns with

20  respect to the status of Hilco, am I right?

21            MR. KELSEY:  That is my understanding as well,

22  Your Honor.

23            THE COURT:  Very well.  Okay.

24            MR. KELSEY:  Okay.  So, without further ado,

25  perhaps we can just go to the KEIP and the sealing motion.

1  And I thought I would address the KEIP itself first.

2          Your Honor, as you know, the U.S. Trustee filed an

3  objection to both the KEIP and the sealing motion.  And the

4  substance of the U.S. Trustee's objection to the KEIP was

5  that the metrics embedded in that KEIP to trigger a bonus

6  were not challenging.  And, you know, the consequence of that

7  would be rendering the KEIP as a disguised retention program

8  filed as a 503(c)(1).

9          We spoke with Mr. Fox before the hearing who's

10 representing the U.S. Trustee here.  And he indicated that

11 the office was hoping by its objection to have the debtors

12 make the appropriate showing for the benefit of the court and

13 the public that the KEIP was, in fact, an incentive plan,

14 rather than a retention plan.

15          THE COURT:  Okay.

16          MR. KELSEY:  With that understanding, Your Honor,

17 I think the debtors will largely rely on their papers and Mr.

18 Coulombe's declaration and let Mr. Fox make any presentation

19 he wants.

20          But, I guess, as a mater of order here, we did

21 file a declaration of Mr. Steve Coulombe of the BRG Group in

22 connection with our reply and we'd like to submit that into

23 evidence.

24          I believe it's docket number 236.

25          THE COURT:  It is and I've seen it.

1          Mr. Fox, do you have any opposition not the

2    submission of Mr. Coulombe's declaration as part of the

3    debtors' evidentiary predicate for the relief requested?

4          MR. FOX:  No, Your Honor.

5          THE COURT:  Mr. Fox, good afternoon, sir.

6          Does your office wish to cross-examine Mr.

7    Coulombe or do you want to hold your powder on that until, at

8    least, counsel is completed?

9          MR. FOX:  We don't anticipate needing any

10   evidence, Your Honor.

11         THE COURT:  Very well.  Okay.  You may proceed.

12         MR. KELSEY:  All right, thank you, Your Honor.

13         So, the debtors believe that we've made the

14   showing necessary to demonstrate that the KEIP is a bonus

15   program with difficult metrics to achieve and, thereby,

16   doesn't run afoul of 503(c)(1) of the Bankruptcy Code.

17         As demonstrated --

18         THE COURT:  And, again, the trustee's objection is

19   limited or focused on the KEIP itself and the concern that

20   the KEIP is actually a KERP.

21         MR. KELSEY:  Correct.

22         THE COURT:  Okay.

23         MR. KELSEY:  That's correct.

24         THE COURT:  All right, I understand.

25         MR. KELSEY:  Okay.  As demonstrated by Mr.

1  Coulombe's declaration, however, the metrics triggering bonus

2  rights under the KEIP are challenging and not easy to hit.

3  And based on this evidence, Your Honor, we would submit that

4  the KEIP is not an impermissible retention plan for insiders

5  under Section 503(c)1(1) of the Bankruptcy Code.

6       And, in addition, Your Honor, the debtors believe

7  that the KEIP plan satisfies Section 503(c)(3) of the

8  Bankruptcy Code and is a sound exercise of the business

9  judgment.

10      Just quickly going through the Dana Factors here,

11  the KEIP plan is reasonable, Your Honor, in that the plan

12  itself is reasonably related to the desired result which is

13  the desired result is to maximize the sale proceeds obtained

14  in the sale process and the KEIP bonuses are triggered on,

15  you know, sale now realized in the sale process.  The KEIP is

16  reasonable in the context of these debtors and the unique

17  circumstances facing the managing team.

18      And, finally, Your Honor, the KEIP was thoroughly

19  vetted by the debtors' professionals and, in particular, Mr.

20  Coulombe and his team, to ensure that it was market,

21  comparable to programs approved in other retail bankruptcies.

22      And with that, Your Honor, I'll pause and answer

23  any questions you have.

24      THE COURT:  I don't have any questions at this

25  point.  I did have an opportunity to review Mr. Coulombe's

1   declaration which was filed after the U.S. Trustee's

2   objection and, certainly, does provide a great deal more meat

3   on the bone with respect to the thought process and the

4   mechanics associated with, certainly, the KEIP program.  So,

5   I don't have questions at this point.

6            Before I hear from Mr. Fox, I'd like to hear from

7   the committee.

8            MR. KELSEY:  Oh, there's one thing I wanted to

9   mention before you hear from the committee that I may have

10  neglected.

11           So, we discussed with the committee the KEIP and

12  the KERP and to resolve concerns they had.  We agreed that

13  the proceeds of the KEIP would be junior to an escrow for

14  stub rent, would be junior in priority to an escrow and stub

15  rent and that satisfied the committee that the KEIP here was

16  appropriate.

17           THE COURT:  Okay.

18           MR. KELSEY:  But I'll let Mr. Van Aalten speak for

19  himself.

20           THE COURT:  All right, Mr. Van Aalten.

21           MR. VAN AALTEN:  Good morning, Your Honor.

22           THE COURT:  Good afternoon.

23           MR. VAN AALTEN:  Seth Van Aalten from Cooley,

24  proposed counsel for the committee.

25           Mr. Kelsey stole my exact speech.

1          Your Honor, we did have several discussions with

2   the debtors about what the structure and amounts at issue in

3   the KEIP.  And, ultimately, we're comfortable with those.

4   And, of course, the debtor is agreeing that no KEIP payments

5   will be made until stub rent is paid in full was critical to

6   our determination.  But the committee has no objection to the

7   relief being sought today.

8          THE COURT:  Very good. Does anyone else wish to be

9   heard in support of the debtors' request before I hear from

10  the United States Trustee?

11      (No verbal response)

12         THE COURT:  Very well, Mr. Fox.

13         MR. FOX:  Good afternoon, Your Honor.

14         THE COURT:  Good afternoon.

15         MR. FOX:  May I please the court, Tim Fox on

16  behalf of the United States Trustee.

17         THE COURT:  Good to see you.

18         MR. FOX:  It's good to see you as well.  It's been

19  quite some time since I've been before Your Honor.

20         THE COURT:  I've been here.

21      (Laughter)

22         MR. FOX:  With respect to the KEIP and the KERP,

23  debtors' counsel's representations are accurate.  My office

24  filed its objection.  We do not object in any fashion to the

25  KERP itself.

1           THE COURT:  Sure.

2           MR. FOX:  And that is still the case here today.

3           With respect to the KEIP, the debtors have their

4  burden and with the 2005 amendments to the Bankruptcy Clear,

5  it's clear that Congress thought such program should receive

6  additional scrutiny before they are approved.

7           THE COURT:  Agreed.

8           MR. FOX:  Our objection sought to have the debtor

9  make an adequate showing with the evidentiary record which

10  the submission of the additional Coulombe declaration, I

11  think, takes positive steps toward the timing here of the

12  KEIP with the revelations regarding to the stalking horses,

13  or the potential for a stalking horse, is something that

14  could impact the outcome.

15          But, under the circumstances, this was not a fait

16  accompli prior to today's hearing.  And I don't think that

17  meaningfully should affect the court's analysis.  So,

18  essentially, Your Honor, if you're comfortable that the

19  debtors have made their evidentiary showing with respect to

20  the relief requested by the KEIP, my office, while not

21  withdrawing its objection, would find that to be an

22  acceptable outcome.

23          THE COURT:  You stand on your papers.  Okay.

24          MR. FOX:  Thank you.

25          THE COURT:  Does anyone else wish to be heard?

1       (No verbal response)

2           THE COURT:  All right, I'm prepared to approve and

3   authorize the KEIP and the KERP.  I know that's a threshold

4   matter that the KERP is not the subject of any objection or

5   any extant objection.

6           And as I've noted on many, many prior occasions, I

7   place significant weight on the position of the official

8   committee of unsecured creditors.

9           These are matters that I think Mr. Fox has

10  correctly identified as items that Congress has instructed

11  that courts should pay specific attention and impose

12  meaningful scrutiny upon.

13          And, again, I rely on the process, at least,

14  before it gets to this court in order to ensure that the

15  proposal is appropriate and consistent with the practical

16  needs of the case, and each case is different.  And the

17  circumstances and conditions are -- they vary from case to

18  case.

19          There's a format and a structure that the court is

20  certainly familiar with that's been used in many, many, many

21  cases.  But, again, the threshold consideration for either

22  the KEIP or the KERP is what is necessary in order to maximum

23  returns, to ensure as to the folks in the KERP that they will

24  remain with the company through a necessary period.

25          And then with respect to the KEIP to ensure that

1   it is appropriately providing economic incentive to folks

2   that are in the senior management of the debtor in order --

3   again, to maximize recoveries and to improve the prospects

4   for all stakeholders.

5             So, in the absence of the prosecuted objection --

6   and I note that the U.S. Trustee's objection remains extant,

7   but I'm not necessarily going to belabor the record.

8             As noted, I have admitted Mr. Coulombe's

9   declaration and, as noted by the court a few moments ago, the

10  timing of this in order to get to this hearing does reflect a

11  procedural path that is typical.  The application is filed.

12  The trustee has concerns that are consistent with the

13  policies expressed in revised Bankruptcy Code Section 503.

14  And the debtor engages with the trustee and presumably, in

15  advance, also engage with the committee in order to address

16  legitimate concerns.

17            The evidentiary predicate laid by Mr. Coulombe is

18  sufficient to largely address the concerns of the United

19  States Trustee which is now left to the court to determine

20  whether the debtors have carried their burden.  And, as

21  noted, I will simply find that they have carried their burden

22  under Bankruptcy Code Section 503, Bankruptcy Code Section

23  363, to the extent applicable, Bankruptcy Code Section 105.

24            The motion itself is granted and the order will

25  issue.

1          Do you have a revised form of order that or that

2     reflects the tinkering with the agreement and especially the

3     arrangement with the office of the United States Trustee?

4          Mr. Magaziner, good afternoon.

5          MR. MAGAZINER:  Good afternoon, Your Honor.

6          MR. KELSEY:  The form of order hasn't changed.  I

7     think what we'll change and Mr. Feldman will address is a

8     provision in the DIP order making it clear with respect to

9     the reserve waterfalls that KEIP payments --

10         THE COURT:  Who falls where.

11         MR. KELSEY:  Yeah, that's right.  So, we'll keep

12    payments come below the stub rent.

13         THE COURT:  If that's captured in the DIP or

14    otherwise the committee is satisfied with how well

15    memorializing it, that's certainly fine with me and I'll take

16    your order.

17         MR. VAN AALTEN:  Your Honor, to be clear, the

18    committee is satisfied with how stub rent and KEIP payments

19    provided for in the proposed final DIP order.

20         THE COURT:  Very good.  Thank you, Mr. Van Aalten.

21         MR. GILAD:  Your Honor, may I be heard on that

22    point?

23         THE COURT:  Mr. Gilad.  Welcome, sir.

24         MR. GILAD:  Good afternoon, Your Honor.  It's good

25    to be here in person.  Unfortunately, I was compelled to

1  participate by phone at the first day hearing.

2            THE COURT:  I understand.

3            MR. GILAD:  But thank you for hearing me.

4            As you'll hear later today, we do have some

5  informal limited objections to the form of DIP order.  The

6  provision that was just discussed could implicate our

7  concerns with respect to the DIP order as it relates to the

8  wind-down reserve that is purported to be funded.

9            So, if we can approve the KERP and have that issue

10  remain tentative subject to Your Honor's approval of the DIP

11  order that would be fine.

12            THE COURT:  That sounds fine.  It does seem like

13  they do sort of mesh.  My main question to counsel was

14  whether or not the arrangements and any other modifications

15  that have been negotiated behind the scenes were memorialized

16  in a revised form or order in the existing form of order.

17            So, I think where we'll leave it right now for

18  purposes of our record is that the court has approved and

19  authorized the KEIP and the KERP under Bankruptcy Code

20  Section 503.

21            In addition, I've been advised, at least, of what

22  the arrangements are and the conditions imposed by the

23  committee that have been accepted by the debtor with respect

24  to that.

25            But, you're right, it does implicate the DIP

1  order, so we'll just sit tight on that.  If we need to get a

2  revised order under certification or if it's impacted by

3  whatever happens with the DIP financing, then we'll deal with

4  that.

5          But for our purposes, the record will reflect that

6  the KEIP and the KERP have been approved and we'll deal with

7  these issues if we need to.  Okay.

8          MR. GILAD:  Thank you, Your Honor.

9          THE COURT:  Thank you, Mr. Gilad.

10          MR. KELSEY:  Thank you, Your Honor.

11          THE COURT:  Sure.

12          MR. KELSEY:  So, I think the next --

13          THE COURT:  That brings us to the seal issue.

14          MR. KELSEY:  Yeah, I think we're now at the seal

15  issue which is docket 21.

16          THE COURT:  I have it.

17          MR. KELSEY:  Okay.  Your Honor, good news is that

18  we've worked closely with Mr. Fox and narrowed the issues

19  before the court in respect to the motion to seal.

20          And we've modified with discussions with Mr. Fox.

21  We've modified portion of the sealed exhibit in respect to

22  the KERP to disclose high and low ranges of payouts per

23  individual employee and high and low ranges of percentages of

24  bonuses relative to the salary of each employee.

25          THE COURT:  Okay.

1          MR. KELSEY:  And that satisfied Mr. Fox in terms

2    of disclosure, vis-à-vis the KERP.

3          I would note for the record that we did substitute

4    a new KERP participant for a former participant who recently

5    resigned.  But that substitution actually brings the net cost

6    of the program down by approximately $10,000 dollars.

7          THE COURT:  Okay.

8          MR. KELSEY:  We had advised Mr. Fox of that and

9    the committee of that and there's been no objection.

10          THE COURT:  Does that means that there are still

11    issues remaining with respect to the request for sealing as

12    to the KEIP?

13          MR. KELSEY:  That is correct, Your Honor.

14          THE COURT:  Okay.

15          MR. KELSEY:  That is open.  I believe that the

16    U.S. Trustee intends to prosecute its objection with respect

17    to disclosing the names, titles, compensation, and actual

18    dollar amount of the bonus awards of the KEIP participants.

19          I believe the U.S. Trustee has relented on

20    disclosing the individual sale targets that trigger the bonus

21    which we --

22          THE COURT:  Which would obviously impact the

23    transaction process that we have.

24          MR. KELSEY:  That's correct, Your Honor.  So, I

25    think we're limited.  The universe here we're talking about

1  is the disclosure of the KEIP participants, their title,

2  their comp, both the bonus amount and their regular way comp.

3         THE COURT:  Okay.

4         MR. KELSEY:  Okay.  Your Honor, the debtors

5  believe that protecting the confidentiality of all those

6  categories of information is authorized under Section 407(b)

7  of the Bankruptcy Code.

8         In discussing this issue at length with Mr. Fox,

9  and I appreciate how available he made himself to us, he took

10 the position that some of the information will be disclosed

11 in separate filings in a different context, it's appropriate

12 to disclose this information in this exhibit.

13        I'm being purposely vague about where some of this

14 information might be disclosed because I don't want to give

15 people roadmap on how to find it.

16        THE COURT:  Okay.

17        MR. KELSEY:  Okay.  I mean if we lose the motion -

18 -

19        THE COURT:  Well, these issues that come up either

20 by virtue of a corporate entities various filings or the

21 concern that somebody would be able to reverse engineer by

22 the various pleadings that are filed here or public filings

23 elsewhere.

24        MR. KELSEY:  That's correct?

25        THE COURT:  That's it?

1           MR. KELSEY:  Yeah, that's exactly right, Your

2   Honor.

3           THE COURT:  I get it.

4           MR. KELSEY:  I'm worried about the reverse

5   engineering.  There is no public filing obligation here, but

6   there are other public filing obligations here in this court

7   and under the Code.  And we're worried about that kind of

8   reverse engineering.

9           THE COURT:  I understand.

10          MR. KELSEY:  But I think to give this dispute a

11  little context, I think it's important to note what has been

12  disclosed.

13          The debtors disclosed total cost of the plan

14  itself which ranges in rough dollars, Your Honor, from

15  375,000 on the low end to 940,000 on the high end.

16          We disclosed the number of participants in the

17  program which is five.

18          We disclosed the increment by which the bonuses

19  rise which is five percent for each million dollar over

20  target, and up to a certain amount and that it ratchets down

21  to 2.5 percent thereafter.

22          And these benchmarks are, as I said, sensitive and

23  confidential and the U.S. Trustee has withdrawn its requests

24  for those to be made public.

25          And we finally note that the bonuses themselves

1 are capped at a 125 percent of annual salary.

2          So, in addition to what we've disclosed to the

3 public, we shared unredacted versions of the program with the

4 creditor's committee and their professionals, with Wilmington

5 Trust in its capacity as second lien indenture trustee, and

6 the U.S. Trustee and, obviously, with the court.

7          And, you know, as we were working on the DIP

8 budget itself, we worked very closely with the DIP lenders in

9 developing this program and having its costs included in the

10 budget.

11          In other words, the economic impact of the KEIP

12 has already been disclosed on a general basis to the public.

13 And in granular detail to the state fiduciaries and officers

14 of the court and the United States Government and other

15 significant creditors.

16          So, what we're really talking about here is

17 publicizing individual names, titles, their annual salary and

18 bonus awards.  And we believe that keeping these items

19 confidential is appropriate under 107(b) and is consistent

20 with precedence in this court.  Most notably, the In re

21 Alterra Healthcare Corp case which finds that information

22 that could cause economic harm and commercial injury to the

23 debtors, if disclosed, may be kept confidential under 107(b).

24          In addition, Your Honor, and I think it's cited in

25 our papers similar information has been kept confidential in

1   unpublished cases, but where there was a record in the first

2   Brookstone bankruptcy and in <u>Energy Future Holdings</u>.

3              As for argument, Your Honor, disclosure of the

4   name, salary and bonus will economically damage the estate.

5   Given how small the company is disclosing the titles of the

6   KEIP participants is tantamount to disclosing their names.

7              THE COURT:  I think I understand the bid and the

8   ask.

9              MR. KELSEY:  Okay.

10              THE COURT:  Does any party wish -- actually, the

11   does the committee have an approach or a position?

12              MR. VAN AALTEN:  No opposition, Your Honor.

13              THE COURT:  Very well.

14              Mr. Fox.

15              MR. FOX:  Good afternoon, again, Your Honor.  May

16   I please the court, Tim Fox on behalf of the United States

17   Trustee.

18              Before appearing today on this issue, I did review

19   the transcript of the hearing, the first Brookstone case in

20   2014.  And my colleague, Ms. Leamy, presented our objection

21   in that case.  And she presented an exhibit to the court that

22   helped define the bid and the ask as you just articulated.

23   And I have one of those, again, for purposes of today's

24   hearing if you'd like me to approach.

25              THE COURT:  Okay.  Thank you.

1    MR. FOX:  So, Your Honor, before you is an exhibit

2  that shows the redaction that my office would be comfortable

3  with under the facts and circumstances here in this case.

4    As Your Honor noted in the first Brookstone case,

5  it's my offices duty to raise this objection --

6    THE COURT:  No dispute.

7    MR. FOX:  -- and we get a valuable dialogue and

8  come to meaningful results by virtue of going through this

9  exercise.  And I want to thank debtors' counsel for working

10  cooperatively with me.

11    The backside of the demonstrative that I handed

12  you relates to the KERP and is no longer in dispute based on

13  representations of debtors' counsel.

14    THE COURT:  Agreed.

15    MR. FOX:  So, focusing only on the KEIP.  As

16  debtors' counsel summarized, the office of the United States

17  Trustee takes the position that since the information that is

18  included on the KEIP metrics exhibit will eventually come

19  into public view in some fashion anyway.  It should not be

20  sealed at this time.

21    I think that's increasingly important because of

22  the nature of the relief that's being sought that this

23  information relates to.  As we discussed during our colleague

24  on the substantive KEIP and KERP, this is important

25  information that Congress believes parties in interest and

1 those interested in following court proceedings have access

2 to.

3           As in any case where motion to seal is brought,

4 it's important that a scalpel is used and not a sledgehammer.

5 Here, the debtors have tried to tailor things, but our

6 redacting information in this situation should also be

7 public.

8           THE COURT:  Let me ask you a question.

9           MR. FOX:  Yes.

10           THE COURT:  And it's not about the specifics of

11 this case.  I understand precisely the debtors' request for

12 relief and I understand with perfect clarity your office's

13 concerns.  And I've certainly dealt with Section 107 plenty

14 of times.

15           I think it's a structural or an institutional

16 question.

17           I don't specifically recall dealing with Ms. Leamy

18 on this in the Brookstone case in Brookstone one.  But,

19 obviously, there have been cases where I've dealt with it and

20 then cases where it doesn't come up.  And I'm not being

21 critical of your office.

22           But I guess I have a question of these are not

23 unusual motions as I've said in my ruling.  And is there a

24 standard policy in your office that disclosure is necessary

25 or is it on a case by case basis with respect to the issues

1 of a particular case, the nature of the program, and maybe

2 the needs of the particular business?

3          I guess I'm trying to figure how we get to this

4 discussion.

5          MR. FOX:  Sure.  It's much more the latter, Your

6 Honor, where we evaluate everything on a case by case basis.

7 There isn't some overarching trigger that would impact every

8 case.

9          Here, as I indicated, the information that's

10 contained on the exhibit will be in public view in some

11 fashion.  And respectful of debtors' counsel's comments, I

12 won't go too in-depth into that since we're discussing a

13 motion to seal.

14          But I think factually and important for your

15 analysis of 107(b), as these debtors have been through a

16 Chapter 11 proceeding previously, I think some of the

17 concerns that would implicate 107(b) in commercial

18 confidential information regarding the compensation of these

19 individuals are less pressing because it's not a situation

20 where you've got a firm that's right for poaching.  Coming

21 through a second time in Chapter 11 may reduce the

22 desirability of these individuals or otherwise impact that

23 concern.

24          THE COURT:  Can I ask a practical question.  This

25 is a private company.

1        MR. KELSEY:  That's correct, Your Honor.

2        THE COURT:  So, we've often had this discussion

3   you and your colleagues.  You and your colleagues have stood

4   at the podium and said, look you know these are -- if it's a

5   public company, these are SEC.  They're going to be in the

6   10-K or the 10-Q.  Some of these people may have to file 8-

7   K's or 13D's at different times, depending on what they're

8   doing with their stock or their compensation, et cetera.  So,

9   107 really shouldn't kick in here, and I understand that.

10       Does a debtor appear -- does that impact my

11  analysis that this is information that is not directly out

12  there or reverse engineerable, to use the phrase we were

13  using a minute ago -- at least, with relative ease?

14       MR. FOX:  I don't think it greatly impacts the

15  situation in this case, Your Honor, just based on the nature

16  of the participants and the additional filings that will have

17  to be made at some point during the bankruptcy cases.  I

18  think it largely puts it into the same category as if this

19  were a public company.

20       But I would echo Your Honor's statements that when

21  it is already available in a 10-K or 10-Q this really

22  shouldn't be much of a discussion at all.

23       THE COURT:  Okay.  I don't think I have any

24  questions.  I actually, oddly enough, what I want to do is

25  take this matter under advisement.  I'll rule probably by

1  tomorrow.  But, obviously, I deal with this issue all the

2  time.  I want the chance to take a closer look.

3          Much of my attention was focused on the nuts and

4  bolts of the substantive program.  And I want to, at least,

5  think about it a little bit and get a sense of what I've done

6  in prior cases.

7          And I think you're right, and actually I would

8  commend your offices approach.  I believe that each one of

9  these stands on its own.  While the motion may appear every

10 industry and every business presents its own particular

11 constellation of problems.

12          And so, I don't think I have any questions with

13 respect to the nature of the business, as I said, or why the

14 debtor wants to protect this information.

15          If I am going to grant the debtors' request to

16 seal, I would likely just issue the order.  If I'm not going

17 to grant, then the likelihood would be I would get you on the

18 phone.  These matters are sealed right now, but I, at least,

19 would want the debtor to have some heads up about what the

20 court's ruling would be in order to either know about it in

21 advance and or, perhaps, to fashion some sort of an

22 appropriate remedy.

23          So, one of those two paths forward will follow.

24 But I understand the objection and I think it's been fully

25 presented.

1             MR. FOX:  Thank you, Your Honor.

2             THE COURT:  All right, so the sealing issue is

3  taken under advisement.  And as I said, I'll deal with that

4  promptly.  Okay.

5             MR. KELSEY:  Thank you, Your Honor.

6             THE COURT:  Sure.

7             MR. KELSEY:  Can I indulge you for a minute and a

8  half just to give you some additional context in hopefully in

9  aide of your decision?

10            THE COURT:  Sure.

11            MR. KELSEY:  Thank you.

12            I realize it's not an unfamiliar tale in this

13  court that in a company that's in Chapter 11 employee morale

14  is fragile.  But in this case, in particular, it's more

15  fragile than normal.

16            I just wanted the court to appreciate that one of

17  the matters that was scheduled to be heard today, but the

18  order has been entered was a rejection of a mall retail

19  location in South Carolina.

20            The reason we had to file that motion is the day

21  the bankruptcy was announced, literally the entire staff

22  walked off the job, en masse and hasn't returned.

23            And, in addition, I mention there's a KERP

24  participant who resigned after the announcement of a KERP

25  plan.  So, things are fragile.  It's a very small community.

1  It's a very small company that's had significant employee

2  attrition leading up to it.

3          And, you know, there is a concern, a legitimate

4  concern.  Maybe it's self-serving to say, but more than

5  normal that disclosure of this information could breed

6  resentment and more dislocation rather than do what it's

7  supposed to do which is incentivize and loose morale.

8          Thank you, Your Honor.

9          THE COURT:  So noted.  Okay.

10         MR. MARTORANA:  Good afternoon, Your Honor.

11         THE COURT:  Mr. Martorana.

12         MR. MARTORANA:  Keith Martorana of Gibson Dunn

13  McCrutcher on behalf of the debtors.

14         I'm here today to present the bid procedures

15  motion.

16         THE COURT:  Okay.

17         MR. MARTORANA:  That's agenda item 19.

18         And we filed a revised form of that order --

19         THE COURT:  I have it.  Thank you.

20         MR. MARTORANA:  -- together with the exhibits.

21  That was on Monday at docket number 239.

22         THE COURT:  Yep, I got it.

23         MR. MARTORANA:  That revised order reflects a

24  significant number of changes that were made to the original

25  filed version to accommodate the U.S. Trustee, the committee,

1   the PVGC, Cigna, who was an objector, a formal objector, and

2   various landlords that were also formal and informal

3   objectors.

4           We understand that these changes resolved the

5   filed objection of Cigna and the vast majority and possibly

6   all of the objections of the landlords.

7           In addition, Wilmington Trust, as trustee for the

8   second lien notes, has asked us to confirm the following on

9   the record which we're happy to make that confirmation.

10          And that is Wilmington Trust will be a

11  consultation party under the bid procedures order and will

12  have access to bidding information subject to Wilmington

13  Trust's confidentiality agreement with the estate which

14  prohibits, among other things, Wilmington Trust from sharing

15  this information with bondholders without the debtors'

16  consent.

17          And we're happy to confirm that point.

18          THE COURT:  Okay.

19          MR. MARTORANA:  With respect to the objections

20  that were filed by the landlords represented by Ballard Spahr

21  and Kelley Drye, we have two additional changes that I

22  believe will fully resolve their objections.

23          I have a blackline which I'm happy to hand up at

24  this point.

25          THE COURT:  That would be great.  Thank you.

1          MR. MARTORANA:  Your Honor, the first change is

2    really just a nit.  It appears on page 11 of the blackline.

3    We have been asked to clarify and change the words the same

4    to such bid, which just clarifies that what we are, in fact,

5    talking about is a bid.  I don't think that that is a

6    substantive point.

7          THE COURT:  Sure.

8          MR. MARTORANA:  The second provision appears on

9    the next page, on page 12, which is a paragraph that then has

10   in addition to the blackline some handwritten comments in

11   there as well you should see.

12         This was really intended to address the objections

13   of the Ballard Spahr landlords and the Kelley Drye landlords

14   that they potentially would not have sufficient time to

15   review and object to the adequate assurance information for

16   both, you know, a successful bidder and a backup bidder.

17         They had initially asked that we adjourn the

18   hearing as to any assignment to a backup bidder. But,

19   unfortunately, that would fall outside of our DIP milestone.

20         So, what we have agreed to here is that we will

21   try and work together.  And to the extent that we can't reach

22   agreement on some kind of appropriate timeline for the

23   objection, that they will have the ability to come to you the

24   week of September 27th on a telephonic hearing to press

25   forward and tell you why it is that we need to have an

1  extension of the sale hearing with respect to the assumption

2  and assignment of any potential leases of their landlords.

3          THE COURT:  Okay.  Mr. Heilman.  Good afternoon.

4          MS. HEILMAN:  Good afternoon, Your Honor.  For the

5  record, good afternoon, Your Honor.  Leslie Heilman of

6  Ballard Spahr.

7          Yes, we did file a formal objection to the bid

8  procedures --

9          THE COURT:  I saw it.

10          MS. HEILMAN:  -- as well as worked with the

11  debtors on informal and both formal comments.  And as we

12  stand here today, I believe we are fully resolved subject to

13  the reservation of rights that we are discussing on the

14  record today.

15          THE COURT:  And reservation of rights is

16  predicated also in part on the prospect of a prompt hearing

17  if this thing goes off the rails.

18          MS. HEILMAN:  Correct, Your Honor.

19          And just to give a little bit of color with

20  respect to the objection and the reservation of rights, Your

21  Honor, with respect to any assumption and assignment of

22  leases, we are on a very tight timeline here.

23          And to the extent that the option results in any

24  bidder that implicates the leases, currently there is none.

25  They are anticipating closing all retail stores, and we have

1  IP asset bids or letters of intent for bids presently known

2  to the debtors.  And as of the first day of the case, there

3  were not potential bidders.  They did prepetition marketing

4  for the leases themselves.

5          But to the extent we are in that camp and they are

6  providing for a fulsome option process for any and all assets

7  including partial assets, partial bids, lease bids, and so

8  forth, there is potential that we could have bidders on more

9  than one lease.

10         So, we could have, it would be a good problem to

11 have, a successful bidder for a number of leases and,

12 potentially, a backup bidder for a number of leases, all on a

13 three-day notice, as well as the presentment, if we stuck

14 with the current timeline, evidentiary record is going before

15 Your Honor on more than one bidder, both successful bidders

16 and backup bidders.

17          And what we asked for is that any hearing on a

18 backup bidder with respect to assumption and assignment of

19 leases proceed only if and when the successful bidder fails

20 to close and on a short time.

21         We couldn't get there on that so, instead, we've

22 compromised and asked for, to the extent there is a backup

23 bidder that implicates the leases, we would want to come

24 before Your Honor for a telephone conference to determine if

25 it's appropriate for an adjournment of the sale hearing as to

1  the backup bid.

2         THE COURT:  Okay.  I think I understand that

3  mechanic.  I understand certainly the concerns that have been

4  expressed by landlord's counsel and by you personally in

5  many, many prior cases.

6         I'm cognizant of the burden that's imposed on

7  landlords and other parties, but by transactions that come

8  postured the way that they are, but that is how they come.

9         I think experience teaches that the mechanics of

10 the process are worked out, at least, as smoothly as they can

11 be, and these kinds of conferences are rare.  But to the

12 extent that you need it, I will be here.

13        MS. HEILMAN:  Great.  Thank you, Your Honor.

14        THE COURT:  Very well.  Thank you.

15        Mr. Martorana.

16        MR. MARTORANA:  Thank you, Your Honor.  I don't

17 have anything else to add on this other than to just continue

18 highlight the point that Mr. Kelsey raised earlier which is

19 that I believe nothing in the bid procedures order that we

20 are seeking to have you sign today addresses an upcoming bid

21 protections hearing.  I think our goal would be to file

22 something this week, both a motion to shorten notice, as well

23 as a motion seeking approval of bid protections and have that

24 heard on September 6th.

25        THE COURT:  There are a number of other objections

1  that were filed and I did get a committee statement that I've

2  only had a brief opportunity to review in advance of today's

3  hearing.  So, I think, your point is that this is your record

4  as far as you're concern.

5          And I think I'd like to just hear from any party

6  that wishes to be heard, but I'd start with confirming that

7  the objections that you identified, or that are identified on

8  the agenda, which include Cigna are resolved or reserved.  I

9  did hear, obviously, from Ms. Heilman, so I think those

10 matters are dealt with.  But I'd like to just make sure we

11 close the loop.

12          MS. CONLAN:  Good afternoon, Your Honor.

13          THE COURT:  Good afternoon.

14          MS. CONLAN:  Kelly Conlan of Connolly Gallagher on

15 behalf of Cigna, and we are resolved with the change to the

16 order.  Thank you.

17          THE COURT:  Very good.  Terrific. Thank you very

18 much.

19          Yes, sir.

20          MR. LEHANE:  Good afternoon, Your Honor, Robert

21 LeHane, Kelley Drye & Warren on behalf --

22          THE COURT:  Good to see you.

23          MR. LEHANE:  Good to see you as well, Your Honor -

24 - JLL and Brookfield Properties REINC, formally known as GGP

25 Inc. and Turnberry Associates.

1              We are happily resolved.  And thank counsel --

2              THE COURT:  On the same terms --

3              MR. LEHANE:  Same terms as Ms. Heilman laid out

4  and very grateful for counsel for the debtor working through

5  these issues.  We worked through in numerous cases before and

6  appreciate Your Honor's comments with respect if those issues

7  come up, you're available.

8              THE COURT:  I'll be here.  Very good.  Thank you.

9              I think that addresses the objections that have

10 been received.  The latest correspondence was that the

11 committee objection, I believe, has been largely resolved.

12 What's the status with the committee objection?  Mr. Van

13 Aalten?

14             MR. VAN AALTEN:  Your Honor, the committee

15 objection to bid procedures has been resolved.  We did file a

16 statement concerning the bid procedures motion and a request

17 for status conference here today --

18             THE COURT:  Right.

19             MR. VAN AALTEN:  -- with respect to the issues

20 raised in that statement.

21             I'm happy to proceed with that now, Your Honor.

22 It does relate to the auction process generally.  How we get

23 from here to the 24th of September which is our auction date.

24             THE COURT:  There are, obviously, a number of

25 issues and concerns that are raised in your statement and I

1    don't have any responsive submissions from anybody else.

2            I'm always happy to have a status conference

3    particular in a case that has as many parties and as many

4    moving parts.  So, we can do that right now.

5            I guess the question I'd like to, just so I stay

6    on track, is telling you that I'll give you your status

7    conference today, I'd like to know whether you have any

8    objection to the bidding procedures that are proposed and the

9    timeline and the contents of the proposed form of order.

10           And, if not, then we'll deal with that.  And then

11   we can deal with the concerns that you've got, or do I need

12   to deal with this in advance?

13           MR. VAN AALTEN:  I have no objections to the

14   timeline or procedures otherwise set forth.

15           THE COURT:  All right, why do we close the loop

16   then on the bid procedures order.  And I'll hear from any

17   other party that wishes to be heard as to the bid procedures

18   order.

19           Mr. Preis.  Good afternoon.  Welcome.

20           MR. PREIS:  Arik Preis from Akin Gump Strauss

21   Howard & Feld on behalf of Bluestar Alliance.  I will be very

22   quick.

23           THE COURT:  Okay.

24           MR. PREIS:  This is not an objection.  This is

25   more a statement about the process.  I didn't know if the

1  committee was going to address this issue, so I just wanted

2  to make sure we stated it.

3            THE COURT:  Sure.

4            MR. PREIS:  We've been in contact with the company

5  for a few weeks as was stated.  On Monday, we saw that the

6  debtors filed an LOI with ABG.  We saw that.  We quickly

7  recalibrated within 24 hours.  We put in our bid at $40

8  million.

9            We tried to make this process very simple.  We

10 took the exact same form. We changed the name. We increased

11 the numbers.  We took out the purchase price adjustment.  We

12 added some stuff about Bluestar Alliance that I'm sure was

13 self-serving.  And we filed it.

14            THE COURT:  I expect you got everybody's

15 attention.

16            MR. PREIS:  To make it easy, we did all of that.

17 I want to just make two points that our clients wanted to

18 say.

19            First, we've heard a number of parties.  I think

20 the committee even put in one of their statements that they

21 have concerns about administrative insolvency in this case

22 and paying off secured creditors.

23            To that end, as we stated in our papers, we would

24 encourage the debtors and that they have said that,

25 obviously, they couldn't get their (indiscernible) filed.  We

1 understand that.  But that we would encourage the debtors to

2 quickly decide that they're not going to move forward with a

3 bid that can't possibly now be better than ours.

4         Obviously, ABG could increase their bid.  Someone

5 else could come along.  That's, obviously, true.  But we just

6 don't want to see anymore of the burn, because all we've

7 heard is there's a lot of concern about administrative

8 insolvency.

9         The second point is we did something I think you

10 probably would recognize as a little bit unusual which is

11 file our bid publicly as opposed to doing it privately.  We

12 did that intentionally.  We want this process to be open and

13 notorious. We don't want any games in the process.  We're not

14 pointing fingers at anybody.  But we'd encourage any bidder.

15 If they want to bid, bid on the same terms that we bid so

16 there's an even playing field.

17         That's it.  Thank you.

18         THE COURT:  Very good. Thank you, Mr. Preis.

19         Mr. Brown.

20         MR. BROWN:  Thank you, Your Honor.  Stuart Brown,

21 DLA Piper on behalf of Authentic Brands Group.

22         I didn't come to court today prepared to speak to

23 the process or how any particular party seeks to direct that

24 the bid procedures and sale process would go forward.

25         Authentic Brands Group understands that it's the

1   debtors' process that's being run, not Bluestar's process.

2   And the comments of counsel for Bluestar seemed to indicate

3   otherwise.

4           We just would like to understand that the process

5   will be run according to ordinary terms by the fiduciaries in

6   the case.  And understand -- and would like to understand

7   that Bluestar sits in the same shoes and the position as

8   Authentic Brand Groups.  Not having filed a statement

9   publicly to embarrass the parties in the case, Authentic

10  Brands Group shouldn't be prejudiced in any way.

11          Thank you, Your Honor.

12          THE COURT:  So noted.

13          Does anyone else wish to be heard with respect to

14  bid procedures?

15          Very well, Mr. Martorana.

16          MR. MARTORANA:  Thank you, Your Honor.  Keith

17  Martorana, Gibson Dunn McCrutcher on behalf of the debtors.

18  And I think I'm happy to confirm that it is the debtors'

19  process that we are running here and not Bluestar's process.

20  And I don't see any or either of the parties as being

21  prejudiced by this process.

22          With that, Your Honor, I have a clean version of

23  the bid procedures order.

24          THE COURT:  That would be great.  Okay.  Thank

25  you.

1    I'm prepared to approve the bid procedures as

2 requested.  The court has scheduled, as Mr. Kelsey noted, a

3 hearing for next week on the 6th at 11:00 a.m.  11:00 a.m.?

4         MR. KELSEY:  That's what I heard, Your Honor, yes.

5         THE COURT:  For purposes of consideration of a

6 stalking horse.  Obviously, that's an expedited process.  But

7 it was one that was, as a practical matter, contemplated and,

8 frankly, hoped for, I think, in the motion that's before me

9 today and in the order that is contemplated here.

10        I make no comment with respect to the status of a

11 bid process.  There's some lively debate about whose process

12 it is and everything.  As far as I can tell, this is the

13 debtors' motion and the debtors' process.  But I am certainly

14 pleased as somebody that doesn't have actually skin in the

15 game to see that there is a process and that there's

16 engagement.  And that's, I think, why the debtors commenced

17 this proceeding.

18        So, I make no comment, again, with respect to the

19 competing concerns of prospective bidders.  I said many, many

20 times one of the luxuries that I have in this job is able and

21 experienced professionals that have done this dance many,

22 many times.  And so, there's a busy week ahead of you and, I

23 assume, roughly a busy month ahead of the parties and that's

24 what I would hope for and that's what I would expect.

25        So, with respect to the bid procedures themselves,

1   though, again, this is relatively straightforward consistent

2   with my colloquy with Mr. Kelsey at the beginning.  We're

3   setting up a structure.  I note that the structure is

4   expedited, but I think that the structure is and the timeline

5   is driven by the needs and financial circumstances of the

6   case.

7          And, again, as I have in the past, I place

8   significant weight on the position of the creditors committee

9   and other stakeholders that are supportive both of the

10  timeline and the mechanics.  And my expectation would be that

11  we'll have a hearing in a week or so that will fill in some

12  of those blanks and, again, provide further structure for a

13  sale and auction process that will conclude in late

14  September.

15         So, based upon the record before I'm satisfied

16  that the relief requested is appropriate and warranted.  And

17  I'm satisfied the debtors have carried their burden.  I have

18  a clean form of order that I will sign.  And I will look for

19  the parties to return to me next week.

20         With respect to the bid procedures rather than

21  require additional motion practice, the court has set the

22  hearing for the 6th.  So, I don't need a motion to shorten

23  time. The notice should reflect that the hearing has been

24  scheduled by order of the court.  And you can confer with

25  respect to what an appropriate objection deadline would be.

1 But I think the earliest you can get would probably be -- if

2 the 6th is Thursday, say Wednesday at noon.

3              And anybody that wants an extension gets it.

4              MR. KELSEY:  Understood, Your Honor.

5              THE COURT:  Okay.  So, I've signed this order.

6 We'll have this on the docket this afternoon.

7              MR. MARTORANA:  Thank you, Your Honor.

8              THE COURT:  Sure.  Mr. Magaziner.

9              MR. MAGAZINER:  Good afternoon, Your Honor.  For

10 the record, Drew Magaziner from Young Conaway on behalf of

11 the debtors.

12             One other procedural point, Your Honor, we did

13 file that motion for leave to file the late reply in

14 connection with the KEIP.  If I may approach?

15             THE COURT:  Sure.  Thanks.

16             MR. FELDMAN:  Good afternoon, Your Honor. David

17 Feldman from Gibson Dunn on behalf of the debtors.

18             I rise today to speak about the request for a

19 final order approving the DIP.

20             There's a few things that I'd like to go through.

21 We have filed a markup to the final order reflects changes

22 from the interim order.  From a procedural perspective, we

23 have remaining with us, as we note on the agenda, after

24 extensive rounds of discussions with the creditors committee,

25 we have resolved the creditors committee's objection.

1        That's reflected in our proposed order.  That

2   reflected, not only in discussions between the debtor and the

3   creditors committee, but, of course, the DIP lenders as well

4   resulting in the order that has been filed with Your Honor

5   and I'm happy and plan to go through in some detail how the

6   order works and why we think it is very much appropriate

7   under the circumstances of this case.

8        That which is remaining is while the committee's

9   objection resolved -- while the resolution resolved the

10  committee's objection on the stub rent issue and while there

11  are two larger and notable members of the creditors committee

12  who are Longwoods.  I understand that there are some other

13  landlords who still want to prosecute their objection as to

14  the timing of the payment of stub rent, so you'll hear from

15  them.  And we're happy to -- I will address that as well, as

16  well as respond to their arguments.

17       In addition, I'm not exactly sure what he'll say,

18  but there is counsel for the second lien agent who has also

19  indicated that he is some sort of limited objection to the

20  proposed order as well.  And we'll hear from them.

21       So, what I had intended to do, first, was to

22  generally walk you through the proposed changes to the final

23  order and then address, in some detail, I think, particular

24  the provisions included in paragraph 23 of the order where I

25  think much of the action for today's hearing will reside.

1       So, going through the order and what I intend to

2   do here and I can go page by page, but I'd like to avoid

3   doing that, in all the places where we, you know, had interim

4   order we changed to final --

5       THE COURT:  Yeah, I certainly don't need to go

6   over conforming changes.

7       MR. FELDMAN:  So, I'm going to hit on only some of

8   the highlights.  So, starting with, on page, just a minor, a

9   minor highlight.  On page 13, there's a comment about

10  defaults by the debtors.  There had been an argument that we

11  were in default.  And we had agreed with the DIP lenders that

12  we were in default upon the filing of the case.

13      And we included language here that dealt with the

14  notion that while there was a default, a default into the

15  prepetition given the rollup, there's on longer the accrual

16  of default interest under the prepetition facility.  And that

17  language on page 13 addresses that point.

18      We have a change on page 28.  The page on 28 is

19  one that we discussed and the reason it's showed marked here

20  is, this is the change that we agreed to with regard to the

21  pledge of the distribution facility, distribution center as

22  additional collateral to support the DIP lender's

23  obligations.  That was the language that was negotiated at

24  the interim hearing.  It's showing as a mark, marked against

25  the version of the interim order that we originally filed.

1  But that's not new since the interim hearing.

2          THE COURT:  Paragraph 28?

3          MR. FELDMAN:  No, page 28.  Sorry.

4          THE COURT:  Page 28.

5          MR. FELDMAN:  Page 28, paragraph -- at the very

6  end of paragraph five.

7          We then have changes on -- there are two changes

8  that are found in paragraph, on page 29 of paragraph six.

9  And then, again, a change on paragraph 60 at page 73 relating

10 to changes requested by Texas Tax authorities to deal with

11 some of their claims which are constituted permitted liens

12 under the prepetition facility, as well as a $50,000 dollar

13 adequate protection payment that's been set aside to protect

14 them.  And that $50,000 dollar fund is described in paragraph

15 60 on page 73.

16         THE COURT:  Right.

17         MR. FELDMAN:  Okay.  So, then we turn to page on

18 the blackline, page 42, paragraph 23.  And this is where we

19 talk about the applications of the proceeds of collateral,

20 creation of reserves, and additional carve-outs.

21         So, we were faced in this case with a variety of

22 concerns, not necessarily unique to this case, but certainly

23 of great concern.  And you've heard one mentioned earlier,

24 which is we have, I guess, three competing interests.

25         One, we have a DIP lender who agreed to lend money

1  but required that to bridge us to a sale, but required that

2  upon a consummation of the sale we would have to pay them

3  down.  But also, a need in order to get us through to the end

4  of the case to avoid administrative insolvencies.  That we

5  would have sufficient funds to get us from point A to point

6  B.

7          And in connection with those concerns, you know,

8  we have, as the debtor, concerns about ensuring that there's

9  sufficient funds to pay the professionals as well along, the

10 committee.  And we, as fiduciaries have concern about the

11 stub rent payments that the landlords are seeking, payment of

12 503(b)(9) claims.  Other wind-down expenses to get us through

13 the case, ensuring that we have sufficient cash collateral

14 use to get to the end of the case because of -- I realize

15 it's not an unusual request, but because of the DIP lender's

16 request that they get paid down in the middle of the case

17 rather than the end of the case.

18          Obviously, if we were in a situation, I don't want

19 to insinuate for a moment we're asking the DIP lenders to do

20 this.  They've been very accommodating to us.  But if we were

21 sitting in a situation where the DIP lenders were getting

22 paid at the end of the case, we probably wouldn't have a

23 discussion on any of these points, because they would agree

24 to the use of cash collateral to pay our administrative

25 expenses as we go through the case.  To the extent those

1  payments weren't made during the case, they'd be made
2  pursuant to a plan and the DIP lender would get paid at the
3  end.
4          But what's happening here is the DIP lender is
5  getting paid in the middle of the case, so it creates some
6  complications for us that we need to address.  And also, as
7  part of that and also with the DIP lenders are appropriately
8  asking for at this point in the case is, you know, a 506(c)
9  waiver.
10         So, they're asking that they get the 506(c) waiver
11 effectively today.  The committee, obviously, is very
12 concerned about giving the 506(c) waiver wanting to ensure
13 that we have the necessary cash to get us again from point A
14 to point B.  And so, our settlement here is intended to
15 address all of those concerns.
16         And the settlement effectively provides, and the
17 committee will rise to speak in more detail, but we, as the
18 debtor, you know, we're, obviously, very much a part of this
19 discussion in working with the capital.  Most of this is the
20 committee asked and resolving their significant objections to
21 the DIP.  And paragraph 23, really, is the linchpin for that
22 resolution which allows us to get through the case and also
23 give the lender what it's requested as a condition to extend
24 their financing and let us get through the case.
25         The three additional -- so, we've always had a

1   professional fee carve-out in the case which, you know,

2   thankfully comes at the top of the waterfall for the

3   professionals standing here working today to get us through

4   this process.

5          And then paragraph 23 has the negotiated outcome

6   of a very hotly contested discussion among the committee and

7   the DIP lenders on, you know, in what order we make certain

8   payments.

9          Now, as a practical matter, I would say to you

10  given where the bids currently sit even at the $35 million-

11  dollar level and even sitting aside this newly breaking

12  information on a $40 million-dollar bid, there is sufficient

13  -- and I can take you through the budget, if need be.  There

14  are sufficient assets to pay -- to make all of these payments

15  that we're contemplating out of the sale proceeds together

16  with the anticipated GOB proceeds that will come in between

17  now and the sale closing date.

18         But I think the committee was very concerned that

19  the money be there and not essentially disappear while the

20  lender was kind of being let off the hook by way of a 506(c)

21  waiver at the time it was entered.

22         THE COURT:  Let me ask you a question --

23         MR. FELDMAN:  Yes, please.

24         THE COURT:  -- that doesn't necessarily bear on

25  the deal that's been cut.  But I'm just trying to figure out

1 the dynamic within the case and I have relatively limited

2 visibility into it.

3          I think I understand the committee's concerns and

4 these are squarely what comes up in the context of a 506(c)

5 waiver and the idea that the committee is left, you know,

6 with a pig in a poke at the end of the case.  So, I get that.

7          I think I would ask whether or not this dynamic

8 and the economics of the case are informed or affected by the

9 two proposals that have in recent days been received.  Now, I

10 realize that those are -- they're not closed transactions, et

11 cetera, but in a financing, right, and you've just done this.

12          In a financing, everybody is worried about well

13 what's going to happen at the end of the day.  What are we

14 going to get, and particularly in a sale, God only knows what

15 the transaction will yield.  So, I think I'd like to know

16 whether or not this discussion is, in fact, impacted by the

17 fact that there is, at least, one bid and, yet, another bid.

18          And, again, I understand that that process is in

19 its earliest stages.  But if I were a committee that would be

20 some of the information that I will be thinking of or if I

21 were a junior lender or if I were a landlord, et cetera.  Is

22 this a question that makes any sense?

23          MR. FELDMAN:  It does, Your Honor.

24          THE COURT:  Good answer.

25          MR. FELDMAN:  Without breach any --

1        (Laughter)

2              MR. FELDMAN:  Without breaching any confidences

3   about, you know, the debtors' sale process.

4              THE COURT:  And I'm not asking for confidences.

5              MR. FELDMAN:  I would say this.  One, this order

6   was negotiated and finalized -- what's today, Wednesday --

7   over the weekend.  And I think we filed it on Monday morning.

8   Right?  Monday morning.

9              So, the reality is that we started really

10  negotiating in earnest the committee's objection, I think, on

11  Friday, pre-distinctly because I was supposed to be on

12  vacation.  I was sitting in my hotel room in conference calls

13  all day and night and through the weekend when we finalized

14  this form of order.

15             I will say, at that point, we did have in hand

16  some other indications of interest which gave us some sense

17  that we would have sufficient proceeds to satisfy.  These

18  numbers weren't completely picked out of the blue.

19             THE COURT:  I think that you're answering my

20  question.  And, again, I don't want to get too far down the

21  path.  But I have on many occasions had issues such as this

22  and people want to hondle about it.  And, often, either the

23  debtor or the court will just say, you know something, you're

24  about to have a sale.  And there's a deal on the table that

25  actually pays you, so I'm not going to go over to war over

1  paying a stub rent.  And, again, I'm speaking hypothetically.

2          I'm not answering that question today because if I

3  approve a transaction or if this plays out as everyone

4  expects it will, these issues do not come to fruition.  And

5  so, you know, part of this is I see just a -- and I use the

6  term dynamic.  I see that the debtor has to deal with these

7  issues.  The committee has to take seriously the concern with

8  respect to whether or not, again, they will be left empty

9  handed.

10          And it's not an opposition or it's not, again,

11  they will be left empty handed.  And it's not an opposition

12  or it's not a position I'm taking with respect to the DIP

13  financing order that you're moving forward with today just to

14  try to understand exactly where things stand.

15          Because, again, sometimes these cases present an

16  issue where if the transaction closes, we're all set and

17  there ae no issues.  If the transaction doesn't close, then

18  we have a host of problems. And often we will say well I'm

19  not going to have a hypothetical discussion.  We'll see if

20  the transaction closes and then we'll move on from there.

21          But I think you've largely answered, at least, my

22  question and I'll hear from any party that wishes to be

23  heard.

24          So, I think you were in the midst of walking me

25  through the three separate steps that are built into this

1   paragraph 23.

2          MR. FELDMAN:  So, again, we had a professional fee

3   carve-out.  The professional fee carve-out, one comment about

4   that.

5          Basically, it was an agreed upon budget through

6   the sale closing plus an additional amount.  I think the

7   number was something like $350,000 dollars that would have

8   been -- you know, you would -- that was the number that would

9   both be used as a post-default carve-out.  But, in this case,

10  given the payment of the DIP lender in the middle of the

11  case, it was also basically used as a plug, one the debtor

12  wasn't particularly happy about, as a plus for essentially a

13  professional fee, you know, post-sale payoff wind-down.

14  Clearly, not sufficient. And I think we put a placeholder in

15  that 350 to see where the bids started to shake out.

16  Because, at that point, it wasn't at all clear where the bids

17  were going to be when we had the interim hearing.

18          So, there are three components.  Let me talk about

19  them a little bit out of order and, you know, in part,

20  because this, I think, perhaps, the debtor is most

21  (indiscernible) because I know the committee has a different

22  priority.  And, ultimately, our deal reflects a particular

23  priority.

24          The additional what's called wind-down carve-out

25  here is a more accurate reflection.  Again, it's not an exact

1  science but it's a more accurate reflection of what the

2  debtor and the committee I think would be a more reasonable

3  guestimate of what's necessary to get us through the case

4  once a sale has closed.

5        Another way to have done it would have been to

6  include it in the professional fee carve-out, but that's --

7  it didn't arise in that way.  So, that's one piece of the

8  three.

9        THE COURT:  Okay.

10       MR. FELDMAN:  The other two pieces are the stub

11  rent, which, as you can imagine, is a highly contested issue

12  in every case, particularly in this case because of the

13  timing of the GOB sales.  And the ultimate resolution that's

14  built into this is that the stub rent is going to be paid,

15  you know, upon the closing.  You know, the language is

16  immediately after, but it's effectively on the same day when

17  the DIP is paid off.

18       And that stub rent, as far as the three escrows

19  that are being funded out of those three escrows, we've

20  agreed that the stub rent that escrow gets funded first.

21  Now, again, based on what the bids are there is not

22  expectation or concern that we won't have the wherewithal to

23  fund all three escrows.  But as part of the heightened

24  concern of the committee on the stub rent, we included the

25  stub rent in that, the number one place in the waterfall.

1          Now, let me digress for a moment on the KEIP

2    point.  And we can do this anyway people like.  What the KEIP

3    order says, and this is not, you know, really my

4    (indiscernible).  What the KEIP order says is that we're

5    authorized to pay -- the KEIP order says you can do it

6    provided in the KEIP plan which is described in the motion.

7          It says you can pay the KEIP upon the consummation

8    of the sale.  We had added an additional condition

9    effectively on that KEIP payment in order to get the

10   committee to stand down on a variety of issues including the

11   KEIP that we won't pay that administrative expense, even

12   though we have the authority under this order, until that

13   stub rent escrow --

14          THE COURT:  Until the stub rent is paid.

15          MR. FELDMAN:  -- is paid.  We could have put that

16   provision in the KEIP order.  But an order -- we thought

17   about as we were literally caucusing between the various

18   people handling the various motions, where's the most

19   appropriate so there's no confusion.

20          THE COURT:  Right, we discussed that.  I

21   understand.

22          MR. FELDMAN:  It's not an escrow.  It's a payment

23   that's being made.  We're not asking for authority on other

24   admin claims.

25          THE COURT:  No, it's an order of proceeds issue.

1          MR. FELDMAN:  Right.

2          THE COURT:  And so, I think I get it.

3          MR. FELDMAN:   Right. So, that's the point.  I

4   don't think it's anything different than -- and I know Mr.

5   Gilad, you know, stood up on this issue.  The budget that we

6   filed always contemplated that we're paying the KEIP amounts

7   upon the closing.  That hasn't changed.  It's just this

8   additional condition that we've agreed to with the committee

9   that, you know, a second before we fund, you know, send the

10  wire to fund the KEIP amounts, we'll wire the money into the

11  escrow for the stub rent.

12          The third piece that's currently reflected in the

13  order is by way of escrow is a 503(b)(9) escrow.  Speaking a

14  moment about the amounts, the stub rent, we think, is a

15  pretty good estimate of what the aggregate amount of stub

16  rent is.  I think the 503(b)(9) we're undertaking that

17  analysis now.  Both of these escrows provide that if the

18  amount set aside is more than is necessary, the remainder

19  will be taken out of the escrow and put back into the estate.

20          But the 503(b)(9) one is one particular, you know,

21  we'll be working on a drilling down.  But I think for now as

22  a conservative estimate, we believe is --

23          THE COURT:  $2.5 million.

24          MR. FELDMAN:  -- $2.5 million.

25          THE COURT:  I understand.

1        MR. FELDMAN:  So, those are the three components.

2   We believe strongly that this is an authorized use of cash

3   collateral. That it is an appropriate additional set of

4   carve-outs to be approved by this court.  We think it is an

5   excellent resolution of issues and concerns of the creditors

6   committee.  We're pleased to have the support of our DIP

7   lenders to reach this conclusion.

8        I would preview one issue and, again, I don't know

9   whether Your Honor is inclined, you know, to get into the

10  details of, you know, the subordination agreement.

11       I will tell you and you noted when I first set up

12  here about you know our initial shot across the bound, the

13  subordination agreement when we filed our initial motion,

14  because I think we anticipated some pushback on this.  I

15  think in large part because this is a very -- there's deep

16  subordination in this subordination agreement and Mr. Gilad

17  should know that because he is the one who negotiated the

18  agreement four years ago.

19       And, unfortunately, it puts him in a very

20  difficult position with very little leverage.  Makes clear

21  that if the DIP lender, if the senior lender agrees to a

22  carve-out, he's bound to agree to that carve-out.  If the

23  senior lender agrees to use of cash collateral, he's bound to

24  that use of cash collateral.

25       I'm happy to go through these provisions of the

1  subordination agreement in detail, but that's the situation

2  that we're facing.  Obviously, we believe the subordination

3  agreement by way of an intercreditor is enforceable in this

4  court and, frankly, we believe it should be enforced in this

5  situation. And that with the consent of our senior lender

6  that we should be able to use the cash collateral and set

7  these carve-outs in the amount that we provided and, in

8  particular, to ensure administrative insolvency of this

9  estate and allow us to get to the end of the case.

10         With that, I would cede the podium to the

11 committee and any others who want to speak in favor and then,

12 I assume, you'll hear from the objectors.

13         THE COURT:  Very good.  I'll hear from the

14 committee.  Mr. Van Aalten.

15         MR. VAN AALTEN:  Thank you, Your Honor.

16         Your Honor, before I get into my remarks about the

17 settlement, I'd like to address Your Honor's remark earlier

18 about where are we in this case.  And, Your Honor, and I

19 recently had a case and still have a case in which there was

20 significant fighting at the outset only to be obviated by a

21 tremendous auction results.

22         THE COURT:  Money fixes lots of things.

23         MR. VAN AALTEN:  Money fixes lots of things.  But,

24 unfortunately, we're not in that position today.  Okay.

25 Whether we're at a 35 or a $40 million-dollar level on the

1  stalking horse bid, we're still looking at prospects of

2  administrative insolvency.  And without any other bids for

3  any of the other assets, that's where we are today, so that

4  is a tremendous concern of ours.

5          Your Honor, the committee filed its objection to

6  the DIP last Friday prior to and subsequent to that that we

7  were actively engaged with the debtors and the DIP lenders in

8  negotiations to improve certain aspects of the interim DIP

9  order and the interim budget.

10          Those negotiations continued through the weekend,

11 Your Honor, and a global compromise was reached Monday

12 morning. Your Honor, that compromise provides for substantial

13 improvements which we believe will put this case on the path

14 to administrative solvency.

15          I don't need to go through the carve-outs.  I

16 think Mr. Feldman did that perfectly.

17          THE COURT:  I think I followed it.

18          MR. VAN AALTEN:  I would note for Your Honor that

19 the DIP order clarifies that the 60-day challenge period

20 will, for the committee to investigate, the DIP lenders will

21 not apply to the committee's investigation of Sanpower.  That

22 is, obviously, a big concern of our and for which we have

23 requested a status conference for later today.

24          THE COURT:  And we'll have that.

25          MR. VAN AALTEN:  Terrific.

1          And nor will that investigation period or cap that

2    we agreed to with the DIP lenders be applicable to the

3    Sanpower investigation as well, Your Honor.

4          And with those concessions having been made, the

5    committee supports entry of the final DIP order and approval

6    of the final budget.  We withdraw our objection pending

7    approval an entry of that order.  And that is because in our

8    view, Your Honor, there are substantial improvements that

9    have been made here and which will pave the way, hopefully,

10   for a solvent estate her.

11         THE COURT:  Okay.  I'd like to hear from the DIP

12   lender.  We'll get Mr. LeHane in just a moment.  I'd like to

13   hear from the DIP lender.  Mr. Falgowski.

14         MR. FALGOWSKI:  Good afternoon, Your Honor.  Cory

15   Falgowski from Burr Forman for Wells Fargo.

16         With me today are my co-counsel from Morgan &

17   Lewis, Mark Leduc and Chris Carter.  And if you'll indulge

18   Mr. Leduc, he'll.

19         THE COURT:  Very good.  Mr. Leduc.  Good

20   afternoon.

21         MR. LEDUC: For the record, Mark Leduc from Morgan

22   & Lewis for Wells Fargo.

23         We're very supportive of the DIP order as filed.

24   I think Mr. Feldman did a really nice job explaining sort of

25   what the global settlement with the committee was.  And with

1 the help of the committee, we think we ended up in the right

2 place in this case and we hope that it's helpful for this

3 case to move forward successfully for everybody.

4           THE COURT:  Okay.  I understand.

5           Any other parties wish to be heard in support of

6 the request for DIP financing?

7           All right, Mr. LeHane.

8           MR. LEHANE:  Good afternoon, Your Honor.  Again,

9 Robert LeHane, Kelley Drye & Warner on behalf of three

10 landlords: JLL, Turnberry Associates and Brookfield

11 Properties.

12           Brookfield Properties, Your Honor, is a member of

13 the unsecured creditors committee.  And, obviously, we are

14 very grateful for the incredible hard work that's been done

15 over the weekend.

16           he settlement is a tremendous result from where we

17 thought we were when we filed our very limited objection to

18 the DIP financing.  And it's a limited objection that also

19 ties into the store closing sales and it highlights the

20 natural tension that is in place between a DIP lender that

21 has a lien on all collateral and the landlords who have

22 properties that the debtor conducts store closing sales at

23 the very beginning of the case.  So, the debtors using the

24 properties outside the ordinary course of business.

25           This is a high-class problem we're having now in

1  that we've got two very good bids in IP and a much improved

2  outlook for the case.  The problem for the landlords is we're

3  being asked to step back from the typical posture we believe

4  we're in when there's a store closing sale at the outset of

5  the case is that part of the adequate protection you're

6  entitled to is payment of that stub rent during that store

7  closing period before the store closing sales end, before the

8  DIP lender is paid out in full.

9          The other important date and the timeline that I

10  don't believe has been mentioned is that our understanding is

11  the store closing sales will end on September 30th.  And so,

12  the store closing sales and the collateral that is what's

13  being liquidated in the stores and would be the subject of

14  any 506(c) surcharge fight is gone for all practical

15  purposes, and we're left with proceeds.

16          And the much straighter route, in our view, is

17  that under 363(e), landlords are entitled to adequate

18  protection.  It can't be a claim. It should be something

19  other than that.

20          And then we're left with the proposed order in the

21  settlement and a specific carve-out for stub rent which is,

22  puts us above KEIP and immediately on closing of the sale and

23  we have active bidders.

24          Looking at the posture that we're in today, it's

25  hard to say this isn't a fairly safe position.  We just don't

1  have the 506(c) surcharge rights and we would be essentially

2  letting the argument of 363(e) and the ZB Company line of

3  cases go by the waist side.

4         Under the circumstances and if the DIP order is

5  approved, it's hard to say that we aren't fairly certain that

6  there will be payment of the stub rent on the closing of the

7  sale of the IP.

8         THE COURT:  But your concern is it's a crystal

9  ball issue.

10        MR. LEHANE:  It's a crystal ball and there's risk.

11 There's significant risks and it's really be shifting --

12        THE COURT:  And the issue is where should that

13 risk lie.

14        MR. LEHANE:  Right.  It's being shifted from the -

15 - and the DIP lender, the first lien lender, naturally they

16 want to get paid out in full and they don't want to have to

17 pay some of the costs associated with liquidating their

18 collateral.  And, critically, that's the stub rent.

19        And the clients that Kelley Drye represents,

20 Brookfield Properties, it's approximately 430,000 and there's

21 another 90,000 between the other two clients, so the total is

22 521,000.  It's not a, you know from our client's perspective

23 not a small sum.

24        There will be more clarity on September 6th when

25 there's a stalking horse, if a stalking horse bid is

1  approved.  I think that would add a level of comfort.  But as

2  we stand here today especially not know whether or not this

3  DIP order has been approved on a final basis and whether or

4  not there is line items in the budget that have been

5  approved, they are in the budget right now for payment.  As

6  noted stub rent is in the budget.

7          That typically would give us the comfort level

8  we're looking for, but we also wouldn't have the situation as

9  debtors' counsel laid out where the store closing sales have

10 already ended and the DIP lender has been paid out in full

11 and indefeasibly.

12         THE COURT:  In the middle of the process.

13         MR. LEHANE:  Those are the issues we're looking

14 at, Your Honor.  It's, obviously, a close call and awkward

15 position.  And get back to, we're in a much different

16 position than we were when the case was filed.  We think,

17 overall, obviously, the settlement is a very good one for

18 many of the parties in the case.

19         THE COURT:  Okay.  All right, thank you.

20         Anyone else wish to be heard?

21         Ms. Heilman?

22         MS. HEILMAN:  Good afternoon, Your Honor.  For the

23 record, Leslie Heilman of Ballard Spahr on behalf of the

24 Dallas Mall Investors, Marketplace Philadelphia, which is an

25 airport location, Your Honor, recently closed on August 27th;

1  Starwood Retail Partners, the Forbes Company, and the

2  Macerich Company.  All of our other clients, Your Honor, are

3  with respect to the mall closures and subject to the going

4  out of business sales currently being held and scheduled to

5  conclude on 9:30.

6          Your Honor, I concur with many of the statements

7  that Mr. LeHane has raised today before the court on our

8  objections.  Your Honor, we are kind of tag teaming today as

9  you would in issues that are raised.  And we do find

10  ourselves with this conundrum or seeking some adequate

11  protection for the payment of stub rent, primarily because of

12  this timing issue.

13          And the timing issue is the fact that it is the

14  collateral of the first lien lenders that is being liquidated

15  in the inventory of the stores.  But they're going to shift

16  the risk to the seconds and the estate by getting paid out

17  first and then the funding of the stub rent.

18          THE COURT:  I don't disagree with you, but I think

19  I'd ask a question.  Obviously, issues of adequate protection

20  363(e), at the end of the day what we're talking about is

21  what confidence is there that you'll be paid.  And I think

22  Mr. LeHane laid out the concern.

23          The current posture is certainly an improvement

24  over what was on the table last week or on Monday.  But,

25  again, the concern is it's a crystal ball issue and there's

1  no guarantee.

2          As I evaluate that, though, I'd like to know

3  whether or not there is significance to the point that was

4  negotiated by the creditors committee as to the KEIP and KERP

5  payments.  Because if you think about it from the debtors'

6  point of view, I guess what I would say is as a hypothetical

7  matter, the court's experience is that the KEIP and the KERP

8  are matters of great significance to the debtor.

9          First, that they promise them; second, they

10 prosecuted the motion; third, they've negotiated the

11 resolution and presumably obtained approval.  Payment of

12 those are likewise, at least, and, again, I speak generally

13 of utmost significance to a debtor.

14          And in this situation, the debtor has agreed that

15 you stand ahead of those parties. Again, I think it's an

16 elegant resolution of those concerns, but I think the debtor

17 was pretty square about it.  Can I attribute significance as

18 I evaluate whether or not you are or not adequately protected

19 in, frankly, the thought process that the debtor has gone

20 through?

21          Am I making myself clear?  You know what I'm

22 talking about?

23          MS. HEILMAN:  I think you are, Your Honor.  I

24 think that there is significance in that resolution.  Mainly

25 because, I mean while the stub rent may be in the budget, it

1 is a post-closing budget.

2          THE COURT:  It is.

3          MS. HEILMAN:  Which means that it is no longer the

4 use of the first lender's cash collateral.  It is the use of

5 the second lender's cash collateral.  The difference on the

6 KEIP and the KERP payments is with respect to it is a line

7 item budgeted as part of the first lender's cash collateral.

8 So, they are making the payments later.  But it is a budgeted

9 line item that is certain to be paid.

10          The stub rent which is also an administrative

11 expense of these estates and for the use and occupancy of the

12 premises during a period of time that is not ordinary course

13 of the debtors, that is an administrative claim of these

14 estates that really isn't budgeted except for this agreement

15 with the committee.

16          And our concern really is, Your Honor, I think

17 that maybe adequately protected to the extent that the

18 seconds must agree to this.  But I don't think that that's

19 what the language says here.  It says if there's sufficient

20 use availability of cash collateral, these carve-outs will be

21 made.

22          THE COURT:  Well then perhaps I don't understand

23 the deal that's been cut by the committee.  Because unless I

24 misunderstood Mr. Feldman and Mr. Van Aalten's comments, the

25 KEIP and the KERP are not paid before stub rent.  And if the

1  stub rent is not paid because we have this discussion about

2  whether or not it's a budgeted item or whose line or whose

3  order or whose money it's coming out of, it would seem to me

4  that, at least, what was reported to me is I will not

5  authorize and there will not be paid the KEIP and the KERP

6  unless the stub rent is paid.

7         Money is fungible.  That's the sort of thing that

8  gives a DIP lender a cow.  But I think I need some clarity on

9  that because that's how I understood the resolution that was

10 articulated.  I know Mr. Gilad that's an issue that we're

11 going to circle back to.  But that's how I understood it.

12        And, again, I read the committee objection.  It's

13 not an insignificant objection.  And I understood the

14 resolution as reported to me that the KEIP and the KERP which

15 I approved will not be paid until and unless the stub rent is

16 paid.  And if I don't have that right or if there's -- then

17 somebody needs to tell me and probably today.

18        MS. HEILMAN:  And, Your Honor, I don't disagree

19 with you.  I think that is why we are before Your Honor on

20 this last remaining issue is because I don't think it is

21 clear that the carve-outs after the DIP obligations are paid

22 can be funded if the debtors don't have sufficient use of

23 cash collateral, meaning consent of the seconds.

24        And I think you will hear from the seconds today

25 that they might have some issues with these reserves being

1  set aside after the payment of the DIP obligations.  So,

2  that's where our conundrum occurs is that we are left then

3  just with a claim against the estate as opposed to adequate

4  protection for the payment of the use and occupancy of the

5  premises.

6           THE COURT:  But do you disagree that in that

7  context where you would be left with, again, nothing more

8  than a claim as it relates to stub rent, anything -- we're

9  talking stub here -- that that by definition means that the

10  beneficiaries under the KEIP and the KERP program are in

11  precisely the same situation?  As a matter of fact, a

12  subordinate situation because, again, payment -- as I heard

13  it.  Payment of the stub rent is the trigger to permit

14  payment of the KEIP and the KERP.

15           MS. HEILMAN:  And that's how we read as well

16  except for, I think, there might be some difference if it is

17  a budgeted line item from the first collateral versus a

18  budgeted line item from the seconds collateral, Your Honor.

19           THE COURT:  Okay.  I understand.

20           MS. HEILMAN:  And I think with respect to that,

21  that's where we are.  Because if we're just left with a

22  claim, Your Honor, we have been in cases many times now where

23  there is this pull between the firsts and the seconds.  And

24  what result is in years, months or years of litigation as to

25  whether or not there will be any funds to fund the stub rent

1 and administrative obligation of the estates.  Or we've asked

2 to take a haircut with respect to the stub rent obligation of

3 the estates.

4       So, we're sitting here today right now just with a

5 claim and some certainty that there will be a reserve put in

6 place, but it may be subject to contest and which leaves us

7 just with a claim instead of adequate protection of payment.

8       THE COURT:  I understand.

9       MS. HEILMAN:  Thank you, Your Honor.

10       THE COURT:  Sure.

11       MR. FELDMAN:  I just want to clarify --

12       THE COURT:  Mr. Galid, you can come on up.

13       MR. FELDMAN:  I'm just clarifying a couple of

14 things just so the record is clear on one or two things

15 before Mr. Gilad speaks.

16       One, just on the order of the payment -- when the

17 payments are being made.  I hope I was specific when I said

18 the KEIP payments which are the payments of the executives

19 are the ones that are coming after the stub rent, the KERP.

20       THE COURT:  After the stub rent okay.

21       MR. FELDMAN:  The way the KERP is set up is the

22 KERP payments are going to be made right, you know --

23       THE COURT:  On a rolling basis.

24       MR. FELDMAN:  I think they're going to be made

25 once everyone signed -- they're made in advance --

1          THE COURT:  Right.

2          MR. FELDMAN:  -- under the KERP.  And they're made

3   in advanced subject to every employee who signed an agreement

4   saying that they'll stay for the period and so, it's the KEP

5   which is significant, obviously, because the party making the

6   decisions.  And I agree with Your Honor and, unfortunately,

7   each time I sit here in your courtroom you always come up

8   with an issue that I wish I had thought of before on that

9   very point.

10          I mean you're absolutely right, there is a great

11  amount of confidence in the part of senior management here

12  who is subject to the KEIP.  And they're putting their money

13  where their mouth is.  And, again, I'm just repeating your

14  point -- their money where their mouth is on this very issue.

15          The last thing would say about Ms. Heilman's

16  comments is that that is the precise reason for our request

17  today that these not just be promised to pay, but a carve-out

18  that is approved today under this order, so that there is no

19  uncertainty about having sufficient funds for the payment of

20  stub rent and all those other things --

21          THE COURT:  Well then walk me through this and

22  I'll hear from Mr. Gilad in a moment.  But as I understood

23  the concern articulated by Ms. Heilman it was, okay, so what

24  we've got is a commitment that this carve-out will be funded.

25  But at the closing what we're going to do is we're going to

1  turn to the DIP lender and we'll pay them off and then

2  they're out of it.  So, any of the funds that we're talking

3  about would be subject to whatever the collateral rights of

4  the seconds would be and if the seconds said well that's a

5  lovely idea that they agreed that all my money was going to

6  get set aside, but I'm not agreeing to that.

7         I think I need clarity on that because I don't --

8  I'm not necessarily addressing the rights of the seconds

9  here, but the one thing that will not happen is to set up

10 either the employees and the KEIP or the stakeholders and the

11 stub rent and the 503(b)(9)'s for a bait and switch where the

12 court blesses it today.  And then, again, and I'm not casting

13 aspersions on anybody.  But if somebody says well you made

14 promises with my money that's the dynamic I need to

15 understand.

16        MR. FELDMAN:  Well on the KEIP payments, I would

17 say we believe that we're authorized, pursuant to this order,

18 upon your entry today, to make those payments.  And we have

19 the authorization.  We have the consent of the existing DIP

20 lender.  And it's just the question of when the timing of

21 that payment will take place.  Upon the sale happening that

22 payment is going to be made, subject to funding the escrow on

23 the stub rent.

24        We believe that the orders that you've entered

25 today, both on the DIP order and on the KEIP/KERP order will

1   give us the authority today without coming back for a second

2   look to anybody to make those payments upon the closing.

3   That's the relief that we're seeking, to be able to make all

4   of those payments from those escrows, make all those payments

5   that it will be, based on our numbers, cash beyond that.

6   There will be based on our numbers, there will be millions of

7   dollars in cash beyond that, we hope, if the sale closes.

8         As to that cash, that we're going to have to deal

9   with and look to see whether or not the second liens have a

10  security interest in the cash collateral.  And if they do,

11  then we'll have to deal with that issue going forward.  But

12  the whole purpose of this settlement is to avoid that very

13  situation where the DIP lender walks away and then all of

14  these payments that essentially are getting us through the

15  case essentially go by the waist side, so the second lien

16  lender can convert the case.

17        That's exactly the reason we're asking for the

18  relief we're asking from Your Honor today and probably the

19  reason why I think we certainly need to add to this litany in

20  the DIP order the provision on the KEIP payment just so it's

21  crystal clear on that point.  So, that, I think that's what I

22  want to say on that point.

23        That is precisely the relief that we are

24  requesting, not to leave this issue open to a further

25  negotiation.  There will be a negotiation and discussion on

1  other, but this cash which we believe is critical and part of

2  our deal and embedded in the whole 506(c) waiver, DIP lender

3  deal that that money be approved to be paid today, but be

4  paid upon the closing.

5         THE COURT:  Okay.  I understand.  Hang on, just a

6  second.

7         Mr. Van Aalten, I just want clarity on where

8  everybody stands before --

9         MR. VAN AALTEN:  Your Honor, I would like to just

10 briefly respond to Ms. Heilman's comments.

11        I understand her position which is with respect to

12 the downside risk here, the landlords would like to be paid

13 ahead of the DIP lenders.  But to say that what this

14 settlement does with respect to creating that stub rent

15 escrow is to set aside for stub rent after the DIP lender

16 gets out fundamentally misconstrues what this settlement is.

17        The DIP lender doesn't get out until, among other

18 things, it receives a release from the committee is not

19 receiving a lease from the committee until those escrows are

20 funded.  It remains the DIP lender until it gets a release

21 and until it receives a final payoff letter.

22        That is our position.  It is the DIP lender.

23        THE COURT:  Okay.  Mr. Gilad.

24        MR. GILAD:  Good afternoon, Your Honor.  Erez

25 Gilad, Stroock & Stroock & Lavan on behalf of the second lien

1  notes trustee.

2         It's fair to say I've had several pages worth of

3  prepared comments that are now out the window.  So, I also

4  had a prepared presentation with respect to seeking leave of

5  the court to address our objections to the proposed form of

6  final DIP Order, notwithstanding the fact that we didn't file

7  written pleadings so we would seek leave of the court to

8  address the concerns that we do have.

9         I think they fall into several buckets and these

10  issues were, in fact, previewed to debtors' counsel

11  yesterday.

12         First, we didn't receive the final form of order

13  until -- well, we didn't know about it until it was filed on

14  the docket with the court.  It sounds like those changes were

15  negotiated heavily over the course of the weekend and the

16  debtors may not have had a chance to give us a head's up on

17  that.  But it's fair to say, though, that the deal was cut

18  without seeking a (indiscernible) obtaining our prior

19  consent.

20         THE COURT:  Did it require your prior consent?

21         MR. GILAD:  I believe it did.

22         Number two --

23         THE COURT:  What's the effect then of the

24  subordination agreement?

25         MR. GILAD:  I'm happy to take you through the

1  effect of the subordination agreement right now.  And I also

2  think that seeking to add an entirely new concept into the

3  DIP order on 48 hours' notice and seeking to enforce a

4  subordination agreement in a way in which we dispute is

5  inappropriate and not appropriate for a hearing on this day

6  before this court.

7           Second, the other nature of our objection relates

8  to issues that we addressed, albeit, by phone at the interim

9  hearing, which weren't adequately addressed.  I think there's

10 just one paragraph in the DIP order that relates to a finding

11 that the subordination agreement is enforceable.  And it

12 includes only select language regarding the subordination

13 agreement.

14          And as this hearing will illustrate fall short of

15 truly reflecting the terms of that subordination agreement

16 that, again, I think that it would be inappropriate for there

17 to be any kind of stipulation that would require me to bring

18 a challenge to initial a stipulation as to the enforceability

19 of the subordination agreement.

20          So, as a procedural matter if I may seek leave of

21 the court to address the court today that would be

22 appreciated.

23          THE COURT:  Well, look, I'm certainly happy to

24 hear from anybody who will come here.  I want to be clear,

25 though, that I make no comment and no finding with respect to

1  whether or not the points that you're going to raise, whether

2  characterized as statements, responses, objections, concerns,

3  whether or not they implicate or, in fact, violate the

4  subordination agreement and I expect that you had thought

5  through that process.  So, while I'm happy to have you at the

6  podium, you may proceed.

7          MR. GILAD:  Your Honor, those are welcome comments

8  from my perspective.  It's the debtors' ironically enough of

9  all the folks that approached the podium, it was the debtors,

10  not the lenders who invoked the subordination agreement.

11          So, it's they that are seeking to enforce and

12  impose it on this hearing, so I welcome that.

13          THE COURT:  Well, they just want to make sure I

14  don't bounce you off to state court in New York.

15          MR. GILAD:  Understood.  And, Your Honor, the

16  irony here is that Section 12 of the subordination agreement

17  expressly provides that the subordination agreement is solely

18  effective -- solely relates to the relative priorities

19  between the first and second lien lenders and does not confer

20  an interest upon any third-party -- any person including the

21  obligor or any obligor including without limitation any

22  obligor.

23          So, truth be told, it's not upon the debtors nor

24  do the debtors have the right to seek to invoke that

25  subordination agreement.  It's an issue for the lenders.  And

1   as I understand the settlement agreement that was cut, Your

2   Honor hit the nail on the head.  They couldn't deal with our

3   money.

4           What they did is they manufactured a situation

5   where the senior lenders are paid in full within a month's

6   time.  And, for the record, we support the DIP.  We support

7   entry of the DIP order subject to the issues we raised here

8   today with Your Honor.  We support the paydown.  We support

9   all the benefits and the protections that the DIP lenders

10  negotiated for.  Our issue is solely with the points that are

11  subject of discussion today.

12          And having represented DIP lenders in many other

13  cases, we find that the waivers and protections negotiated

14  for are standard, if not appropriate, and particularly

15  relevant here where you have a Chapter 22 liquidating

16  retailer.

17          So, from our perspective, you know, unless the

18  creditor committee had an alternative financing ready and

19  available to refinance out the existing incumbent DIP

20  lenders, I think the DIP lenders stood in good stead in terms

21  of their current (indiscernible) financing.

22          But what's happened here is a situation where the

23  DIP lenders have said, the committee and the debtors

24  negotiated a deal whereby, look, we're not -- I know it was

25  described as a carve-out, but a carve-out from what?  This is

1  not a carve-out from the lien or claim or cash collateral

2  interest of the DIP lenders. This is a carve-out from our

3  lien, from our claims, and our cash collateral.

4       The issue here is that they cut this deal with the

5  committee and then, I presume, turned it over to the lenders

6  and said you guys have a problem with this.  And the issue

7  with inserting this into the final DIP order.  So, if I'm a

8  DIP lender and I see here the carve-out that's being imposed

9  not on me, but on the next guy, great, why not.

10      And I think to the point that Your Honor made, and

11 I think counsel previewed this very eloquently about shifting

12 risks.  Your Honor made a comment about well what is the

13 impact of the now higher bids and what should be the prospect

14 of competitive tension going forward. We haven't even hit the

15 auction yet and we see active incremental bidding.

16      Well what is the impact here?  We think that,

17 frankly, that obviates the need for a wind-down reserve.  It

18 should comfort some of the constituents that we, in fact,

19 have an administratively solvent case.  But the issue then

20 is, this is a court of equity and the court is balancing

21 risks, the risk has now been shifted entirely to the second

22 lien noteholders.  That's what this arrangement does.

23      What it effectively is, is on 48 hours' notice an

24 upfront request by the debtors for the non-consensual use of

25 cash collateral where there has been no discussion, let alone

1  consent with regard to any form of adequate protection

2  offered to the 2L noteholders from and after the closing.

3  The current DIP order does not currently provide for any

4  adequate protection.  We are not requesting adequate

5  protection.  It is the lender's prerogative to offer that.

6  They have not done so.

7          We approached the debtors.  In fact, we made this

8  the linchpin of our remarks at the first day hearing.  What

9  is the game plan?  The notion that hey we'll deal with our

10 cash collateral interest at some indefinite later point in

11 time doesn't work.  And we flagged this issue a month ago,

12 but we have made no progress on that.

13         In fact, from the second lien noteholders'

14 perspective, our situation now is worse relative to the

15 estate because now as I look at the updated budget that was

16 filed with the court -- I don't know if Your Honor has that

17 in front of you.

18         THE COURT:  You know, I actually think I left that

19 on my desk.  Just get a copy.

20         Actually, why don't we do this.  We've been at

21 this for a while.  We've dealt with some of the orders, some

22 of the motions already.  We'll just take a five-minute break.

23         Mr. Gilad, you're at the podium and you'll be at

24 the podium when we get back.

25         It seems to me, though, that the threshold

1  argument that's, at least, made by the debtor, not

2  necessarily by the DIP lender is an issue about whether or

3  not these are objections and concerns that you can prosecute

4  today.  And that does seem to me to be a gaiting question.

5       I think I perceive from the colloquy before you

6  got up and now what the nature of the concern is and whether

7  or not, again, parties have made commitments to pay,

8  guarantees to pay, reserves, escrows, carve-outs, whatever

9  you want to call it with your money.  That's, at least, the

10 way it seems.  If I've got that wrong, I'd like to hear from

11 the debtor.

12      I think I heard from the committee that they don't

13 believe it's really with your money or, at least, that they

14 understand the timing and the mechanics of the payment will

15 come before we see the back of the DIP lender.  So, I think

16 that there needs to be, at least, a little bit of clarity for

17 the court on that.

18      This has been moving fairly quickly.  But I do

19 want to make sure that I understand what it is that people

20 are looking to do.  And, again, the subordination agreement

21 and its impact is something that the debtors raised from the

22 outset and I think will probably need to deal with upfront

23 and it sounds like you're prepared to do so.

24      So, why don't we just take five-minutes.  And if

25 the parties could use or want more than that, than that's

1  fine. All right, we'll stand in recess.

2           MR. GILAD:  Thank you, Your Honor.

3       (Recess at 2:55 p.m.)

4       (Proceedings resume at 3:13 p.m.)

5       (Call to order of the court)

6           THE COURT:  Please be seated.

7           Mr. Gilad.

8           MR. GILAD:  Thank you, Your Honor.

9           Again, for the record Erez Gilad, Stroock &

10 Stroock & Lavan on behalf of the 2L trustee.

11          So, given Your Honor's comments, I wonder if the

12 best way for me to proceed now, if you agree, is for me to

13 point out the two provisions in the DIP order that we're

14 acutely focused on because there's one provision that wasn't

15 yet highlighted in the prior presentations.

16          THE COURT:  Sure.

17          MR. GILAD:  And then, as I understand the issue,

18 is address the question of standing, which I think will

19 require taking Your Honor through the terms of the

20 subordination agreement which I'm prepared to do.

21          THE COURT:  Okay.

22          MR. GILAD:  So, first, just to be clear, the issue

23 arises with the new paragraph 23(b).  That's the provision

24 that provides for the payment of this "carve-out."  And I

25 want to note that before I continue that as we read it --

1              THE COURT:  Hang on.  Let me ask you a question

2   about the end game.

3              Leave aside the subordination agreement --

4              MR. GILAD:  I would be happy to do.

5              THE COURT:  I expect.

6              But and we'll leave aside the KEIP for a moment,

7   but I don't think there's anyone in this courtroom that

8   expects that I would permit this matter to proceed without

9   providing a measure of competence and comfort that stub rent

10  in a source where GOB's are being conducted is going to be

11  paid.

12             And, likewise, I would -- again, leaving all these

13  issues aside -- be highly unlikely to support a scenario

14  where 503(b)(9) claims were not, otherwise, provided for.

15  And so, while we can have this debate, even in the absence of

16  the subordination agreement, if you were just standing up

17  here as a typical second lien lender.  We got the first.  We

18  got the seconds.  We expect the first will get paid out, but

19  the seconds, you know, there's a question I have about how

20  academic this discussion is because these are getting paid.

21             MR. GILAD:  So, Your Honor, I think that's a fair

22  question and I was going to address that.

23             The end game here what we were expecting is that

24  market practice would prevail.  There would be a discussion,

25  as in every other case, identify who were the lenders that

1  have asserted interest in cash.  We have asserted an interest

2  in the cash sale proceeds.  That's what's funding all of

3  this.  So far, as I'm aware, no one has come forward and

4  indicate that they dispute of our interest in that cash. But

5  if they do, I would like to know that.

6         And then what we expect, as is the case as is

7  routine, that there would have been a discussion between the

8  petition date and now whereby we would, in good faith, work

9  through a post-closing budget that would provide for payment

10 of the KEIP and would provide for certain other payments.

11 And that that would be coupled with an appropriate adequate

12 protection package for the benefit of the 2L lenders.

13        And if there were concern about reconciling that

14 with the subordination agreement, there is certainly non-

15 economic AP that could have been afforded to the 2L holders

16 now such as AP liens and AP claims, junior to the DIP liens

17 and claims.  But that was not entertained.  And there's

18 certainly an opportunity to provide today for AP that would

19 govern or kick in from and after the sale closing the

20 proceeds come in and the DIP lenders are paid in full.

21        THE COURT:  I understand.  But I guess the point

22 that I'm boiling down to is assuming that the process has

23 been described plays out, your concern is that it's your ox

24 that's being gored by agreements that other parties are

25 making.  I get that.

1          And I think your concern is that you were not

2    afforded a dialogue to determine how that process would play

3    out and we've seen it play out a hundred different ways.  And

4    I get that.

5          I guess the point I'm raising and we talk about it

6    in the context of the subordination agreement and, again, we

7    can walk through that.  And I'm sure you're competent in your

8    position.  I expect the debtor is as well.  Do you want me to

9    do that today and go through that exercise today for

10   obligations that I think I just told you I would require to

11   be paid in any event?

12         So, if I play this string out and, again, you guys

13   know your case and you know the moving parts much much better

14   than I do.  So, the view from 30,000 feet is if we have this

15   discussion today and I say that the debtors' characterization

16   of the subordination agreement is right and you have to sit

17   on your hands until the day that, again, we see the back of

18   the DIP lender then we are where we are.

19         If we don't have that discussion, but we

20   generally, as I would, require of first and second lien

21   lenders come to terms that these relatively standard and

22   routine obligations will, in fact, be provided for, which I

23   would require in the context of a DIP and in the absence of

24   which I wouldn't approve a 506(c) waiver, then we get to the

25   same place without necessarily having that determination made

1  about whether or not you do have, in fact, the right to stand

2  at that podium right that.

3          MR. GILAD:  From my perspective, the solution

4  would be to have that discussion in the context of an AP

5  package for the 2L's.  That's our view.  And that that's

6  generally how things play out.

7          And I think that given the time and opportunity,

8  you know, when we first voiced our concerns with the new

9  language, as soon as we could after speaking with our client,

10  we offered to sit down with the debtors and work through that

11  solution.  And I think that that would be the way to solve

12  for this.

13          I think practically I imagine the debtors will say

14  they face a DIP order milestone that needs to be satisfied.

15  Nobody in the room wants to see the case crash and there be a

16  DIP default.  So, with time, I think, that even the course of

17  the day I wonder if there isn't something that could be

18  worked out.

19          That would be my suggestion for how to work this

20  out consensually.  Everyone is here in the room.  If we need

21  to spend all day and all night, if need be.  If there's -- I

22  can't address the DIP milestone, it's in the DIP and I don't

23  want to touch that.

24          THE COURT:  Sure.

25          MR. GILAD:  But I think that would be my

1  suggestion for going forward, because we hear you loud and

2  clear. But the question then is -- the premise underlying our

3  objection is, notwithstanding what committee counsel said,

4  the words say in this new paragraph 23(b) Subject to and

5  after the funding of the carve-out, that's the professional

6  fee carve-out, and immediately upon the repayment in full in

7  cash of the DIP.  So, that has to happen first.

8           Now, it may be the case that the UCC will say I'm

9  not giving you my release letter until I know

10 contemporaneously therewith or immediately prior to the

11 issuance of that letter.  I'm assuming it would be like a

12 corporate closing.  Here's a release letter held in escrow

13 until you fund each of these reserves.

14          But the predicate here is that the DIP is fully

15 paid in full.  And the argument that I understood the debtors

16 were making is that we can't object because this is a carve-

17 out and we under the subordination agreement agreed to be

18 subject to any carve-out agreed to by the lender.  But if the

19 DIP lenders are paid in full and this is being paid a moment

20 in time after the DIP lenders are paid, this is not a carve-

21 out of the DIP liens and claims.

22          THE COURT:  Let me ask you a question.

23          And I know that things get negotiated, but just as

24 a matter of straight up law and, again, leaving the

25 subordination agreement aside.

1          If we were to have a hearing, a contested hearing

2   with committee objection, et cetera, and the court said at

3   the conclusion of that all right, here's the deal.  I don't

4   really know when or how the first and the seconds are going

5   to get paid off because that's a sale process that is not

6   before me today, but will play itself out.  I don't know

7   whether you get paid in full.

8          But the one thing I can promise is that these

9   categories of obligations will be paid because that's part of

10  the ticket that you paid to come into here.  That is part of

11  the cost of doing business.  Okay.  So, we have that

12  discussion.  You've been here for that discussion once or

13  twice.

14         And then we have a transaction that goes poorly.

15  And it only covers two thirds of the senior lender's

16  obligation.  Then those obligations which, again, I would

17  have ruled, they get paid, that comes out of, frankly, the

18  first lien lenders.  In that situation hitch is a disastrous,

19  obviously, your people are wiped out.  But in the

20  alternative, again, if there's an amount that gets over the

21  first and into the second then, again, with consent or not

22  those are amounts that I would prospectively said they get

23  paid.  And so, it is, in fact, coming out of your hide.

24         So, I'm trying to figure out, and I'm not trying

25  to be cute.  I'm trying to figure out where we're going to

1   war over amounts that I'm going to order get paid.  And that

2   everybody standing there is going to agree that they're going

3   to get paid, whether it comes out of your collateral or the

4   first collateral.  Again, if this goes terribly, nobody says

5   it's going to, but it would come from those guys.

6           And I agree with you that the language of this is

7   not necessarily tracking precisely what's been reported to

8   the court, but I'm more confident in what's been reported

9   than what I'll sign.  So that's the question I have.

10          MR. GILAD:  So, Your Honor, we understand and we

11  hear you.  Then, I would say give us the opportunity then to

12  work out an adequate protection package.  The DIP lenders are

13  receiving a number of benefits and protections and waivers.

14          The burden of risk is being shifted to the 2L's.

15  And, at least, give us the opportunity to have a discussion

16  with the committee, with the debtors that would allow entry

17  of this order and, perhaps, allow payment of the wind-down

18  reserve subject to the parties consulting in good faith

19  regarding an appropriate adequate protection package. And we

20  could set that for hearing, you know, sometime in conjunction

21  with the sale approval.

22          THE COURT:  I'd like to hear from the debtor, but

23  I'll hear from Mr. Leduc first.  But I would note, right, as

24  the process plays itself out, and you know this better than I

25  do, that to the extent that you're right, the committee's

1  objection revives.  And the committee's objection was your

2  basic committee doorstop objection.

3          And, again, so and I think the debtor will remind

4  me of the interplay between the subordination agreement, the

5  respective rights of the parties and the DIP order.  And so,

6  you know, it's not just this particular question.  It is if

7  the net affect of this is there's an otherwise consensual

8  order that goes completely off the rails based in concerns

9  articulated by the seconds, again, the debtors would have to

10  demonstrate and, likewise, you would have to demonstrate what

11  impact the intercreditor agreement has on that.  And we'll

12  have that discussion if we need to.

13          Mr. Leduc.

14          MR. GILAD:  Let me just close my notes here.

15  Thank you, Your Honor.

16          THE COURT:  Sure.

17          MR. LEDUC:  Your Honor, thank you.

18          Just a few things I want to clarify that I feel

19  were a little bit maybe mischaracterized through the last

20  few, the last hour or so.

21          The cash -- the subordination agreement remains in

22  full force and effect until the indefeasible payment in full

23  of the senior claims, okay.  And that date -- if the

24  challenge period doesn't run until October 17th, so as long

25  as the challenge period hasn't run, the indefeasible payment

1  in full has not occurred and, therefore, the cash collateral

2  is still the cash collateral of the senior lenders.

3         The subordination agreement remains in full force

4  and effect, again, until the indefeasible payment in full and

5  cash of the obligations, the senior obligations.  There is an

6  express provision in the subordination agreement that says

7  that if the senior lenders agree to any carve-out with

8  respect to the cash collateral that the second lien lenders

9  will consent to that provision.  It doesn't say they won't

10  object.  It says they actually consent to it.  Okay.

11         The other aspect of it is that in Section, again,

12  2.3(g) that the second liens cannot object to any aspect of

13  the DIP financing.  Okay. Certainly, as part of a global

14  settlement with the committee, we agreed to certain carve-

15  outs in order to accommodate expenses that Your Honor

16  correctly stated would need to be paid anyway.  And that's

17  what we were trying to do and we thought we were trying to be

18  fair with the estate as to those payments and reach a

19  reasonable and amicable solution for everybody.

20         The last point I just want to make on the

21  subordination agreement to be very clear is it is likewise

22  expressed in the subordination agreement, in Section 2.3 both

23  (g) and (h), that the second liens cannot ask or accept

24  adequate protection for so long as the subordination

25  agreement remains outstanding.  And that would be, you know,

1 for the period until the challenge period has run on October

2 1th.

3         So, I wanted to make those points. And if you have

4 any questions, I'm happy to answer them.

5         THE COURT:  No, I don't have any questions.

6         I'm going to hear from the debtor in a minute, but

7 you were up first.

8         MR. GILAD:  Okay.  So, first, there is one

9 provision of the DIP order that I don't want the court to

10 lose sight.  I don't think it was highlighted.  I just want

11 to put it on your radar before we forget while we've been

12 debating the wind-down reserve.

13         THE COURT:  Sure.

14         MR. GILAD:  There's a provision that was added,

15 there's height of irony here.  In paragraph 45, the provision

16 that says that there's no marshalling against the DIP lender.

17         THE COURT:  Right.

18         MR. GILAD:  So, I'm looking at a redline.  I don't

19 know if Your Honor is looking at a clean or a redline.

20         THE COURT:  I think I am looking at a redline.

21 Yeah, I'm looking at a redline.  Page 62, paragraph 45, no

22 marshalling application of proceeds.

23         MR. GILAD:  Right.  So, I'm looking at a redline

24 that has the new language on page 64 and it begins,

25 notwithstanding the foregoing or anything to the contrary.

1           THE COURT:  I'm looking at a different version.

2           MR. GILAD:  Okay.

3           THE COURT:  Hang on.  Page -- what page?

4           MR. GILAD:  Well, the redline I have -- this is --

5           THE COURT:  This is the notice of filing, proposed

6   order.

7           MR. GILAD:  Right.  This is docket 240-2.

8           THE COURT:  Okay.

9           MR. GILAD:  And there's redlining that begins

10  notwithstanding -- one, two, three, four, six lines down

11  notwithstanding the foregoing.

12          THE COURT:  Hang on a second.  Paragraph 45?

13          MR. GILAD:  Correct.

14          THE COURT:  Sorry.  All right.  I'm there.

15          MR. GILAD:  Okay.

16          THE COURT:  My bad.

17          MR. GILAD:  So, in the same paragraph that

18  provides for a no marshaling waiver -- a marshaling waiver

19  with respect to the DIP there is a new provision here that

20  says upon the closing of a sale of substantially all of the

21  debtors' assets, including the IP, any balance of the DIP or

22  prepetition ABL outstanding on the closing date shall be

23  deemed to be satisfied, first, from the proceeds of IP and

24  inventory.

25          So, this is, in effect, a reverse -- the best way

1  to interpret this is some sort of reverse marshaling concept,

2  I think, directed against the two lenders which I think is

3  designed to sort of reverse marshal against our collateral

4  because the UCC has taken a position, which I'm not in a

5  position to concede today, but they've taken the position

6  that we don't have a perfected lien in real estate.  Whether

7  or not that's the case it would be totally inappropriate for

8  there to be any kind of marshaling waiver here.  To the

9  extent this is being requested by the DIP lenders I can point

10  to language in the same subordination agreement that they

11  continue to invoke where there is a cross-waiver of

12  marshaling right between the first and second-lien agents.

13          So, this, I think, is totally inappropriate.

14  There is no basis in law or fact for any kind of reverse

15  marshaling concept in this DIP order today.  I do submit that

16  if this is something the debtors and the committee insist on

17  going forward on they're going to have to establish the

18  equitable basis for what is reverse marshaling including

19  showing the requisite standard; the legal standards as well

20  as the factual basis because it would have the effect of

21  significantly prejudicing a third party and it's my

22  understanding that marshaling is not typically granted to the

23  extent that it prejudices and has the potential of capping

24  our recovery as against the IP bid that's been posted. I just

25  wanted to make sure that I raised that with Your Honor.

1          In response to comments made by the bank counsel

2   we keep coming back to the subordination agreement.  I have a

3   number of responses to the points that they've been making.

4   I can address that now.

5          Back to the solution that I requested I think that

6   they're sort of dancing on a pinhead here because they're

7   saying, well, we're not indefeasibly paid in full because the

8   committee will be discharging us, but there's still a

9   challenge that may be leveled by another party in interest.

10  That's because the challenge provision in here is twofold.

11  It allows an investigation by the committee and it allows an

12  investigation by a party in interest.  Again, we want the DIP

13  lenders indefeasibly paid in full, in cash.

14         There are a number of solutions there.  We could

15  just as easily strike that second prong and defer to the

16  committee, the fiduciary, since this is an avoidance action

17  and allow the committee to determine whether there are any

18  claims present against the DIP lenders.  I don't know why

19  there is a need especially in a liquidating case for the

20  estate to incur potentially uncoordinated challenges from

21  individuals that don't, on their face, have standing or a

22  fiduciary of the case.  That would immediately solve that

23  issue.  I think they're manufacturing the issue so that they

24  can come to you and say we're not indefeasibly paid in full.

25         So, this is, frankly, an effort to try and use the

1  subordination agreement not to protect the DIP, but to divert

2  cash collateral to unsecured creditors and admin claimants

3  ahead of the secured creditor.  Your Honor, I think that

4  there's more in the subordination agreement that bears on

5  this.  I have a copy if I can present it to you.

6            THE COURT:  Yeah.

7            MR. GILAD:  I wasn't expecting to get into this.

8            MR. FELDMAN:  Your Honor, I have a clean copy.

9            MR. GILAD:  Oh.  Thank you, David.

10           THE COURT:  Here you go.  I'll return this to you,

11  Mr. Gilad.

12           MR. GILAD:  That may be helpful though because

13  it's got tabs on it.  So, I defer to you, Your Honor.

14  David's copy is better.

15           THE COURT:  All right.  Before we do this deep

16  dive into the subordination agreement, which I will do if we

17  need to, I'd like to hear from the debtor because I think I

18  heard from the committee -- I'm sorry, I heard from the

19  senior lender.  I'd like some context from the debtor.  And

20  we'll figure out how we go forward from here.

21           MR. FELDMAN:  Okay.  You know, a few things.  One,

22  you know, I think it's ironic that Mr. Gilad is -- one of the

23  issues they raise is with regard to the marshaling point

24  which I think are probably best addressed by the committee as

25  party of their deal with the DIP lender.  The reason I say

1  that is because this whole process today and the process from

2  the very beginning in speaking with Mr. Gilad because we've

3  spoke to him several times.  He implied that we ignored him

4  and wouldn't speak to him.  We spoke to him including last

5  night and today.  Frankly, we've made offers to him to

6  resolve his issues including a significant pay-down to his

7  client as well.

8          I don't like to get into the details about he

9  said/she said.  I'm not going to say what he said to me, but

10 I'll tell you what I said to him which is we talked about and

11 we got approval from the committee and the DIP lender of

12 making a pay-down to him on the closing of the sale, but he

13 wasn't looking for that.

14         What he seems to be looking for this whole time --

15 it's one of the reasons, frankly, that we are so keenly

16 focused on making sure these freights of the cases' expenses

17 are set aside for because he has been threatening to put in

18 jeopardy those payments from the outset.  Our concern about

19 that, and I think the whole game here that he's playing is to

20 try to get adequate protection out of the box, which as Mr.

21 Leduc commented, is expressly prohibited not only from

22 seeking, but from receiving adequate protection.

23         The whole game here, in my view, is what Mr. Gilad

24 pointed out.  He doesn't have a security interest in the real

25 estate.  The real estate here is going to be worth a

1 significant -- a fairly significant amount of money in this

2 case.  The biggest value is who the IP -- probably second the

3 inventory and then -- but the real estate.  It's not

4 insignificant.  That is a whole.

5        So, the whole game here is to imply leverage and

6 pressure on this freight of the case expenses so that he can

7 get something that he negotiated away four years ago when he

8 signed this agreement so he can get adequate protection and

9 to seek to get claims against that real estate which he

10 doesn't have today.  Frankly, I don't think there's anything

11 that he's presented here today that should allow that to

12 happen.

13        You know, Mr. Leduc made it very clear, but if you

14 look at section -- most of what we're talking about is in

15 2.3(g) --

16        THE COURT:  (h), (g) and (h).

17        MR. FELDMAN: (g) and (h), but there are -- again,

18 there's the provision that he can't seek or receive adequate

19 protection.  He's deemed to consent to any carve-outs and

20 that's what we're talking about here.  And then he can't, you

21 know, object to any use of cash collateral and that's also

22 what we're talking about here.

23        This whole idea that we manufactured a timing

24 element on when the lenders get their release is absurd.  You

25 know, frankly we agreed to the challenge period, you know, up

1   front.  We now have a sale process that's happening.  This

2   whole thing is being driven by a sale process, by a lack of

3   sufficient liquidity to drag this thing out and to get the

4   sale done as soon as possible, but at the same time give

5   parties in interest an appropriate time to review liens and

6   claims.

7            I think that's all I would say for now.  I mean we

8   can -- if you want to get into blow by blow on the

9   subordination agreement there are --

10           THE COURT:  I think that's your argument.  I think

11  your argument is that -- I'm not saying it's right or its

12  wrong, but I said I think it's a gating issue.  In the

13  absence of a subordination agreement Mr. Gilad is saying you

14  would be hondelling with him and with the seniors, with him

15  in the first, and you're not.  That because he's got liens

16  he's entitled under the code to adequate protection until and

17  unless he's not by virtue of either the operation of the

18  bankruptcy code or whatever contractual commitment's he's

19  made.

20           So, I think where we have now come is that I think

21  we need to look at the subordination agreement and determine

22  whether or not the seconds are entitled to pursue their

23  concerns.

24           I think the colloquia, at least for me, has been

25  productive.  This may have been crystal clear to all of you

1  before you walked in, but, again, I see it now and I

2  understand it.  I think the threshold question is the effect

3  of the subordination agreement and the extent to which the

4  seconds are entitled to pursue their concerns and to object

5  as a practical matter to entry of this financing order

6  because that is precisely what is happening.

7           MR. FELDMAN:  The one thing I would say, Your

8  Honor, on this point about whether you need to look at the

9  subordination agreement or not and the one thing that somehow

10  seems to be implicit in this hearing, but I want to make sure

11  everyone understands where it comes from, and I can have

12  officers of the company that can testify to this, Mr. Gilad's

13  client does not have account control agreements over the

14  cash.  That belongs to the first-lien lender.  His security

15  interest in the cash is solely as a bailee.  If you look at

16  Section 3, Paragraph (d) is as a bailee under the first-lien

17  lenders account control agreement.

18           So, Mr. Gilad basically wants you to assume that

19  he has this interest in cash collateral, this properly

20  perfected interest in cash collateral, but the only way to

21  assume that is to read the subordination agreement.  Our view

22  is he can't have both the benefit of the subordination

23  agreement.  I have standing to object to my use of my cash

24  collateral and at the same time say, but I don't need to

25  listen to the part about adequate protection, carve-outs and

1  use of cash collateral.

2          THE COURT:  Okay.

3          MR. FELDMAN:  That can be found in, again, Section

4  3(d) of this document.  Frankly, to put a finer point on this

5  and I don't want to get into it today, it's not entirely

6  clear to me that when the first-lien lenders are paid out

7  that he has any rights in cash collateral after that because

8  once his rights as a bailee go away under the subordination

9  agreement, that period of time where he thinks he's in the

10 driver seat, he doesn't have.  The automatic stay will

11 prevent him from perfecting a lien in cash collateral.

12         So, it's just another wrinkle that we have to get

13 there.  If we do want to get into the subordination agreement

14 that's something, I think, that bears some attention.  With

15 that I'll sit down.

16         THE COURT:  Okay.  I understand.

17         Mr. Gilad.

18         MR. GILAD:  Okay.  So, I won't reward a breach of

19 408 with another breach.  So, I'm not going to get into any

20 discussions that we had with counsel in the 24 hours that we

21 had an opportunity to discuss the cash collateral order or

22 the DIP order.  I appreciate the offer for testimony, but I

23 don't want to put Mr. Feldman's client through the torture of

24 testimony.

25         I think these issues can be addressed from the

1  podium; although, I have not seen a copy of the DACAS.  They

2  might be available to us in the data room.  I don't know.  I

3  haven't seen a copy of the DACAS.  So, I don't know if we

4  appear as a party on it. I have not seen them.  So, I am not

5  in a position to address that comment nor do I concede the

6  point that we don't have a lien in cash.

7       The one thing that Mr. Feldman overlooks is UCC 9-

8  315.  We do have UCC-1 financing statement on file.  I am

9  pretty sure Gibson Dunn has a copy of those.  Those were

10  recorded as part of the closing in the prior case.  I will

11  also note that the debt and the liens were granted pursuant

12  to a confirmation order that purports to grant perfected

13  liens in substantially all the assets.

14       So, if there's a dispute about the extent of our

15  lien and whether it extends to cash we would probably point

16  to the prior confirmation order as well, but as to the point

17  of a 9-315 unless they dispute the UCC-1 financing statements

18  that we have on file those statements do cover IP as general

19  intangibles and they do cover inventory.

20       So, to the extent that that asset is sold UCC 9-

21  315 expressly provides that a security interest in proceeds

22  is a perfected security interest if the security interest in

23  the original collateral was perfected.  So, basically, if you

24  convert the inventory and the IP into cash and that cash

25  proceeds are readily identifiable that's in 9-315(d), 9-

1  315(d)(2) I think.

2         So, to the extent that the sale proceeds here are

3  identifiable and the debtors are under an obligation under

4  the bankruptcy code to segregate all cash collateral, and I

5  don't think that it's going to be difficult to readily

6  identify the sale proceeds.  I don't know how much cash the

7  debtors currently have on file, but they're hopefully going

8  to receive an influx of cash to the turn of, at least, $40

9  million dollars.  So, to the extent the debtors satisfy their

10  obligation to segregate those funds as required under the

11  bankruptcy code and to the extent they recognize the UCC-1

12  financing statements we have, we have a continuing perfected

13  lien in the IP and the inventory and the cash proceeds of the

14  sale of that inventory.

15         THE COURT:  Okay.

16         MR. GILAD:  So, from our perspective we have a

17  valid perfected lien in the sale proceeds.  That is a

18  position we've consistently taken.  This is the first time

19  that somebody has disputed that security interest.  So, I'd

20  appreciate more of an opportunity to address that and we can,

21  but I hope facially, at least, I've satisfied the court that

22  we have a real valid and perfected lien in the cash.

23         Your Honor, without further ado I'd like to get

24  into the subordination agreement and address it.  I think the

25  best way to do it is go through key aspects of the agreement.

1  If Your Honor doesn't mind if I just take a sip of water.

2          THE COURT:  Help yourself.

3          MR. GILAD:  I think that our position is formed by

4  the confluence of many provisions which create, you know, a

5  larger picture.

6          So, if Your Honor has the subordination agreement

7  in front of you --

8          THE COURT:  I do.

9          MR. GILAD:  -- the first provision I'd like to

10 point out is the definition of enforcement action.

11         THE COURT:  Page 3?

12         MR. GILAD:  That appears on Page 3.  There is a

13 proviso at the bottom of that.  That proviso continues to the

14 next page.  So, anything that falls within a proviso is an

15 action that is permitted to be taken or more accurately

16 stated not prohibited by the subordination agreement.

17         So, please note romanette (ii),

18             "To the extent it would not prevent, restrict or,

19             otherwise, limit any rights granted or created

20             here under or, otherwise, contravene the

21             subordination agreement, the filing by the second-

22             lien agent of any necessary responsive or

23             defensive proceedings."

24         Admittedly, that's if it's circulated.  You know,

25 we can file a responsive pleading so long as it's not

1  inconsistent with the subordination agreement.  Then you

2  would look to romanette (iv), if Your Honor sees that.

3          THE COURT:  I'm there.

4          MR. GILAD:  It says, taking of any action by the

5  second-lien agent or any holder of sub-notes in order to,

6          "Create, perfect or preserve the liens of the

7          second-lien agent on the collateral."

8          Your Honor, as I've stated we believe we've

9  satisfied the burden of demonstrating that we have a security

10 interest in collateral and a perfected interest in that.

11 From our perspective what this wind-down reserve accomplishes

12 is a stripping of our lien.  So, we believe that the concept

13 of preserving our lien is protected here.  That is what we

14 are trying to protect against.

15         THE COURT:  How does that then interplay because

16 much of this is about filing a proof of claim or taking

17 necessary steps?  How does this romanette (iv) in particular

18 turn into a ticket for the seconds who, frankly, litigate

19 against the first.

20         MR. GILAD:  Its only to the extent -- Your Honor,

21 we had no problem with the DIP order until two days ago.  To

22 the extent they've taken an action that seeks to strip our

23 lien as they've done here then I think we have that right.  I

24 think then they have pointed to other language in the

25 subordination agreement which purports to require me to

1  consent to certain actions.  I disagree.  I will point you to

2  that next.

3            THE COURT:  Okay.

4            MR. GILAD:  Let me skip because I want to address

5  the payment in full concept, but let me skip to the carve-out

6  concept that has garnered much attention.

7            If Your Honor turns to Paragraph -- its Section

8  2.3(g), it's located on Page 11.

9            THE COURT:  I'm there.

10           MR. GILAD:  Okay.  It reads in (E), this all the

11 way at the bottom.

12           THE COURT:  I'm there.

13           MR. GILAD:  The second-lien agent and the sub-

14 notes will consent to any "carve-out" agreed to by the first-

15 lien agent and/or the other lenders.

16           Yes.  There is provision elsewhere about our

17 inability to request adequate protection.  That is certainly

18 in the agreement, but there also provides that we will

19 consent to any "carve-out."

20           So, a couple of things there.  Number one, the

21 word carve-out is put in quotes.  The reason that was done is

22 because the word carve-out is a term of art in bankruptcy.

23 It is a term of art that if you said to somebody what do I

24 mean by a carve-out in a DIP order, it's a professional fee

25 carve-out.  We don't believe that the word carve-out has the

1  broad meaning that the DIP lenders or whoever it is that's

2  making the argument, the other side is making regarding the

3  breadth of a carve-out.

4        To me it seems as if what they are saying is that

5  any carve-out from the estate we have agreed to consent to.

6  That can't possibly be.  Any diversion of assets from the

7  estate that the lenders agree, even though they've been paid

8  in full, that's been consented to.  I think that that's not a

9  commercially reasonable read of that word and that it's

10  limited to a term of art which is a professional carve-out.

11        THE COURT:  So, your point would be that if

12  they're reading of it was correct and you agreed to any

13  carve-out that the senior lenders could agree to a $25

14  million dollar carve-out for Mr. Van Aalten's constituency in

15  this case and you would be precluded from --

16        MR. GILAD:  Right.

17        THE COURT:  Okay.

18        MR. GILAD:  Under the lender's view I should be

19  grateful, but there's more, Your Honor.  When we speak of a

20  carve-out in the context of this agreement a carve-out from

21  what?  The carve-out is from your lien and from your claim.

22  As I've noted here the timing here is important.  The timing

23  here is such.  I encourage the DIP lenders to come up here

24  and tell me if I'm wrong that they want to be paid first.

25  It's only after they get paid first that the wind-down

1  reserve then gets paid.  So, if they are getting paid first

2  this is not a carve-out of the DIP lender's liens or the DIP

3  lender's claims.  That is the second argument here, which I

4  think --

5          THE COURT:  Well, let me ask.  So, what is the

6  agreement -- and I think that this is Mr. Van Aalten's

7  expectation that these will actually be funded prior to

8  payment because they're not going to get their release so the

9  money won't go out the door and the committee won't sign

10 that.

11         So, pick a number. I forget what the DIP lenders

12 are owned.  What is the ballpark?  What's the number?

13         MR. GILAD:  25.

14         THE COURT:  $25 million.  Okay.  So, the DIP

15 lender is owed $25 million dollars, agrees to a carve-out,

16 $40 million dollars comes in, in the transaction.  Okay.

17 Let's assume it's all subject to their liens.  And we're not

18 going to get into a debate.  We'll assume that your liens are

19 their liens for this discussion, right.  Classic first,

20 second identical collateral package.

21         So, again, I'm trying to figure out what, as a

22 practical matter is happening here because if the fact

23 pattern that you are asking for occurs and that Mr. Van

24 Aalten expects will occur $40 million dollars comes into the

25 estate.  The debtor turns and says I need to fund these

1  carve-outs of X, Y and Z for stub KEIP and the 503(b)(9)'s.

2  So, boom, I'm going to fund them.  All right.  They're in an

3  account and then he turns to Mr. Van Aalten or he turns to

4  the debtor and says give me the balance, you owe me $25

5  million dollars.

6        They're not going to say $25 million dollars less

7  the KEIP and the 503(b)(9)'s.  They're going to say give me

8  my 25 million, pay me out indefeasibly and we're done.  That

9  -- then whatever remains would be, again, subject to your

10 security interest in that situation.  What am I missing?

11       MR. GILAD:  I think it's a question for the DIP

12 lenders.  I think we would need to hear from the DIP lenders

13 whether they are saying that they're okay with the wind-down

14 reserve being paid before they get paid in full.  If it's at

15 the time of the closing or thereafter, I mean cash is

16 fungible.  So, I think that the timing here is important.  I

17 think that, frankly, if they're saying we must be paid in

18 full first then it is not a carve-out.

19       THE COURT:  But that's -- I guess I'm --

20       MR. GILAD:  One other thing, Your Honor.

21       THE COURT:  Yeah.

22       MR. GILAD:  This agreement precludes us from

23 taking position with respect to the DIP lenders cash

24 collateral.  The cash collateral doesn't exist yet.  How is

25 it that we can be precluded from objecting to cash that

1   hasn't even hit the estate?  That is why from my perspective

2   I don't see how, to us my other example -- I think these are

3   all related points.  I don't see how we can be precluded

4   from, you know, to your point, Your Honor, them having put a

5   provision in here that says $50 million dollars gets paid to

6   unsecured creditors pursuant to the cash collateral order.

7           Again, I do think timing here is important.  We

8   should hear from the DIP lenders whether they've conceded

9   that they are subordinating their liens and claims to the

10  payment of this wind-down.

11          THE COURT:  We're in the middle of the

12  subordination agreement.  I'll hear from the DIP lenders in

13  response.  I think the DIP lender would respond that this

14  hearing this afternoon is precisely why we entered into a

15  subordination agreement and that this discussion is what the

16  subordination agreement -- I think they're going to say this

17  was what this was intended to avoid.  So, that is, I think,

18  what I'm struggling with.

19          The other thing that, again, I am struggling with

20  and it's not necessarily fixable today, but that I see this

21  as you used the phrase angels on the head of a pin.  This

22  seems to me, at least, from the confidence of the various

23  professionals that are in front of me who have been around

24  the block this is an academic discussion, but I'm happy to

25  have it.

1          MR. GILAD:  Okay.  So, let me then address a few

2    other points, if I can, about the subordination agreement.

3          THE COURT:  Yeah.

4          MR. GILAD:  First, its Paragraph 12, Paragraph

5    12(a) is the provision that expressly provides that the

6    agreement solely for the purpose of defining the relative

7    rights of the holders of the sub-notes and the lenders and

8    those not deemed to create any rights or priorities in favor

9    of any other person including without limitation any obligor

10   meaning the subordination agreement is for the DIP lenders to

11   enforce, not the lenders.

12          Skipping around, Your Honor --

13          THE COURT:  You mean not the debtors.

14          MR. GILAD:  Oh, yes.  If I misspoke apologies.

15          THE COURT:  Right.

16          MR. GILAD:  Skipping around because this relates

17   to the second provision I mentioned to you about the reverse

18   marshaling, to the extent the subordination agreement is

19   being enforced it should be enforced across the board.

20          Page 25, 23.11 each secured creditor to the

21   fullest extent permitted by applicable law waives as to each

22   other secured creditor any requirement regarding and agrees

23   not to demand, request, plead or, otherwise, claim the

24   benefit of any marshaling.

25          So, I think the provision in the DIP order that

1  was inserted that purports to reverse marshal our collateral

2  violates the subordination agreement is not something the DIP

3  lenders can sign onto.  I want to address, if I can, the

4  concept of payment in full because I think to us I appreciate

5  the points Your Honor is making about the academic nature of

6  this exercise, I get it.  I also understand that there are

7  payments that need to be made inevitably for this process to

8  go forward.

9       (Phone interruption)

10          THE COURT:  You may proceed.

11          MR. GILAD:  Thank you, Your Honor.

12          So, let me address the payment in full concept,

13  okay, because the way we read the DIP order and again to your

14  point about as reported or as written the way it's written

15  the DIP lenders are getting paid in full.  That, to us, is a

16  meaningful distinction.  Paid in full is a defined term in

17  the subordination agreement which requires the,

18          "Indefeasible payment in full, in cash of all

19          outstanding senior debt."

20          There is a bunch of verbiage that appears after

21  that.  So, what I think they're saying is we're not

22  technically deemed indefeasible payment in full because

23  although there will be a release letter from the committee

24  there could be other challenges.  As I mentioned that can be

25  solved.

1       You know, what does the word indefeasible mean?

2  Let me bring that into focus in light of Section 16.  Section

3  16 has a provision that says this agreement shall terminate

4  upon the payment in full of the senior indebtedness provided,

5  however, that this agreement shall be reinstated if at any

6  time any payment of the senior debt is rescinded it must,

7  otherwise, be returned by any holder of the senior debt.

8       The point there is if they're paid there's no

9  reason to believe that that payment does not deem satisfied

10 in full for purposes of the subordination agreement and there

11 is a provision in here that to the extent there is a

12 challenge and a disgorgement of that debt then the

13 subordination agreement kicks in.  So, from my perspective

14 the way to view the legal landscape once the debtors' get

15 paid in full in cash and the committee issues that letter

16 that they're deemed paid in full.

17      With that I appreciate Your Honor hearing me out

18 on all the various provisions of the subordination agreement.

19      THE COURT:  I think I would like your argument.  I

20 don't think we specifically addressed Paragraph 12(h) with

21 respect to adequate protection and that seems to be at the

22 cure of your request; 12(h) on Page 12 -- I'm sorry, 2.3(h).

23      MR. GILAD:  So, again, Your Honor, this is limited

24 to -- this is the point we've been making all along.  We

25 can't seek, under the terms of this subordination agreement,

1  post-petition interest, adequate protection in connection

2  with DIP financing or use of cash collateral.  So, I think

3  what this is intended to say -- our view is this isn't part

4  of the DIP financing.

5          The arrangement that was struck here with respect

6  to the wind-down reserve was never a condition precedent to

7  the DIP financing.  It has nothing to do with the roll-up.

8  It was never a component to the financing and it doesn't

9  involve cash collateral of the DIP lenders because our view

10 is they're paid in full and their lien in the cash at that

11 point falls away.  So, it's part of our broader point that

12 this doesn't implicate adequate protection or cash collateral

13 in a manner adverse to the lenders because they're already

14 paid out.

15          THE COURT:  Okay.  I understand.

16          MR. GILAD:  Your Honor, I appreciate your time

17 unless you have any other questions.

18          THE COURT:  No.  Here's what I want to do.  I at

19 least want to make some observations.  We'll take a very,

20 very short break.  Then I need some guidance on -- I know we

21 have the Hilco issue still out there as well.

22          Here are the concerns that I have or the

23 observations that I would share with you.  I read the

24 subordination agreement, at least the sections that you've

25 walked me through, and I don't necessarily agree starting

1  with the definition section, in particular romanette (iv)

2  about actions by the second-lien lenders to protect their

3  respective interests.  I see that as a relatively standard

4  provision that permits a creditor in a bankruptcy proceeding

5  to take those routine steps which are necessary in order to

6  protect its interests, but it does not vitiate or, otherwise,

7  undermine the rights that are accorded to senior creditors

8  and senior lenders as I see them in Section 2.3.

9          Specifically, I would simply observe without

10  making a particular ruling right now, that the range of

11  action for the second-lien lenders in the context of Section

12  2.3(g) and 2.3(h) is as narrow as I believe I've seen in a

13  subordination agreement.  I don't believe that your client

14  has the right in this context to demand adequate protection,

15  that that right has been waived contractually as a practical

16  matter and likewise that -- and I see that, again, being the

17  core of your request.

18          I do share -- and I would ask the parties to

19  confer, and if I need further argument on it -- I do have a

20  problem with the marshaling provision that's identified in

21  the form of order.  I understand that it may be part of the

22  economic deal that the committee believes it has cut, but it

23  does not necessarily seem to me consistent with what I would

24  expect to see in a DIP financing order.  Likewise, at least

25  on a first glance it does seem to me that it is not

1   necessarily consistent with the terms of the subordination

2   agreement.  So, I would not, at least right now, be prepared

3   to approve that aspect of it.

4           With respect to most of the rest of the concerns

5   that have been articulated you did identify a, I guess, worst

6   case scenario.

7           Yeah, I know, I've asked them to turn the air

8   conditioning back up.

9       (Laughter)

10          THE COURT:  You did identify a worst-case

11  scenario, but this is not that case.  We would have a very

12  different discussion if the lenders decided to, you know,

13  fund a host of equity or fund a full unsecured creditor

14  distribution.  I think I've made abundantly clear that the

15  obligations that have been identified, that have been

16  negotiated for and that are built into here are those that I

17  would expect to be provided for.

18          It may be frustrating and of concern to your

19  clients that they have not been part of a colloquia and a

20  dialogue that would often be the case with first and seconds,

21  but the fact of the matter is that the subordination

22  agreement has a meaningful impact that has lead these parties

23  to, at least, engage with you on a less fulsome basis then

24  you would have expected.  So that, at least, should give the

25  parties some guidance as to where I stand on the DIP

1  financing issues.  We can reconvene on those.

2          With respect to the Hilco issue I'd like just some

3  sense when we reconvene in a few minutes about whether we're

4  talking witnesses, et cetera, and whether or not we might

5  just push that to our hearing on the 6th and whether that's

6  doing violence.  I realize people came, but there is only so

7  much I can get done in the afternoon.

8          So, we will take a five-minute break.  I

9  appreciate everyone's patience.  Stand in recess.

10      (Recess taken at 4:03 p.m.)

11      (Proceedings resumed at 4:21 p.m.)

12      (Call to order of the Court)

13          THE COURT:  Please be seated.

14          MR. MARTORANA:  Good afternoon, Your Honor; Keith

15  Martorana, Gibson Dunn & Crutcher, on behalf of the debtors.

16          I think with respect to the Hilco 327(a) issue

17  what the parties would like to do is -- unfortunately, Mr.

18  Fredericks is not going to be available on September 6th.

19          THE COURT:  Okay.

20          MR. MARTORANA:  So, what I think we'd like to do

21  is just do the evidentiary portion of that today if we can --

22          THE COURT:  Okay.

23          MR. MARTORANA:  -- and then defer oral argument to

24  the 6th; just oral argument on the legal issues.

25          THE COURT:  Sure.

1          MR. MARTORANA:  The issue is that we do have a DIP

2   milestone that comes due today with respect to entry of a

3   final order.

4          THE COURT:  Sure.

5          MR. MARTORANA:  I think what we would like to do -

6   and I would ask the DIP lenders to stand-up and put on the

7   record that they consent to extension of the milestone.  Then

8   I think we would like to, if we can, so order the record that

9   the interim order is extended until September 6th if that's

10  doable.

11         THE COURT:  Mr. Leduc.  Can you get to the podium

12  just so we can pick you up on the mic?  Yes, sir.

13         MR. LEDUC:  Your Honor; March Leduc, Morgan Lewis,

14  for Wells Fargo.

15         The DIP lenders and agent are okay extending

16  milestone (b), its (b)(6) regarding the approval of the

17  agency agreement from August 29th to September 8th.

18         THE COURT:  Okay.  I think he asked you about the

19  DIP order too, right?

20         MR. MARTORANA:  No.  I'm sorry.  Just the DIP

21  milestone.

22         In terms of -- I'm sorry, we would like to have

23  the store closing order, which has been entered on an interim

24  basis, to be extended to September 6th or whatever date the

25  court, you know, closes the hearing on the store closing

1   motion.

2              THE COURT:  Counsel, did you wish to be heard,

3   sir?

4              MR. VAN AALTEN:  Your Honor, just briefly.  With

5   respect to our request for a status conference.

6              THE COURT:  Oh, yeah.

7              MR. VAN AALTEN:  Given the late hour why don't we

8   push that off to the 6th?

9              THE COURT:  Are you okay with that?

10             MR. VAN AALTEN:  I am.  Thank you.

11             THE COURT:  Okay.  That's fine.

12             I'm not sure though, Mr. Martorana, what I'm being

13  asked to do today.  Where are we with the DIP order?  I think

14  I've given you my rulings or observations with respect to the

15  concerns raised by Mr. Gilad.

16             Mr. Feldman.

17             MR. FELDMAN:  David Feldman again for the record.

18             We have spoken with the committee and the DIP

19  lenders and on the marshaling point -- and I can show this to

20  other people, but I'll describe to you what it says.  We

21  would strike the language -- we're talking about the second

22  sentence in Paragraph 45.  The first sentence stays the same.

23             We would strike, essentially, the heart of the

24  marshaling provision except for with respect to avoidance

25  actions and that's at the committee's request.  Frankly, the

1  second -- the DIP lenders have those proceeds as part of the

2  DIP, but the second-lien lenders do not. So, it would read as

3  follows, the second sentence and we'll give you a hand-marked

4  copy.

5           "Notwithstanding the foregoing or anything to the

6           contrary in the final order or the DIP documents

7           the DIP obligations and prepetition ABL

8           obligations shall only be satisfied out of causes

9           of action arising under Chapter 5 of the

10          Bankruptcy Code, and State Law equivalents and

11          proceeds thereof after all other DIP collateral

12          has been exhausted."

13          So, that is the only piece of that marshaling

14  provision that we would seek to preserve.

15          THE COURT:  Okay.  I think I understand.

16          MR. FELDMAN:  The only other change to the order

17  that we would ask for, as I talked about at the beginning of

18  the hearing, on the KEIP and that is on Page 42 in the now

19  famous Paragraph 23(b).

20          THE COURT:  I'm there.

21          MR. FELDMAN:  We have X, Y and Z right now.  We're

22  going to change the lettering to X becomes one and then after

23  one we would add in and then payments under the KEIP plan

24  approved by the court on August 29th, 2018.  Then we continue

25  on Y becomes three and Z becomes four.

1         THE COURT:  Okay.

2         MR. FELDMAN:  Those are the two changes.  We can

3  give it to the committee and ask Mr. Gilad to look at those

4  changes.

5         THE COURT:  Parties will have a chance to take a

6  look at it.  Does that order have to be entered today for the

7  milestone or tomorrow?  Tomorrow is a good answer, just

8  saying.

9      (Laughter)

10        MR. FELDMAN:  The milestone currently says today.

11  We would need the DIP lender to agree to extend it to

12  tomorrow.

13        THE COURT:  Mr. Leduc seems like a very

14  accommodating fellow.

15      (Laughter)

16        Mr. Gilad.

17        MR. GILAD:  So, again, just want to thank the

18  court, again, for your time today in dealing with what are

19  very complex and detailed issues on the subordination

20  agreement.

21        THE COURT:  I believe I am obliged, though, to

22  speak to the two landlord objections that were raised by Mr.

23  LeHane and Ms. Heilman.  I am going to overrule those

24  objections and I'll give you my reasons.

25        Obviously, most of the attention has been spent on

1   the colloquia with Mr. Gilad about the various issues that

2   we've talked through and the subordination agreement.  I am

3   sensitive to the concerns that were raised both by Ms.

4   Heilman and by Mr. LeHane in terms of, frankly, the

5   legitimate concern that this process is being run through

6   their stores for the purposes of the GOB's in particular and

7   that stub-rent is not being paid.

8          So, the question becomes really one of adequate

9   protection.  We have talked a lot about that concept, but,

10  again, in the colloquia that the court had with Ms. Heilman I

11  do attribute significance to the fact that the debtor has

12  structured this in a way that payments that matter deeply to

13  the debtor and, in particular, will come after the -- I'm

14  sorry will -- yes, will come after the KEIP payments.

15         From that view I take a substantial measure of

16  comfort that, in fact, the obligations will be provided for

17  and will be paid.  Again, I don't think I could have been

18  more clear in the colloquia with Mr. Gilad that these are

19  obligations that I see as being obligations of the case as

20  part of the freight of running a Chapter 11 case in this

21  court and I fully expect that they will get paid.

22         So, while I am sympathetic to the concern and a

23  different case may rise to a different result, but under the

24  circumstances of this case I will overrule that objection and

25  I will be prepared to enter an order, and will take that

1  under certification after people have had an opportunity to

2  look at it.  I will look for that tomorrow morning.  Okay.

3          The DIP motion is granted.  The debtors have

4  carried their burden under Bankruptcy Code Section 361, 363,

5  364 and Bankruptcy Rule 4001 for purposes of obtaining post-

6  petition secured financing as well as the use of cash

7  collateral.  Okay.

8          ALL:  Thank you, Your Honor.

9          MR. GILAD:  Your Honor, I have a few points,

10  though, I want to address with respect to the DIP order if I

11  may.

12          THE COURT:  Yeah.

13          MR. GILAD:  First, I want to clarify for the

14  record that to the extent any statements made that could be

15  construed as a request for adequate protection were only made

16  in the context of seeking adequate protection at a point in

17  time where the DIP lenders were paid in full, the

18  subordination provisions fall away and we're then in a

19  position to make that request.  I just want to clarify that,

20  number one.

21          THE COURT:  Okay.

22          MR. GILAD:  Number two, it seems that at this

23  point, if I'm correct, that the DIP -- you know, having heard

24  Your Honor's ruling that the DIP order is being entered on

25  the consent by the DIP lenders, the committee, the debtors

1 and with the change our support as well.  I just wanted to

2 confirm that.

3          THE COURT:  Very well.

4          MR. GILAD:  Then, lastly, Your Honor, there is the

5 issue that day two, what happens after the sale closing

6 occurs and the DIP lenders are paid in full.  It sounds like

7 not resolved today is the question of when the DIP lenders

8 are indefeasibly paid in full.  We've addressed the timing

9 and the carve-out issue, but at what point in time can we

10 then step in, to my earlier point, and say, okay, we spring

11 into being and we're allowed to seek adequate protection.

12          It seems to me that the best thing and my intent

13 would be to try and negotiate that between now and then so

14 that we don't have to suffer through another four-hour

15 hearing like this one.

16          THE COURT:  I'll have the air conditioning

17 working.  I promise I'm not sending a subtle signal to you

18 all.

19          MR. GILAD:  It's quite all right.

20          I think a good part of that could be -- future

21 risk could be obviated with clarifying exactly when their

22 paid in full.  I don't mean to open up a new line of inquiry.

23 All I'm suggesting is we earlier suggested that at some point

24 the committee will be issuing their no challenge letter and

25 release.  Let that be the point in time where they're deemed

1   indefeasibly paid in full and cash.

2            It seemed to us, based on off-line discussion,

3   that the concern the DIP lenders had was, well, that doesn't

4   indefeasibly pay us because there still remains open the

5   challenge rights of individuals or a party in interest

6   outside of the committee.  I mean I think there are any

7   number of ways to address that, Your Honor.  All I'm trying

8   to say is I just want to know when I can get back into the

9   game.

10           From our perspective we can strike that so that

11  the committee is the -- you know, the estate rests with the

12  fiduciary.  I don't know how relevant it is or how cost

13  effective it is to have a challenge right inuring to the

14  benefit of parties in interest.  The challenge here relates

15  only to the senior debt.  I don't believe it relates to our

16  debt and it doesn't relate to the Sanpower debt.

17           THE COURT:  Here's where I would leave that right

18  now, and it's not even just because of the hour; I'm not

19  prepared to provide a ruling on that today.  While I

20  understand it's a legitimate ask it is also typically the

21  subject of colloquia and discussion between the parties.  But

22  the concept of indefeasible payment is certainly not a novel

23  one.  The concern you've expressed that this will get strung

24  out for purposes that may be harmful to your client I think I

25  understand that, at least as a hypothetical matter.

1            One of the things that I had learned is that

2   there's a lot that happens and, again, this will be informed

3   by a sale process by the GOB's, by the economics, by the

4   dollars and, again, by the discussion presumably between and

5   among the parties.  So, I am not prepared to answer that

6   question, again, because I find it, at least as a threshold

7   matter, that the concept of indefeasible payment to a senior

8   secured lender or a DIP lender is a pretty basic proposition.

9   It's certainly a common feature of a DIP order in a sale

10  case.

11           While there may be issues that arise later, at

12  least as a practical matter, until and unless those issues

13  arise I'm not going to pre-judge them or anticipate the

14  format in which they'll be presented, but I understand the

15  issue.

16           MR. GILAD:  Your Honor, we look forward to those,

17  you know, pending discussions with the debtors and the

18  committee.

19           THE COURT:  Very well.

20           MR. GILAD:  Thank you.

21           THE COURT:  Thank you.

22           Mr. Alberto.

23           MR. ALBERTO:  Thank you, Your Honor; Justin

24  Alberto from Bayard.  I have a small housecleaning matter.

25           THE COURT:  Yeah.

1          MR. ALBERTO:   The committee filed a DIP objection

2    at docket 233.   There was attendant sealing order.   We have

3    conversed with the Office of the United States Trustee, they

4    have no issue with respect to the information that we would

5    request remain redacted.

6          THE COURT:   Very good.

7          MR. ALBERTO:   May I approach with an order?

8          THE COURT:   All right.   I have signed that order.

9    We will have that on the docket today.

10          If I understood Mr. Martorana then the only thing

11   that remains would be to commence the hearing on the GOB

12   issue and in particular the Hilco issue in that the U.S.

13   Trustee is concerned to illicit Mr. Fredericks's testimony

14   and then argument would be reserved for the 6th or whatever

15   date works for the parties.   Do I have that right?

16          MR. MARTORANA:   That's correct, Your Honor.

17          You know, while the debtors have filed a joinder

18   and do fully support the arguments of our consultant --

19          THE COURT:   Yeah, this is their show.

20          MR. MARTORANA:   Yeah.   I would defer to either the

21   U.S. Trustee or Mr. Reisman.

22          THE COURT:   Let's do this; why don't we take just,

23   literally, a two-minute break because it would seem to me

24   that there are, at least, some people in this sauna that may

25   not be as interested in this dispute.   Then we will reconvene

1    for the folks that are here for the Hilco matter, but,

2    otherwise, I think that concludes the items that are,

3    otherwise, on the agenda; do I have that right?

4          (No verbal response)

5             THE COURT:  All right.  Two minutes.  Stand in

6    recess.  Thanks.

7          (Recess taken at 4:34 p.m.)

8          (Proceedings resumed at 4:39 p.m.)

9          (Call to order of the Court)

10            THE COURT:  Please be seated.

11            MR. HERRMANN:  Good afternoon, Your Honor; Doug

12   Herrmann from Pepper Hamilton on behalf of the joint venture

13   between Hilco Merchant Resources and Gordon Brothers Retail

14   Partners.  With me is my co-counsel Steve Reisman and Cindy

15   Giglio from Katten.

16            Before we start with Mr. Fredericks's testimony a

17   housekeeping matter.  Mr. Fox and I have agreed to have

18   certain documents admitted into evidence.

19            THE COURT:  I saw there was also a joint

20   stipulation of facts that I had had a chance to just quickly

21   review.  I appreciate the effort that went into that.

22            MR. HERRMANN:  That is one of the documents, Your

23   Honor.  The other documents are the store closing agreement

24   which was attached to the interim order.

25                THE COURT:  It is.

1        MR. HERRMANN:  And the two declarations that were

2   filed by representatives of HMR and Gordon Brothers Retail

3   Partners by Mr. Fredericks and Ms. Shay.  Also, the

4   declaration of Mr. Coulombe which was admitted into evidence

5   on the first day as well.

6        THE COURT:  Okay.  The first day dec.  Any issue

7   with that, Mr. Fox?

8        MR. FOX:  Just a slight correction.  That's the

9   Coulombe declaration that was in support of the store

10  closing's motion which was at docket number 63.

11       THE COURT:  Which is a separate declaration then

12  the first declaration.

13       MR. FOX:  There is a reference in the stipulation

14  of facts to Mr. Tribou's first-day declaration and I guess

15  for purposes of this hearing it would be also useful to admit

16  that first-day declaration if there's no objection from

17  Hilco.

18       MR. HERRMANN:  There's no objection from us.

19       THE COURT:  Great.  That sounds fine.

20       MR. HERRMANN:  Also, Your Honor, Mr. Fredericks is

21  unavailable on the 6th.  So, I'm not sure how much time Your

22  Honor has, but we'd ask if we could get completely done with

23  him both on direct and cross.

24       THE COURT:  Sure.

25       MR. HERRMANN:  With that I think, Your Honor,

1  we'll call Mr. Fredericks to the stand.

2           THE COURT:  All right.  Very good.

3           MR. HERRMANN:  I'm going to try not to duplicate

4  because of the joint stipulation that we really appreciated

5  working with the U.S. Trustee's Office on that.

6           THE COURT:  And I have had an opportunity to

7  review it.

8           MR. Fredericks, welcome sir.

9           MR. FREDERICKS:  Your Honor, it's good to be here.

10          THE COURT:  Please remain standing.  We'll swear

11 the witness.

12                    IAN FREDERICKS, WITNESS, SWORN

13          THE CLERK:  Please state and spell your name for

14 the record.

15          THE WITNESS:  Ian Fredericks, I-A-N, F-R-E-D-E-R-

16 I-C-K-S.

17          THE COURT:  Welcome.

18          THE WITNESS:  Thank you.

19                    DIRECT EXAMINATION

20 BY MR. HERRMANN:

21 Q     Good afternoon, Mr. Fredericks.

22       Who is your current employer?

23 A     Hilco Merchant Resources.

24 Q     And what is your title there?

25 A     Executive vice president and chief legal officer.

1  Q     And how long have you worked at Hilco Merchant

2  Resources?

3  A     A little under three years.

4  Q     If I refer to Hilco Merchant Resources as HMR you'll

5  understand what I mean?

6  A     Yes.

7  Q     Before working at HMR where were you employed?

8  A     Immediately before that I was employed by Hilco Trading

9  which is the parent company.  They own a little over a

10  majority of the shares of Hilco Merchant Resources or the

11  equity insurance in Hilco Merchant Resources.

12  Q     And how long were with Hilco Trading?

13  A     A little over four years.

14  Q     Before that, briefly, what was your experience?

15  A     So, before that -- immediately before that I was in the

16  corporate restructuring department at Skadden in Wilmington

17  and immediately before that I was in the restructuring

18  department at Young Conaway.

19  Q     For how many years were you practicing -- were you an

20  attorney practicing in a law firm?

21  A     Between seven and eight.

22  Q     Now, focusing on your time at HMR what are your duties

23  and responsibilities?

24  A     I guess I have a dual role.  And over time my legal

25  time has become less and less, but on the legal side I'm

1  primarily responsible for the day to day legal

2  responsibilities or the day to day legal affairs of the

3  business.  Again, that has transitioned more and more back up

4  to the holding company.  I've assumed more and more on the

5  business side.  It started out with business development and

6  some strategic growth initiatives.  It's moved more and more

7  into the administration and operation of the business.

8  Q     And at your time at Hilco both at the parent and at HMR

9  how many engagements have you been involved in with retailers

10 closing stores?

11 A     Probably over 100 I would say.  I never counted them.

12 Q     Are you familiar with Gordon Brothers Retail Partners?

13 A     I am.

14 Q     How many of those store closing engagements have been

15 partnerships or joint ventures with Gordon Brothers Retail

16 Partners?

17 A     Probably in the neighborhood of half; maybe a little

18 bit more than half.

19 Q     Have they always been with -- have those joint ventures

20 always been with Gordon Brothers Retail Partners or any other

21 Gordon Brothers entity?

22 A     When it's a retail transaction -- so that question, let

23 me take it in part.  When it's a retail transaction and it's

24 HMR that's involved it's with Gordon Brothers Retail

25 Partners.  When I was at Hilco Trading other Gordon Brothers

1  entities may have joint ventured with other Hilco entities,

2  but on the retail side those would be the two entities.

3  Q     And your biography on HMR's website describes you as,

4        "One of the principal architects of the transaction

5        estate of Aeropostale."

6        Can you explain what you did in Aeropostale?

7             THE COURT:  I'm sure Mr. Fredericks's parents are

8  very proud.

9        (Laughter)

10            THE COURT:  Why don't we move on?

11            MR. HERRMANN:  Okay.

12 BY MR. HERRMANN:

13 Q     In general terms what services does HMR provide to

14 retailers?

15 A     Generally we provide services related to store closing

16 or going out of business sales or other event sales.

17 Q     And does that involve proposing pricing strategies such

18 as discounts?

19 A     Yes.  We make recommendations to the company on

20 discounts and other promotions.

21 Q     And does that involve proposing advertising strategies?

22 A     Yes.  We would make proposals around signage, email

23 distribution, social media posts, things like that?

24 Q     Does it involve proposing visual presentations in

25 stores?

1  A     Yes.  We would make recommendations around how the

2  store should be merchandised.

3  Q     With HMR's engagements with retailers who ultimately

4  makes the decision on implementing each of these strategies?

5  A     So, when we're engaged on a fee for service basis, as

6  is the case here, the retailer has all the discretion.  So,

7  we can make recommendations.  The retailer can come back to

8  us and say no and we have no ability to override the

9  retailer.

10 Q     Are HMR's -- does HMR provide services to retailers

11 both in and out of bankruptcy?

12 A     Yes.  We regularly provide them to retailers in and out

13 of bankruptcy.

14 Q     Can you explain how a retailer being in bankruptcy

15 versus one not in bankruptcy effects the services that HMR

16 provides?

17 A     The services that we provide are, for the most part

18 identical.  Where you get into differences around what kind

19 of relief the court can grant to override certain lease

20 restrictions or, you know, what would, otherwise, be

21 applicable non-bankruptcy law; things like that.  Otherwise,

22 the services are functionally the same.  We're allowed to do,

23 maybe, some different types of advertising and things like

24 that.

25 Q     And based on your experience at HMR what is your

1  understanding of why retailers close stores?

2  A    It can take several different reasons.  It can be

3  natural lease expiration, it can be that stores specific

4  performance, it can be an overall restructuring of the

5  business.  There are a variety of factors that go into the

6  decision.

7  Q    What does a retailer's decision to close stores say

8  about a retailer's overall financial health?

9  A    It can say nothing or it can say a lot.  For example,

10  the case of Brookstone, obviously them shutting all of their

11  mall stores was part of a larger restructuring and bankruptcy

12  filing.  We do a lot of work for healthy retailers where they

13  close stores and it says nothing about their financial

14  condition.  It's just part of everyday business.

15  Q    And what is your understanding as to why retailers

16  select HMR, Gordon Brothers Retail Partners or a joint

17  venture of the two to provide store liquidating services?

18  A    It primarily allows their teams to focus on the go-

19  forward aspects of the business and not have the distraction

20  of dealing with matters incident to that store closing.  You

21  know, those people have full time jobs generally and when you

22  overlay some of the tasks that go along with a store closing

23  because there's a finite amount of time within which things

24  have to get done those people don't have to deal with the

25  distraction.  You know, we can come in and provide that

1  service where they might not even have the experience in

2  having to ever close the store; the particular individuals

3  who are responsible for it.

4  Q    In your experience do retailers ever decide to close --

5  strike that.

6        In your experience do retailers -- have you ever seen

7  retailers engage in store closings on their own without the

8  aid of a liquidator?

9  A    Yes.

10  Q    And do you know why they decide to do that as opposed

11  to with the aid of a liquidator?

12            MR. FOX:  Objection; hearsay.

13            THE COURT:  I'll allow it.  I think it goes to

14  weight.  The witness has testified to extensive experience in

15  the retail sector.  I think the question is, sort of, as a

16  hypothetical how retailers make decisions in the context of

17  store closings.  I think the witness can testify to it, but

18  I'll certainly give you broad latitude on cross.

19            THE WITNESS:  In my experience they will do it

20  because they've developed that competency in house sometimes

21  or they have other business considerations of why they don't

22  want to run a store closing project.  They may not -- you

23  know, they may have decided that the best way to achieve

24  value was to bring goods back to their distribution center

25  or, otherwise, distribute them through their store network

1  and then just shut the store as opposed to running an event

2  sale.

3  BY MR. HERRMANN:

4  Q    What licenses does HMR have to liquidate stores?

5  A    We just have general doing business licenses in the

6  places we do business.  There are no licenses to close

7  stores, specific to closing stores that I'm aware of.

8  Q    With respect to any of the joint ventures that you've

9  had with Gordon Brothers Retail Partners have any of those --

10 have you ever obtained a license to provide store liquidating

11 services to a retailer?

12 A    No, not that I'm aware of.  There's no license

13 requirements.

14 Q    To your knowledge what accrediting bodies are there

15 that govern store liquidating services?

16 A    I'm not aware of any.

17 Q    How about professional associations related to store

18 liquidating services?

19 A    I'm not aware of any.

20 Q    How about any schooling -- special schooling required

21 to close a school?

22 A    I'm not aware of any.

23 Q    Going back to your experience -- HMR's experience with

24 retailers in bankruptcy proceedings.  What percentage of

25 HMR's clients are in bankruptcy proceedings?

1  A     We do quite a bit of work outside of bankruptcy.  I

2  don't know an exact percentage, but we do quite a bit of work

3  outside of bankruptcy.  We're doing several projects right

4  now that are outside of bankruptcy.  It's hard to say because

5  sometimes we start projects for retailers or work for them

6  for years and then unfortunately they eventually end up in

7  bankruptcy.  So, it's hard for me to say, but I would say

8  more of our projects happen outside of bankruptcy, but more

9  stores get closed inside of bankruptcy.

10 Q     Could you explain to the court, generally, how HMR goes

11 about closing a store?

12 A     Sort of from the beginning to the end I guess what we

13 do is, you know, usually we're contacted by either the

14 company or its representatives to -- because they have an

15 interest in closing stores.  They usually will sign an NDA.

16 They will provide us with financial information.  We will

17 build a model to show them what we think the inventory will

18 recover.  That model has various components to it including

19 what we think the recommended term would be, what the overall

20 discounting would be on the merchandise, how much discount

21 you would have to give to get to the overall recovery, what

22 the expenses are, incremental expenses as well as their

23 formal operating expenses.

24      The retailer will then look at that model, make some

25 decisions around what they strategically want to do.  It's

1 not always trying to get the best bottom line.  So, they'll

2 make decisions.  We'll update the model based on those

3 decisions.  They'll engage us to, sort of, take over -- not

4 take over, but oversee the sale at the stores.  We will have

5 field supervision that will be responsible for one or more

6 stores depending on how much inventory and store geography.

7 We'll have our corporate office that will sort of communicate

8 with them.

9        The field team typically has a lead supervisor that's

10 headquartered at the retailer's home office and sometimes a

11 financial -- they call it the project controller or financial

12 lead that will be responsible for looking at the financial

13 aspects of the sale.  We will help them with -- we will make

14 recommendations around merchandising.  We will make

15 recommendations around discounts.  We will make

16 recommendations for signage and other advertising.  Then we

17 will implement what they agree to.

18 Q    And who controls the decision making with respect to

19 the store closings?

20 A    The company, the client.

21 Q    I want to turn now to the work you're doing or the

22 consultants doing for the Brookstone debtors.

23        Your Honor, certain of these facts -- certain facts for

24 the background are already in the joint stipulation in

25 Paragraphs 1 through 22.   Those involve the negotiations of

1  the store closing agreement and the terms of the store

2  closing agreement.

3          THE COURT:  I think they're stipulated facts and

4  they're also, at least from my quick scan, largely,

5  consistent with the parties' submissions and briefing.  So,

6  you definitely don't need to elicit all of this testimony. I

7  think that's what your about to ask me, right?

8          MR. HERRMANN:  I wasn't going to.  I just wanted

9  to give you the background and then I'm going to ask some

10  additional questions.

11          THE COURT:  Go ahead.

12  BY MR. HERRMANN:

13  Q    HMR and Gordon Brothers Retail Partners entered into an

14  agreement with the Brookstone debtors?

15  A    Correct.

16  Q    What services do the consultant -- and if I use the

17  term consultant, do you understand that to be the joint

18  venture between HMR and Gordon Brothers Retail Partners?

19  A    Yes.

20  Q    What services did the consultant agree to provide to

21  the debtors?

22  A    Generally the services I just described to you of how

23  we run a sale.  So, we agreed to make discount

24  recommendations; we agreed to procure signage that they

25  approved; we agreed to put field supervisors in the field; we

1 agreed to put a lead team -- in this case I think it's just a

2 project lead and not a financial lead.  I think we're

3 handling the financial side of it from the corporate office,

4 but I might be off on that.  So, we put the field supervisors

5 in, we make recommendations around merchandising; things like

6 that.

7 Q    Who selected which stores would be closed?

8 A    Brookstone.

9 Q    Was there any negotiation with the debtors about which

10 stores would be closed?

11 A    No.

12 Q    What services do the consultant -- can you be more

13 specific about what services that we talked about provided

14 discounted merchandise?

15 A    So, we make recommendations to them around which

16 buckets of inventory should have which discounts.  So, you

17 might have some inventory that's only going to be discounted

18 at 10 percent for a period of time and other stuff that

19 you're deeper in that we would recommend discounting at, say,

20 30 percent or more.  Then we look at those as their sell-

21 through and we decide or we then make recommendations based

22 on how the sales progressing of where to move the discounts

23 to.

24         (Phone interruption)

25              THE COURT:  You may proceed.

1  BY MR. HERRMANN:

2  Q    How about with respect to what services did the

3  consultant provide about advertising?

4  A    We showed them a proposed signed package.  They

5  approved it.  We ordered the signs.  We hung the -- you know,

6  we gave instructions on how the store staff should hang the

7  signs and our supervisors assisted where necessary.  We made

8  recommendations to them around email distribution and maybe

9  social media too.  I don't remember.

10  Q    And who made the final determination about adopting --

11  A    Brookstone, the debtors.

12  Q    If you let me finish my question it would make the

13  record better.

14  A    Sorry.

15  Q    Who made the determination about whether to adopt those

16  recommendations?

17  A    The debtors did.

18  Q    What discretion, if any, does the consultant have in

19  providing services to the debtor?

20  A    I don't believe we have any discretion.  In other

21  words, if we told the company you should do X and the company

22  said no, we have no ability to say we're doing X anyway.  So,

23  the company at the end of the day makes all the final

24  decisions.

25  Q    During these -- well, in connection with your

1  negotiations with Brookstone or making recommendations to

2  Brookstone are there any examples of the debtors not

3  accepting a recommendation from the consultant?

4  A    Yeah.  Originally, when we built the original model

5  showing them sort of the optimal term for moving through the

6  inventory we had recommended that the sales run through mid-

7  October.  The company came back to us and said no, we want

8  you to conclude the sales at the end of September for -- it

9  had to do with rent considerations, you know, given the Third

10  Circuit's rulings relative to rent.  It was a bigger

11  consideration for them then the incremental value they would

12  have received.

13  Q    Does HMR -- strike that.

14      Does the consultant post any bonds in any state?

15  A    No, it doesn't.  No, we don't.

16      Going back to your last question one of the things that

17  I forgot to mention was the supervision plan, the company, I

18  believe, came back to us on the supervision plan.  The number

19  of supervisors we had originally proposed they asked us to

20  pull back on that and use a fewer number of supervisors to

21  handle the sale.  To complete that note we're not required to

22  post any bonds.

23  Q    So, just to follow-up the consultant recommended more

24  supervisors then the debtors ultimately decided upon, is that

25  correct?

1  A     Correct.

2  Q     Are you aware of whether any state has requested -- I

3  want to go back to the bond issue.  I think your answer was

4  no state had required you to post -- that you have not posted

5  any -- the consultant has not posted any bonds in any state,

6  is that correct?

7  A     No.

8  Q     Has any state requested such a bond?

9  A     No, not that I'm aware of.  I believe when you're doing

10  -- when one of these sales happens outside of a bankruptcy

11  some state laws require the company to post bonds, the

12  underlying company that's conducting the sale.  So, they will

13  post bonds.  The underlying retailer that is closing the

14  store the state may require them to post bonds.

15  Q     In running these store closings can you explain the

16  process of how a consumer purchases something at one of the

17  debtors' locations during the store closing process -- during

18  the store closing sales?

19  A     It's no different than the way that a consumer would

20  purchase it if the sale wasn't going on.  The consumer walks

21  in, picks the item off the shelf, brings it to the cash

22  register in the store, the merchant's employees are the ones

23  who operate their POS systems; consumer hands the goods, its

24  scanned at the POS system, the receipt is generated, the

25  merchant collects the proceeds of the sale from whatever

1  tender the customer gave, customer walks out with the receipt

2  and the merchandise.  The one difference would be that the

3  receipt would be stamped, typically, all sales final or

4  something to that effect.

5  Q      Do customers -- do consumers have the opportunity to

6  bid on items?

7  A      No.  There is no bidding.  There is no negotiation.

8  The price is set at what the retail price was before the sale

9  started and then there is a discount that's overlaid on top

10 of that.  So, if the item has a 10 percent discount on it, it

11 was a hundred-dollar item the price is $90 dollars, that's

12 the price to everybody that walks in the store until the

13 discounts change.

14 Q      Is the process -- the liquidator -- strike that.

15        The consultant was hired also to sell certain FF&E, is

16 that right?

17 A      Yes.

18 Q      Is the process the same with respect to FF&E as

19 merchandise?

20 A      It's a little bit different because the FF&E typically

21 doesn't have a price before the sale starts because it's a

22 fixture that they're using.  So, we will typically go in,

23 make recommendations around what the opening price should be

24 for that FF&E.  Sometimes our clients accept that.  Sometimes

25 they make some changes or they exclude items.  That pricing

1  gets set and then there's discounting that's recommended off

2  of that pricing.  So, that is the way that we sell FF&E.

3  Q     Is there bidding on the FF&E?

4  A     No.  The only time that you'll have -- if somebody

5  comes in and says I want all the FF&E in the store then we'll

6  typically try to come up with, what we call, a bulk purchase

7  price and then go to the client and say this is the best

8  price that we were able to negotiate for this, we recommend

9  you take this or you can go the other route and sell it

10 piecemeal, then the client decides.

11 Q     Do you what an auctioneer is?

12 A     Yes.

13 Q     What is an auctioneer?

14 A     My understanding of an auctioneer is generally somebody

15 who is engaged by a client to sell certain items and they run

16 an open bidding process where they either start the bidding

17 at some nominal amount, start the bidding at a reserve price,

18 a price that's been set by the client as nothing as below

19 that, then they open it up.  They usually advertise when the

20 auction is going to be.  Sometimes it's a public auction,

21 sometimes it's a private auction.  The bidding starts and the

22 sale prices happen when the auctioneer typically bangs the

23 gavel or closes the auction.  That usually happens once all

24 the bidding on that particular item is complete; there is no

25 more bidding.

1   Q      Is the consultant acting as an auctioneer in the

2   Brookstone debtors' cases?

3            MR. FOX:  Objection; calls for a legal conclusion.

4            THE COURT:  That is pretty much why we're here.

5   Sustained.

6   BY MR. HERRMANN:

7   Q      Does the consultant have any -- what responsibilities

8   does the consultant have with respect to calling for or

9   accepting bids to purchase the debtors' merchandise?

10  A      We don't.  We don't call for bids to purchase the

11  debtors' merchandise.  I would even go so far as to say if

12  there was a circumstance where an auctioneer was required for

13  -- and it would only relative to the FF&E's circumstances I

14  could think of.  If an auction was required we would either

15  go out and engage that third-party auctioneer to run an

16  auction or we would make a recommendation to the company that

17  they seek an auctioneer because the value they might be able

18  to achieve through an auction could be higher then what we

19  would achieve.  In that rare instance that happens it is --

20  the auctioneer typically comes in and assesses what they

21  think the value would be and then the company makes a

22  determination which way to go; to have us sell it or have an

23  auctioneer run an auction.

24  Q      Has that happened here?

25  A      No.

1  Q     What assistance is the consultant providing the debtors

2  with respect to the formation or negotiation of a plan of

3  reorganization?

4  A     We're not providing them any assistance.

5  Q     What assistance is the consultant providing the debtors

6  with respect to negotiations with creditors or stakeholders?

7  A     Other than that we assist the debtor with negotiating

8  the typical landlord -- what we call landlord side letters

9  relative to certain signage -- the use of certain signage at

10 stores and things like that.  We have no negotiations with

11 creditors.

12 Q     And can you explain the typical negotiations of one of

13 those side letters?

14 A     So, they typically involve -- we have, you know, a

15 signed package that we're going to employ at the stores based

16 on what we recommended and the company approved.  Then what

17 will happen is certain landlords don't want some of that

18 signage in their stores and so they will limit the number of

19 callers we can use.  For example, they'll limit, maybe the

20 number of interior signs per thousand square feet.  They want

21 to make sure that a walk-through is conducted around what

22 FF&E is going to be sold; things like that.  That would be

23 the customary things.  It's typically the stuff you see in

24 their objections to a sale.  We usually negotiate around

25 those issues.

1  Q      What assistance is the consultant providing the debtors

2  with respect to claims reconciliation?

3  A      None.

4  Q      What negotiations, if any, is the consultant doing with

5  respect to landlord's claim amounts?

6  A      None.

7  Q      How long do you expect the engagement with the debtors

8  to last?

9  A      The sales are supposed to conclude by no later than

10  9/30.

11  Q      And of the services the consultant is providing to the

12  debtors how do those compare to the services provided to

13  retailers not in bankruptcy?

14  A      They're basically identical.  The only time that they

15  vary slightly is around what the court may or may not order

16  doesn't require compliance.

17  Q      You talked about your years of private practice with

18  law firms.  Are you -- based on that experience are you

19  familiar with the requirements of Section 327?

20  A      Yes.

21  Q      Can you explain why those requirements --

22          MR. FOX:  Objection -- sorry, I jumped the gun a

23  little bit there.

24          MR. HERRMANN:  I'm happy to hear the objection

25  before I ask the question.

1        THE COURT:  Go ahead.  I'm about to sustain it.

2        MR. FOX:  If you're going to ask him what he

3  understands the requirements of 327 to be that calls for a

4  legal conclusion and I don't think it's appropriate.

5        MR. HERRMANN:  That wasn't my question.

6        THE COURT:  All right.

7  BY MR. HERRMANN:

8  Q    Can you explain why those requirements concern the

9  consultant -- why the consultant is concerned about being

10 retained under Section 327?

11 A    Yeah.  I mean the primary issue is, as I've sort of

12 seen it, where we have sort of two roles in a lot of cases.

13 Right.  I can't think of one off the top of my head right now

14 before this court, but in a lot of instances a company that's

15 going into a bankruptcy has identified a first round of

16 stores that they want to close.  The reason why they engage

17 us on a fee for service basis, in my experience, a lot of the

18 time in that context is they want the control to be able to

19 dictate what happens at those stores to protect the overall

20 larger stores they want to reorganize around.

21      So, they engage us on that fee for service basis.  We

22 do the work at those stores.  Then if they're successful in

23 reorganizing, which does happen, then they move on outside of

24 bankruptcy.  If they're not successful in reorganizing then

25 they call for bids for their assets on either a going concern

1   or liquidation basis.  We, being one of only maybe four

2   companies of our size and have the capital in the world to be

3   able to do those large-scale liquidations, were called in to

4   bid what we call on an equity or guarantee basis for the

5   balance of the assets.

6        The primary concern that I have and sort of have

7   identified is can you be a retained 327 professional in that

8   first instance and then is it permissible for you to come in

9   later and bid on assets of the estate when and if you are

10  that estate professional.  And the problem I have is that

11  there is no clear answer one way or another and I think, in

12  fact, probably the U.S. Trustee takes the position that if

13  you are a 327(a) professional you can't do the latter thing,

14  which means no competitive auction for the debtors which

15  means we don't have an opportunity to bid there.  Likely the

16  overall estate suffers because there's no other group to bid.

17            MR. HERRMANN:  I have no further questions, Your

18  Honor.

19            THE COURT:  Very well.

20            MR. FOX:  Your Honor, just a moment to confer with

21  co-counsel.

22            THE COURT:  Of course.  Why don't we just take a

23  minute or two and then we'll reconvene, but it will just be a

24  minute.

25            Mr. Fredericks, you are not to discuss your

1  testimony during the break.

2       (Recess taken at 5:10 p.m.)

3       (Proceedings resumed at 5:17 p.m.)

4       (Call to order of the Court)

5            THE COURT:  Please be seated.

6            MR. Fredericks, I would remind you, sir, that you

7  remain under oath.

8            Mr. Fox, are we good or do you need another

9  moment?

10           MR. FOX:  No, no. I think I'm almost ready.  Just

11 as one additional housekeeping matter with respect to the

12 joint stipulation and the admission of the declarations that

13 were submitted by Ms. Shay and Mr. Fredericks we're admitting

14 those for the purposes of the final hearing with respect to

15 the liquidator motion and the store closings motion, but

16 resolve all rights as to any additional proceedings that

17 those may be set to be

18           THE COURT:  So, noted. I think that's pretty much

19 the approach we've taken often with stuff like first-day

20 affidavits that have lots of stuff in there and the concern

21 is from other parties.  Not so much your office, but often

22 other parties are concerned that the representations in them

23 are unchallenged for purpose and may surface as law of the

24 case or findings by the court.  So, I think that is a

25 legitimate observation.

1           I think at the outset, though, Mr. Herrmann

2    identified that there was a stack of documents that the

3    parties had agreed to.  I don't know that I've received a

4    set.

5           MR. HERRMANN:  May I approach, Your Honor?

6           THE COURT:  Sure.

7           MR. FOX:  So, the package that counsel for Hilco

8    and Gordon Brothers is handing up does not have the first-day

9    declaration from Mr. Tribou or the Coulombe declaration at --

10          THE COURT:  I have both of those.  I'll just put a

11   -- because they're both in my office.  So, I don't need extra

12   copies.

13          MR. FOX:  But counsel is submitting the rest of

14   the documents.

15          THE COURT:  Perfect.

16          MR. HERRMANN:  May I approach, Your Honor?

17          THE COURT:  Sure thing.  Thank you, sir.

18          Mr. Fox, you ready to proceed?

19          MR. FOX:  Yes.

20                     CROSS EXAMINATION

21   BY MR. FOX:

22   Q    Good afternoon, Mr. Fredericks.  How are you?

23   A    I'm well.  Thank you.

24   Q    Just to try to set forth some labels when I refer to

25   the liquidation consultant that will be both Hilco Merchant

1  Resources and Gordon Brothers Retail Partners jointly.  If I

2  try to identify one of them specifically I will try to use

3  their names.  If I refer to the liquidators instead of the

4  liquidation consultant that should just mean the liquidation

5  consultant.  Do, you understand the terminology I'm going to

6  seek to use for purposes of this cross-examination?

7  A    Yes.

8  Q    Thank you.

9       Isn't it true that the debtor is seeking to close 102

10  store locations and principally all their retail operations

11  is a significant portion of the restructuring efforts that

12  are being undertaken in these bankruptcy cases?

13  A    I don't know the answer to that.  You would have to ask

14  the debtors about the restructuring efforts.

15  Q    When the liquidation consultant was entertaining being

16  engaged by the debtors did they have discussions about the

17  scope of the restructuring?

18  A    Not that I was a part of.  There were discussions

19  around whether or not all of the retail stores would close

20  and/or all of the, what they call, Airport retail stores.  I

21  can say specifically that I know the debtors have been

22  soliciting, because we were in discussions with them, bids on

23  a going concern basis that have involved even these stores

24  they slated to close as well as the Airport stores.

25  Q    With respect to your last answer there have either

1  Hilco or Gordon Brothers provided a bid with respect to

2  purchasing assets of the debtors?

3  A      We have not provided a bid with respect to purchasing

4  assets of the debtors, no.

5  Q      Before today's hearing did you have an opportunity to

6  review the joint stipulation that was submitted on behalf of

7  the parties?

8  A      I did.

9  Q      With respect to Paragraph 22 are you familiar that the

10 joint stipulation included that Hilco and Gordon Brothers as

11 a joint venture submitted an offer to the debtors to purchase

12 certain assets of the debtors that expired by its own terms

13 prior to August 28th, 2018?

14 A      Sure.  So, if you want me to unpack that sentence and

15 tell you what we submitted I'm happy to do it.  The debt --

16 our transactions are not typically structured as purchase

17 transactions.  They're structured as guarantee or equity bids

18 where we act as an agent and provide an upfront payment of a

19 guarantee amount.  The transaction was structured in that

20 sense.  The partner that we have identified was interested in

21 buying and purchasing the intellectual property.

22 Q      Is it still possible that either Hilco or Gordon

23 Brothers or both may submit additional offers with respect to

24 property of the debtors at this point in time?

25              MR. HERRMANN:  Objection, Your Honor; I only rise

1  because of the generic use of Hilco or Gordon Brothers.

2           THE COURT:  I think I know what he meant.

3           THE WITNESS:  It's possible, although I think

4  unlikely, that HMR and Gordon Brothers Retail Partners would

5  submit something for any of the debtors' remaining assets.

6  BY MR. FOX:

7  Q    In your experience with respect to store closings isn't

8  it true that it would not be the ordinary course of a typical

9  retailers' business to close substantially all of its store

10 locations?

11 A    I would say that it would be -- yeah, I would say that

12 that would not be typically what a retailer would do to close

13 substantially all of their stores.  That would not be

14 typical.

15 Q    In your testimony on direct you indicated that the

16 liquidation consultant will primarily make recommendations to

17 the debtors or its clients regarding aspects of the process

18 and that the client or the debtors will have the final say in

19 exercising discretion on those recommendations.  In your

20 experience isn't that common for debtors or clients to take

21 the same position with respect to legal advice from counsel?

22 A    In my experience when I was a lawyer for a debtor, yes,

23 I would make recommendations to them and then they would make

24 decisions on which way they wanted to go.

25 Q    So, the recommendations that Hilco and Gordon Brothers

1  make are similar to that of what counsel would make with

2  respect to their respective ambits of discretion -- strike

3  that.

4           THE COURT:  Expertise, that's what I think you

5  meant.

6           MR. FOX:  Yes.

7  BY MR. FOX:

8  Q    So, Hilco or Gordon Brothers and its recommendations

9  are substantially similar to that that legal counsel would

10  make within their respective areas of expertise, is that

11  correct?

12  A    I guess I would never say that we're providing legal

13  advice which I'm gathering your questions and asking me for

14  providing legal advice to the company.  So, we would not

15  provide legal advice to the company.  The scope of the

16  recommendations that a lawyer would make to its client would

17  be in the context of given a store closing event would be

18  greater than the recommendations that we make to our clients.

19           THE COURT:  I think that the question -- and I

20  anticipated this question when your testimony on direct

21  described the mechanics.  And I think Mr. Herrmann walked you

22  through and, again, solicited your testimony with respect to

23  who makes the decision about signage, who makes the decision

24  about the mechanics of it, who makes the decision and you

25  provide guidance.

1        I think the U.S.T.'s question is isn't that a lot

2   like what a lawyer does?  Can I do this?  What are my

3   options?  Then the client says I don't want to do that, I

4   want to do that for whatever reason. I think that's the kind

5   of question that we're boiling down to.  Is it as you've

6   described the activity?

7        Emphasis during your direct was placed on the

8   decision making and the discretion resting with the client

9   and is that materially different from, say an attorney/client

10  relationship.  Again, nobody is suggesting this is an

11  attorney/client issue, but the testimony, I think, gives rise

12  to the question.  Do you understand the question?

13       THE WITNESS:  No, I do.  And so, I would answer it

14  this way.  If you -- let's take, for example, what signs you

15  can use, right, or what signs we would propose using as an

16  example and I can walk through many of these, but when we

17  would propose a sign package to the company that would be the

18  sign package that we think is going to drive the most value

19  to something.  That sign package that we provide to them has

20  both legal implications and it has non-legal implications for

21  the business.

22       THE COURT:  Commercial implications.

23       THE WITNESS:  Yeah, commercial implications.

24  Right.  So, on the legal side I can't answer for the company

25  whether or not that sign package is legally going to comply

1  with their leases, comply with applicable non-bankruptcy law,

2  comply with what the court is going to say, right.  They

3  would have to solicit legal advice from their lawyers to

4  provide input there.

5           On the commercial side they would have their

6  factors that they would decide whether or not we are okay

7  with using this sign package based on the commercial thing.

8  So, in that sense it's similar, but if they go to their

9  lawyer and say I need help with X the lawyer gives them legal

10 advice and then they can stand or not stand on that legal

11 advice.

12          THE COURT:  I understand.  Sorry for the

13 interruption.

14          MR. FOX:  No problem, Your Honor.

15 BY MR. FOX:

16 Q    Mr. Fredericks, with respect to your prior testimony

17 you indicated that the liquidation consultant performs

18 substantially similar services to entities that are not

19 within the bankruptcy context, is that correct?

20 A    Correct.

21 Q    In your experience in Chapter 11's and in the

22 restructuring world at large isn't it also common for

23 financial advisors and investment bankers to provide

24 substantially the same services to non-debtor entities

25 outside of the Chapter 11 context?

1  A     I guess in my experience -- so, in my experience, and

2  I'll use some examples, if you are engaging somebody like

3  FTI, for example, to do work for you as a financial advisor

4  the group that you might engage in a non-bankruptcy context

5  might be FTI in a different arm for non-bankruptcy or non-

6  restructuring experience whereas in a bankruptcy you may have

7  some of those people do some ancillary things, but you're

8  going to have the restructuring group.

9      Similarly, when people would engage Skadden for work in

10 a non-bankruptcy context when I was there or Young Conaway

11 they might engage a group that did other work within that

12 firm and then when they had a restructuring or insolvency

13 even they needed to deal with they would have engaged the

14 restructuring group.  When they come to us to do work it's

15 the same people whether it's in bankruptcy or outside of

16 bankruptcy.

17 Q    If you narrow your focus, though, to simply distressed

18 companies, ones that may not ever file a bankruptcy petition,

19 would your answer change though and instead reflect that if a

20 distressed company were seeking out the assistance of a

21 financial advisor or an investment banker to either

22 effectuate a restructuring transaction with its lenders or,

23 otherwise, sell the company would you agree that those are,

24 essentially, the same services inside of Chapter 11 and

25 outside of Chapter 11?

1   A      No, I wouldn't. I mean, for example, like you wouldn't

2   need, necessarily, the claims reconciliation side.  Again,

3   I'll use FTI as an example.  You wouldn't need the claims

4   reconciliation side of FTI to help out in a non-bankruptcy

5   context; that would be one example.  So, no, I wouldn't agree

6   to engage the same groups.

7   Q      Let me narrow it further.  With respect to an

8   investment banker who is marketing a distressed entity its

9   possible it could file a Chapter 11 petition, it's possible

10  that they effectuate a sale outside of Chapter 11; would you

11  agree that that's the same set of services being provided by

12  that investment banker?

13  A      I would agree that they're probably similar.

14  Unfortunately, I've never been in an investment banking

15  house.  A lot of my experience is not on the distress side,

16  but I would say they're probably similar services.

17  Q      With respect to the recommendations that the

18  liquidation consultant makes to entities that they are

19  engaged by could you explain what the basis is for the

20  recommendations that are made?  What primarily motivates the

21  liquidation consultant in recommending a certain course of

22  action to a client?

23  A      So, it depends -- you know, as I sort of talked about

24  how a whole project lays out, you know, one of the things we

25  try to find out on the front-end with the client is what's

1  the primary objection of closing the stores.  Right.  So,

2  then you try to fashion the model that we build and, sort of,

3  our recommended course of action based on those goals.

4      So, if the goal is to achieve the maximum net recovery,

5  net of expenses, right, so then we will build what we view as

6  sort of the optimal model to do that.  There are three

7  components of getting to a net result.  Right.  You have

8  what's the inventory that's going to be included in this

9  sale.  Right.  What are my expenses and how much time is it

10  going to take me to get to the best result.  Those are the

11  three primary factors that, sort of, dictate.

12      The company tells us the inventory, they give us the

13  store group.  They give us there, basically, store PNL (store

14  profit and loss statements) that's going to show the

15  expenses.  We then take those expenses and that inventor, we

16  decide what do they think the inventory sells on a gross

17  basis.  In other words, you're not going to sell at all at

18  full retail price.  So, you are going to have to discount all

19  of it, some of it more than others, and on a gross basis when

20  you sell all of the inventory what does that number look

21  like.  Then you take the expenses from the company, you take

22  our incremental expenses which are typically supervision and

23  advertising expenses that gets you to your net result.

24      The time period then, if you truncate the time period

25  you're going to get a worse net result probably.  If you

1  extend the time period you might get a worse net result

2  because of the expenses.  So, we try to figure out what's the

3  optimal time period.

4  Q     And in your prior testimony on direct you indicated

5  that unless a retailer entity has developed some internal

6  competency as to those areas they may largely be ignorant of

7  those considerations and what to do to effectuate a

8  successful store closing process?

9  A     I would never want to classify potential clients as

10 ignorant.  So, I wouldn't use that term.  It depends on w3hat

11 their goals are.  A successful store closing even isn't

12 necessarily the maximum net result.  There are a lot of

13 clients we have who, you know, their goal is something

14 different.  Maybe they don't want, you know, all of the "loud

15 signs."  They want a more toned-down sign package.  Maybe

16 they don't want certain language used on the sign package.

17 They want to convey a different message, you know, to their

18 customers coming in.

19     The result might be get me the best result you can

20 under these circumstances; that's a successful sale event for

21 them.  To somebody else a successful sale event is being

22 there one day, shutting the doors the next day and taking

23 down all of my signage and getting all my inventory to

24 another place.  They view that if the fastest way you can do

25 that and if you can really accomplish that in a day that's a

1  successful sale for them.

2      So, it varies based on what their objectives are.

3  Q    And would you say that the clients that choose to

4  engage the liquidation consultant are reaching out to the

5  liquidation consultant because of the competencies that the

6  liquidation consultant has with respect to each of those

7  different scenarios that you described?

8  A    No.  I would say that they're reaching out to us.  They

9  could be reaching out to us for any number of reasons.  Maybe

10 they just don't have that competency in house for the number

11 of stores they want to close.  Maybe they want to -- maybe

12 it's a distraction for their employees and it's too

13 overwhelming for them.  I mean there are any number of

14 considerations that go into it.

15 Q    Going back to the mechanics of the store closings the

16 liquidation consultant will still provide on the ground

17 supervisors as part of the store closing process, correct?

18 A    Here in Brookstone, yes, we're providing on the ground

19 supervisors.

20 Q    And in facilitating the store closings those on the

21 ground supervisors will make additional recommendations?

22 A    So, they're the people who are primarily making

23 recommendations around merchandising and how the signage

24 should be hung in the most effective way within the stores.

25 The primary discount recommendations come out of the

1   corporate office; although, the team on the ground has a role

2   in that because they are, essentially, the eyes on the ground

3   telling us what they see relative to what the data shows us.

4   Q    And with respect to the financial performance the

5   liquidation consultant is providing services to the

6   Brookstone debtors in this case with respect to financial

7   performance as part of the store closings?

8   A    So, what we do is we take all of the raw data from the

9   company and then we basically present it in some different

10  ways that help us look at stuff.  Then we provide the company

11  with whatever incremental reports they may ask for.  I don't

12  know if Brookstone has asked for separate reports.  Again,

13  we're all using the same data to look at it.  We're just

14  looking at it in different ways.

15       So, if they want to see what sales are they have their

16  own internal reports to see what sales were.  You know, I

17  don't know if we're providing them with separate reports;

18  maybe we are.

19  Q    So, would it be true that to the extent they reach out

20  to the liquidation consultant for additional input on those

21  metrics they're relying on the judgment and experience of the

22  liquidation consultant with respect to taking a different

23  strategy then they would based on their own personal review

24  of the information?

25  A    I guess I would say this; if they're reaching out to us

1  for different reports they're asking if we're looking at

2  information in a different way.  Right.  So, us providing

3  those reports we're not -- there's no judgment that goes into

4  what those reports show.  It's just arranging the data in a

5  different way.  If they're asking us for recommendations

6  around things like do you think more inventory can come into

7  the sale we'll look at their data and say, either, yes, we

8  think based on how the sale is performing you can bring more

9  inventory in or, no, the sale is not performing great and so

10 you shouldn't bring more inventory in.

11 Q     With respect to what's termed augmented goods under the

12 liquidation consulting agreement does the liquidation

13 consultant have primary discretion with respect to the

14 augmented goods?

15 A     Well, here there's no augmented goods.  There are no

16 augmented goods brought in.  As a general matter we have to

17 live within -- if we were doing it in another sale it has to

18 be like kind of similar merchandise to what's sold.  That is

19 typically the agreement.

20 Q     So, despite the terms in the liquidation consulting

21 agreement regarding augmented goods none are being used here

22 in Brookstone?

23 A     Correct.

24 Q     Okay.  The store closings as they're ongoing are open

25 to the public, correct?

1  A      Yes.

2  Q      And the liquidation consultant expects to earn a

3  commission or a fee in exchange for its work should the sales

4  reach the appropriate thresholds under the liquidation

5  consulting agreement?

6  A      Yes.  If we meet the thresholds then I would respect

7  to earn a fee.

8  Q      And the liquidation consultant is being reimbursed for

9  expenses as covered by the budget that was attached to the

10  liquidating consulting agreement?

11  A      We're supposed to be.  I don't know whether we actually

12  have been yet, but, yes, we're supposed to be reimbursed.

13  Q      And unless the liquidation consultant exceeds that

14  amount the debtors will bear all of the cost associated with

15  that budget, correct?  Is that your understanding of the

16  document?

17  A      That's my understanding, yes.

18  Q      Is it your understanding that auctions can take several

19  different forms?

20  A      I guess you can have a public or private auction.  I

21  don't know what -- is your question going to something in

22  particular?

23  Q      All right.  Are you aware of auctions that have only a

24  fixed price as opposed to competitive bidding say, for

25  instance, a silent auction or anything like that?

1  A     My experience with silent auctions is more on a

2  personal basis where you have an item that's, you know, up

3  for auction and people write down either in a closed process

4  what they want to bid or you fill out on a sheet of paper and

5  say the last bid was this, I'll bid X.  In the instance where

6  you write it down and everybody sees them whoever is the

7  winner at the end is the one who wins that item or if it's a

8  closed one its whoever the highest one that bid in that sort

9  of closed envelope was.  That is my experience with that kind

10 of auction.

11 Q     Are you familiar with any sort of electronic auctions

12 say, for instance, eBay?

13 A     Like eBay, yes.

14 Q     Have you ever heard of the Buy It Now price?

15 A     Yes.

16 Q     And would that be a single price that a party could pay

17 for an item?

18 A     I believe so, yes.  I've never bought a Buy It Now

19 item.

20 Q     With respect to the sales of FF&E in the event a

21 potential buyer makes an offer on a mixed assortment of goods

22 does the liquidation consultant do any sort of negotiating or

23 haggling with that potential buyer?

24 A     Sorry, is this like a bulk sale?

25 Q     In your prior testimony you mentioned sales of FF&E and

1  that they could take various shapes and sizes.  It could be

2  after the store closings have wound down and the items have

3  been priced or it could be a scenario where someone walks in

4  and says I want a select section of items all for one sticker

5  price.

6        So, in a situation where someone is identifying not all

7  of the fixtures in a store, but a subset of those, would the

8  liquidation consultant engage in any sort of negotiation over

9  the price to be received for those items?

10 A     It depends on what the -- if the client gave us that

11 ability then, yeah, we would have those negotiations and then

12 bring the client, basically, the result of those negotiations

13 to decide whether they want to sell them.  So, yes.

14 Q     With respect to the liquidation consulting agreement

15 the terms suggest that the debtors will select FF&E that they

16 wish to retain and that any FF&E that isn't identified to be

17 retained by the debtor will then be included in the offer

18 FF&E, is that correct?

19 A     Yeah.  The FF&E that will sell, yes.

20 Q     And with respect to the offered FF&E --

21 A     Try to sell, sorry.

22 Q     And with respect to the offered FF&E does the

23 liquidation consultant have entire discretion over how to

24 dispose of that offered FF&E?

25 A     No.  What we would -- and I don't know if it's at this

1  stage or not because you generally -- so, let me back-up.

2  Generally, FF&E is not the first thing that's focused on in a

3  store closing sale because you can't typically can't start

4  selling it until it becomes visible.  Right. It only becomes

5  visible once items start to move off the shelves.  So,

6  typically your FF&E process starts, you know, later depending

7  on how long the sale goes, if it starts half way through or

8  it can start in the last, you know, couple of weeks.  It just

9  depends.

10         We will generally build or we will generally prepare,

11  you know, what we call sort of an FF&E manual that we then

12  work with the client to create.  So, it will have the

13  client's instructions to us on how they want to price the

14  inventory, what opening discounts they want, when they want

15  to move discounts, generally how the thing should be signed

16  and things like that.  So, that process we do in

17  collaboration with the client if that makes sense.

18             MR. FOX:  I'm getting close to the end, Your

19  Honor.  I don't want to take too much time.

20             THE COURT:  You're welcome to conclude.  I mean,

21  you know, I certainly want to conclude the examination.  The

22  parties have briefed this and this is part of the record for

23  next week's hearing.  So, don't truncate your examination.

24  BY MR. FOX:

25  Q    Mr. Fredericks, you previously testified that as part

1  of your duties with Hilco you had some duties that related to

2  legal aspects of Hilco's business, is that correct?

3  A    So, let's just make sure we're talking about the right

4  Hilco.  So, for the last three years, give or take a couple

5  of days, I have legal responsibility for Hilco Merchant

6  Resources.

7  Q    Okay.

8  A    And some of that responsibility is now shared,

9  ultimately, by the holding company.  Prior to that I had

10 legal responsibility -- I was one of two lawyers that had

11 legal responsibility for the whole Hilco organization.

12 Q    So, let's just focus for purposes of this next series

13 of questions on Hilco Merchant Resources and your current

14 role with that entity.

15      With respect to your experience with the bankruptcy

16 code and the federal rules of bankruptcy procedure have you

17 ever -- are you aware of Federal Rule of Bankruptcy Procedure

18 6005?

19 A    Not off the top of my head, no.

20           THE COURT:  That's two of us.

21           MR. FOX:  Your Honor, may I approach with a copy

22 of the code?

23           THE COURT:  Here, he can take mine.

24           MR. FOX:  Okay.

25           THE WITNESS:  Thank you, Judge.

1  BY MR. FOX:

2  Q    Mr. Fredericks, when you're done reviewing that

3  provision if you could let me know.

4  A    Okay.  I read it.

5  Q    Would -- based on you reading of Federal Rule of

6  Bankruptcy Procedure 6005 would your understanding be that if

7  an auctioneer were retained in a bankruptcy case that it

8  wouldn't have to comply with any residence or licensing

9  requirement as per the language of that rule?

10         MR. HERRMANN:  Objection, Your Honor; calls for a

11  legal conclusion.

12         THE COURT:  It does.  I think the rule says what

13  it says.  I'll sustain the objection.

14  BY MR. FOX:

15  Q    Mr. Fredericks, prior -- in your prior testimony you

16  indicated that there were some concerns that Hilco Merchant

17  Resources and Gordon Brothers and, maybe, potentially their

18  parent entities may have with respect to being retained as a

19  professional and then seeking to perform additional roles or

20  services in a bankruptcy context, but isn't it true that

21  we're not here today on any such matter?  That there is

22  currently no issue at bar that relates to that concern?

23         THE COURT:  Hang on.  I want to make sure I

24  understand what that concern is.  That concern is the

25  opportunity to purchase in the event that there's a separate

1  stage to the transaction or a separate stage to the

2  bankruptcy case?

3        MR. FOX:  That's correct, Your Honor.  We're

4  currently not before the court on any such transaction with

5  respect to Hilco or Gordon Brothers.

6        THE COURT:  I understand the question.

7        THE WITNESS:  I'm not aware of any motion to

8  approve a bid by us, but that doesn't mean -- again, as I

9  said earlier, you know, we had been negotiating with the

10  company for a bid to do a guarantee equity transaction with a

11  partner.  While it's unlikely that that -- I can certainly

12  say it's unlikely that we will not be the stalking horse.

13  It's possible that we would submit a bid later in the

14  process.

15        THE COURT:  Can I chime in.  I want to make sure

16  that I understood your testimony on direct.  And this is

17  exactly where Mr. Fox is going.

18        Mr. Herrmann asked you why are you concerned which

19  I think is -- the U.S. Trustee's point is why don't you just

20  file a retention application.  I think I understood your

21  response to be, perhaps among other things, if we are

22  retained as a consultant to provide the services, if this

23  case heads in a different direction and there's an

24  opportunity to purchase the balance of the assets or to

25  conduct an agency arrangement, et cetera, your concern would

1  be that having been retained as a professional under 327

2  would preclude you from acting in that role in this case.  Do

3  I have that right?

4            THE WITNESS:  Yes.  That would be one of the

5  concerns.

6            THE COURT:  All right.  I just want to make sure I

7  understood his testimony and concern.

8            MR. FOX:  No problem, Your Honor.

9  BY MR. FOX:

10 Q    Mr. Fredericks, are you familiar with Hilco Merchant

11 Resources website and its advertising materials that it uses

12 to solicit clients?

13 A    Somewhat, yes.

14 Q    With respect to that advertising does Hilco hold itself

15 out as having able experienced and confident professionals to

16 assist retailers and other potential clients with their

17 specialized needs?

18 A    I don't know if we use those words.  If you want me to

19 look at particular language I'll be happy to look at it.

20            MR. FOX:  One moment, Your Honor.

21            THE COURT:  Sure.

22            MR. FOX:  Your Honor, may I approach?

23            THE COURT:  Of course.

24            THE WITNESS:  Thank you.

25 BY MR. FOX:

1  Q    Mr. Fredericks, does the print-out of the web page

2  refresh your recollection as to Hilco's advertising

3  materials?

4  A    Yeah.  These look like some of our advertising

5  materials, yes.  These are some of our advertising materials,

6  yes.

7  Q    And if you could, would you please, on the first page,

8  just read the provision located in the middle of the page

9  starting with Hilco Merchant Resources offers?

10 A    Yup.

11        "Hilco Merchant Resources offers broad and deep

12        expertise in all retail sectors.  Our seasoned

13        professionals deliver a wide range of analytical,

14        advisory, asset monetization, and capital investment

15        solutions to help define and execute your strategic

16        initiatives."

17 Q    Thank you.

18        Mr. Fredericks, in your opinion is that what the

19 liquidation consultant is striving to do on behalf of the

20 Brookstone debtors?

21 A    Are you asking me if our marketing materials absolutely

22 100 percent match the services that we're doing?

23 Q    No.  That wasn't my question.

24        I was asking if what the liquidation consultant is

25 seeking to do on behalf of the Brookstone debtors is

1  consistent with how it presents itself in its marketing

2  materials.

3  A      Well, I don't -- let me answer it this way.  Okay.  I

4  don't think by using the word professional here it means that

5  I'm a professional of that the company is a professional

6  under Section 327 of the Bankruptcy Code.  I think that these

7  are marketing materials where we're trying to, you know,

8  market and sell our services to clients.  There is probably a

9  bit of puffery, but do we do analytics; yes, we do analytics.

10  Are we providing some type of advisory role in the sense that

11  we're making recommendations to the client, yes.  Are we

12  working to help them monetize their assets, yes?  Are we

13  providing capital investment solutions, no.

14  Q      With respect to each of the functions that you did

15  mention that Hilco and Gordon Brothers as their status as

16  liquidation consultant are providing to the Brookstone

17  debtors would you say that those functions help facilitate a

18  Chapter 11 restructuring, reorganization and similar

19  successful path through the bankruptcy system?

20  A      I would say that the services we're doing are one

21  component of whatever the debtors' plan is to get through

22  this case.  That would be my answer to that.

23          MR. FOX:  I believe that's all, Your Honor.  Thank

24  you.

25          THE COURT:  Thank you, Mr. Fox.

1      MR. HERRMANN:  I believe just one question, Your

2   Honor.

3           THE COURT:  Sure.

4                    REDIRECT EXAMINATION

5   BY MR. HERRMANN:

6   Q     In your opinion does acting in a professional manner

7   always make you a professional?

8   A      No.

9           THE COURT:  Any re-cross?

10          MR. FOX:  No, Your Honor.

11          THE COURT:  Mr. Fredericks, thank you, sir, you

12   may step down.

13        (Witness excused)

14          THE COURT:  Safe travels, sir.

15          MR. HERRMANN:  Mr. Fox and I were having a

16   conversation when Your Honor came in and he was just

17   confirming that this closes the evidentiary portion of this

18   matter.

19          THE COURT:  That sounds fine.  I think each of the

20   documents -- let me ask you a question; is this to be

21   admitted?

22          MR. FOX:  I don't believe that's necessary, Your

23   Honor.  It's covered by the stipulation of facts that the

24   language is used.

25          THE COURT:  Okay.  Well, I'm going to hang onto

1  it.

2        MR. FOX:  Okay.

3        THE COURT:  I think the other items that have been

4  submitted are all admitted by agreement.

5        MR. FOX:  I had brief colloquia with co-counsel.

6  Can we mark that as U.S.T 1 and move for admission into

7  evidence?

8        THE COURT:  Any objection?

9     (No verbal response)

10       THE COURT:  Okay.  It's admitted.

11    (United States Trustee documents admitted)

12       THE COURT:  All right.  So, my understanding is

13  that that concludes the evidentiary portion.  We'll take

14  argument on next Thursday in the context of the hearing.  If

15  there are issues with respect to other matters that are on,

16  again, I'm really at your pleasure for if it gets moved to

17  another date or not, but, otherwise, I will plan that this is

18  fully briefed, the evidentiary record is closed and I will

19  look forward to argument from the parties.

20       MR. HERRMANN:  One question, Your Honor.  How long

21  do you have for that hearing and would it be possible to get

22  a separate time for this matter in particular?

23       THE COURT:  I don't know how long I have.  I would

24  have to ask Ms. Bello that.  I will tell you what, we will be

25  happy to -- if counsel wants to call Chambers we'll figure

1   out precisely what's going to go on.  My point is I don't

2   want somebody to get hung-up especially if next Thursday

3   turns into a whole dog and pony show on competing bids and

4   everything else then you don't want to be behind that.  That

5   is a decision that, frankly, you folks can make probably

6   better then I, but one thing you can be confident of is that

7   we'll be able to accommodate a scheduling requirement.  If it

8   happens on that day great and if not then we'll deal with it.

9           MR. HERRMANN:  We appreciate the accommodation.

10          THE COURT:  All right.  Do we have anything

11  further today?

12      (No verbal response)

13          THE COURT:  All right. I have been very patient.

14  Mr. Reisman, where is my two-dollar bill?

15      (Laughter)

16          THE COURT:  Thank you very much, counsel.  We

17  stand in recess.

18          ALL:  Thank you, Your Honor.

19      (Proceedings concluded at 5:58 p.m.)

20

21

22

23

24

25

1                              CERTIFICATE

2

3   I certify that the foregoing is a correct transcript from the

4   electronic sound recording of the proceedings in the above-

5   entitled matter.

6
    /s/Mary Zajaczkowski                    August 31, 2018
7   Mary Zajaczkowski, CET**D-531

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25