**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BROOKSTONE HOLDINGS CORP., | ) | |
| *et al.*, | ) | |
| | ) | Case No. 18-11780 (BLS) |
| | ) | |
| Debtor. | ) | Re: Docket Nos.: 25; 261 |
| | ) | |

**OPINION**[1]

Before the Court is the Motion for Interim and Final Orders Authorizing the Debtors To Assume the Closing Store Agreement and for related relief (the "Store Closing Motion") [Docket No. 25]. By this Motion, Brookstone seeks to assume a store closing agreement (the "Agreement") with Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC (collectively referred to hereinafter as "Hilco") to perform certain services relating to going-out-of-business sales (the "GOB Sales"). The United States Trustee ("UST") does not object generally to the relief sought by way of the Store Closing Motion, but argues that assumption of the Agreement is procedurally improper to the extent that the Agreement with Hilco constitutes the retention of a "professional" under Bankruptcy Code § 327(a). For the reasons that follow, the Court determines that Hilco is not a professional for the purposes of the Bankruptcy Code § 327(a), and the Debtor has otherwise carried its burden to warrant assumption of the Agreement.

[1] This Opinion constitutes the Court's findings of fact and conclusions of law, as required by the Federal Rules of Bankruptcy Procedure. *See* Fed. R. Bankr. P. 7052, 9014(c).

## INTRODUCTION

Hilco is a familiar player in Chapter 11 retail restructurings in this Court. In countless cases, it has provided valuable services to debtors relating to disposition and monetization of inventory, real estate, intellectual property and other estate assets. The procedural mechanism by which Hilco (and the handful of entities that are its industry peers) are engaged to perform these services has — with very few exceptions — been by way of assumption of a services contract by motion under §§ 365(a) and 363(b) of the Bankruptcy Code. Notwithstanding a well-developed practice in this and other courts, the UST has in recent months objected in several cases and insisted that, in the circumstances described above, Hilco is serving as a "professional" in the bankruptcy proceeding and must be retained under the strictures of § 327(a). *See Heritage Home Corp., LLC, et al.*, Case No. 18-11736 (KG), UST Objection [Docket No. 265]; *Samuels Jewelers, Inc.*, Case No. 18-11818 (KJC), UST Limited Objection [Docket No. 162].

In a very recent case, my colleague Judge Gross was called upon to decide whether SB360 Capital Partners was a professional where it was acting in a role broadly similar to Hilco in the instant case. *Heritage Home Corp., LLC, et al.*, Case No. 18-11736 (KG), Mem. Op. dated September 27, 2018 ("Heritage Home") [Docket No. 330]. After review of the applicable legal test derived from the *First Merchants* decision discussed in detail below, Judge Gross distilled the relevant analysis down to a standard the undersigned cannot improve upon: "What is clear in *First Merchants* is that a 'professional' is limited to those occupations which control, purchase or sell assets that are important to reorganization, is negotiating the terms of a plan of reorganization, [and] has discretion to exercise his or her own personal judgment…." *Id.* at ¶ 12, citing *In re First Merchants Acceptance Corp.*, 1997 WL 873551 at *3 (D. Del. Dec. 15, 1997).

Applying this test to the case at bar, this Court is satisfied that Hilco's services, while clearly valuable and important, are not sufficiently central to the development and implementation of the Debtor's reorganization to support a finding that it is a "professional" within the meaning of § 327(a). The established practice requires fulsome disclosure of the services to be provided and the compensation to be paid, followed by a hearing on the merits where a debtor must carry its burden under Bankruptcy Code §§ 365 and 363 to demonstrate that it is proceeding in good faith and that its proposed course of action reflects the exercise of its reasonable business judgment. This structure is compliant with the Bankruptcy Code and is sufficient to address the UST's legitimate desire for transparency and due process without imposing the additional requirements and restrictions required by § 327(a).

**BACKGROUND**

Brookstone Holdings Corporation and its affiliates (hereinafter "Brookstone" or the "Debtor") operate a well-known manufacturing and retailing business which produces and sells Brookstone-branded products in traditional retail outlets, including both mall and airport stores. Declaration of Greg Tribou In Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief (the "First Day Aff.") [Docket No. 2] at ¶ 16. Brookstone also sells its branded products on the internet and as wholesaler. In addition to selling its own products, Brookstone provides distribution and sale opportunities for third-party products that fit within Brookstone's brand concept. *Id*. at ¶ 15.

The record reflects that, as of the commencement of these cases on August 2, 2018 (the "Petition Date"), the Debtor operated 137 retail stores, 102 of which were located in malls and 35 of which were located in airports. *Id*. at ¶ 11. For fiscal year 2017, sales from Brookstone's mall stores made up approximately 52% of Brookstone's net sales, and sales from Brookstone's

airport stores made up approximately 14% of Brookstone's net sales. The balance of Brookstone's sales came from e-commerce and its wholesale operation. *Id*. at ¶ 16.

A number of factors led Brookstone to seek Chapter 11 relief. Notably, the Debtor represents that a shift in consumer preferences has led to a decline in profitability for Brookstone's mall stores, which have been operating at a loss each year since the Debtor's emergence from its first Chapter 11 proceeding in 2014. *Id*. at ¶ 17, 55, 57. While its mall stores have been struggling, however, Brookstone sees potential for improvement in its other business segments. *Id*. at ¶ 18-19, 22-27. In contrast to its mall stores, Brookstone's airport stores have, for the most part, operated profitably. *Id*. at ¶ 18. The Debtor believes that its intellectual property carries substantial value, and its e-commerce presence has potential for expansion and further development. *Id*. at ¶ 27-29. However, Brookstone asserts that in order to realize its potential, it must restructure its operations. *Id*. at ¶ 6-7, 18, 22, 26.

Prior to the Petition Date, Brookstone determined that its restructuring plan would include the closure of its mall stores and the liquidation of a substantial portion of the inventory of those stores. *Id*. at ¶ 66-67. In order to assist Brookstone with the management of those store closures and the associated GOB Sales, it engaged the services of Hilco. *Id*. at ¶ 66-67. On August 1, 2018, the Debtor and Hilco executed the Store Closing Agreement, which laid out the terms and conditions by which Hilco would assist Debtor with its store closures. The Debtor filed its petition for Chapter 11 relief the next day, and contemporaneously filed the Store Closing Motion [Docket No. 25] which requested, *inter alia*, that the Court authorize the Debtor to assume the Agreement.

The UST has filed a limited objection to the issuance of an order granting Debtor approval of the assumption of the Closing Store Agreement (hereinafter the "Limited

Objection") [Docket No. 185]. Specifically, the UST asks the Court to find that Hilco is a professional for the purpose of 11 U.S.C. § 327(a), and that the Debtor therefore must abide by the statutory requirements governing the retention of professionals in bankruptcy proceedings. After a hearing, the Court issued an Interim Order [Docket No. 75] granting most of the relief requested by the Debtor in the Store Closing Motion (and thereby allowing the GOB Sales to proceed), but taking under advisement the issue of whether Hilco is a "professional" for purposes of § 327(a).

Hilco and the UST have prepared and submitted a helpful Joint Stipulation of Facts (the "Joint Stipulation") [Docket No. 261] setting forth agreed-upon facts relevant to the Store Closing Motion and the Limited Objection. The Joint Stipulation reflects that, prior to the Petition Date, the Debtor determined to close 102 stores and liquidate inventory over an 8-week post-petition period, and in order to facilitate this process, it entered into the Store Closing Agreement with Hilco. Joint Stipulation at ¶ 2-4. Hilco's duties and obligations are as follows:

(i) Recommend appropriate discounting to effectively sell all of Merchant's goods located at the Stores as of the Sale Commencement Date or thereafter delivered thereto as may be mutually agreed by the parties in accordance with a "store closing" and other mutually agreed upon themed sale, and recommend appropriate point-of-purchase, point-of-sale, and other internal and external advertising in connection therewith;

(ii) Provide qualified supervision to oversee the conduct of the Sale;

(iii) Maintain focused and constant communication with Merchant's Store Operations team to coordinate and keep them abreast of strategy and timing and to properly effect Store-level communication by Merchant's employees to customers and others about the Sale;

(iv) Establish and monitor accounting functions for the Sale, including evaluation of sales of Merchant's goods located at the Stores by category, sales reporting and expense monitoring;

(v) Recommend loss prevention strategies;

(vi) Coordinate with Merchant so that the operation of the Stores is being properly maintained including ongoing customer service and housekeeping activities; and

> (vii) Recommend appropriate staffing levels for the Stores and appropriate bonus and/or incentive programs (to be funded by Merchant) for Store employees.

*Id*. at ¶ 8.

The parties have also stipulated that Hilco's fee arrangement in the Store Closing Agreement is as follows:

> …the Debtors agreed to pay the Consultant a sliding "Incentive Fee" from no Incentive Fee to 1.50 percent, which is tied to merchandise sales and the Aggregate Recovery Percentage. The Consultant will be reimbursed for controlled expenses ("Consultant Controlled Expenses") upon presentation of reasonable documentation for expenses actually incurred up to $520,871 (or such amount as mutually agreed by Consultant and Debtors). The Consultant will also receive a separate 15% commission for selling furnishings, trade fixtures, and equipment, which the Debtors has not informed the Consultant that the Debtors wish to retain ("Retained FF&E"). Any furniture, fixtures, and equipment not identified as Retained FF&E, the Consultant may sell on a commission basis.

*Id*. at ¶ 9.

The record reflects that Hilco and Brookstone anticipated, at the time of entry into the Agreement on the eve of the bankruptcy proceeding, that they might enter into additional transactions or business arrangements beyond the GOB Sales contemplated in the Agreement. The potential for such transactions is expressly mentioned in the Agreement between Hilco and the Debtor. As described in the Joint Stipulation, the Agreement contained a provision which provided that:

> The Consultant is a service provider to the Debtors whose services have a limited purview, but may be expanded should the Debtors and [Hilco] agree mutually upon the terms of a global transaction (an 'Alternative Transaction') for assets not subject to the Closing Stores Agreement. In the event that the Debtors and the Consultant do enter into an Alternative Transaction, the Store Closing Agreement may be terminated.

*Id*. at ¶ 22; Agreement § 2(C).

Additionally, Hilco and the Debtor also envisioned the prospect that Hilco might make an offer to purchase assets of the Debtor unrelated to the GOB Sales:

> [Hilco] and a third party, as a joint venture submitted an offer to the Debtors to purchase certain other assets of the Debtors that expired by its own terms prior to August 28, 2018. It is still possible that [they] may submit additional offers at this time.

Joint Stipulation at ¶ 22.

In connection with the request for assumption of the Agreement, Hilco has filed comprehensive disclosures under penalty of perjury identifying connections and relationships relevant to this case. See Declaration of Disinterestedness of Ian Fredericks [Docket No. 232]; Declaration of Disinterestedness of Mackenzie Shea [Docket No. 234]. Hilco has represented that, while it is not required to file such disclosures in the context of an assumption motion under § 365, it has developed this practice in many prior cases either in response to concerns raised by the UST or in an effort to provide greater transparency regarding the transaction at hand. Brief of Hilco in Support of the Motion to Assume at ¶ 74 [Docket No. 186].

The foregoing recounts a complicated but hardly unusual business relationship in the context of a retail bankruptcy. In a nutshell, Hilco contracted immediately before the Petition Date to assist the Debtor with the GOB Sales in exchange for compensation that appears in line with industry standards. However, informed by decades of experience with the potential pitfalls of even the most promising retail restructurings, Hilco and the Debtor left open and expressly contemplated that Hilco might be called upon or invited to play other roles in the case as circumstances may require, such as buying estate assets or even serving as a lender to Brookstone.

## JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of this matter constitutes a "core proceeding" under 28 U.S.C. § 157(b)(2)(A) and (O).

## THE PARTIES' POSITIONS

The UST posits that Hilco is serving as an auctioneer and so must be retained under Bankruptcy Code § 327(a). Alternatively, the UST contends that, given the nature of the services to be performed by Hilco for the Debtor here, Hilco is an "other professional" within the meaning of that term as it is used in § 327(a) and therefore must be formally retained.

Hilco and the Debtor offer several responses to the UST's objection. First, the Debtor observes that Hilco and its peers have performed these services, without being retained under § 327(a), in scores if not hundreds of retail bankruptcies stretching back decades. Next, Brookstone submits that Hilco is not an auctioneer since it is not in any fashion conducting an auction. Brookstone then walks through the familiar six-factor test laid down in *First Merchants* to assert that Hilco is not an "other professional" under § 327(a). And finally, Brookstone contends that any ruling that would require Hilco to be retained as a professional would have a significant and detrimental impact, not only in this case, but in most retail Chapter 11 cases by severely limiting the types of work and services Hilco could perform.

## DISCUSSION

The issue before the Court is whether Hilco must be retained as a professional pursuant to § 327(a) of the Bankruptcy Code. That section provides as follows:

> Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or *other professional persons*, that do not hold or represent an interest adverse to the estate,

> and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a) (emphasis added).[2] If Hilco, serving in the role described by the Store Closing Agreement, is a professional for the purposes of § 327(a), the retention of Hilco must be requested and approved under section § 327(a) and Federal Rule of Bankruptcy Procedure 2014. These provisions operate to require the Debtor and Hilco to provide the Court with disclosures that relate to all connections and potential conflicts-of-interest. The Court must also determine that the professional is "disinterested" [3] and does not "hold or represent an interest adverse to the estate." *Id*. Importantly, if Hilco is a retained professional, it would likely be precluded from engaging in further transactions with the Debtor (such as purchasing assets not encompassed within the GOB Sales) that were referenced in the Agreement. *See, e.g.*, 18 U.S.C. § 154(a).

As noted above, the UST argues as a threshold matter that Hilco must be retained as a professional, pursuant to § 327(a), because Hilco is an "auctioneer." Limited Objection at 12-13. In the alternative, the UST argues that Hilco must be retained as a professional because Hilco is an "other professional" for purposes of § 327(a). *Id*. at 13. The Court addresses both arguments, in turn, below.

---

[2] "Although section 327 speaks only in terms of a trustee, a debtor in possession in a [C]hapter 11 case has all of the rights, duties and powers of a trustee." 3 Collier on Bankruptcy P 327.01 (16th 2018). *See also In re Borders Grp., Inc.*, 453 B.R. 477, 485 (Bankr. S.D.N.Y. 2011) ("Section 327(a)…permits a debtor-in-possession, with the court's approval, to retain professional persons, including auctioneers.").

[3] The Code defines "disinterested person" as a person or entity that:

> (A) is not a creditor, an equity security holder, or an insider;
> (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and
> (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. § 101(14).

### A. Hilco is Not an Auctioneer for the Purpose of § 327(a)

An auctioneer is a professional identified under § 327(a). If a party is serving as an auctioneer, no matter how modest the compensation or how limited the services, it must be formally retained. *In re Borders Grp., Inc.*, 453 B.R. 477, 485 (Bankr. S.D.N.Y. 2011). The Bankruptcy Code does not define the term “auctioneer.” The Court looks therefore to common usage of the term. An auctioneer is defined as “[o]ne who conducts sales by auction.” Oxford English Dictionary 778 (2nd ed. 2004). An auction is “[a] public sale in which each bidder offers an increase upon the price offered by the preceding, the article put up being sold to the highest bidder.” Oxford English Dictionary 778 (2nd ed. 2004). These general definitions are consistent with the Court’s understanding and expectation regarding usage of these terms in the bankruptcy context.

The undisputed record reflects that inventory being sold by Hilco is not being sold to the highest bidder at a public sale. Instead, it is being priced and sold at stores in a manner typical of a retail sale, not an auction. Transcript regarding hearing held August 29, 2018 at 149 [Docket No. 336] (hereinafter “August 29 Tr.”). During the course of Brookstone’s GOB Sales, the customer does not compete with other purchasers for items, negotiate with Hilco regarding price, or make bids for any of the items for sale. Instead, the customer browses, selects, and purchases pre-priced merchandise from the store:

> The consumer walks in, picks the item off the shelf, brings it to the cash register in the store, the merchant’s employees are the ones who operate their [point-of-sale] systems; consumer hands the goods, it’s scanned at the [point-of-sale] system, the receipt is generated, the merchant collects the proceeds of the sale from whatever tender the customer gave, customer walks out with the receipt and the merchandise…*There is no bidding. There is no negotiation*.

August 29 Tr. at 149-150 (emphasis added).

In addition to the retail sale of inventory, Hilco is also under contract with the Debtor to sell the "furniture, fixtures, and equipment" ("FF&E") in the stores. [Docket No. 25, Exhibit 2, ¶ 6 (A)-(D)]. While the disposal of this FF&E is distinct from a typical retail sale, it is, nevertheless, not sold in an auction; nor does Hilco act as an auctioneer. Ian Fredericks, an officer of Hilco, testified that the FF&E is marked with prices and is available for purchase. August 29 Tr. at 150-51. At no point is the FF&E the subject of competitive bidding or of an auction process managed by Hilco. *Id*. at 150-51.

The Court is of course aware that there is a variety of ways to conduct an auction. However, the sale process contemplated by the Agreement between the Debtor and Hilco is not an auction in any respect. Because the undisputed record clearly establishes that Hilco was not hired to conduct an auction on behalf of Debtor, the Court concludes that Hilco has not been engaged as an "auctioneer" for the purposes of § 327(a). *Accord Heritage Home* at ¶ 8.

**B. Hilco Is Not an "Other Professional" For the Purposes of 327(a)**

The Court turns now to whether Hilco is an "other professional" as that term is used in § 327(a). In addition to "attorneys, accountants, appraisers [and] auctioneers," § 327(a) allows debtors-in-possession to retain "other professional persons." 11 U.S.C. § 327(a). "Professional" is a term not defined in the Bankruptcy Code, and courts have struggled to identify clear principles to use to determine whether a given employee is an "other professional" which must be retained under § 327(a). *See First Merchants* at *2 (D. Del. Dec. 15, 1997) (describing approaches to the issue as "vague and difficult to apply").

Chief Judge Farnan's approach in *First Merchants* is helpful and instructive. In that case, First Merchants operated a business that primarily serviced payments on account of sub-prime vehicle loans. *Id*. at *1. The debtor proposed to sell certain of its receivables to Ugly Duckling

Corporation ("Ugly Duckling"), and under the arrangement presented to the court, the debtor would enlist the assistance of Ugly Duckling in servicing not just the receivables it was purchasing, but all of the receivables in the debtor's portfolio. *Id*. At bottom, the debtor's business consisted of moving and accounting for payments received from a portfolio of loans, and Ugly Duckling was to largely take over that process. *Id*. at *1, *3-*4. The UST objected to the proposed hiring of Ugly Duckling, contending that the breadth and significance of the service to be provided by Ugly Duckling rendered it an "other professional" and so it was required to be formally retained. *Id*. at *1.

To resolve that question, the court developed and applied a "list of factors to be considered and applied in making the determination of whether an employee is a 'professional' within the meaning of Section 327." *Id*. at *2. Chief Judge Farnan wrote that "[a]lthough the list is not exclusive…it reflects many of the considerations that have impacted judicial decisions in this area." *Id*. at *3. The court in *First Merchants* noted — and this Court emphasizes — that "in applying these factors…no one factor is dispositive…the factors should be weighed against each other and considered *in toto*." *Id*. While affording substantial flexibility in applying the test, the court stressed that the most important considerations were the amount of independence and discretion afforded to Ugly Duckling in its relationship with the debtor and the nexus between the services to be provided and the debtor's reorganization. *Id*. at *3-*4 ("[T]he Court finds the amount of discretion afforded [Ugly Duckling] in the Consultation Agreement to be troublesome.").

The six factors developed in *First Merchants* are as follows:

(1) whether the employee controls, manages, administers, invests, purchases or sells assets that are significant to the debtor's reorganization;

(2) whether the employee is involved in negotiating the terms of a Plan of Reorganization;

(3) whether the employment is directly related to the type of work carried out by the debtor or to the routine maintenance of the debtor's business operations;

(4) whether the employee is given discretion or autonomy to exercise his or her own professional judgment in some part of the administration of the debtor's estate, i.e. the qualitative approach;

(5) the extent of the employee's involvement in the administration of the debtor's estate, i.e. the quantitative approach; and

(6) whether the employee's services involve some degree of special knowledge or skill, such that the employee can be considered a "professional" within the ordinary meaning of the term.

*Id*. at *3 (footnotes removed). Applying these factors to the stipulated facts of the instant proceeding helps shape the Court's analysis, and informs its ultimate determination that Hilco is not acting as an "other professional" when performing its duties pursuant to the Store Closing Agreement.

The first *First Merchants* factor is "whether the employee controls, manages, administers, invests, purchases or sells assets that are significant to the debtor's reorganization." *Id*. Here, Brookstone is hiring Hilco to assist with the closure of 102 of Brookstone's stores, which together were responsible for more than 50% of the debtor's sales in FY 2017. First Day Aff. at ¶ 6. At first blush, then, it would appear that Hilco is in fact engaged in "[selling] assets that are significant to the debtor's reorganization plan." *First Merchants* at *3.

However, the record developed here shows that the Debtor and its management and staff remain at all times in complete control of all aspects of the GOB sales. The sales are conducted in their stores, run by the Debtor's existing employees, and the Debtor retains control over both the pricing strategies and the duration of the GOB Sales at the stores. So while it is true that Hilco is certainly providing services in connection with an important sale process, the record does not support a finding that Hilco "controls" or "manages" that process. The first factor weighs in favor of Hilco and the Debtor.

The second *First Merchants* factor is "whether the employee is involved in negotiating the terms of a Plan of Reorganization." *Id*. at *3. The record reflects that Hilco is not involved in negotiating the terms of a plan, and the parties are in agreement as to this prong. *See* Limited Objection at 14 (stating that "factors 1 and 3 through 6 weigh in favor" of determining that Hilco is a professional). This factor weighs in favor of Hilco and the Debtor.

The third *First Merchants* factor concerns "whether the employment is directly related to the type of work carried out by the debtor or to the routine maintenance of the debtor's business operations…" *First Merchants* at *3. If it is, then there is an assumption that the provider of these services is not a "professional."

The closure of 102 of Brookstone's retail stores — in essence, the shuttering of its entire mall retail business segment — is not "routine." *Id*.; First Day Aff. at ¶ 11. The stores to be closed were collectively responsible for more than half of Brookstone's net sales in FY 2017. First Day Aff. at ¶ 16. Liquidations and store closures at this scale are not the "type of work carried out by the debtor." Instead, the Debtor entered into these proceedings with the expectation that the GOB Sales and the related store closings would constitute a substantial part of the Debtor's restructuring. First Day Aff. at ¶ 66.

The Debtor entered into Chapter 11 with the expectation of being able to "execute an orderly store closing process." *Id*. at ¶ 66. That process, which includes the liquidation and store closure services provided by Hilco, is undoubtedly enabled by the Debtor's entry into Chapter 11 proceedings. The protections afforded to the Debtor by the Bankruptcy Code (and this Court) allow the Debtor to operate the GOB Sales free from contractual and regulatory restrictions that might otherwise restrict the Debtor's ability to quickly and efficiently liquidate its inventory and close its stores. As the parties stipulated, "[i]nside of bankruptcy, retailers face fewer

restrictions…can receive relief from lease restrictions…[and] have other rights that a retailer in a non-bankruptcy context does not." Joint Stipulation at ¶ 17. Given these facts, the Court finds that Hilco's services for the Debtor relate to the Debtor's restructuring activity, not the Debtor's routine "business operations," *First Merchants* at *3, and that this factor weighs in favor of the UST.

The fourth *First Merchants* factor is "whether the employee is given discretion or autonomy to exercise his or her own professional judgment in some part of the administration of the debtor's estate …" *Id*. The UST argues that Hilco has "a meaningful amount of autonomy and control" in overseeing the GOB Sales. Limited Objection 15. However, the record developed in this case and the Joint Stipulation actually reflect that the discretion afforded to Hilco under the Agreement is limited, and the discretion that is being exercised by Hilco is not being exercised "in the administration of the debtor's estate." *Id*. The two most important considerations in conducting the GOB Sales are (1) pricing strategy and (ii) the timeline for the sales. Hilco may offer advice or guidelines to the Debtor as to these areas, but it does not enjoy the freedom to dictate how the process is implemented. Indeed, the record reflects that Hilco offered advice to the Debtor as to how long to run the GOB Sales, and the Debtor rejected that advice. Joint Stipulation at ¶ 4; August 29 Tr. at 148.

It is useful to compare Hilco's role in this case to the amount of discretion and control granted Ugly Duckling, the consultant in the *First Merchants* case. As noted above, Ugly Duckling was given extensive and exclusive discretion to manage virtually all of the assets of the debtor.[4] *First Merchants* at *3. Ugly Duckling was even given the discretion to determine the

[4] In the initial version of the agreement between First Merchants and Ugly Duckling, Ugly Duckling — again, in its role as an alleged "consultant" to debtor First Merchants — was granted the "sole discretion, [to] employ outside personnel or consultants without the scrutiny of the Court, creditors, or the [UST]." *First Merchants* at *3. The

scope of its own contractual obligations to the debtor: the agreement between First Merchants and Ugly Duckling provided that Ugly Duckling would "support the Debtor with specific accounting, record keeping and cash management functions with respect to billing, payment and collection of the Serviced Receivables" and this support was to be provided "[t]o the extent *deemed necessary and appropriate by [Ugly Duckling]*" — not by First Merchants, the debtor-in-possession. *Id*. (emphasis added). The court emphasized the extent to which Ugly Duckling was proposing to essentially run the debtor's entire business:

> [Ugly Duckling] will be intimately involved in the management of these receivables, the primary asset remaining in the Debtor's estate, and in accomplishing tasks that are within the fiduciary duties undertaken by a debtor-in-possession.

*Id*.

In contrast to the wide discretion given to Ugly Duckling in *First Merchants*, Hilco is given a relatively narrow mandate under the Agreement. Hilco did not determine that store closures were warranted, which stores would be closed, or what the duration of the Store Closing Sale would be. Joint Stipulation at ¶ 2-4, August 29 Tr. at 148. The Debtor retained final authority over the Store Closing Sale, acting as the final word on matters as minor as the design of the signage advertising for the GOB Sales and as major as pricing strategy and the sale timeline. Joint Stipulation at ¶ 2-4; August 29 Tr. at 138-39, 148, 150.

Further, what discretion is being exercised by Hilco is not being "exercise[d]…in some part of the administration of the debtor's estate." *First Merchants* at *3. Unlike the consultant in *First Merchants*, Hilco has not been given discretion to "accomplish[] tasks that are within the fiduciary duties undertaken by a debtor-in-possession." *Id*. Here, Hilco provides advice and

extent of the discretion sought by Ugly Duckling is striking, although First Merchants later submitted a revised version of the agreement which narrowed Ugly Duckling's hiring power to "such persons as the Debtor currently utilizes or as approved by the Court or the United States Trustee's office." *Id.* at *3.

guidance on an inventory reduction and liquidation strategy. In *First Merchants*, by contrast, the court stressed the extraordinary mandate granted to the putative consultant:

> [Ugly Duckling's] role under the Consultation Agreement extends beyond mere debt collection to the evaluation and assessment of the [d]ebtor's equipment, personnel, organization, current and future facilities, and certain procedures and policies, relating to servicing the [r]eceivables.

*Id*. at *4. This factor weighs in favor of Hilco and the Debtor.

The fifth *First Merchants* factor is “the extent of the employee's involvement in the administration of the debtor's estate …” *Id*. The analysis of this factor is similar to the analysis of the fourth *First Merchants* factor, because both factors address Hilco’s involvement in “the administration of the debtor’s estate.” *Id*. The closure of 102 of the Debtor’s stores does, as asserted by the UST, “represent[s] a significant amount of restructuring activity.” Limited Objection at 14. However, there is considerable distance between Hilco’s assistance in inventory disposition, and the negotiation and implementation of a reorganization strategy that will be embodied in a plan that hopefully will enjoy stakeholder input and support. Indeed, the record reflects that Hilco’s work for Brookstone has already concluded as of the date hereof, long before the filing of a plan or the closing of other transactions that form the core of the restructuring strategy. Accordingly, the Court finds that Hilco’s role in the store closures does not constitute meaningful participation in the “administration of the debtor’s estate” as contemplated by § 327(a). The fifth factor therefore favors Hilco and the Debtor.

The sixth *First Merchants* factor is “whether the employee's services involve some degree of special knowledge or skill, such that the employee can be considered a ‘professional’ within the ordinary meaning of the term.” *First Merchants* at *3. In all candor, the Court finds this prong of the test to be entirely unhelpful. Long experience teaches that literally all business and service activities require “specialized knowledge or skill” on the part of the service provider.

Hilco personnel undoubtedly possess specialized knowledge or skill, but so do all of the other entities providing services to the Debtor, from IT support to waste management services and beyond. This factor therefore does not meaningfully weigh into the Court's decision today.

Considering the relevant factors "in *toto*," as *First Merchants* contemplates, the Court is satisfied that Hilco is not acting as an "other professional" when it provides services to the Debtor pursuant to the Agreement.

**CONCLUSION**

For the reasons stated above, the Limited Objection of the UST is overruled, and the Store Closing Motion is granted. The parties are requested to confer and provide the Court with a form of order consistent with this Opinion within 7 days of the date hereof.

Dated: October 1, 2018
Wilmington, Delaware

By the Court:

BRENDAN LINEHAN SHANNON
UNITED STATES BANKRUPTCY JUDGE