THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN. VOTES MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES, AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BROOKSTONE HOLDINGS CORP., *et al.*,[1] | Case No. 18-11780 (BLS) |
| Debtors. | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF BROOKSTONE HOLDINGS CORP., *ET AL.*, SUBMITTED BY THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AS CO-PROPONENTS

**GIBSON, DUNN & CRUTCHER LLP**
Matthew J. Williams
Matthew K. Kelsey
Keith R. Martorana
Jason Zachary Goldstein
200 Park Avenue
New York, New York 10166
Tel:     (212) 351-4000
Fax:     (212) 351-4035
Email:  mjwilliams@gibsondunn.com
            mkelsey@gibsondunn.com
            kmartorana@gibsondunn.com
            jgoldstein@gibsondunn.com

**COOLEY LLP**
Seth Van Aalten
Cathy Hershcopf
Robert Winning
1114 Avenue of the Americas
New York, New York 10036
Tel:     (212) 479-6000
Fax:     (212) 479-6275
Email:  svanaalten@cooley.com
            chershcopf@cooley.com
            rwinning@cooley.com

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Michael R. Nestor (No. 3526)
Sean M. Beach (No. 4070)
Andrew L. Magaziner (No. 5426)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:     (302) 571-6600
Fax:     (302) 571-1253
Email:  mnestor@ycst.com
            sbeach@ycst.com
            amagaziner@ycst.com

**BAYARD, P.A.**
Justin Alberto (No. 5126)
Erin R. Fay (No. 5268)
600 North King Street, Suite 400
Wilmington, Delaware 19801
Tel:     (302) 655-5000
Fax:     (302) 658-6395
Email:  jalberto@bayardlaw.com
            efay@bayardlaw.com

*Co-Counsel to the Debtors and
Debtors in Possession*

*Co-Counsel to the Official Committee of Unsecured
Creditors of Brookstone Holdings Corp., et al.*

Dated: January 2, 2019

---

[1] The Debtors, along with the last four digits of each Debtor's tax identification number, are: Brookstone Holdings Corp. (4638), Brookstone, Inc. (2895), Brookstone Company, Inc. (3478), Brookstone Retail Puerto Rico, Inc. (5552), Brookstone International Holdings, Inc. (8382), Brookstone Purchasing, Inc. (2514), Brookstone Stores, Inc. (2513), Big Blue Audio LLC (N/A), Brookstone Holdings, Inc. (2515), and Brookstone Properties, Inc. (2517). The Debtors' corporate headquarters and the mailing address for each Debtor is One Innovation Way, Merrimack, NH 03054.

**TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................................................. 1

    A.  Definitions and Exhibits ............................................................................................... 1
    B.  Notice to Creditors ....................................................................................................... 1
    C.  Disclosure Statement Enclosures ................................................................................. 3
    D.  Inquiries ....................................................................................................................... 4
    E.  Summary Table of Classification and Treatment of Claims and Interests Under the Plan ......................................................................................................................... 4

II.     OVERVIEW OF DEBTORS' OPERATIONS AND CHAPTER 11 CASES............................ 6

    A.  Debtors' Prepetition Business Operations .................................................................... 6
    B.  Corporate Headquarters and Distribution Center ......................................................... 9
    C.  Organizational Structure ............................................................................................. 10
    D.  Prepetition Capital Structure ...................................................................................... 10
    E.  Significant Events Leading to Commencement of Chapter 11 Cases........................... 13
    F.  Chapter 11 Cases ........................................................................................................ 15

III.    OVERVIEW OF THE PLAN ............................................................................................... 18

    A.  General........................................................................................................................ 18
    B.  Description and Summary of Classification and Treatment of Claims and Existing Equity Interests Under the Plan ................................................................... 19
    C.  Administrative Claims, Priority Tax Claims, and Professional Fee Claims .................. 19
    D.  Classification and Treatment of Claims and Interests ................................................. 20
    E.  Means for Implementation of the Plan........................................................................ 23
    F.  Treatment of Executory Contracts and Unexpired Leases............................................ 33
    G.  Provisions Governing Distributions ............................................................................ 35
    H.  Procedures for Resolving Contingent, Unliquidated, and Disputed Claims.................. 37
    I.  Settlement, Release, Injunction, and Related Provisions.............................................. 38
    J.  Effect of Confirmation of the Plan.............................................................................. 41
    K.  Conditions Precedent to Consummation of the Plan ................................................... 41
    L.  Modification, Revocation, Or Withdrawal of the Plan ................................................ 42
    M.  Retention Of Jurisdiction ............................................................................................ 43
    N.  Miscellaneous Provisions ........................................................................................... 44

IV.     ALTERNATIVES TO THE PLAN ....................................................................................... 48

    A.  Liquidation Under Chapter 7 of the Bankruptcy Code ................................................ 49
    B.  Alternative Chapter 11 Plan ....................................................................................... 49
    C.  Certain Risk Factors ................................................................................................... 49

V.      CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.................... 50

    A.  General........................................................................................................................ 50
    B.  Consequences to the Debtors ...................................................................................... 51
    C.  Consequences to Holders of Claims and Interests ...................................................... 51
    D.  Tax Treatment of a Liquidating Trust and Holders of Beneficial Interests .................. 52
    E.  Withholding on Distributions, and Information Reporting........................................... 54

VI.     VOTING PROCEDURES AND REQUIREMENTS............................................................... 55

    A.  Ballots and Voting Deadline....................................................................................... 55

B.       Holders of Claims Entitled to Vote.................................................................55

C.       Votes Required for Acceptance by a Class...................................................56

D.       Voting Procedures...........................................................................................56

VII.    CONFIRMATION OF THE PLAN............................................................................56

A.       Acceptance of the Plan ..................................................................................56

B.       Confirmation of the Plan If a Class Does Not Accept the Plan/No Unfair Discrimination/Fair and Equitable Test............................................................57

C.       Best Interests Test...........................................................................................58

D.       Feasibility........................................................................................................59

E.       Classification of Claims and Existing Equity Interests Under the Plan...........59

F.       Confirmation Hearing .....................................................................................59

VIII.   CONCLUSION.........................................................................................................60

# I. INTRODUCTION

This is the disclosure statement (the "Disclosure Statement") of Brookstone Holdings Corp. ("Holdings"), Brookstone, Inc., Brookstone Company, Inc., Brookstone Retail Puerto Rico, Inc., Brookstone International Holdings, Inc., Brookstone Purchasing, Inc., Brookstone Stores, Inc., Big Blue Audio LLC, Brookstone Holdings, Inc., and Brookstone Properties, Inc. (collectively, the "Debtors," the "Company" or "Brookstone"), in the above-captioned chapter 11 cases pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), filed in connection with the Debtors' and the Committee's (collectively, the "Plan Proponents") *Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code of Brookstone Holdings Corp., et al., Submitted by the Debtors and the Official Committee of Unsecured Creditors as Co-Proponents*, dated January 2, 2019 (the "Plan"), a copy of which is annexed to this Disclosure Statement as Exhibit A.

## A. Definitions and Exhibits

1. Definitions. Unless otherwise defined herein, capitalized terms used in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan.

2. Exhibits. The exhibits to this Disclosure Statement are incorporated as if fully set forth herein and are a part of this Disclosure Statement.

## B. Notice to Creditors

1. Scope of Plan. Summarily, the Plan provides for (i) the distribution on the Effective Date (or as soon as reasonably practicable thereafter) of Cash to the Holders of Allowed Administrative Claims, and Allowed Other Priority Claims in an amount equal to the Allowed amount of such Claims, (ii) the treatment of Holders of Allowed Priority Tax Claims in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code, (iii) the distribution on the Effective Date (or as soon as reasonably practicable thereafter) to the Holders of Allowed Other Secured Claims (if any), at the option of the Debtors, of either (a) payment in full (in Cash) of such Allowed Other Secured Claim, (b) satisfaction of such Allowed Other Secured Claim by delivering the collateral securing such Allowed Other Secured Claim and paying any interest required to be paid under section 506(b) of the Bankruptcy Code, or (c) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code, and (iv) distribution to the Holders of Allowed General Unsecured Claims of their Pro Rata Share of the Liquidating Trust Interests in accordance with the Plan, which shall entitle such Holder to distributions from the Liquidating Trust. **IT IS THE OPINION OF THE PLAN PROPONENTS THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND CREDITORS. THEREFORE, THE PLAN PROPONENTS RECOMMEND THAT CREDITORS VOTE TO ACCEPT THE PLAN.**

Claims and Existing Equity Interests are divided into five Classes under the Plan, and the proposed treatment of Claims and Existing Equity Interests in each Class is described in the Plan and summarized below. Such classification takes into account the different nature and priority of the Claims and Existing Equity Interests. The Plan contains one Class of Other Priority Claims (Class 1) that is Unimpaired, one Class of Other Secured Claims (Class 2) that is Unimpaired, one Class of Impaired General Unsecured Claims (Class 3), one Class of Impaired Existing Equity Interests in the Brookstone Subsidiaries (Class 4), and one Class of Impaired Existing Equity Interests in the Brookstone Parent (Class 5).

The Debtors, in consultation with the Committee, analyzed, *inter alia*, the Debtors' books and records, intercompany accounting practices, corporate structure, shared staff and services, financial

reporting, and cash management practices. Based on that analysis, the Plan contemplates and is predicated upon entry of an Order substantively consolidating the Debtors' Estates and the Chapter 11 Cases. This means that, solely for such purposes, on and after the Effective Date, (i) all assets and all liabilities of the Debtors shall be deemed merged into Brookstone Parent, (ii) all guaranties of any Debtor of the payment, performance, or collection of obligations of another Debtor shall be eliminated and cancelled, (iii) any obligation of any Debtor and all guaranties thereof executed by one or more of the other Debtors shall be treated as a single obligation, and such guaranties shall be deemed a single Claim against the consolidated Debtors, (iv) all joint obligations of two or more Debtors and all multiple Claims against such entities on account of such joint obligations shall be treated and allowed only as a single Claim against the consolidated Debtors, and (v) each Claim filed in the Chapter 11 Case of any Debtor shall be deemed filed against the consolidated Debtors and a single obligation of the consolidated Debtors on and after the Effective Date.

On or before the Effective Date, the Liquidating Trust shall be established to administer certain post-Effective Date responsibilities under the Plan. The Liquidating Trust shall consist of the Liquidating Trust Assets (which include, among other things, all remaining assets of each of the Debtors, Cash owned by each of the Debtors (other than to fund certain reserve accounts), and all Debtor Causes of Action that have not otherwise been released). On the Effective Date, as provided in the Implementation Memorandum, the Debtors shall transfer all of the Liquidating Trust Assets then held by the Debtors to the Liquidating Trust free and clear of all liens, claims, and encumbrances, except to the extent otherwise provided herein. A Liquidating Trustee and a Liquidating Trust Oversight Committee shall each be jointly appointed by the Plan Proponents to oversee the Liquidating Trust. Each of the Liquidating Trustee and Liquidating Trust Oversight Committee shall be permitted to retain professionals, as provided in the Plan and, on the Effective Date, the Retained Professionals shall be retained on behalf of the Liquidating Trust. The Retained Professionals and the terms of their retentions are described in Exhibit B hereto.

Pursuant to the Plan, Holders of Allowed General Unsecured Claims will receive a percentage of the Liquidating Trust Interests that equals such Holder's Allowed General Unsecured Claim when divided by the sum of all Allowed General Unsecured Claims *plus* all Disputed General Unsecured Claims. Pursuant to the Plan, additional Liquidating Trust Interests will be distributed to Holders of Allowed General Unsecured Claims if a Disputed General Unsecured Claim is subsequently Disallowed. If a Disputed General Unsecured Claim is subsequently Allowed, the Holder of such newly Allowed General Unsecured Claim shall receive its percentage of the Liquidating Trust Interests pursuant to the calculation above. The Liquidating Trustee will then distribute the appropriate Net Proceeds of the Liquidating Trust Assets to Holders of Allowed General Unsecured Claims in proportion to the Liquidating Trust Interests held by such Holder.

The Plan also provides reserve accounts for Administrative/Priority Claims and Other Secured Claims. On or prior to the Effective Date, the reserve accounts will be funded in the estimated amount of all Administrative/Priority Claims and Other Secured Claims. If an Administrative/Priority Claim or Other Secured Claim is ultimately Disallowed, the portion of the reserve set aside for such claim shall become part of the Liquidating Trust Assets.

2.    Purpose of Disclosure Statement. The purpose of the Disclosure Statement is to set forth information that (i) summarizes the Plan and alternatives to the Plan, (ii) advises Holders of Claims and Interests of their rights under the Plan, (iii) assists creditors entitled to vote on the Plan in making informed decisions as to whether they should vote to accept or reject the Plan, and (iv) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

By order dated [_____], the Bankruptcy Court approved this Disclosure Statement, finding that it contains "adequate information," as that term is used in section 1125(a)(1) of the

Bankruptcy Code. However, the Bankruptcy Court has not passed on the merits of the Plan. Creditors should carefully read the Disclosure Statement, in its entirety, before voting on the Plan.

This Disclosure Statement and the attached Plan are the only materials creditors should use to determine whether to vote to accept or reject the Plan.

**THE LAST DAY TO VOTE TO ACCEPT OR REJECT THE PLAN IS [_____] AT 4:00 P.M. (EASTERN TIME) (THE "<u>VOTING DEADLINE</u>").**

**THE RECORD DATE FOR DETERMINING WHICH CREDITORS MAY VOTE ON THE PLAN IS [_____] (THE "<u>RECORD DATE</u>").**

**THE CONFIRMATION HEARING WILL BE HELD BEFORE THE HONORABLE BRENDAN L. SHANNON, UNITED STATES BANKRUPTCY JUDGE, IN COURTROOM # 1 OF THE 6TH FLOOR OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, WILMINGTON, DELAWARE 19801, ON [_____] AT [\_]:[\_] [\_].M. (PREVAILING EASTERN TIME), OR AS SOON THEREAFTER AS COUNSEL MAY BE HEARD. THE BANKRUPTCY COURT HAS DIRECTED THAT OBJECTIONS, IF ANY, TO CONFIRMATION OF THE PLAN BE SERVED AND FILED ON OR BEFORE [_____] AT 4:00 P.M. (PREVAILING EASTERN TIME).**

**PLEASE READ THE DISCLOSURE STATEMENT, INCLUDING THE PLAN, IN ITS ENTIRETY. A COPY OF THE PLAN IS ANNEXED HERETO AS <u>EXHIBIT A</u>. THE DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ALL SUCH SUMMARIES. ACCORDINGLY, IF THERE EXISTS ANY INCONSISTENCY BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.**

The Plan Supplement will be filed with the Bankruptcy Court no later than 10 business days prior to the Confirmation Hearing. The financial and other information included in this Disclosure Statement is for purposes of soliciting acceptances of the Plan.

**C.     Disclosure Statement Enclosures**

Accompanying the Disclosure Statement are the following enclosures:

1.      <u>Disclosure Statement Approval Order</u>. A copy of the order of the Bankruptcy Court, dated [_____], approving the Disclosure Statement and, among other things, establishing procedures for voting on the Plan (the "<u>Voting Procedures</u>") and scheduling the hearing to consider, and the deadline for objecting to, confirmation of the Plan (the "<u>Approval Order</u>").

2.      <u>Notice of Confirmation Hearing</u>. A copy of the notice of the deadline for submitting ballots to accept or reject the Plan and, among other things, the date, time, and place of the Confirmation Hearing and the deadline for filing objections to Confirmation of the Plan (the "<u>Confirmation Hearing Notice</u>").

3.      <u>Ballots</u>. One or more ballots (and return envelopes) for voting to accept or reject the Plan, unless you are not entitled to vote because you are (i) to receive no distribution under the Plan and are deemed to reject the Plan, (ii) not impaired under the Plan and are deemed to accept the Plan, or (iii) a holder of a Claim subject to an objection filed by the Debtors, which Claim is temporarily disallowed for voting purposes. *See* Section I.E below for an explanation of which parties in interest are entitled to vote.

The Bankruptcy Code provides that only creditors who vote on the Plan will be counted for purposes of determining whether the requisite acceptances have been attained. Failure to timely deliver a ballot by the Voting Deadline will constitute an abstention. Any ballot that is executed and timely delivered but does not indicate an acceptance or rejection shall not be counted as either an acceptance or rejection.

**D.      Inquiries**

If you have any questions about the packet of materials that you have received, please contact Omni Management Group, the Debtors' Claims and Balloting Agent at 844-378-2716.

Additional copies of this Disclosure Statement or copies of the Plan Supplement are available upon request made to the Claims and Balloting Agent, at the following address:

**Brookstone Holdings Corp., et al. Balloting Center**
**c/o Omni Management Group**
**5955 De Soto Ave., Suite 100**
**Woodland Hills, CA 91367**

Copies of the Disclosure Statement and the Plan Supplement also are available on the Claims and Balloting Agent's website, http://omnimgt.com/BKST/.

**E.      Summary Table of Classification and Treatment of Claims and Interests Under the Plan**

The following table provides a summary of the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the Plan, a copy of which is annexed hereto as <u>Exhibit A</u>.

| Class Number | Description of Class | Treatment Under the Plan/ Estimated % Recovery Under Plan |
|---|---|---|
| N/A | Administrative Claims | - Recovery: 100% |
| | | - Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment of its Allowed Claim, each Holder of an Allowed Administrative Claim will receive an amount of Cash equal to the amount of such Allowed Administrative Claim either (i) on the Effective Date, or as soon as practicable thereafter or (ii) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which such Administrative Claim is Allowed by a Final Order, or as soon as reasonably practicable thereafter. |
| | | |
| N/A | Priority Tax Claims | - Recovery: 100% |
| | | - Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment of its Allowed Claim, the Holder of such Allowed Priority Tax Claim shall be treated in accordance with |

| Class Number | Description of Class | Treatment Under the Plan/ Estimated % Recovery Under Plan |
|---|---|---|
| | | the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. |
| | | |
| Class 1 | Other Priority Claims | - Recovery: 100%<br><br>- Unimpaired<br><br>- Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Other Priority Claim, each such Holder shall receive payment in full in Cash of the amount of such Holder's Allowed Other Priority Claim either: (i) on the Effective Date, or as soon as reasonably practicable thereafter, or (ii) if the Other Priority Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which such Other Priority Claim is Allowed by Final Order, or as soon as reasonably practicable thereafter. |
| | | |
| Class 2 | Other Secured Claims | - Recovery: 100%<br><br>- Unimpaired<br><br>- Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment of its Allowed Other Secured Claim, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Other Secured Claim shall receive the following treatment at the option of the Debtors: (i) payment in full (in Cash) of such Allowed Other Secured Claim, (ii) satisfaction of such Allowed Other Secured Claim by delivering the collateral securing such Allowed Other Secured Claim and paying any interest required to be paid under section 506(b) of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. |
| Class 3 | General Unsecured Claims | - Recovery: 16.4-22.5%<br><br>- Impaired<br><br>- Each Holder of an Allowed Class 3 Claim shall receive its Pro Rata share of the Liquidating Trust Interests in accordance with Article IV.C.2 of the Plan on account of such Holder's General |

| Class Number | Description of Class | Treatment Under the Plan/ Estimated % Recovery Under Plan |
|---|---|---|
| | | Unsecured Claim(s) against the Debtors, which shall entitle such holder to distributions from the Liquidating Trust as and to the extent set forth in the Plan and the Liquidating Trust Agreement. |
| | | |
| Class 4 | Existing Equity Interests in Brookstone Subsidiaries | - Recovery: 0%<br><br>- Impaired<br><br>- On the Effective Date or as soon as reasonably practicable thereafter, all Existing Equity Interests shall be cancelled and extinguished. Holders of Existing Equity Interests in the Brookstone Subsidiaries shall not receive any distribution or retain any property pursuant to the Plan. |
| | | |
| Class 5 | Existing Equity Interests in Brookstone Parent | - Recovery: 0%<br><br>- Impaired<br><br>- On the Effective Date or as soon as reasonably practicable thereafter, all Existing Equity Interests in Brookstone Parent shall be cancelled and extinguished. Holders of Existing Equity Interests in Brookstone Parent shall not receive any distribution or retain any property pursuant to the Plan. |

## II.     OVERVIEW OF DEBTORS' OPERATIONS AND CHAPTER 11 CASES

### A.     Debtors' Prepetition Business Operations

Prior to the Petition Date, the Debtors were a product development company and multichannel retailer that offer a number of highly distinctive and uniquely designed products. The Brookstone brand was strongly associated with cutting-edge innovation, superior quality, and sleek and elegant design.

Brookstone began as a catalog company in the 1960s. The Brookstone brand was introduced through a classified ad in Popular Mechanics Magazine featuring "hard-to-find tools." By the 1970s, Brookstone expanded its business operations, opening a retail store in Peterborough, New Hampshire. By the 1990s, Brookstone added internet sales and marketing through its website, www.brookstone.com. From there, Brookstone could offer thousands of products to its customers, including certain products that were not even available in stores

As of the Petition Date, Brookstone operated 137 retail stores across 40 states and Puerto Rico. In addition, the Debtors operated one liquidation center in North Conway, New Hampshire. Of the 137 retail stores, 102 stores were located in malls (the "Mall Locations") and 35 stores were located at airports. Certain airport stores were operated as a joint venture between one of the Debtors and one or more third parties. These joint ventures were (and as of the date hereof, continue to be) organized as limited liability companies. Mall Locations varied in size from approximately 2,500 to 3,500 square feet and carried

approximately 700 active stock keeping units ("SKUs"). Airport stores varied in size from approximately 75 to 2,300 square feet and carried approximately 375 active SKUs.

For the fiscal year ended 2017, net sales for the Debtors were $264 million and adjusted EBITDA was booked at negative $60 million. For the first half of 2018, net sales were $74 million and adjusted EBITDA was booked at negative $29 million.

<u>Product Categories</u>

Prior to the Petition Date, the Debtors manufactured and sold products in three core categories: (i) "wellness" which focused on products that improve consumers' health and well-being, such as massage and sleep improvement products, massage chairs, and exercise/fitness monitoring products, (ii) "entertainment" which focused on audio, wine and barbeque, seasonal décor and toys, and (iii) "travel" which focused on in-flight comfort (such as pillows), mobile solutions (chargers/headphones), and travel lifestyle products.

The key to the Debtors' product offerings was Brookstone's unique "Plus One" model, which was woven throughout all three product categories. For example, Brookstone did not offer merely a weighted blanket (a product which helps relieve stress and enhances relaxation); rather, Brookstone offered a weighted blanket with Nap® fabric, a specially designed fabric that is softer than the weighted blankets offered by competitors. Similarly, Brookstone did not offer merely Bluetooth headphones, they offered lighted Bluetooth headphones that also featured lighted cat ears that doubled as additional external speakers and allowed the user to control and change the light displayed thereon. It is this "Plus One" doctrine, together with Brookstone's commitment to quality, which was the primary strength and value driver associated with the "Brookstone" brand.

In addition to Brookstone branded products, Brookstone offered a number of unique and innovative products created by third parties who—prior to their relationship with Brookstone—did not have access to wide distribution channels. Brookstone's partnerships with these third parties offered tremendous synergies, allowing Brookstone to supplement sales revenue with products that fell within the Brookstone model but that didn't directly compete with Brookstone branded merchandise, allowing the third party producer to access to a much more significant consumer base than would otherwise be available.

<u>Product Channels</u>

Prior to the Petition Date, Brookstone marketed its branded products, and those of its third party product partners, in four channels: (i) mall retail, (ii) airport retail, (iii) e-commerce through www.brookstone.com and certain other third party sites (including www.Amazon.com) and (iv) wholesale (including TV shopping). In 2017, net sales by channel were approximately 53% mall/outlet, 21% e-commerce, 14% airport retail, and 12% wholesale.

**(i)    Mall Retail**

Prior to the Petition Date, Brookstone operated 101 stores in malls throughout the United States, and one store in Puerto Rico (the "Puerto Rico Store"). The products offered in Mall Locations spanned each of the Debtors' three product categories, and were the Debtors' primary sales platform for the majority of the Debtors' existence. The Debtors Mall Locations operated at a loss each year consecutively since 2014 as a result of shift of consumer preferences away from brick and mortar retailers (and shopping malls in particular) and the attendant loss of foot traffic that is so critical to the successful operation of retail stores. For the year ended 2017, each of the Debtors' Mall Locations operated at a negative adjusted

EBITDA, with an aggregate net sales of approximately $137.9 million, and adjusted EBITDA of negative $30 million.

### (ii)    Airport Retail

Prior to the Petition Date, Brookstone operated 35 stores in airports throughout the United States. Geared towards travelers, the airport stores carried less SKUs than the Mall Locations and the products offered are focused primarily in the Travel product category. Unlike the Mall Locations, consistent foot traffic, a captive consumer audience and limited seasonality allowed these stores to thrive (on an aggregate level) in comparison to the Debtors' Mall Locations. For the year ended 2017, the majority of the Debtors' airport stores operated with positive adjusted EBITDA, with aggregate net sales of $37.7 million, and adjusted EBITDA of $1.4 million.

### (iii)    E-Commerce Segment

Since 1996, the Debtors operated an interactive website at www.brookstone.com. In addition to offering products available in retail stores, the website contained thousands of additional items that were designed to broaden and deepen Brookstone's presence in key product categories. The "web-only" assortment of products available on the e-commerce site accounted for approximately 30% of Brookstone's e-commerce sales for fiscal year 2017.

For much of the Debtors' history they supplemented their in-store and online sales with hard copy catalog mailings. The catalogs, which were mailed predominantly to customers that matched Brookstone's key demographic profiles during the busiest sales periods of the year, had the added benefit of marketing the Brookstone brand name (indirectly enhancing in-store and online sales). In 2018, due predominantly to liquidity constraints, Brookstone determined to cease its hard copy catalog mailings. As described further below, this strategic decision negatively impacted both store retail and online sales in the years that followed.

For the fiscal year ended 2017, the Debtors' e-commerce operations accounted for net sales of $55.2 million, and had a negative adjusted EBITDA of $1 million.

### (iv)    Wholesale Segment

The Debtors have engaged in a wholesale business since 2007; however this segment was largely neglected from a strategic standpoint until the downfall of the mall store model became apparent in recent years. Historically, the Debtors sought out resellers and corporate partners to include Brookstone branded products in their stores, media outlets and catalogs, but only allowed such vendors to select from a small assortment of products already sold in malls.

In the months leading up to the Petition Date, Brookstone focused significant energy to seeking out wholesale partners to significantly build this sales segment. Prior to the Petition Date the management team for this segment was able to garner commercial partnerships with Bed, Bath & Beyond, Costco and Home Shopping Network (among others) to carry significant amounts of the Debtors' products.

For the fiscal year ended 2017, the Debtors' wholesale operations accounted for net sales of $32.6 million, and had an adjusted EBITDA of $5 million.

<u>Intellectual Property and Licensing</u>

Prior to the Going Concern Sale (as defined below) one of the Debtors' most valuable assets was the "Brookstone" brand name, which is recognizable by the Debtors' broad customer base both in the United States and abroad and is associated with premium quality and innovative products. In addition, prior to the Going Concern Sale the Debtors were the owners of many prominent and recognizable "sub-brands" that are associated with their premium quality products. Such sub-brands included "Big Blue Audio®", "Nap®", "Theraspa®", "BioSense®" and "Carry On®". These sub-brands were owned by the Debtors in various trademark classes in both the U.S. and internationally. In total, the Debtors owned a portfolio of 169 trademarks, 191 patents and 980 copyrights.

Prior to the Going Concern Sale the Debtors licensed (the "<u>Brookstone China License</u>") certain of their patents and trademarks that are registered in China to Brookstone Electronics Co., Ltd. ("<u>Brookstone China</u>"), an entity that is currently 10% owned (indirectly) by the Debtors and 90% owned by Sanpower (Hong Kong) Company Limited ("<u>Sanpower</u>"), an indirect non-debtor parent of the Debtors. In sum, the Brookstone China License permitted Brookstone China to use the Brookstone name, and sell Brookstone branded products, in China. Under the terms of the Brookstone China License, and prior to the Going Concern Sale, the Debtors were entitled to receive royalties equal to three percent of the cost of Brookstone branded goods purchased for sale in stores operated by Brookstone China. The Brookstone China License expires by its terms on December 31, 2018.

<u>Product Development and Sourcing</u>

Prior to the Petition Date, the products sold by the Debtors through their various sales channels consisted of Brookstone branded products and, to a lesser extent, products designed and branded by third parties. As of the Petition Date, Brookstone branded products accounted for nearly 70% of net sales across all channels, and accounted for a substantially higher profit margin on a gross basis (approximately 60-70% margins on proprietary products as opposed to 40-50% for third party merchandise).

Certain of the Brookstone branded products were designed from the ground-up at the Debtors' prepetition Merrimack, New Hampshire headquarters, while others were sourced from concepts developed overseas that were brought to market in the U.S. The Debtors' "Design Lab" would oversee the creation of new products and the introduction of externally sourced items to market. This design segment was first launched in 1999, with a view towards not only developing innovative "need to own" products, but also with an aggressive "freshness" goal of replacing one third of all branded inventory on an annual basis.

The design team had historically consisted of approximately 30 experienced industrial designers and electrical and mechanical engineers (i.e. the teams that designed new products from ideas or significantly modified sourced products in partnership with vendors), and merchants (i.e. the teams that uncovered or created new product opportunities, validated the business plan, managed the development timeline and directed product marketing for the newly designed products). In addition, Brookstone had historically employed a team of QA/QC personnel in-house that conducted quality assurance, managed quality control and ensured all necessary government compliance measures for each of Brookstone's product offerings. As liquidity and profitability has flagged over recent years, the Debtors were forced to make a number of cuts to the design, merchant and QA/QC teams. Once designed, products were sourced through various vendors in the United States and Asia.

**B.      Corporate Headquarters and Distribution Center**

Prior to the Petition Date, the Debtors owned their corporate headquarters located in Merrimack, New Hampshire (the "<u>HQ Building</u>"). Brookstone also operated a single 400,000 square feet distribution

center in Mexico, Missouri (the "Distribution Center") that was subject to a capital lease between Brookstone and the City of Mexico, Missouri. Prior to the Petition Date, the Debtors received and distributed nearly all of their inventory through the Distribution Center, which supported the retail, e-commerce and wholesale segments. As described further below, the Debtors' interests in each of the HQ Building and the Distribution Center were sold as part of the Going Concern Sale.

### C. Organizational Structure

Brookstone conducts its operations through a network of affiliated companies that own the various assets comprising its businesses. These companies are all directly or indirectly owned by Sanpower Group Co., Ltd.

Brookstone Holdings Corp. and Brookstone, Inc. are both incorporated in Delaware and are holding companies, the principal asset of which is the capital stock of Brookstone Company, Inc., a New Hampshire corporation that, along with its direct and indirect subsidiaries, operated the Debtors' businesses.

The Debtors are 100% owned by Sanpower Group Co., Ltd. through a series of wholly-owned intermediate holding companies.

### D. Prepetition Capital Structure

The chart below sets forth the Debtors' funded debt obligations as of the Petition Date:

| Debt Obligation | Original Principal Amount | Approximate Principal Amount Outstanding as of Petition Date | Maturity | Security Status |
|---|---|---|---|---|
| Prepetition ABL Facility | $70,000,000.00 (Revolver)<br><br>$15,000,000.00 (Term Loan) | $13,513,758.59 (Revolver)<br><br>$15,000,000.00 (Term Loan) | 7/7/19 | Secured |
| Prepetition Second Lien Notes | $10,000,000.00 | $14,870,087.41 | 7/7/21 | Secured |
| Sanpower Secured Notes | $39,490,281.05 | $39,490,281.05 | 7/8/19 | Secured |
| Sanpower Unsecured Notes | $46,625,906.44 | $46,625,906.44 | 7/8/19 | Unsecured |

Prepetition ABL Facility

Brookstone Company, Inc. as successor borrower,[2] Wells Fargo Bank, National Association ("Wells Fargo"), as Agent (as successor to General Electric Capital Corporation ("GECC")), and certain lenders were parties to a Credit Agreement, dated as of July 7, 2014 (as amended, modified, supplemented, or restated from time to time, the "Prepetition ABL Facility"). Each of the other Debtors guaranteed the obligations under the Prepetition ABL Facility. The Prepetition ABL Facility was comprised of a $70.0

---

[2] Sailing Innovation (US) Inc. was the initial borrower, and was subsequently merged into Brookstone Holdings, Corp.

million revolving credit facility and a term loan with an initial principal amount of $15.0 million. Gordon Brothers Finance Company ("Gordon Brothers") was the lender under the Term Loan.

The Prepetition ABL Facility obligations were secured by first priority liens on substantially all of the Debtors' assets, including receivables, inventory, general intangibles, intellectual property, documents, deposit accounts, equipment, fixtures, and inventory, all as set forth in that certain Guaranty and Security Agreement, dated as of July 7, 2014 by and among Brookstone Company, Inc., as successor borrower, the guarantors party thereto, and GECC, as Agent, and the companion patent, trademark and copyright agreements entered into as of July 7, 2014 and June 3, 3015. The Prepetition ABL Facility was further secured by a first mortgage on the Debtors' corporate headquarters property in Merrimack, New Hampshire.

Prepetition Second Lien Notes

Brookstone Holdings Corp. issued 10.00% Second Lien Subordinated Secured Notes Due 2021 (the "Prepetition Second Lien Notes") pursuant to the Indenture, dated as of July 7, 2014, by and among Brookstone Holding Corp. as issuer, the other Debtors as guarantors, and Wilmington Trust, National Association ("Wilmington Trust") as Trustee. The Prepetition Second Lien Notes Indenture provided for the payment of interest either in cash or in kind ("PIK Interest"), at the option of the issuer. The Prepetition Second Lien Notes were originally issued with a face value of $10.0 million; however, following the accrual of PIK Interest, the Prepetition Second Lien Notes carried a face value of $14,870,087.41 as of the Petition Date. The Prepetition Second Lien Notes were secured by second priority liens on substantially the same assets as the Prepetition ABL Facility, however, the collateral securing the Prepetition Second Lien Notes did not include the Debtors' interests in real estate.

Brookstone Company, Inc., GECC as Agent under the Prepetition ABL Facility and Wilmington Trust, as Trustee for the Prepetition Second Lien Notes entered into a Subordination Agreement dated as of July 7, 2014 that, among other things, governed the relative priorities of liens granted under the Prepetition ABL Facility and Prepetition Second Lien Notes, respectively.

Sanpower Secured Notes

Beginning in January 2018 through to July 16, 2018, Sanpower, as lender, entered into 17 separate Secured Subordinated Promissory Notes (collectively, the "Sanpower Secured Notes") with Brookstone Company, Inc., as borrower, each due July 8, 2019. A listing of each of the Sanpower Secured Notes is below:

| No. | Date | Original Principal Amount |
|-----|------|---------------------------|
| 1. | 01/22/18 | $1,000,000.00 |
| 2. | 01/23/18 | $2,490,000.00 |
| 3. | 01/25/18 | $2,510,000.00 |
| 4. | 02/28/18 | $5,000,000.00 |
| 5. | 03/13/18 | $6,000,000.00 |
| 6. | 04/04/18 | $4,000,000.00 |
| 7. | 04/13/18 | $2,000,000.00 |

| No. | Date | Original Principal Amount |
|-----|------|---------------------------|
| 8. | 04/18/18 | $1,500,000.00 |
| 9. | 04/20/18 | $500,000.00 |
| 10. | 05/02/18 | $1,000,000.00 |
| 11. | 05/04/18 | $1,999,985.00 |
| 12. | 05/07/18 | $1,799,985.00 |
| 13. | 05/24/18 | $690,336.05 |
| 14. | 06/06/18 | $2,499,975.00 |
| 15. | 06/20/18 | $1,500,000.00 |
| 16. | 07/06/18 | $2,000,000.00 |
| 17. | 07/16/18 | $3,000,000.00 |
| | **TOTAL** | **$39,490,281.05** |

The Sanpower Secured Notes were guaranteed by Brookstone Purchasing, Inc. and Big Blue Audio LLC pursuant to a Guaranty entered into as of June 29, 2018 (the "Sanpower Guaranty"), and were not guaranteed by any of the other Debtors. The Sanpower Secured Notes were secured (i) by liens on all of the assets of Brookstone Company, Inc., and (ii) by certain intellectual property assets of Brookstone Purchasing, Inc. and Big Blue Audio LLC pursuant to an Intellectual Property Security Agreement entered into as of July 6, 2018. The Sanpower Secured Notes were not secured by assets of any of the other Debtors. Pursuant to the terms of the Sanpower Secured Notes, the obligations owed to Sanpower under the Sanpower Secured Notes were contractually subordinated to the obligations underlying the Prepetition ABL Facility until payment in full of such obligations.

Sanpower Unsecured Notes

Beginning in February 2016 through to September 2016, Sanpower, as lender, entered into 10 separate Unsecured Subordinated Promissory Notes (collectively, the "Sanpower Unsecured Notes") with Brookstone Company, Inc., as borrower, each due July 8, 2019. A listing of each of the Sanpower Secured Notes is below:

| No. | Date | Original Principal Amount |
|-----|------|---------------------------|
| 1. | 02/04/16 | $5,000,000 |
| 2. | 09/07/16 | $5,000,000 |
| 3. | 10/12/16 | $5,000,000 |
| 4. | 04/18/17 | $3,000,000 |
| 5. | 05/15/17 | $6,000,000 |
| 6. | 06/02/17 | $3,000,000 |

| No. | Date | Original Principal Amount |
|-----|------|---------------------------|
| 7. | 07/05/17 | $15,000,000 |
| 8. | 08/30/17 | $2,125,906.44 |
| 9. | 09/11/17 | $1,300,000 |
| 10. | 09/15/17 | $1,200,000 |
| | **TOTAL** | **$46,625,906.44** |

The Sanpower Unsecured Notes were guaranteed by Brookstone Purchasing, Inc. and Big Blue Audio LLC pursuant to the Sanpower Guaranty, and were not guaranteed by any of the other Debtors, and were not secured by any liens. Pursuant to the terms of the Sanpower Unsecured Notes, the obligations owed to Sanpower under the Sanpower Unsecured Notes were contractually subordinated to the obligations underlying the Prepetition ABL Facility until payment in full of such obligations.

Trade Debt

As of the Petition Date, the Debtors estimated that their unsecured debt was between $75 and $85 million (excluding the Sanpower Unsecured Notes) including approximately $40 million owed to Shenzhen Yuanchuang International Trading Co. d/b/a Sanpower Sourcing Group ("SSG"). As of the Petition Date, SSG was Brookstone's largest sourcing partner. Pursuant to a supply agreement between Brookstone and SSG, a significant majority of Brookstone's products that were sourced from Asia were provided through SSG's network of factories. Prior to the Petition Date, approximately 48% of Brookstone's products, as measured by net sales, were sourced by SSG. As described in Section II.F.5. below, the General Unsecured Claims of SSG, the Sanpower Secured Notes, and the Sanpower Unsecured Notes were released in connection with the Going Concern Sale and the DIP Facility and the Prepetition Second Lien Notes were repaid from the proceeds of the Going Concern Sale.

**E.      Significant Events Leading to Commencement of Chapter 11 Cases**

Prior Bankruptcy

In 2007, Brookstone had reached its peak profitability, generating net sales of $563 million and adjusted EBITDA of $59 million. Following the great recession of 2008, Brookstone struggled to perform anywhere near pre-recession levels. In fiscal 2013, Brookstone's adjusted EBITDA was a mere $10.7 million.

During and after the economic downturn, Brookstone attempted to improve its balance sheet by eliminating unprofitable stores, cutting staff, reducing overhead, streamlining product development and cutting marketing efforts (including cutting catalog circulation by 50%). At the same time, Brookstone attempted to de-lever its balance sheet through exchange offers and repurchases of its then outstanding notes. Despite these cost cutting efforts, a disappointing holiday sales season in 2013 and a looming January 15, 2014 interest payment on then outstanding second lien notes made it clear that a bankruptcy filing was inevitable.

Following entry into a forbearance agreement, on April 3, 2014, the Debtors, together with certain affiliated entities, filed petitions for relief pursuant to chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware (the "2014 Bankruptcy"). Immediately prior to filing the 2014 Bankruptcy, Brookstone entered into a stalking horse agreement with an affiliate of Spencer Spirit

Holdings, Inc. ("Spencer") to purchase newly issued shares of reorganized Brookstone Holdings Corp. pursuant to a to-be-filed plan of reorganization. The plan sponsor stalking horse agreement, however, was subject to a competitive marketing and auction process. Following a lengthy auction, affiliates of Sanpower Group Co., Ltd. were declared to be the successful bidder, and were substituted as plan sponsor for Spencer.

On June 24, 2014, the plan of reorganization of the Debtors was confirmed by the Bankruptcy Court, and on July 7, 2014 the plan was declared effective.

<u>Events Following the 2014 Bankruptcy</u>

Following the 2014 Bankruptcy, sales continued to lag almost immediately. For the years ended 2014 and 2015, net sales were pegged at approximately $420 million and $389 million respectively, while adjusted EBITDA was booked at negative $38 million and negative $24 million respectively. While a number of factors contributed to the underperformance, sourcing of products and supply chain difficulties were the major drivers.

In 2016 and early 2017, Brookstone pressured vendors to change their payment terms from a standard 10 days to 60 days. In addition, Brookstone sought out vendors who would accept Chinese Yuan (RMB) as opposed to U.S. Dollars. These moves caused certain vendors to cease sales to Brookstone.

The drop in net sales in 2016 and 2017 was further exacerbated by the decline in the mall model as a means for consumers to buy products of the type sold by Brookstone. During this time, foot traffic at Mall Locations decreased drastically, as consumers continued to seek out products online as a replacement for traditional brick and mortar shopping. For the fiscal years ended 2016 and 2017, net sales were approximately $351 million and $264 million respectively, while adjusted EBITDA was negative $39 million and negative $60 million respectively.

Brookstone was unable to compensate for the decline in mall shopping through its e-commerce platform. Consistent leadership changes in the e-commerce segment led to a loss of institutional knowledge and significant junior associate turnover. At the same time, the Debtors' changed the technology underlying the e-commerce platform, and in so doing lost a substantial amount of data and indexing, damaging Brookstone's web presence. In 2018 the Debtors also made the strategic decision to eliminate the production and mailing of hard copy catalogs as a cost cutting measure. Because the catalogs were responsible for a significant portion of the web traffic on the Debtors' e-commerce site, this strategic initiative ultimately led to a negative impact on the Debtors' online sales.

During the years ended 2016 and 2017, the Debtors were able to survive only through continued investments of cash from Sanpower. From February 2016 to September 2017 Sanpower provided approximately $47 million in subordinated unsecured loans to Brookstone. Further loans were provided, this time on a subordinated secured basis, in the aggregate amount of approximately $40 million throughout 2018.

In June 2018, Brookstone was informed by Sanpower that it would only provide limited funding in July 2018, and that Brookstone would have to look elsewhere for financing sources, or significantly reduce operating expenses. Without the means to continue to operate absent funding from Sanpower, the Debtors hired restructuring professionals to prepare for a bankruptcy filing, secure DIP financing and market the Debtors' businesses for an in-court sale process.

F.      **Chapter 11 Cases**

1.      <u>Commencement of Chapter 11 Cases</u>. On August 2, 2018, Brookstone Holdings Corp., Brookstone, Inc., Brookstone Company, Inc., Brookstone Retail Puerto Rico, Inc., Brookstone International Holdings, Inc., Brookstone Purchasing, Inc., Brookstone Stores, Inc., Big Blue Audio LLC, Brookstone Holdings, Inc., and Brookstone Properties, Inc. each commenced the Chapter 11 Cases in the United States Bankruptcy Court for the District of Delaware. As of the date hereof, the Debtors continue to manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      <u>Appointment of Official Committee of Unsecured Creditors</u>. On August 14, 2018, the Committee was appointed by the Office of the United States Trustee pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Cases. The Committee currently consists of the following five members:

| | | | |
|---|---|---|---|
| 1. | TELESTAR<br>9817 Valley View Road<br>Eden Prairie, MN 55344<br>Attn: Reza Aghelnegad | 4. | PILOT AIR FREIGHT, LLC<br>c/o Offit Kurman<br>401 Plymouth Road<br>Plymouth Meeting, PA 19462<br>Attn: Chris Ashiotes, Esq. |
| 2. | SIMON PROPERTY GROUP, L.P.<br>225 West Washington Street<br>Indianapolis, IN 46204<br>Attn: Ronald M. Tucker | 5. | NATASHA DAVIS<br>c/o Dundon Advisers LLC<br>P.O. Box 259H<br>Scarsdale, NY 10583 |
| 3. | GGP LIMITED PARTNERSHIP<br>350 N. Orleans St., Suite 300<br>Chicago, IL, 60654<br>Attn: Julie Minnick Bowden | | |

The Committee retained (i) Cooley LLP, The Grace Building, 1114 Avenue of the Americas, 46th Floor, New York, New York, 10036, and (ii) Bayard, P.A., 600 N. King Street, Suite 400, Wilmington, Delaware 19801, as its attorneys and Province Inc., 2360 Corporate Circle, Suite 330, Henderson, Nevada 89074, as its financial advisors. The Committee has actively participated in all aspects of the Chapter 11 Cases.

3.      <u>DIP Financing</u>. As part of the preparation for the commencement of the Chapter 11 Cases, the Debtors negotiated the terms of a post-petition Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement (the "<u>DIP Credit Agreement</u>") with Wells Fargo, as Lender and Agent (the "<u>Revolving DIP Agent</u>") under the revolving credit facility portion of the DIP Facility (defined below), and Gordon Brothers, as Lender and Agent (the "<u>Term DIP Agent</u>," and together with the Revolving DIP Agent, the "<u>DIP Agents</u>"), under the term loan facility portion of the DIP Facility. The DIP Credit Agreement provided for the Debtors to obtain post-petition financing on a secured and super-priority basis up to a maximum aggregate amount of $30 million, consisting of $15 million in aggregate principal amount of revolving loans, and $15 million in aggregate principal amount of term loans (collectively, the "<u>DIP Facility</u>").

Subject to certain exceptions, the Debtors' obligations under the DIP Credit Agreement were secured by first priority security interests in and liens on substantially all of the Debtors' assets and

junior security interests in and liens on certain of the Debtors' assets encumbered by non-avoidable liens. By orders dated August 3, 2018 [Docket No. 76] and August 30, 2018 [Docket No. 278], the Bankruptcy Court approved the DIP Facility on an interim and final basis, respectively, and also granted the DIP Agents and the lenders under the DIP Facility (the "DIP Lenders") allowed super-priority Administrative Claims, with priority over all other Administrative Claims, subject only to the Carve-Out (as defined in the DIP Credit Agreement). The Bankruptcy Court also granted to the agents and lenders under the Prepetition ABL Facility adequate protection in the form of (i) Administrative Claims pursuant to section 507(b) of the Bankruptcy Code, with priority immediately junior to the Administrative Claims of the DIP Agents and DIP Lenders, (ii) security interests in and liens on certain property of the Debtors' estates, with a priority immediately junior to the liens under the DIP Facility, and (iii) current payment of interest and reimbursement by the Debtors of all reasonable fees and expenses. In addition to funding the costs of the Chapter 11 Cases, the DIP Facility provided funding for the Debtors to repay in full the Prepetition ABL Facility in the form of a "roll-up" of that facility.

As described further below, on October 22, 2018, the DIP Facility was indefeasibly paid in full with the proceeds of the Going Concern Sale.

4.    Store Closing Sales. Prior to the Petition Date, the Debtors, in consultation with their professional advisors, completed a comprehensive review of their retail operations to analyze, among other things, the profitability and viability of each store location. As a result of this analysis, the Debtors determined to, among other things, implement store closing initiatives at each of their Mall Locations. In furtherance thereof, the Debtors filed a motion [Docket No. 25] (the "Store Closing Motion") seeking authority to conduct store closing sales at the Mall Locations and, subsequent thereto, obtained Bankruptcy Court authority to conduct such sales at the Mall Locations through and including September 30, 2018. At the conclusion of that process, the Debtors rejected each lease of nonresidential real property that governed the Debtors' occupancy of the Mall Locations, to the extent that the Debtors did not enter into lease termination agreements with applicable landlord prior thereto.

5.    Going Concern Sale Process and Auction. While the Debtors conducted store closing sales at their Mall Locations, they simultaneously prosecuted the *Debtors' Motion, Pursuant To Sections 105, 363 And 365 Of The Bankruptcy Code, Fed. R. Bankr. P. 2002, 6003, 6004, 6006, 9007, 9008 And 9014 And Del. Bankr. L.R. 2002-1, 6004-1 And 9006-1, For Entry Of (A) An Order (I) Approving Bid Procedures In Connection With The Sale Of Substantially All Of The Debtors' Assets, (II) Scheduling An Auction For And Hearing To Approve Sale Of Assets, (III) Approving Notice Of Respective Date, Time And Place For Auction And For Hearing On Approval Of Sale, (IV) Approving Procedures For The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, (V) Approving Form And Manner Of Notice Thereof, And (VI) Granting Related Relief; And (B) An Order Authorizing And Approving (I) The Sale Of Substantially All Of The Debtors' Assets Free And Clear Of Liens, Claims, Rights, Encumbrances, And Other Interests, (II) The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases And (III) Related Relief* [Docket No. 100] (the "Bidding Procedures Motion"), pursuant to which the Debtors sought to implement a value-maximizing sale process for substantially all of their assets. The Bankruptcy Court entered an order approving the Bidding Procedures Motion on August 29, 2018 [Docket No. 265] (the "Bidding Procedures Order"), thereby initiating the auction and sale process further detailed below. Pursuant to the Bidding Procedures Order, the Debtors were authorized to seek out and enter into an agreement with one or more potential purchasers of some or all of the Debtors' assets in advance of a formal auction (a "Stalking Horse Purchaser"), for the purposes of setting a "floor" purchase price for a potential sale (or sales). In furtherance thereof, on August 24, 2018, the Debtors entered into a letter of intent with Authentic Brands Group, LLC ("ABG") for the sale of substantially all of their intellectual property assets in exchange for $35 million in cash (the "ABG LOI"). The ABG LOI provided that the agreement was terminable by the Debtors in the event that (among other things) (i) the Debtors received a higher or better offer for the intellectual property assets at a formal auction, or (ii) the Debtors were

compelled by an exercise of their fiduciary duties to terminate the agreement (the "Fiduciary Out"). On August 31, 2018, the Debtors exercised their Fiduciary Out under the ABG LOI, and in lieu thereof, executed a letter of intent with Bluestar Alliance, LLC ("Bluestar"), which provided for the sale of substantially all of the Debtors' intellectual property assets to Bluestar in exchange for $43 million in cash (the "Initial Bluestar LOI"). Also on August 31, 2018, the Debtors filed a motion seeking authority to designate Bluestar as the Stalking Horse Purchaser with respect to the Debtors' intellectual property assets, and to provide certain bidding protections to Bluestar in connection with the Bluestar LOI [Docket No. 287] (the "Bidding Protections Motion").

On September 5, 2018, the Debtors entered into a letter of intent with Bluestar (the "Revised Bluestar LOI") which replaced in its entirety the Initial Bluestar LOI. The Revised Bluestar LOI increased the purchase price for the Debtors' intellectual property assets to at least $56.35 million (with a potential purchase price adjustment of an additional $400,000 payable in certain circumstances) and providing for the potential "going concern" option whereby approximately 30-50 of the Debtors' stores would remain open for business following the closing. On September 7, 2018, the Bankruptcy Court entered an order approving the Bidding Protections Motion as revised to incorporate the Revised Bluestar LOI. On September 18, 2018, the Debtors entered into an asset purchase agreement with Bluestar (the "Stalking Horse APA") which formalized the terms set forth in the Revised Bluestar LOI.

Pursuant to the terms of the Bidding Procedures Order, the Debtors established September 20, 2018 as the date by which bids for any of the Debtors assets (including but not limited to the assets that were subject to the Stalking Horse APA) were due. The Debtors received a number of bids related to (i) the Debtors' intellectual property assets, (ii) the Debtors' unexpired real property leases or concession agreements used to operate Brookstone airport stores (the "Airport Leases"), (iii) the Debtors' equity interests in certain non-Debtor joint venture subsidiaries which also operate Brookstone airport stores (the "JV Equity Interests"), (iv) the Debtors' Distribution Center, and (v) the Debtors' HQ Building (collectively, the "Auction Assets").

On September 26, 2018, the Debtors commenced a formal auction (the "Auction") with respect to Auction Assets. The Auction formally concluded on September 30, 2018. At the conclusion of the Auction, (i) a bid submitted by an affiliate of Brady Sullivan Properties, LLC (the "Real Estate Purchaser") was declared the "successful bid" for the HQ Building, with a cash purchase price of $6.1 million, and (ii) a joint bid submitted by Bluestar and Apex Digital Inc. ("Apex," and together with Bluestar, the "Going Concern Purchasers") was declared the "successful bid" for the Debtors' intellectual property assets, the Airport Leases, the JV Equity Interests, and the Distribution Center (the "Going Concern Assets"), in exchange for (a) $65 million in cash, (b) a waiver of claims held by Sanpower arising under the Sanpower Secured Notes and the Sanpower Unsecured Notes, and (c) a waiver of all claims held by SSG.

6.    Going Concern Sale Closing and Debt Payoff. On October 1, 2018, the Bankruptcy Court entered that certain *Order (I) Authorizing the Sale of a Certain Parcel of Real Property and Certain Related Assets of the Debtors Free and Clear of all Liens, Claims, Liabilities, Rights, Encumbrances and Other Interests, and (II) Granting Related Relief* [Docket No. 475], approving the sale of the HQ Building (the "Real Estate Sale") to the Real Estate Purchaser. The Real Estate Sale closed on October 25, 2018.

On October 5, 2018, the Court entered that certain *Order (I) Authorizing the Sale of Certain Assets of the Debtors Free and Clear of All Liens, Claims, Liabilities, Rights, Encumbrances and Other Interests, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts in Connection Therewith, and (III) Granting Related Relief* [Docket No. 507] approving the sale of the Going Concern Assets (the "Going Concern Sale") to the Going Concern Purchaser. The Going Concern Sale closed on October 19, 2018. The DIP Facility and the Prepetition Second Lien Notes were each paid in full from the

proceeds of the Going Concern Sale (the "Debt Payoff"). Because (i) the Prepetition ABL Facility had been paid in full from the proceeds of the DIP Facility and (ii) the consideration for the Going Concern Sale included a waiver of claims held by Sanpower, none of the funded debt obligations described in Section II.D. above remained outstanding following the Debt Payoff.

7.  <u>The TSA and Airport Lease/JV Equity Assignment</u>. A critical element of the Going Concern Sale was the Debtors' entry into a transition services agreement (the "TSA") with Apex pursuant to which the Debtors agreed to perform certain continued services in connection with the operation of the Debtors' airports stores for a transition period running through January 31, 2019 (the "TSA Period"). Pursuant to the TSA, Apex has committed to fund the costs of the Debtors' go-forward operations during the TSA Period. During the TSA Period, the Debtors and Apex will seek consent (where necessary) of landlords and governmental agencies that are related to the Debtors' airport store operations for the assignment of the Airport Leases and JV Equity Interests to Apex.

8.  <u>Executory Contracts and Unexpired Leases</u>. As of the Petition Date, the Debtors were parties to hundreds of executory contracts and unexpired leases of nonresidential real property and personal property. As discussed above, since the Petition Date, the Debtors have closed and rejected the leases associated with each of the Mall Store Locations, and are in the process of seeking to assume and assign the Airport Leases and transfer the JV Equity Interests to Apex. The Debtors have also undergone a thorough analysis of their executory contracts and, pursuant to a motion dated November 13, 2018 [Docket No. 758], sought authority to reject numerous such contracts that could have resulted in the incurrence of additional unwanted Administrative Costs (the "Executory Contract Rejection Motion"). The Executory Contract Rejection Motion was approved by order of the Bankruptcy Court on December 3, 2018 [Docket No. 846]. The remainder of the Debtors' executory contracts will be assumed or rejected pursuant to the Plan or additional motions to assume or reject executory contracts.

9.  <u>Claims Process</u>. By order dated October 31, 2018 [Docket No. 653] (the "Bar Date Order"), the Bankruptcy Court established (i) December 5, 2018 as the deadline for each person or entity, excluding governmental units but including holders of claims arising under section 503(b)(9) of the Bankruptcy Code, to file a proof of Claim against the Debtors in the Chapter 11 Cases (the "General Bar Date"), and (ii) January 29, 2019 (the "Government Bar Date," and together with the General Bar Date, the "Bar Dates") as the deadline for each governmental unit to file a proof of Claim against the Debtors in the Chapter 11 Cases. Certain parties holding claims (including parties that are affected by any amendment or supplement to the Debtors' schedules and statements and any parties that are asserting rejection damages claims) may file claims after the Bar Dates if permitted by the Bar Date Order.

Notice of the Bar Dates was given as required, and the Bar Dates have passed. To date, over 2,100 proofs of claim have been filed against the Debtors. The Debtors have begun the process of analyzing the proofs of claim filed, but have not yet filed objections to any such proofs of Claim.

## III.   OVERVIEW OF THE PLAN

### A.   General

This Section of the Disclosure Statement summarizes the Plan, which is set forth in its entirety as Exhibit A hereto. This summary is qualified in its entirety by reference to the Plan. **YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN**.

In general, a chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the consideration that each class is to receive under the plan, and (iii) contains other provisions necessary to implement the Plan. Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and

"shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class. Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (a) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class or (b) provides, among other things, for the cure of existing defaults and reinstatement of the maturity of claims in such class. Class 3 is impaired under the Plan, and holders of Claims in such Class are entitled to vote to accept or reject the Plan unless the Claims are subject to an objection filed by the Debtors. Ballots are being furnished herewith to all Holders of Claims in Class 3 that are entitled to vote to facilitate their voting to accept or reject the Plan.

A chapter 11 plan may also specify that certain classes of claims or equity interests are to have their claims or equity interests remain unaltered by the plan. Such classes are referred to as "not impaired," and, because of the treatment accorded to such classes, they are conclusively deemed to have accepted the plan and, therefore, need not be solicited to vote to accept or reject the plan. Classes 1 and 2 are unimpaired and will not be solicited to vote to accept or reject the Plan.

A chapter 11 plan may also specify that certain classes will not receive any distribution under the plan. Under section 1126(g) of the Bankruptcy Code, such classes are conclusively deemed to have rejected the plan and, therefore, need not be solicited to accept or reject the plan. Holders of Existing Equity Interests in Classes 4 and 5 are impaired and will not receive any recovery under the Plan on account of such Existing Equity Interests, and such Classes, therefore, are conclusively deemed to reject the Plan. No ballot is enclosed for Holders of Existing Equity Interests in Classes 4 or 5.

The "Effective Date" of the Plan means the date on which the conditions precedent to the occurrence of the Effective Date of the Plan specified in Article X.B of the Plan have been satisfied or waived by the Plan Proponents pursuant to Article X.C of the Plan and the Plan is implemented.

**B.      Description and Summary of Classification and Treatment of Claims and Existing Equity Interests Under the Plan**

Claims and Existing Equity Interests are divided into five Classes under the Plan, and the proposed treatment of Claims and Existing Equity Interests in each Class is described in the Plan and summarized below. Such classification takes into account the different nature and priority of the Claims and Existing Equity Interests. The Plan contains one Class of Other Priority Claims (Class 1) that is unimpaired, one Class of Other Secured Claims (Class 2) that is unimpaired, one Class of impaired General Unsecured Claims (Class 3), one Class of impaired Existing Equity Interests in the Brookstone Subsidiaries (Class 4), and one Class of impaired Existing Equity Interests in the Brookstone Parent (Class 5). The meaning of "impairment," and the consequences thereof in connection with voting on the Plan, are set forth in Section III.A above.

**C.      Administrative Claims, Priority Tax Claims, and Professional Fee Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.      Administrative Claims.

Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment of its Allowed Administrative Claim, each Holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either (i) on the Effective Date, or as soon as practicable thereafter

or (ii) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which such Administrative Claim is Allowed by a Final Order, or as soon as reasonably practicable thereafter, or All requests for payment of an Administrative Claim must be Filed with the Bankruptcy Court and served on counsel to the Liquidating Trustee, counsel to the Debtors, and the U.S. Trustee no later than the Administrative Claim Bar Date**.**

        2.      <u>Priority Tax Claims.</u>

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, the Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

        3.      <u>Professional Fee Claims.</u>

All final applications for payment of Professional Fee Claims shall be filed with the Bankruptcy Court and served on the Plan Proponents and the Liquidating Trustee on or before the Professional Fee Claims Bar Date or such later date as may be agreed to by the Liquidating Trustee. Each holder of an Allowed Professional Fee Claim shall be paid in Cash from the Liquidating Trust in an amount equal to such Allowed Professional Fee Claim on or as soon as reasonably practicable after the first Business Day following the date upon which such Claim becomes Allowed, unless such holder shall agree to a different treatment of such Claim.

**D.**      **Classification and Treatment of Claims and Interests**

        1.      <u>Classification of Claims and Interests.</u>

Claims and Interests, except for Administrative Claims, Priority Tax Claims, and Professional Fee Claims, are classified in the Classes set forth in Article III of the Plan. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 4 | Existing Equity Interests in the Brookstone Subsidiaries | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 5 | Existing Equity Interests in Brookstone Parent | Impaired | Not Entitled to Vote (Deemed to Reject) |

        2.      <u>Treatment of Claims and Interests.</u>

(a)     Class 1—Other Priority Claims.

a.      *Classification*: Class 1 consists of all Other Priority Claims.

b.      *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Other Priority Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive payment in full in Cash of the amount of such Holder's Allowed Other Priority Claim either: (i) on the Effective Date, or as soon as reasonably practicable thereafter or (ii) if the Other Priority Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which such Other Priority Claim is Allowed by Final Order, or as soon as reasonably practicable thereafter.

c.      *Voting*: **Class 1 is Unimpaired under the Plan. Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan**.

(b)     Class 2—Other Secured Claims.

a.      *Classification*: Class 2 consists of all Other Secured Claims.

b.      *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment of its Allowed Other Secured Claim, on the Effective Date or as soon as reasonably practicable thereafter or, if the Other Secured Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which such Other Secured Claim is Allowed by Final Order, or as soon as reasonably practicable thereafter, each Holder of an Allowed Other Secured Claim shall receive the following treatment at the option of the Debtors: (i) payment in full (in Cash) of such Allowed Other Secured Claim, (ii) satisfaction of such Allowed Other Secured Claim by delivering the collateral securing such Allowed Other Secured Claim and paying any interest required to be paid under section 506(b) of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

c.      *Voting*: **Class 2 is Unimpaired under the Plan. Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan**.

(c)     Class 3—General Unsecured Claims.

a.      *Classification*: Class 3 consists of all General Unsecured Claims.

b.      *Treatment*: Each Holder of an Allowed Class 3 Claim shall receive its Pro Rata share of the Liquidating Trust Interests in accordance with Article IV.C.2 of the Plan on account of such Holder's General Unsecured Claim(s) against the Debtors, which shall entitle such holder to distributions from the Liquidating Trust as and to the extent set forth in the Plan and the Liquidating Trust Agreement.

c.      *Voting*: **Class 3 is Impaired under the Plan. Therefore, Holders of Allowed Claims in Class 3 are entitled to vote to accept or reject the Plan**.

(d)     Class 4—Existing Equity Interests in the Brookstone Subsidiaries.

a.  *Classification*: Class 4 consists of all Existing Equity Interests in the Brookstone Subsidiaries.

b.  *Treatment*: On the Effective Date or as soon as reasonably practicable thereafter, as provided in the Implementation Memorandum, all Existing Equity Interests shall be cancelled and extinguished. Holders of Existing Equity Interests in the Brookstone Subsidiaries shall not receive any distribution or retain any property pursuant to the Plan.

c.  *Voting*: **Class 4 is Impaired under the Plan. Each Holder of an Allowed Interest in Class 4 is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan**.

(e)  Class 5—Existing Equity Interests in Brookstone Parent.

a.  *Classification*: Class 5 consists of all Existing Equity Interests in Brookstone Parent.

b.  *Treatment*: On the Effective Date or as soon as reasonably practicable thereafter, as provided in the Implementation Memorandum, all Existing Equity Interests in Brookstone Parent shall be cancelled and extinguished. Holders of Existing Equity Interests in Brookstone Parent shall not receive any distribution or retain any property pursuant to the Plan.

c.  *Voting*: **Class 5 is Impaired under the Plan. Each Holder of an Allowed Interest in Class 5 is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan**.

3.  Special Provision Governing Unimpaired Claims.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

4.  Acceptance or Rejection of the Plan.

(a)  Voting Classes.

Class 3 is Impaired under the Plan. The Holders of Claims in Class 3 are entitled to vote to accept or reject the Plan.

(b)  Presumed Acceptance of the Plan.

Classes 1 and 2 are Unimpaired under the Plan. The Holders of Claims in such Classes are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

(c)  Deemed Rejection of the Plan.

Classes 4 and 5 are Impaired under the Plan. The Holders of Interests in Classes 4 and 5 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

5. Elimination of Vacant Classes.

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

6. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

Provided Class 3 votes to accept the Plan, the Plan Proponents jointly request Confirmation pursuant to section 1129(b) of the Bankruptcy Code.

7. Controversy Concerning Impairment.

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy at or before the hearing conducted by the Bankruptcy Court to consider confirmation of the Plan. Any dispute with respect to Impairment that is not raised in sufficient time to enable the Bankruptcy Court to determine such dispute on or prior to the Confirmation Date shall be deemed waived.

8. Subordinated Claims.

Pursuant to section 510 of the Bankruptcy Code, the Plan Proponents reserve the right to jointly reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

9. Provision Governing Allowance and Defenses to Claims.

On and after the Effective Date, the Liquidating Trust shall have all of the Debtors' and the Estates' rights under section 558 of the Bankruptcy Code. Nothing under the Plan shall affect the rights and defenses of the Debtors, the Estates, and the Liquidating Trust in respect of any Claim not allowed by Final Order, including all rights in respect of legal and equitable objections, defenses, setoffs, or recoupment against such Claims. The Liquidating Trust may, but shall not be required to, setoff against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made) any claims of any nature whatsoever that the Estates or the Liquidating Trust may have against the Claim Holder, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Liquidating Trust of any such Claim it may have against such Claim Holder. The Liquidating Trustee may (i) designate any Claim as Allowed at any time from and after the Effective Date and (ii) may designate any Claim disputed and not Allowed at any time from and after the Effective Date until the Claim Objection Deadline, other than Claims that have already become Allowed by Final Order.

E. **Means for Implementation of the Plan**

1. Substantive Consolidation.

The Debtors, in consultation with the Committee, analyzed, *inter alia*, the Debtors' books and records, intercompany accounting practices, corporate structure, shared staff and services, financial reporting, and cash management practices. Based on that analysis, the Plan contemplates and is predicated upon entry of an Order substantively consolidating the Debtors' Estates and the Chapter 11 Cases as set forth below. Entry of the Confirmation Order shall constitute the approval, pursuant to section 105(a) of

the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Debtors for voting, confirmation, and distribution purposes under the Plan. Solely for such purposes, on and after the Effective Date, (i) all assets and all liabilities of the Debtors shall be deemed merged into Brookstone Parent, (ii) all guaranties of any Debtor of the payment, performance, or collection of obligations of another Debtor shall be eliminated and cancelled, (iii) any obligation of any Debtor and all guaranties thereof executed by one or more of the other Debtors shall be treated as a single obligation, and such guaranties shall be deemed a single Claim against the consolidated Debtors, (iv) all joint obligations of two or more Debtors and all multiple Claims against such entities on account of such joint obligations shall be treated and allowed only as a single Claim against the consolidated Debtors, and (v) each Claim filed in the Chapter 11 Case of any Debtor shall be deemed filed against the consolidated Debtors and a single obligation of the consolidated Debtors on and after the Effective Date. Upon the Effective Date, all Intercompany Claims shall be cancelled and extinguished. Holders of Intercompany Claims shall not receive any distribution or retain any property pursuant to the Plan.

The substantive consolidation effected pursuant to Article IV.A of the Plan shall not affect (other than for purposes related to funding distributions under the Plan and as set forth in Article IV.A of the Plan), among other things, (i) the legal and organizational structure of the Debtors, (ii) any Causes of Action, (iii) defenses to any Causes of Action or requirements for any third party to establish mutuality to assert a right of setoff, or (iv) distributions out of any insurance policies or proceeds of such policies. The Plan and Disclosure Statement, jointly, shall serve as, and shall be deemed to be, a motion for entry of an Order of the Bankruptcy Court approving the substantive consolidation of the Debtors' Estates and Chapter 11 Cases. If no objection to the Plan is timely filed and served by any Holder of an Impaired Claim affected by the Plan as provided herein on or before the Voting Deadline or such other date as may be established by the Bankruptcy Court, the Plan, including the substantive consolidation of the Debtors' Estates and Chapter 11 Cases, may be approved by the Bankruptcy Court as part of the Confirmation Order. If any such objections are timely filed and served, the Plan and the objections thereto shall be considered by the Bankruptcy Court at the Confirmation Hearing.

2.     <u>Plan Transactions.</u>

On the Effective Date or as soon as practicable thereafter, as provided in the Implementation Memorandum, the Debtors shall effect the Plan Transactions. Notwithstanding anything to the contrary in the Plan, the means and timing for implementation of the Plan Transactions are set forth in the Implementation Memorandum.

Without limiting the foregoing, unless otherwise provided by the Implementation Memorandum, all such Plan Transactions will be deemed to occur on the Effective Date or as soon as practicable thereafter and may include one or more mergers, conversions, consolidations, dispositions, liquidations or dissolutions, as may be determined by the Debtors to be necessary or appropriate. Subject to the immediately preceding sentence, the actions to effect these transactions may include (i) the execution and delivery of appropriate agreements or other documents of merger, conversion, consolidation, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable state law and such other terms to which the applicable Entities may agree, (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable Entities may agree, (iii) the filing of appropriate certificates or articles of merger, conversion, consolidation, dissolution or change in corporate form pursuant to applicable state law, and (iv) the taking of all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions. Any such transactions may be effected on or subsequent to the Effective Date without any further action by the Debtors. All documents, agreements,

and instruments entered into and delivered on or as of the Effective Date, or as soon as practicable thereafter, contemplated by or in furtherance of the Plan shall become and shall remain effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

3.    The Liquidating Trust.

(a)    Execution of the Liquidating Trust Agreement.

On or before the Effective Date, the Liquidating Trust Agreement, in form jointly acceptable to the Plan Proponents, shall be executed, and all other necessary steps shall be taken to establish the Liquidating Trust and the Liquidating Trust Interests, which shall be for the benefit of the Liquidating Trust Beneficiaries. Article IV.C of the Plan sets forth certain of the rights, duties, and obligations of the Liquidating Trustee and the Liquidating Trust Oversight Committee. In the event of any conflict between the terms of Article IV.C of the Plan and the terms of the Liquidating Trust Agreement, unless otherwise specified in the Plan, the terms of the Liquidating Trust Agreement shall govern.

(b)    Interests in the Liquidating Trust.

There shall be one class of interests in the Liquidating Trust. The Liquidating Trust shall issue the Liquidating Trust Interests to the Holders of Allowed General Unsecured Claims in accordance with Article III.B.3 of the Plan so that each Holder of an Allowed General Unsecured Claim shall receive a percentage of the Liquidating Trust Interests equal to such Holder's Allowed General Unsecured Claim divided by the sum of all Allowed General Unsecured Claims *plus* all Disputed General Unsecured Claims; *provided, however*, that (i) if a Disputed General Unsecured Claim is subsequently Disallowed, (a) the amount of such Disputed General Unsecured Claim shall no longer be included in the calculation set forth above and (b) the Liquidating Trust shall issue additional Liquidating Trust Interests to the Holders of Allowed General Unsecured Claims in accordance with the calculation set forth above and (ii) if a Disputed General Unsecured Claim subsequently becomes an Allowed General Unsecured Claim, the Liquidating Trust shall make subsequent distributions of Liquidating Trust Interests to such Holder on account of such Allowed General Unsecured Claim. Liquidating Trust Interests shall be uncertificated. The Liquidating Trust Beneficiaries shall be bound by the Liquidating Trust Agreement.

(c)    Purpose of the Liquidating Trust.

The Liquidating Trust shall be established to administer certain post-Effective Date responsibilities under the Plan, including, but not limited to, (i) resolving outstanding Disputed General Unsecured Claims to determine the amount of Allowed General Unsecured Claims, (ii) resolving all Disputed Administrative/Priority Claims and Disputed Other Secured Claims, (iii) prosecuting, settling, and resolving Causes of Action (other than the Released Causes of Action), (iv) recovering, through enforcement, resolution, settlement, collection, or otherwise, assets on behalf of the Liquidating Trust (which assets shall become part of the Liquidating Trust Assets), (v) abandoning, liquidating, and reducing to Cash the Liquidating Trust Assets, as necessary, and (vi) distributing the Liquidating Trust Assets. The Liquidating Trust has no objective to continue or engage in the conduct of a trade or business.

(d)    Liquidating Trust Assets.

The Liquidating Trust shall consist of the Liquidating Trust Assets. On the Effective Date, as provided in the Implementation Memorandum, the Debtors shall transfer all of the Liquidating Trust Assets

then held by the Debtors to the Liquidating Trust free and clear of all liens, claims, and encumbrances, except to the extent otherwise provided herein. The transfer of the Liquidating Trust Assets to the Liquidating Trust shall not affect any attorney-client privilege, the work-product privilege, and any other applicable evidentiary privileges of the Debtors.

(e)     Governance of the Liquidating Trust.

The Liquidating Trust shall be governed by the Liquidating Trustee and the Liquidating Trust Oversight Committee.

(f)     Role of the Liquidating Trustee.

On the Effective Date, the Plan Proponents shall jointly appoint a trustee to oversee the Liquidating Trust (the "Liquidating Trustee"). In furtherance of and consistent with the purposes of the Liquidating Trust and the Plan, the Liquidating Trustee shall have the power and authority to, among other things, (i) hold, manage, sell, invest, and distribute to the Liquidating Trust Beneficiaries the Net Proceeds of the Liquidating Trust Assets, (ii) hold the Liquidating Trust Assets for the benefit of the Liquidating Trust Beneficiaries, (iii) prosecute and resolve (a) objections to General Unsecured Claims and (b) subject to obtaining necessary approval of the Bankruptcy Court, any claims for equitable subordination and recharacterization in connection with such objections, (iv) prosecute, resolve, and satisfy Administrative/Priority Claims and Other Secured Claims, (v) prosecute, settle, and resolve Causes of Action (other than the Released Causes of Action), (vi) recover assets through enforcement, resolution, settlement, collection, or otherwise on behalf of the Liquidating Trust, (vii) abandon, liquidate, and reduce to Cash the Liquidating Trust Assets, as necessary, in consultation with the Liquidating Trust Oversight Committee, (viii) perform such other functions as are provided in the Plan and the Liquidating Trust Agreement, and (ix) administer the closure of the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules. The Liquidating Trustee shall be responsible for all decisions and duties with respect to the Liquidating Trust and the Liquidating Trust Assets and shall file periodic public reports on the status of claims reconciliation and distributions, which reports may be included in the quarterly reporting required by the U.S. Trustee. In all circumstances, the Liquidating Trustee shall act in the best interests of all Liquidating Trust Beneficiaries and in furtherance of the purpose of the Liquidating Trust, and in accordance with the Liquidating Trust Agreement and not in its own best interest.

(g)     Role of the Liquidating Trust Oversight Committee.

On the Effective Date, the Plan Proponents shall jointly appoint one or more Persons or Entities that shall serve as a committee to oversee the activities of the Liquidating Trustee (the "Liquidating Trust Oversight Committee"). In furtherance of and consistent with the purpose of the Liquidating Trust and the Plan, the Liquidating Trust Oversight Committee shall oversee the activities of the Liquidating Trustee as set forth in the Liquidating Trust Agreement. The Liquidating Trustee shall report material matters to, and seek approval for material decisions from, the Liquidating Trust Oversight Committee, as and to the extent set forth in the Liquidating Trust Agreement and consistent with Article VII.C.2 of the Plan. In all circumstances, the Liquidating Trust Oversight Committee shall act in the best interests of all Liquidating Trust Beneficiaries and in furtherance of the purpose of the Liquidating Trust, and in accordance with the Liquidating Trust Agreement and not in its own best interest.

(h)     Transferability of Liquidating Trust Interests.

Liquidating Trust Interests shall be transferable only (i) as permitted by the Liquidating Trust Agreement and (ii) to the extent that the transferability thereof would not require the Liquidating Trust to register the beneficial interests under Section 12(g) of the Securities Exchange Act of 1934, as amended.

(i)     Investment of Liquidating Trust Assets.

The Liquidating Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by the Liquidating Trust Agreement or as otherwise permitted by an order of the Bankruptcy Court, subject to the oversight of the Liquidating Trust Oversight Committee.

(j)     Costs and Expenses of Liquidating Trustee and Liquidating Trust Oversight Committee.

The costs and expenses of the Liquidating Trust, including the fees and expenses of the Liquidating Trustee and the Liquidating Trust Oversight Committee, their professionals, and other professionals retained on behalf of the Liquidating Trust (including the Retained Professionals), shall be paid out of the Liquidating Trust Administrative Fund, subject to the terms of the Liquidating Trust Agreement and subject to the oversight of the Liquidating Trust Oversight Committee.

(k)     Compensation of Liquidating Trustee and Liquidating Trust Oversight Committee.

The Liquidating Trustee and Liquidating Trust Oversight Committee shall each be entitled to reasonable compensation, subject to the terms of the Liquidating Trust Agreement, in an amount consistent with that of similar functionaries in similar types of bankruptcy cases. Such compensation shall be payable from the Liquidating Trust Administrative Fund, subject to the terms of the Liquidating Trust Agreement.

(l)     Distribution of Liquidating Trust Assets.

Subject to Article VI of the Plan, the Liquidating Trustee shall distribute (to the extent there are sufficient Liquidating Trust Assets available for distribution in accordance with the Liquidating Trust Agreement), beginning on the first Business Day following the Effective Date, or as soon thereafter as is reasonably practicable, the appropriate Net Proceeds of the Liquidating Trust Assets to the Liquidating Trust Beneficiaries in proportion to the Liquidating Trust Interests held by such Liquidating Trust Beneficiary; *provided* that, if a Disputed General Unsecured Claim subsequently becomes an Allowed General Unsecured Claim after a distribution(s) has been made, the Liquidating Trustee shall make one or more catch-up distributions to such Holder on account of its Liquidating Trust Interests, as applicable. The Liquidating Trustee shall utilize, in accordance with the Liquidating Trust Agreement and the Plan, Cash from the Liquidating Trust Administrative Fund in amounts sufficient to fund (i) costs and expenses of the Liquidating Trust, including, without limitation, the fees and expenses of the Liquidating Trustee and the Liquidating Trust Oversight Committee, their respective professionals, and the Retained Professionals, (ii) compensate the Liquidating Trustee and the Liquidating Trust Oversight Committee, and (iii) satisfy other liabilities incurred by the Liquidating Trust in accordance with the Plan or the Liquidating Trust Agreement (including any taxes imposed on the Liquidating Trust or in respect of the Liquidating Trust Assets).

(m)     Retention of Professionals by Liquidating Trustee and Liquidating Trust.

The Liquidating Trustee and the Liquidating Trust Oversight Committee may retain and reasonably compensate counsel and other professionals to assist in their duties as Liquidating Trustee and Liquidating Trust Oversight Committee or to assist on behalf of the Liquidating Trust on such terms as the Liquidating Trustee and the Liquidating Trust Oversight Committee deem appropriate without Bankruptcy Court approval, subject to the provisions of the Liquidating Trust Agreement. The Liquidating Trustee and the Liquidating Trust Oversight Committee may retain any professional who represented parties in interest, including the Debtors or the Committee, in the Chapter 11 Cases. All fees and expenses incurred in connection with the foregoing shall be payable from the Liquidating Trust Administrative Fund subject to

the terms of the Liquidating Trust Agreement. Notwithstanding anything herein to the contrary or in the Liquidating Trust Agreement, on the Effective Date, the Retained Professionals shall be retained on behalf of the Liquidating Trust.

        (n)      U.S. Federal Income Tax Treatment and Reporting of Liquidating Trust.

        For all U.S. federal and applicable state and local income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, Liquidating Trust Oversight Committee, and the Liquidating Trust Beneficiaries) shall treat the Liquidating Trust, other than any portion thereof in respect of Disputed Claims (the "Disputed Claims Reserve"), as a liquidating trust under Treasury Regulation Section 301.7701-4 and that the trust be owned by the Liquidating Trust Beneficiaries. Accordingly, for federal income tax purposes, it is intended that the Liquidating Trust Beneficiaries be treated as if they had received a distribution from the Estates of an undivided interest in the Liquidating Trust Assets (to the extent of the value of their respective share in the applicable Assets) and then contributed such interests to the Liquidating Trust, and the Liquidating Trust's Beneficiaries will be treated as the grantors and owners thereof.

        For all U.S. federal and applicable state and local income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, Liquidating Trust Oversight Committee, and the Liquidating Trust Beneficiaries) shall treat the Disputed Claims Reserve as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9. Following the funding of the Liquidating Trust, Brookstone Parent shall provide a "§ 1.468B-9 Statement" in respect of the Disputed Claims Reserve to the Liquidating Trustee in accordance with Treasury Regulation section 1.468B-9(g).

        The Liquidating Trustee shall be responsible for filing all federal, state, and local tax returns for the Liquidating Trust and for the Debtors. The Liquidating Trustee shall be responsible for payment, out of the Liquidating Trust Assets, of any taxes imposed on the Liquidating Trust or the Liquidating Trust Assets. The Liquidating Trustee may request an expedited determination of taxes of the Liquidating Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

        The Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements. The Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements including, without limitation, requiring that, as a condition to the receipt of a Distribution, the Holder of an Allowed Claim complete the appropriate IRS Form W-8 or IRS Form W-9, as applicable to each Holder. Notwithstanding any other provision of the Plan, (i) each Holder of an Allowed Claim that is to receive a Distribution from a Liquidating Trust shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income and other tax obligations, on account of such Distribution and (ii) no Distribution shall be made to or on behalf of such Holder under the Plan unless and until such Holder has made arrangements satisfactory to the Liquidating Trustee to allow it to comply with its tax withholding and reporting requirements. Any property to be distributed by the Liquidating Trust shall, pending the implementation of such arrangements, be treated as an undeliverable Distribution to be held by the Liquidating Trustee, as the case may be, until such time as Liquidating Trustee is satisfied with the Holder's arrangements for any withholding tax obligations.

(o)     Indemnification of Liquidating Trustee and Liquidating Trust Oversight Committee.

The Liquidating Trustee and the Liquidating Trust Oversight Committee (and their agents and professionals) shall not be liable for actions taken or omitted in its or their capacity as, or on behalf of, the Liquidating Trustee, the Liquidating Trust Oversight Committee, or the Liquidating Trust, except those acts arising out of its or their willful misconduct (including, but not limited to, conduct that results in a personal profit at the expense of the Liquidating Trust), gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty (to the extent applicable), or ultra vires acts, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its or their actions or inactions in its or their capacity as, or on behalf of, the Liquidating Trustee, the Liquidating Trust Oversight Committee, or the Liquidating Trust, except for any actions or inactions involving willful misconduct (including, but not limited to, conduct that results in a personal profit at the expense of the Liquidating Trust), gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty (to the extent applicable), or ultra vires acts. Any indemnification claim of the Liquidating Trustee, the Liquidating Trust Oversight Committee, and the other parties entitled to indemnification under this subsection shall be satisfied (i) first from the Liquidating Trust Administrative Fund and (ii) second from the Liquidating Trust Assets, as provided in the Liquidating Trust Agreement. The Liquidating Trustee and the Liquidating Trust Oversight Committee shall be entitled to rely, in good faith, on the advice of their professionals

4.     <u>Reserve Accounts</u>.

(a)     Administrative/Priority Claims Reserve Account.

Prior to the Effective Date, the Debtors shall establish a reserve account (the "<u>Administrative/Priority Claims Reserve Account</u>") in an amount equal to the estimated Administrative/Priority Claims. The Administrative/Priority Claims Reserve Account shall be funded with Cash. The funds in the Administrative/Priority Claims Reserve Account shall be used solely for the payment of Allowed Administrative/Priority Claims in accordance with Articles II or III (as applicable) and VI.B of the Plan. To the extent funds held in the Administrative/Priority Claims Reserve Account relate to Administrative/Priority Claims that (i) have been Disallowed by the Bankruptcy Court, (ii) are no longer claimed as evidenced by a written release of such Claim, or (iii) have been satisfied by a means other than Cash in accordance with Articles II or III (as applicable) of the Plan, then such funds shall become Liquidating Trust Assets pursuant to the Plan. The Administrative/Priority Claims Reserve Account shall be closed once all required payments have been made. Any funds remaining in the Administrative/Priority Claims Reserve Account after all required payments have been made shall become Liquidating Trust Assets pursuant to the Plan.

(b)     Other Secured Claims Reserve Account.

Prior to the Effective Date, the Debtors shall establish a reserve account (the "<u>Other Secured Claims Reserve Account</u>") in an amount equal to the estimated Other Secured Claims. The Other Secured Claims Reserve Account shall be funded with Cash. The funds in the Other Secured Claims Reserve Account shall be used solely for the payment of Allowed Other Secured Claims in accordance with Articles III.B.2 and VI.B of the Plan. To the extent funds held in the Other Secured Claims Reserve Account relate to Other Secured Claims that (i) have been Disallowed by the Bankruptcy Court, (ii) are no longer claimed as evidenced by a written release of such Claim, or (iii) have been satisfied by a means other than Cash in accordance with Article III.B.2 the Plan, then such funds shall become Liquidating Trust Assets pursuant to the Plan. The Other Secured Claims Reserve Account shall be closed once all required payments

have been made. Any funds remaining in the Other Secured Claims Reserve Account after all required payments have been made shall become Liquidating Trust Assets pursuant to the Plan.

       5.       Governance, Directors and Officers; Employment-Related Agreements and Compensation Programs; Other Agreements.

       (a)       Directors and Officers of the Debtors.

       On and after the Effective Date, the boards of directors and officers of the Debtors shall stay in place until such time as the Debtors are dissolved, as provided in the Implementation Memorandum. On the Effective Date, the Tail Fund shall be funded for purposes of payment of administrative costs (including but not limited to the salaries of the Debtors' board members and officers) of the Debtors prior to such dissolution. Immediately prior to the dissolution of the Debtors, any remaining portion of the Tail Fund shall be transferred to the Liquidating Trust and become part of the Liquidating Trust Assets.

       (b)       Transactions Effective as of the Effective Date.

       Pursuant to section 1142 of the Bankruptcy Code, the following shall occur and be effective as of the Effective Date, if no such other date is specified in such other documents, including the Implementation Memorandum, all matters, instruments, releases and other agreements or documents related to any of the foregoing, (iii) appointment of the Liquidating Trustee, as provided in the Plan, (iv) appointment of the Liquidating Trust Oversight Committee, as provided in the Plan, (v) all actions necessary to effectuate the Liquidating Trust Agreement and the Liquidating Trust, and (vi) any other matters provided for under the Plan or described in the Implementation Memorandum or any Plan Document involving the Liquidating Trust, the corporate structure of the Debtors, or any action to be taken by or required of a Plan Proponent.

       6.       Cancellation of Existing Securities and Agreements.

       On the Effective Date, except to the extent otherwise provided in the Plan or the Implementation Memorandum, all notes, instruments, certificates, and other documents evidencing Claims or Interests, shall be deemed cancelled and surrendered without any need for a Holder to take further action with respect thereto and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged; *provided*, *however*, that notwithstanding Confirmation or Consummation, any such agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of allowing Holders to receive distributions under the Plan; *provided further*, *however*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors.

       7.       Corporate Action.

       Upon the Effective Date, the Debtors or the Plan Proponents, as applicable, shall perform each of the actions and effect each of the transfers required by the terms of the Plan, in the time period allocated therefor, and all matters provided for under the Plan that would otherwise require approval of the stockholders, partners, members, directors, or comparable governing bodies of the Debtors shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to the applicable general corporation law (or other applicable governing law) of the states in which the Debtors are incorporated or organized, without any requirement of further action by the stockholders, partners, members, directors, or comparable governing bodies of the Debtors. Each of the Debtors shall be authorized and directed, following the completion of all disbursements, other transfers, and other actions required of the Debtors by

the Plan and Implementation Memorandum, to file its certificate of cancellation or dissolution as provided in the Plan and the Implementation Memorandum. The filing of such certificates of cancellation or dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including, without express or implied limitation, any action by the stockholders, partners, members, directors, or comparable governing bodies of the Debtors.

8.     <u>Effectuating Documents; Further Transactions</u>.

Each of the officers of each of the Debtors is authorized and directed to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

9.     <u>Securities Law Matters</u>.

The offering, issuance, or distribution of the Liquidating Trust Interests or any units or other beneficial interests in the Liquidating Trust in accordance with the Plan is exempt from the provisions of Section 5 of the Securities Act and any state or local law requiring registration for the offer, issuance, or distribution of a security by reason of section 1145(a) of the Bankruptcy Code. The Liquidating Trust Interests shall be transferable to the extent provided in Article IV.C.8 of the Plan.

10.     <u>Section 1146 Exemption</u>.

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property or interests pursuant to the Plan, including the recording of any amendments to such transfers, or any new mortgages or liens placed on the property in connection with such transfers, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

11.     <u>Administration of Taxes</u>.

Subject to the Implementation Memorandum and the Liquidating Trust Agreement, Brookstone Parent shall be responsible for all of the Debtors' tax matters until a certificate of cancellation or dissolution for Brookstone Parent shall have been filed in accordance with the Plan and Implementation Memorandum.

Following the filing of a certificate of cancellation or dissolution for Brookstone Parent, subject to the Plan, the Implementation Memorandum, and the Liquidating Trust Agreement, the Liquidating Trustee shall prepare and file (or cause to be prepared and filed) on behalf of the Debtors, all tax returns, reports, certificates, forms, or similar statements or documents (collectively, "<u>Tax Returns</u>") required to be filed or that the Liquidating Trustee otherwise deems appropriate, including the filing of amended Tax Returns or requests for refunds, for all taxable periods ending on, prior to, or after the Effective Date.

Each of the Debtors and the Liquidating Trustee shall cooperate fully with each other regarding the implementation of Article IV.K of the Plan (including the execution of appropriate powers of attorney) and shall make available to the other as reasonably requested all information, records, and

documents relating to taxes governed by Article IV.K of the Plan until the expiration of the applicable statute of limitations or extension thereof or at the conclusion of all audits, appeals, or litigation with respect to such taxes. Without limiting the generality of the foregoing, the Debtors shall execute on or prior to the filing of a certificate of cancellation or dissolution for Brookstone Parent a power of attorney authorizing the Liquidating Trustee to correspond, sign, collect, negotiate, settle, and administer tax payments and Tax Returns for the taxable periods described in Article IV.K of the Plan.

The Debtors and the Liquidating Trustee shall have the right to request an expedited determination of the tax liability of the Debtors, if any, under section 505(b) of the Bankruptcy Code with respect to any tax returns filed, or to be filed, for any and all taxable periods ending on or before the filing of a certificate of cancellation or dissolution for Brookstone Parent.

Following the filing of a certificate of cancellation or dissolution for Brookstone Parent, subject to Liquidating Trust Agreement, the Liquidating Trustee shall have the sole right, at its expense, to control, conduct, compromise, and settle any tax contest, audit, or administrative or court proceeding relating to any liability for taxes of the Debtors and shall be authorized to respond to any tax inquiries relating to the Debtors.

12.     Employee Benefits.

On the Effective Date, the Debtors shall retain the OPEB Plan or, with the consent of the Liquidating Trustee, transfer the OPEB Plan to the Liquidating Trust and, in each case, shall preserve all rights thereunder. The Plan fully complies with sections 1114 and 1129(a)(13) of the Bankruptcy Code. The Debtors reserve all rights of the Debtors, the Liquidating Trust, and/or the Liquidating Trustee to terminate the OPEB Plan at any time on or after the Effective Date.

13.     Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Debtors shall retain and transfer to the Liquidating Trust all rights to enforce, commence, and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, including, without limitation the right to commence, prosecute, or settle such Causes of Action, which shall be preserved notwithstanding the occurrence of the Effective Date. The Liquidating Trustee, on behalf of the Liquidating Trust, may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Liquidating Trust. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Liquidating Trust will not pursue any and all available Causes of Action against it and all rights associate therewith are expressly reserved, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled pursuant to the Plan or a Final Order, all rights with respect to Causes of Action are expressly reserved for later adjudication and no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Debtors reserve and shall retain the Causes of Action and shall transfer such Causes of Action to the Liquidating Trust notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3)(B) of the Bankruptcy Code, any Causes of Action that a Debtor or its Estate may hold against any Entity shall vest in the Liquidating Trust, pursuant to the terms of the Plan and Implementation Memorandum. The Liquidating Trust, through its respective authorized agents or representatives, shall retain and may

exclusively enforce any and all such Causes of Action. On or after the Effective Date, the Liquidating Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

F.     **Treatment of Executory Contracts and Unexpired Leases**

1.     Assumption, Assumption and Assignment, and Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, except as otherwise provided herein, each of the Debtors' Executory Contracts and Unexpired Leases not previously assumed or rejected pursuant to an order of the Bankruptcy Court shall be deemed rejected as of the Effective Date in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code except any Executory Contract or Unexpired Lease (i) identified on the Assumed Executory Contract and Unexpired Lease List (which shall be included in the Plan Supplement) as an Executory Contract or Unexpired Lease designated for assumption, (ii) which is the subject of a separate motion or notice to assume or reject Filed by the Debtors and pending as of the Confirmation Hearing, (iii) that previously expired or terminated pursuant to its own terms, or (iv) that was previously assumed or rejected by any of the Debtors. Any objection to the assumption, assumption and assignment, or rejection of an Executory Contract or Unexpired Lease, as applicable, must be Filed, served, and actually received by the counsel to the Debtors, the clerk of the Bankruptcy Court, and the U.S. Trustee on or before the Plan Objection Deadline (as set forth in the Disclosure Statement Order). The Bankruptcy Court shall rule on any such objection at the time of the Confirmation Hearing or such other date and time agreed by the parties or ordered by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or rejection will be deemed to have assented to such assumption, assumption and assignment, or rejection, as applicable.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumption of Executory Contracts and Unexpired Leases identified on the Assumed Executory Contract and Unexpired Lease List and rejection of all other Executory Contracts and Unexpired Leases, subject to the exceptions noted above, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party on or prior to the Effective Date, shall be transferred to the Liquidating Trust and be deemed a Liquidating Trust Asset. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the counterparty thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Plan Proponents reserve the right to jointly alter, amend, modify, or supplement the Assumed Executory Contract and Unexpired Lease List prior to the Confirmation Date on no less than five days' notice to any counterparty to an Executory Contract or Unexpired Lease affected thereby.

2.     Claims Based on Rejection of Executory Contracts and Unexpired Leases.

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Rejection Claims pursuant to the Plan or otherwise must be Filed with the Claims and Balloting Agent no later than the later of 35 days after the Effective Date or 35 days after the effective date of rejection.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with Article III, as applicable. Any Rejection Claims that are not timely Filed pursuant to Article V.B of the Plan shall be forever disallowed and barred.

3.      <u>Cure of Defaults for Assumed Executory Contracts and Unexpired Leases</u>.

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned, as applicable, pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount specified on the Cure Notice and Schedule in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree and no cure no objection to the cure amount specified on the Cure Notice and Schedule shall be permitted; *provided*, *however*, that any objection to a proposed cure amount filed pursuant to the terms of the Cure Notice and Schedule will be permitted.

The Bankruptcy Court shall rule on any disputed cure amount(s) or objection to assumption of an Executory Contract or Unexpired Lease at the time of the Confirmation Hearing or such other date and time agreed by the parties or ordered by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that failed to object to the cure amount applicable to an Executory Contract or Unexpired Lease to be assumed or assumed and assigned pursuant to the terms set forth in the Cure Notice and Schedule is deemed to have assented to such cure amount. **Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

In the event of a permitted dispute regarding (i) the amount of any payments to cure a default in connection with a proposed assumption or assumption and assignment of an Executory Contract or Unexpired Lease, (ii) the ability of the Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or to be assumed and assigned, or (iii) any other matter pertaining to assumption or assumption and assignment, as applicable, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or Final Orders resolving the dispute and approving the assumption or assumption and assignment, as applicable.

Assumption, rejection, or assumption and assignment, as applicable, of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assumed and assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

4.      <u>Insurance Policies</u>.

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan or Plan Documents, on the Effective Date, the Debtors shall be deemed to have rejected all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims; *provided*, *however*, that the Assumed Insurance Policies shall be assumed pursuant to the Plan and assigned to the Liquidating Trust.

5.        Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned, as applicable, shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to pre-petition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the pre-petition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

6.        Reservation of Rights.

Nothing contained in the Plan, including identification in the Assumed Executory Contract and Unexpired Lease List, shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease subject to assumption or rejection pursuant to section 365(a) of the Bankruptcy Code, or that any Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, if necessary.

7.        Nonoccurrence of Effective Date.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

**G.        Provisions Governing Distributions**

1.        Distribution Record Date.

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors, or their agents, shall be deemed closed, (ii) there shall be no further changes in the record holders of any of such Claims or Interests, and the Plan Proponents shall have no obligation to recognize any transfer of such Claims or Interests occurring on or after the Distribution Record Date, and (iii) the Plan Proponents shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable; *provided*, *however*, that if the Liquidating Trust Interests are transferable as set forth in Article IV.C.8 of the Plan, then the Liquidating Trustee may set additional record dates for subsequent distributions to holders of Liquidating Trust Interests, in accordance with the Liquidating Trust Agreement.

2.        Method of Distribution Under the Plan.

On the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors or the Liquidating Trustee, as applicable, shall (i) remit to holders of Allowed Administrative/Priority Claims and Allowed Other Secured Claims (in each case except as otherwise provided herein) Cash equal to the Allowed amount of such Claims from the Administrative/Priority Claims Reserve Account and Other

Secured Claims Reserve Account respectively and (ii) transfer the Liquidating Trust Assets then held by the Debtors to the Liquidating Trust free and clear of all liens, claims, and encumbrances, but subject to any obligations imposed by the Plan and the Liquidating Trust Agreement, on behalf of the Liquidating Trust Beneficiaries. At the option of the Debtors or the Liquidating Trustee, as applicable, any Cash payment to be made under the Plan, the Liquidating Trust, or the Liquidating Trust Agreement, as applicable, may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

3.       <u>Delivery of Distributions and Undeliverable or Unclaimed Distributions</u>.

(a)       Delivery of Distributions in General.

Except as otherwise provided in the Plan or the Liquidating Trust Agreement, all distributions to any holder of an Allowed Claim shall be made (i) at the address for each such Holder as indicated on such Holder's Proof of Claim, (ii) to a different address and to another party if the Debtors or Liquidating Trustee, as applicable, are so directed in writing by a Holder of an Allowed Claim, or (iii) if no Proof of Claim has been filed, as reflected in the Debtors' books and records as of the date of any such distribution.

(b)       Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Debtors or the Liquidating Trustee, as applicable, have determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that 90 days after the date such undeliverable distribution was initially made, all such unclaimed property or interests in property shall irrevocably revert to the Liquidating Trust automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

4.       <u>Compliance with Tax Requirements</u>.

In connection with the Plan, to the extent applicable, any party issuing any instrument or making any distribution under the Plan or Liquidating Trust Agreement shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions under the Plan and all Plan Documents shall be subject to any such withholding or reporting requirements. In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax. Notwithstanding the foregoing, each holder of an Allowed Claim or Interest that receives a distribution under the Plan shall have responsibility for any taxes imposed by any governmental unit, including income, withholding, and other taxes, on account of such distribution. Notwithstanding any provision in the Plan to the contrary, the Debtors and the Liquidating Trustee, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary or appropriate to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.

5.       <u>Time Bar to Cash Payments</u>.

Checks issued by the Debtors or the Liquidating Trustee, as applicable, in respect of Allowed Claims shall be null and void if not negotiated within 60 days after the date of issuance thereof. Requests for re-issuance of any check shall be made to the Debtors or the Liquidating Trustee, as applicable,

by the holder of the Allowed Claim to whom such check originally was issued. Any Claim in respect of such a voided check shall be made on or before 30 days after the expiration of the 60 day period following the date of issuance of such check. Thereafter, the amount represented by such voided check shall irrevocably revert to the Liquidating Trust, and any Claim in respect of such voided check shall be discharged and forever barred.

6.    Setoffs and Recoupment.

The Debtors and the Liquidating Trustee, as applicable, may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors or the Liquidating Trust may have against the Holder of any such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Liquidating Trustee, as applicable, of any such Claim it may have against the Holder of such Claim.

**H.    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims**

1.    Disputed Claims.

On and after the Effective Date, except as otherwise provided in the Plan, all Allowed Claims shall be paid in accordance with the terms of the Plan and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced. Nothing in this paragraph shall in any way limit the Debtors' or Liquidating Trustee's rights to contest the validity, amount, or enforceability of any Claim regardless of whether a Proof of Claim is required for such Claim.

2.    Objections to Claims and Interests.

Unless a different time is set by an order of the Bankruptcy Court or otherwise established pursuant to the Plan, all objections to Claims and Interests must be Filed by the Claim Objection Deadline; *provided*, that no such objection may be Filed with respect to any Claim or Interest after a Final Order has been entered Allowing such Claim or Interest.

3.    Prosecution, Compromise, and Settlement.

(a)    Prosecution of Disputed Claims.

Except as otherwise provided herein, the Liquidating Trust shall have the right to object to all Claims on any basis. Subject to further extension by the Bankruptcy Court with or without notice, the Liquidating Trustee may object to the allowance of all Claims on or before the Claim Objection Deadline. From and after the Effective Date, the Liquidating Trust shall succeed to all of the rights, defenses, offsets, and counterclaims of the Debtors, the Estates, and the Committee in respect of all Claims, and in that capacity shall have the exclusive power to prosecute, defend, compromise, settle, and otherwise deal with all such objections.

(b)    Compromise and Settlement of Claims.

Pursuant to Bankruptcy Rule 9019(b), the Liquidating Trustee may settle any Disputed Claims (or aggregate of Claims if held by a single creditor), without notice, a hearing or Bankruptcy Court approval; *provided* that if such Disputed Claim is to be Allowed pursuant to the settlement in an amount

which is two hundred and fifty thousand (250,000) dollars or more, the procedures in the following paragraph shall apply.

The Liquidating Trustee shall give notice to the Liquidating Trust Oversight Committee of a settlement of any Disputed Administrative/Priority Claim, Disputed Other Secured Claim, or Class 3 Claim (or aggregate of Claims if held by a single creditor) that results in such Disputed Claim(s) being Allowed in an amount which is two hundred and fifty thousand (250,000) dollars or more. The Liquidating Trust Oversight Committee shall have 10 days to object to such settlement. Any such objection shall be in writing and sent to the Liquidating Trustee and the settling party. If no written objection is received by the Liquidating Trustee and the settling party prior to the expiration of such 10 day period, the Liquidating Trustee and the settling party shall be authorized to enter into the proposed settlement without a hearing or Bankruptcy Court approval. If a written objection from the Liquidating Trust Oversight Committee is timely received, the Liquidating Trustee, the settling party and the Liquidating Trust Oversight Committee shall use good faith efforts to consensually resolve the objection. If the objection is consensually resolved, the Liquidating Trustee and the settling party may enter into the proposed settlement (as and to the extent modified by the resolution of the objection) without further notice or Bankruptcy Court approval. Alternatively, the Liquidating Trustee may seek Bankruptcy Court approval of the proposed settlement upon expedited notice and a hearing.

4.      No Distributions Pending Allowance.

If a Claim or Interest, or any portion of a Claim or Interest, is Disputed, no payment or distribution provided hereunder shall be made on account of such Disputed Claim or Interest, unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

5.      Distributions After Allowance.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Debtors or the Liquidating Trustee, as applicable, shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

I.      **Settlement, Release, Injunction, and Related Provisions**

1.      No Discharge of Claims.

**In accordance with section 1141(d)(3) of the Bankruptcy Code, the Plan does not discharge the Debtors. Section 1141(c) of the Bankruptcy Code nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors. As such, no Entity holding a Claim against the Debtors may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Entity under the Plan. As of the Confirmation Date, all parties are precluded from asserting against any property to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.**

2.      Releases.

(a)      Releases.

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Releasing Parties will be deemed to release and forever waive and discharge the Released Parties from and against all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating to the Debtors, the Chapter 11 Cases, the Plan, the Disclosure Statement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, including, without limitation, the administration of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, or related agreements, instruments, or other documents, or any other act, omission, transaction, agreement, event, or other occurrence taking place before the Effective Date and that could have been asserted by or on behalf of the Debtors or their Estates at any time on or prior to the Effective Date against the Released Parties, except that the Debtors will not be deemed to release, waive, or discharge the Released Parties from and against any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Executory Contract or Unexpired Lease assumed during the Chapter 11 Cases or under the Plan.

Each Holder of a Claim in Class 3 shall be a Releasing Party and, as such, provides the releases set forth in Article VIII.B.1 of the Plan, unless such Holder votes to reject the Plan or does not vote on the Plan and timely submits a Release Opt-Out indicating such Holder's decision to not participate in the releases set forth in Article VIII.B.1 of the Plan. For the avoidance of doubt, each Holder of a Claim in Class 3 that votes to accept the Plan is a Releasing Party and any Release Opt-Out that might be submitted by any such Holder that voted to accept the Plan shall be void and of no effect.

(b)      Release of Liens.

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors and their Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Debtors and their successors and assigns, including the Liquidating Trust, in accordance with the Plan.

3.      Exculpation.

Except as otherwise specifically provided in the Plan, each Debtor, each Estate, and each Exculpated Party is hereby released and exculpated from any claim, obligation, Cause of Action,

or liability for any Exculpated Claim, except to the extent such claim, obligation, Cause of Action, or liability arises from willful misconduct or gross negligence, but in all respects such released Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors, the Estates, and the Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with applicable law with regard to the transactions and treatment of Claims and Interests in the Chapter 11 Cases and in connection with the Plan Transactions, the negotiation, formulation, or preparation of the Plan Documents or related agreements, instruments, or other documents in connection with the Plan, and the distribution of and the solicitation of votes on the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Without limiting the generality of the foregoing, each Debtor, each Estate, and each Exculpated Party shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code. Notwithstanding anything to the contrary in the foregoing, the releases and exculpations set forth above do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed or deemed executed to implement the Plan, or any Executory Contract or Unexpired Lease assumed during the Chapter 11 Cases or under the Plan.

4.    Injunction.

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Parties and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Interest, from taking any of the following actions against, as applicable, any Debtor, any Estate, any Released Party, the Liquidating Trust, their respective successors and assigns, and any of their respective assets and properties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, Causes of Action or interests, (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtors or the Released Parties on account of or in connection with or with respect to any such claims, Causes of Action or interests, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Released Parties, or their respective property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests, (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtors or the Released Parties or against their respective property or estates on account of or in connection with or with respect to any such claims, Causes of Action or interests unless such Entity has timely asserted such setoff right before Confirmation in a Proof of Claim or document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim, Cause of Action or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise, and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, Causes of Action or interests released or settled pursuant to the Plan.

5.    Setoffs.

Except as otherwise expressly provided for in the Plan, the Liquidating Trust or any Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, as applicable, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of

Action of any nature that such Debtor or the Liquidating Trust may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or Liquidating Trust of any such claims, rights, and Causes of Action that such Debtor or Liquidating Trust may possess against such Holder.

        6.     <u>Recoupment</u>.

In no event shall any Holder of a Claim be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors or the Liquidating Trust, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors or the Liquidating Trustee on or before the Confirmation Date.

        7.     <u>Subordination Rights</u>.

The classification and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and, subject to the provisions of Article III.H. of the Plan, any such subordination rights shall be settled, compromised, and released pursuant to the Plan.

**J.     Effect of Confirmation of the Plan**

Upon entry of the Confirmation Order, the Bankruptcy Court shall be deemed to have made and issued pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014, the Confirmation Order Findings of Fact and Conclusions of Law. Upon entry of the Confirmation Order, the Confirmation Order Findings of Fact and Conclusions of Law shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law in the Plan shall constitute conclusions of law even if they are stated as findings of fact.

**K.     Conditions Precedent to Consummation of the Plan**

        1.     <u>Conditions Precedent to the Confirmation Date</u>.

It shall be a condition to the Confirmation Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X.C of the Plan:

        (a)     The Disclosure Statement Order shall have been entered by the Bankruptcy Court in form and substance jointly acceptable to the Plan Proponents;

        (b)     All Plan Documents are in form and substance jointly acceptable to the Plan Proponents and have been filed with the Bankruptcy Court; and

        (c)     The Bankruptcy Court shall have entered the Confirmation Order in form and substance jointly acceptable to the Plan Proponents which, among other things, approves the Plan Documents.

2.     <u>Conditions Precedent to the Effective Date</u>.

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X.C of the Plan:

(a)     The Confirmation Order shall have been entered by the Bankruptcy Court in form and substance jointly acceptable to the Plan Proponents, in full force and effect, and not be subject to any stay or injunction, and shall have become a Final Order;

(b)     All actions, documents, Certificates, and agreements necessary or appropriate to implement the Plan shall have been effected or executed or deemed executed and delivered, as the case may be, to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws;

(c)     All authorizations, consents, regulatory approvals, rulings, or documents that are necessary or appropriate to implement and effectuate the Plan shall have been received; and

(d)     The Administrative/Priority Claims Reserve Account and the Other Secured Claims Reserve Account have each been funded as required pursuant to the Plan.

3.     <u>Waiver of Conditions</u>.

The conditions set forth in Article X.A. and X.B of the Plan may be waived only by joint written consent of the Plan Proponents. Such waiver may be effectuated without notice to or entry of an order of the Bankruptcy Court and without notice to any other parties in interest.

4.     <u>Effect of Failure of Conditions</u>.

If Consummation does not occur on or prior to September 30, 2019 (or such date which may be jointly extended further by the Plan Proponents), the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement shall (i) constitute a waiver or release of any claims by the Debtors, Holders of Claims, or Holders of Interests or any Causes of Action, (ii) prejudice in any manner the rights of the Debtors, the Committee, or any other Entity, or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, the Committee, or any other Entity in any respect, including with respect to substantive consolidation and similar arguments.

**L.**     **Modification, Revocation, Or Withdrawal of the Plan**

1.     <u>Modification and Amendments</u>.

Except as otherwise provided in the Plan, the Plan Proponents jointly reserve the right to modify the Plan and any Plan Document (including, without limitation, any Plan Supplement document) and seek Confirmation consistent with the Bankruptcy Code. Such modification may be material or immaterial, and may include material modifications to the economic terms of the Plan. Further, subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Plan Proponents jointly expressly reserve the right to exercise reasonable discretion to revoke or withdraw, or to alter, amend, or modify the Plan with respect to any Debtor, one or more times, after Confirmation, and, to the extent necessary or appropriate, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Plan Documents, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary or appropriate to carry out the purposes and intent of the Plan. Any such revocation, withdrawal, alteration, amendment,

modification, or supplement contemplated by this paragraph shall be in form and substance jointly acceptable to the Plan Proponents. Additionally, any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XI of the Plan.

2.      Effect of Confirmation on Modifications.

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof made in accordance with Article XI of the Plan are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

3.      Revocation or Withdrawal of Plan.

The Plan Proponents reserve the right to jointly revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of liquidation or reorganization. If the Plan Proponents jointly revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan, assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed or deemed executed pursuant to the Plan, shall be deemed null and void, and (iii) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims, Interests or Causes of Action, (ii) prejudice in any manner the rights of such Debtor or any other Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity, including with respect to substantive consolidation and similar arguments.

**M.      Retention Of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code to the extent provided under applicable law, including jurisdiction to:

(a)      Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative/Priority Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

(b)      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

(c)      resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including cure amount pursuant to section 365 of the Bankruptcy Code, (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned, and (iii) any dispute regarding whether a contract or lease is or was executory or expired;

(d)      ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and the Liquidating Trust Agreement;

(e)     enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

(f)     issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

(g)     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

(h)     enter an order or Final Decree concluding or closing the Chapter 11 Cases;

(i)     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(j)     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

(k)     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed or deemed executed in connection with the Plan;

(l)     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan, including under Article VIII of the Plan, regardless of whether such termination occurred prior to or after the Effective Date;

(m)     enforce all orders previously entered by the Bankruptcy Court; and

(n)     hear any other matter not inconsistent with the Bankruptcy Code.

**N.     Miscellaneous Provisions**

1.     _Immediate Binding Effect_.

Subject to Article X.B of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, as of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Plan Proponents, the Liquidating Trustee, and any and all Holders of Claims or Interests (irrespective of whether the Holders of such Claims or Interests, as applicable, have, or are deemed to have, accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

2.     _Dissolution of Committee_.

On the Effective Date, the Committee shall dissolve; _provided_, _however_, that, following the Effective Date, the Committee shall continue to have standing and a right to be heard with respect to (i) Claims and/or applications for compensation by professionals and requests for allowance of Administrative Expenses for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code, (ii) any appeals of the Confirmation Order that remain pending as of the Effective Date to which the Committee is a party, and (iii) responding to creditor inquiries for 180 days following the Effective Date.

3.     <u>Additional Documents</u>.

On or before the Effective Date, the Plan Proponents may jointly file with the Bankruptcy Court such agreements and other documents, which agreements and other documents shall be in form and substance jointly acceptable to the Plan Proponents, as may be necessary to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Liquidating Trust, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

4.     <u>Payment of Statutory Fees</u>.

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Debtors or the Liquidating Trustee on behalf of each of the Debtors, on the Effective Date, and following the Effective Date, the Debtors, or the Liquidating Trustee on behalf of each of the Debtors, shall pay such fees as they are assessed and come due for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

5.     <u>Reservation of Rights</u>.

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Plan Proponent with respect to the Plan, the Disclosure Statement, or the Plan Documents shall be or shall be deemed to be an admission or waiver of any rights of any of the Plan Proponents with respect to the Holders of Claims or Interests prior to the Effective Date.

6.     <u>Successors and Assigns</u>.

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

7.     <u>Disallowed Claims</u>.

No distribution shall be made under the Plan on account of or in relation to Disallowed Claims.

8.     <u>Notices</u>.

All notices, requests, and demands to or upon the Plan Proponents to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

if to the Debtors, to:

        c/o Brookstone
        One Innovation Way
        Merrimack, NH 03054
        Attn:   Stephen Gould and Greg Tribou
        Email:  SGould@brookstone.com; GTribou@brookstone.com

with copies to:

**GIBSON, DUNN & CRUTCHER LLP**
Matthew J. Williams
Matthew K. Kelsey
Keith R. Martorana
Jason Zachary Goldstein
200 Park Avenue
New York, New York 10166
Tel:    (212) 351-4000
Fax:    (212) 351-4035
Email:  mjwilliams@gibsondunn.com
        mkelsey@gibsondunn.com
        kmartorana@gibsondunn.com
        jgoldstein@gibsondunn.com

if to the Committee, to:

**COOLEY LLP**
Seth Van Aalten
Cathy Hershcopf
Robert Winning
1114 Avenue of the Americas
New York, New York 10036
Tel:    (212) 479-6000
Fax:    (212) 479-6275
Email:  svanaalten@cooley.com
        chershcopf@cooley.com
        rwinning@cooley.com

After the Effective Date, the Debtors and the Liquidating Trustee, as applicable, shall have authority to send a notice to Entities providing that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors and the Liquidating Trustee, as applicable, are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

9.      <u>Automatic Closure of Certain Chapter 11 Cases; Final Decree for Remaining Chapter 11 Case</u>.

Upon the date that is thirty 30 days after the Effective Date, without the need to obtain further approval from the Bankruptcy Court, the Chapter 11 Cases (collectively, the "<u>Closed Chapter 11 Cases</u>") of all of the Debtors (collectively, the "<u>Closed Case Debtors</u>") except for Brookstone Parent shall be deemed closed as of the date that is 30 days after the Effective Date without prejudice to the rights of any party in interest to seek to reopen the Closed Chapter 11 Cases, and (i) all motions, contested matters, adversary proceedings and other matters with respect to the Closed Chapter 11 Cases and the Closed Case Debtors shall be administered in the Chapter 11 Case of Brookstone Parent without prejudice to the rights of any party in interest, (ii) the caption of the Remaining Chapter 11 Case shall be amended as necessary to reflect the closure of the Closed Chapter 11 Cases, and (iii) a docket entry shall be made by the Clerk of

the Bankruptcy Court in each of the Closed Chapter 11 Cases that reflects the closure of those cases pursuant hereto. Upon the Liquidating Trustee's determination that all Claims have been Allowed, Disallowed, expunged, or withdrawn, and that all Causes of Action held by the Liquidating Trust have either been finally resolved or abandoned, the Liquidating Trustee shall move for the entry of a Final Decree for the Remaining Chapter 11 Case pursuant to section 350 of the Bankruptcy Code. On entry of the Final Decree, the members of the Liquidating Trust Oversight Committee, the Liquidating Trustee, and the Liquidating Trust's professionals and agents shall be deemed discharged pursuant to the Liquidating Trust Agreement and the Liquidating Trust shall be dissolved.

If at any time the Liquidating Trustee determines that the expense of administering the Liquidating Trust so as to make a final distribution to the Liquidating Trust Beneficiaries is likely to exceed the value of the Liquidating Trust Assets remaining in the Liquidating Trust, the Liquidating Trustee shall apply to the Bankruptcy Court for authority to (i) distribute to each Liquidating Trust Beneficiary its Pro Rata share of Cash remaining in the Liquidating Trust Administrative Fund (after reserving for administrative cost associated therewith) and (ii) close the Chapter 11 Case of Brookstone Parent in accordance with the Bankruptcy Code and Bankruptcy Rules. Notice of such application shall be given electronically, to the extent practicable, to those parties who have filed requests for notices and whose electronic addresses remain current and operating.

10. Term of Injunctions or Stays.

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

11. Entire Agreement.

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Plan Supplement.

12. Exhibits.

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' or Committees' counsel at the address above or by downloading such exhibits and documents from the Claims and Balloting Agent website at http://omnimgt.com/BKST or the Bankruptcy Court's website at http://www.deb.uscourts.gov/. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

13. Nonseverability of Plan Provisions.

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. To the extent that one of the individual Debtor's chapter 11 plans is found to be unconfirmable, the Plan Proponents may jointly sever such Debtor from the

Plan and seek confirmation of the Plan. Notwithstanding any such holding, alteration, interpretation or severance, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, interpretation or severance. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms, (ii) integral to the Plan and may not be deleted or modified without the Plan Proponents' joint consent, and (iii) nonseverable and mutually dependent.

14. <u>Votes Solicited in Good Faith</u>.

Upon entry of the Confirmation Order, the Plan Proponents will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Plan Proponents and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Liquidating Trustee or Liquidating Trust Oversight Committee will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

15. <u>Waiver or Estoppel</u>.

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors, the Plan Proponents or their respective counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

16. <u>Conflicts</u>.

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement (other than the Liquidating Trust Agreement), or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control. In the event of a conflict between the terms of the Plan, the Disclosure Statement, the Plan Supplement and, in each case, all documents, attachments, and exhibits thereto, on the one hand, and the terms of the Confirmation Order, on the other hand, the terms of the Confirmation Order shall control.

17. <u>No Stay of Confirmation Order</u>.

The Plan Proponents will request that the Bankruptcy Court waive any stay of enforcement of the Confirmation Order otherwise applicable, including, without limitation, pursuant to Bankruptcy Rules 3020(e), 6004(h) and 7062.

IV. **ALTERNATIVES TO THE PLAN**

The Plan reflects discussions and negotiations held between the Debtors and the Committee. The Debtors and the Committee have determined that the Plan is the most practical means of providing maximum recoveries to creditors. Alternatives to the Plan which have been considered and evaluated by the Debtors and the Committee during the course of the Chapter 11 Cases include (i) liquidation of the

Debtors' assets under chapter 7 of the Bankruptcy Code and (ii) an alternative chapter 11 plan. The Debtors' and the Committee's thorough consideration of these alternatives to the Plan has led them to conclude that the Plan, in comparison, provides a greater recovery to creditors on a more expeditious timetable and in a manner which minimizes inherent risks than any other course of action available to the Debtors.

### A. Liquidation Under Chapter 7 of the Bankruptcy Code

If the Plan or any other chapter 11 plan for the Debtors cannot be confirmed under section 1129(a) of the Bankruptcy Code, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, in which event a trustee would be elected or appointed to liquidate any remaining assets of the Debtors for distribution to creditors pursuant to chapter 7 of the Bankruptcy Code. A chapter 7 trustee, who would lack the Debtors' knowledge of their affairs, would be required to invest substantial time and resources to investigate the facts underlying the multitude of Claims filed against the Debtors' estates. If a trustee is appointed and the remaining assets of the Debtors are liquidated under chapter 7 of the Bankruptcy Code, all creditors holding Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims may receive distributions of a lesser value on account of their Allowed Claims and likely would have to wait a longer period of time to receive such distributions than they would under the Plan. A liquidation under chapter 7 likely would result in smaller distributions made to creditors than that provided for in the Plan because of (i) additional administrative expenses involved in the appointment of a chapter 7 trustee and (ii) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the chapter 7 liquidation. A liquidation analysis is attached as <u>Exhibit C</u> hereto.

### B. Alternative Chapter 11 Plan

If the Plan is not confirmed, the Debtors or any other party in interest (if the Debtors' exclusive period in which to file a chapter 11 plan has expired) could attempt to formulate an alternative chapter 11 plan which might provide for the liquidation of the Debtors' assets and the treatment of Claims other than as provided in the Plan. Because the Debtors do not have any ongoing operations, the Debtors and the Committee believe that any alternative chapter 11 plan will necessarily be substantially similar to the Plan. Accordingly, the Debtors and the Committee do not believe that a realistic alternative chapter 11 plan is likely or in the best interests of creditors.

### C. Certain Risk Factors

1. <u>The Debtors May Not Be Able to Obtain Confirmation of the Plan</u>. With regard to any proposed plan, the Debtors may not receive the requisite acceptances to confirm a plan. In the event that votes with respect to Claims in the Class entitled to vote are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Plan Proponents intend to seek Confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Plan Proponents may not be able to obtain Confirmation of the Plan. Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court might not confirm the Plan as proposed if the Bankruptcy Court finds that any of the statutory requirements for confirmation under section 1129 of the Bankruptcy Code have not been met. If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan of liquidation would be on terms as favorable to Holders of Claims as the terms of the Plan. In addition, there can be no assurance that the Plan Proponents will be able to successfully develop, prosecute, confirm and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtors' creditors. In the event that the Plan is not confirmed or the Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code, the Debtors and the Committee believe that such action or inaction, as the case may be, will cause the Debtors to incur substantial expenses and otherwise serve only to prolong unnecessarily the Chapter 11 Cases and negatively affect creditors' recoveries on their Claims.

2.      The Conditions Precedent to the Effective Date of the Plan May Not Occur. As more fully set forth in the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not occur.

3.      General Unsecured Creditors May Recover Less Than Projected. The Cash available for Distributions to Holders of Allowed General Unsecured Claims may be reduced by, among other things, the prior payment of (i) the Liquidating Trust expenses, (ii) any other wind-down fees, costs, and expenses of the Debtors, and (iii) Claims required to be paid pursuant to the Plan with priority over General Unsecured Claims.

4.      The Allowed Amount of Claims May Differ From Current Estimates. There can be no assurance that the Debtors' estimated Claim amounts are correct, and the actual amount of Allowed Claims may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from the Debtors' estimates. Furthermore, a number of additional Claims may be filed, including on account of rejection damages for executory contracts and unexpired leases rejected pursuant to the Plan. Any such claims may result in a greater amount of General Unsecured Claims than the Debtors' estimates. For example, Eight Dragons Investment Limited has filed a Proof of Claim (No. 296) in the amount of approximately $163 million. The Debtors strongly dispute this alleged Claim.

## V.      CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.      General

The following discussion summarizes certain material United States federal income tax consequences of the implementation of the Plan to the Debtors and to certain Holders of Allowed Claims. This summary does not address the federal income tax consequences to Holders of Claims who are deemed to have rejected the Plan in accordance with the provisions of Section 1126(g) of the Bankruptcy Code, or Holders whose Claims are entitled to payment in full in Cash.

This summary is based on the Internal Revenue Code ("IRC"), existing and proposed Treasury Regulations, judicial decisions, and published administrative rules and pronouncements of the IRS as in effect on the date hereof, all of which are subject to change, possibly on a retroactive basis. Any such change could significantly affect the federal income tax consequences described below.

The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan. This summary does not address state, local or foreign income or other tax consequences of the Plan. Creditors who are non-U.S. Holders should consult their own tax advisors with respect to the tax consequences of the Plan applicable to them.

The following discussion generally assumes that the Plan will be treated as a plan of liquidation of the Debtors for U.S. federal income tax purposes, and that all Distributions to Holders of Claims will be taxed accordingly.

ACCORDINGLY, THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR FOR ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT ITS OWN TAX

ADVISORS FOR THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.

## B. Consequences to the Debtors

1. <u>Cancellation of Debt</u>. The Debtors may realize cancellation of debt ("<u>COD</u>") income by reason of the discharge of the Debtors' indebtedness. COD is the amount by which the adjusted issue price of indebtedness discharged exceeds the sum of the amount of Cash, the issue price of any debt instrument and the fair market value of any other property given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the canceled debt would have given rise to a tax deduction). Because the Debtors anticipate utilizing a tax provision applicable to COD income realized in connection with the discharge of indebtedness in a chapter 11 case, the Debtors do not expect to incur COD income as a result of the implementation of the Plan.

2. <u>Transfer of Assets to Liquidating Trust</u>. The Debtors' transfer of assets to the Liquidating Trust may result in the recognition of gain or loss by the Debtors, depending in part on the value of such assets on the date of such transfer to the Liquidating Trust relative to the Debtors' adjusted tax basis in such assets.

## C. Consequences to Holders of Claims and Interests

1. <u>Realization and Recognition of Gain or Loss, In General</u>. The federal income tax consequences of the implementation of the Plan to a Holder of a Claim or Interest will depend, among other things, upon the origin of the Holder's Claim or Interest, when the Holder receives payment in respect of such Claim or Interest, whether the Holder reports income using the accrual or cash method of tax accounting, whether the Holder acquired its Claim or Interest at a discount, whether the Holder has taken a bad debt deduction or worthless security deduction with respect to such Claim or Interest, and whether (as intended and herein assumed) the Plan is treated as a plan of liquidation for federal income tax purposes. A Holder of an Interest should consult its tax advisor regarding the timing and amount of any potential worthless stock loss.

Generally, a Holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim for Cash or other property (including any Liquidating Trust Interests), in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value on the date of the exchange of any other property received by the Holder, including, as discussed below, any beneficial interests in a Liquidating Trust (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted tax basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the Holder's taxable income).

When gain or loss is recognized as discussed below, such gain or loss may be long-term capital gain or loss if the Claim or Interest disposed of is a capital asset in the hands of the Holder and the Holder's holding period in the Claim or Interest exceeds one year. Each Holder of an Allowed Claim or Interest should consult its own tax advisor to determine whether gain or loss recognized by such Holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

As discussed below, each Holder of an Allowed Claim that receives a beneficial interest in the Liquidating Trust will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Liquidating Trust Assets (consistent with its economic rights in the trust). Pursuant to the Plan, the Liquidating Trustee will in good faith value the assets transferred to the

Liquidating Trust, and all parties to the Liquidating Trust (including Holders of Claims receiving Liquidating Trust Interests) must consistently use such valuation for all U.S. federal income tax purposes.

A Holder's share of any proceeds received by a Liquidating Trust upon the sale or other disposition of the assets of the Liquidating Trust should not be included, for federal income tax purposes, in the Holder's amount realized in respect of its Allowed Claim but should be separately treated as amounts realized in respect of such Holder's ownership interest in the underlying assets of the Liquidating Trust.

A Holder's tax basis in its respective share of the Liquidating Trust Assets will equal the fair market value of such interest, and the Holder's holding period generally will begin the day following the establishment of a Liquidating Trust.

2.      Allocation of Consideration to Interest. In general, to the extent any amount received (whether stock, Cash, or other property) by a Holder of a debt instrument is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income under the Holder's normal method of accounting). Conversely, a Holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each Holder of an Allowed Claim is urged to consult its own tax advisor regarding the allocation of consideration and the taxation or deductibility of unpaid interest for tax purposes.

## D.      Tax Treatment of a Liquidating Trust and Holders of Beneficial Interests

1.      Classification of the Liquidating Trust. The Liquidating Trust (other than the Disputed Claims Reserve, which is intended to qualify as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9) is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (i.e., all income and loss is taxed directly to the Liquidating Trust Beneficiaries). However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. Any Liquidating Trust will be structured to comply with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Liquidating Trustee, Holders of Allowed Claims, and the Liquidating Trust Beneficiaries) will be required to treat, for U.S. federal income tax purposes, the Liquidating Trust (other than the Disputed Claims Reserve) as a grantor trust of which the Liquidating Trust Beneficiaries are the owners and grantors. The following discussion assumes that any Liquidating Trust will be so respected for U.S. federal income tax purposes. However, no opinion of counsel has been requested, and the Debtors or Liquidating Trustee may or may not obtain a ruling from the IRS, concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully the classification of a Liquidating Trust, the U.S. federal income tax consequences to the Liquidating Trust, the Liquidating Trust Beneficiaries and the Debtors could vary from those discussed herein (including the potential for an entity-level tax on income of the Liquidating Trust).

2.      General Tax Reporting by the Liquidating Trust and Beneficiaries. For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, Holders of Allowed Claims, and the Liquidating Trust Beneficiaries) must treat the transfer of the Liquidating Trust Assets to the Liquidating Trust in accordance with the terms of the Plan. Pursuant to the Plan, the Liquidating Trust Assets (other than the Disputed Claims Reserve) are treated, for U.S. federal income tax purposes, as having been transferred, subject to any obligations relating to those Assets, directly

to the Holders of the respective Claims receiving Liquidating Trust Interests (with each Holder receiving an undivided interest in such assets in accordance with their economic interests in such assets), followed by the transfer by the Holders of such assets to the Liquidating Trust in exchange for the Liquidating Trust Interests. Accordingly, all parties must treat the Liquidating Trust (other than the Disputed Claims Reserve) as a grantor trust of which the Holders of Liquidating Trust Interests are the owners and grantors, and treat the Liquidating Trust Beneficiaries as the direct owners of an undivided interest in the Liquidating Trust Assets, consistent with their economic interests therein, for all U.S. federal income tax purposes.

Allocations of taxable income of the Liquidating Trust among the Liquidating Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed Distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to Disputed Claims) to the Liquidating Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent Distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating Distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets for this purpose shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Liquidating Trustee shall make a good faith valuation of the Liquidating Trust Assets. All parties to the Liquidating Trust (including, without limitation, the Debtors and the Liquidating Trust Beneficiaries) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a Liquidating Trust Beneficiary will be treated as income or loss with respect to Liquidating Trust Beneficiary's undivided interest in the Liquidating Trust Assets, and not as income or loss with respect to its prior Allowed Claim. The character of any income and the character and ability to use any loss will depend on the particular situation of the Liquidating Trust Beneficiary.

The U.S. federal income tax obligations of a Holder with respect to its Liquidating Trust Interest are not dependent on the Liquidating Trust distributing any Cash or other proceeds. Thus, a Holder may incur a U.S. federal income tax liability with respect to its allocable share of Liquidating Trust income even if the Liquidating Trust does not make a concurrent Distribution to the Holder. In general, a Distribution of Cash by the Liquidating Trust will not be separately taxable to a Liquidating Trust Beneficiary since the beneficiary is already regarded for federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Liquidating Trust).

The Liquidating Trustee will comply with all applicable governmental withholding requirements. Thus, in the case of any Liquidating Trust Beneficiaries that are not U.S. persons, the Liquidating Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate). As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders; accordingly, such Holders should consult

their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the Liquidating Trust.

The Liquidating Trustee will file with the IRS tax returns for the Liquidating Trust consistent with its classification as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a). The Liquidating Trustee also will send annually to each holder of a Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

3.    Disputed Claims. Until such time as all of the beneficial interests in the Liquidating Trust can be distributed to the Holders in accordance with the terms of the Plan, the Disputed Claims Reserve will be treated as owning a portion of the assets in the Liquidating Trust. Distributions will be made to Holders of Disputed Claims when such Claims are subsequently Allowed and to Holders of Allowed Claims when Disputed Claims are subsequently disallowed. The Liquidating Trust shall file all income tax returns with respect to any income attributable to the Disputed Claims Reserve and shall pay the federal, state, and local income taxes attributable to the Disputed Claims Reserve, based on the items of income, gain, deduction, credit, or loss allocable thereto.

Holders should note that the tax treatment of a Disputed Claims Reserve is unclear and should consult their tax advisors as to the tax consequences to them of the establishment of, the income on, and distributions from, the Disputed Claims Reserve.

## E.    Withholding on Distributions, and Information Reporting

All Distributions to Holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%). Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. These categories are very broad; however, there are numerous exceptions. Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, a Holder of an Allowed Claim or a Liquidating Trust Beneficiary that is a not a U.S. person may be subject to up to 30% withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate. As to certain Claims, it is possible that withholding may be required with respect to Distributions by the Debtors even if no withholding would have been required if payment was made prior to the Chapter 11 Cases. A non-U.S. Holder may also be subject to other adverse consequences in connection with the implementation of the Plan. As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally

address the consequences to non-U.S. Holders. Holders are urged to consult their tax advisors regarding potential withholding on Distributions by the Debtors or payments from the Liquidating Trustee.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the Holder's tax returns.

## VI.   VOTING PROCEDURES AND REQUIREMENTS

### A.   Ballots and Voting Deadline

**IT IS IMPORTANT THAT THE HOLDERS OF CLAIMS IN CLASS 3 TIMELY EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE CHAPTER 11 PLAN. All known holders of Claims entitled to vote on the Plan have been sent a** ballot together with this Disclosure Statement. Such holders should read the ballot carefully and follow the instructions contained therein. Please use only the ballot that accompanies this Disclosure Statement.

The Debtors have engaged Omni Management Group as their Claims and Balloting Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan. **IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE CLAIMS AND BALLOTING AGENT AT THE ADDRESS SET FORTH BELOW BEFORE THE VOTING DEADLINE OF [_____] AT 4:00 P.M. (EASTERN TIME).**

**IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE CLAIMS AND BALLOTING AGENT AT THE NUMBER SET FORTH BELOW. ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE CHAPTER 11 PLAN SHALL NOT BE COUNTED AS EITHER AN ACCEPTANCE OR REJECTION OF THE CHAPTER 11 PLAN.**

**IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE CLAIMS AND BALLOTING AGENT AT (844) 378-2716, OR AT:**

**Brookstone Holdings Corp., et al. Balloting Center**
**c/o Omni Management Group**
**5955 De Soto Ave., Suite 100**
**Woodland Hills, CA 91367**

### B.   Holders of Claims Entitled to Vote

Class 3 is the only Class of Claims under the Plan that is impaired and entitled to vote to accept or reject the Plan. Each holder of a Claim in Class 3 as of the Record Date established by the Debtors for purposes of this solicitation may vote to accept or reject the Plan (other than Holders of Claims subject to an objection filed by the Debtors).

### C. Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of claims occurs when holders of at least two-thirds in dollar amount and more than one half in number of the allowed claims of that class that cast ballots for acceptance or rejection of the chapter 11 plan vote to accept the plan. Thus, acceptance of the Plan by Class 3, for example, will occur only if at least two-thirds in dollar amount and a majority in number of the holders of such Class 3 Claims that cast their ballots vote in favor of acceptance. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

### D. Voting Procedures

1. <u>Holders of Claims in Class 3</u>. All Holders of Claims in Class 3 that are entitled to vote on the Plan should complete the enclosed ballot and return it to the Claims and Balloting Agent so that it is received by the Claims and Balloting Agent before the Voting Deadline.

2. <u>Withdrawal of Ballot</u>. Except as otherwise provided in the Approval Order, any party who has delivered a valid ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Claims and Balloting Agent at any time prior to the Voting Deadline. To be valid, a notice of withdrawal must (i) contain the description of the Claims to which it relates and the aggregate principal amount represented by such Claims, (ii) be signed by the withdrawing party in the same manner as the ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claims and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be actually received by the Claims and Balloting Agent prior to the Voting Deadline.

Except as otherwise provided in the Approval Order, any party who has previously delivered a valid ballot for the acceptance or rejection of the Plan may revoke such ballot and change its vote by delivering to the Claims and Balloting Agent prior to the Voting Deadline a subsequent properly completed ballot for acceptance or rejection of the Plan. In the case where multiple ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last timely received, properly executed ballot will be deemed to reflect that voter's intent and will supersede and revoke any prior ballot.

## VII. CONFIRMATION OF THE PLAN

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that the Plan is (i) accepted by all impaired Classes of Claims entitled to vote or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class and as to the impaired Classes of Claims and Existing Equity Interests that are deemed to reject the Plan, (ii) feasible, and (iii) in the "best interests" of the holders of Claims and Existing Equity Interests impaired under the Plan.

### A. Acceptance of the Plan

The Bankruptcy Code defines acceptance of a chapter 11 plan by a class of creditors as acceptance by creditors holding two-thirds (2/3) in dollar amount and a majority in number of the claims in such class (other than any such creditor designated under section 1126(e) of the Bankruptcy Code), but for that purpose

counts only those creditors that actually cast ballots. Holders of claims that fail to vote are not counted as either accepting or rejecting a plan.

**B.     Confirmation of the Plan If a Class Does Not Accept the Plan/No Unfair Discrimination/Fair and Equitable Test**

In the event that any impaired Class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cramdown" provisions set forth in section 1129(b) of the Bankruptcy Code. Because the holders of Existing Equity Interests in Classes 4 and 5 will not receive any recovery under the Plan and are, therefore, deemed to have rejected the Plan, the Bankruptcy Court may only confirm the Plan if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Classes.

The "unfair discrimination" test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or equity interests receives more than it legally is entitled to receive for its claims or equity interests. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

- Secured Creditors. Each holder of an impaired secured claim either (i) retains its liens on the property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date, of at least the allowed amount of such claim, or (ii) has the right to credit bid the amount of its claim if its property is sold and retains its lien on the proceeds of the sale (or if sold, on the proceeds thereof), or (iii) receives the "indubitable equivalent" of its allowed secured claim.

- Unsecured Creditors. Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- Equity Interests. Either (i) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan.

These requirements are in addition to other requirements established by case law interpreting the statutory requirement.

The Debtors believe the Plan will satisfy the "fair and equitable" requirement notwithstanding that Classes 4 and 5 are deemed to reject the Plan because (i) no Class that is junior to such Classes will receive or retain any property under the Plan, (ii) no Class of equal rank to Classes 4 or 5 is being afforded better treatment than Class 4 or 5, and (iii) the Existing Equity Interests in Classes 4 and 5 are valueless.

**IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.**

### C.  Best Interests Test

The Bankruptcy Code requires that each holder of an impaired claim or equity interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The first step in determining whether this test has been satisfied is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The gross amount of cash that would be available for satisfaction of claims and equity interests would be the sum consisting of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtors, augmented by the unencumbered cash held by the Debtors at the time of the commencement of the liquidation case.

The next step is to reduce that gross amount by the costs and expenses of liquidation and by such additional administrative and priority claims that might result from the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code. Finally, the present value of such allocations (taking into account the time necessary to accomplish the liquidation) are compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. Other liquidation costs include the expenses incurred during the Chapter 11 Cases allowed in the chapter 7 cases, such as compensation for attorneys, financial advisors, appraisers, accountants, and other professionals for the Debtors and statutory committees appointed in the Chapter 11 Cases, and costs and expenses of members of such committees, as well as other compensation claims. In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases.

The foregoing types of claims, costs, expenses, fees, and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition priority and unsecured Claims.

The Debtors submit that each impaired Class will receive under the Plan a recovery at least equal in value to the recovery such Class would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

The Plan is a plan of liquidation without the additional costs and expenses attendant to a liquidation under chapter 7. After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Cases, including (i) the increased costs and

expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee and (ii) the substantial increases in Claims that would be satisfied on a priority basis, the Debtors have determined that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is not less than such holder would receive pursuant to liquidation of the Debtors under chapter 7.

The Debtors also believe that the value of any distributions to each Class of Allowed Claims in a chapter 7 case, including all Other Secured Claims, would be less than the value of distributions under the Plan because such distributions in a chapter 7 case would not occur for a substantial period of time. In the event litigation was necessary to resolve claims asserted in a chapter 7 case, the delay could be prolonged and administrative expenses increased.  As noted above, a liquidation analysis is attached as <u>Exhibit C</u> hereto.

### D.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if the Bankruptcy Court finds that such plan is feasible. A feasible plan is one which will not lead to a need for further reorganization or liquidation of the debtor. Since the Plan provides for the liquidation of the Debtors, the Bankruptcy Court should find that the Plan is feasible if it determines that the Debtors will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet their post-Confirmation Date obligations to pay for the costs of administering and fully consummating the Plan and closing the Chapter 11 Cases. The Debtors believe that the Plan satisfies the financial feasibility requirement imposed by the Bankruptcy Code.

### E.      Classification of Claims and Existing Equity Interests Under the Plan

The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code which requires that a chapter 11 plan place each claim or equity interest into a class with other claims or equity interests that are "substantially similar." The Plan establishes Classes of Claims and Existing Equity Interests as required by the Bankruptcy Code and summarized above. Administrative Claims, Priority Tax Claims, and Professional Fee Claims are not classified.

### F.      Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold the Confirmation Hearing. The Confirmation Hearing is scheduled for [_____] at [__]:[__] [__].m. (Eastern Time), or as soon thereafter as counsel may be heard, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, in Courtroom #1 of the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Debtors or the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned confirmation hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to Confirmation of the Plan must be in writing, must conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, must set forth the name of the objector and the nature and amount of claims or interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court and served on (a) counsel to the Debtors, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, New York 10166, Attn: Matthew K. Kelsey, Esq. and Keith R. Martorana, Esq., and Young Conaway Stargatt & Taylor LLP, Rodney Square, 1000 North King Street, Wilmington,

Delaware 1980, Attn: Sean M. Beach, Esq. and Andrew L. Magaziner, Esq., (b) Linda Casey, Esquire, Office of the United States Trustee, 844 N. King Street, Room 2207, Lockbox 35, Wilmington DE, 19801; (c) counsel to the Committee, Cooley LLP, 1114 Avenue of the Americas, New York, New York 10036, Attn: Cathy Hershcopf, Esq. and Seth Van Aalten, Esq., and Bayard, P.A., 600 N. King Street, Suite 400, Wilmington, Delaware 19801 Attn: Justin R. Alberto, Esq., so as to be **ACTUALLY RECEIVED** no later than [_____], 2019, at 4:00 p.m. (Eastern Time).

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT**.

At the Confirmation Hearing, the Bankruptcy Court must determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied and, upon demonstration of such compliance, the Bankruptcy Court will enter the Confirmation Order.

## VIII. <u>CONCLUSION</u>

The Debtors and the Committee believe the Plan is in the best interests of all creditors and urge the holders of impaired Claims in Class 3 (General Unsecured Claims) to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received not later than [_____], 2019.

Dated: January 2, 2019

Respectfully submitted,

**BROOKSTONE HOLDINGS CORP.**

By: _/s/ Greg Tribou_
    Name: Greg Tribou
    Title: Authorized Signatory

**BROOKSTONE, INC.**

By: _/s/ Greg Tribou_
    Name: Greg Tribou
    Title: Authorized Signatory

**BROOKSTONE COMPANY, INC.**

By: _/s/ Greg Tribou_
    Name: Greg Tribou
    Title: Authorized Signatory

**BROOKSTONE PURCHASING, INC.**

By: _/s/ Greg Tribou_
    Name: Greg Tribou
    Title: Authorized Signatory

**BROOKSTONE STORES, INC.**

By: _/s/ Greg Tribou_
    Name: Greg Tribou
    Title: Authorized Signatory

**BROOKSTONE HOLDINGS, INC.**

By: _/s/ Greg Tribou_
    Name: Greg Tribou
    Title: Authorized Signatory

**BROOKSTONE PROPERTIES, INC.**

By: _/s/ Greg Tribou_
    Name: Greg Tribou
    Title: Authorized Signatory


**BROOKSTONE RETAIL PUERTO RICO, INC.**

By: _/s/ Greg Tribou_
    Name: Greg Tribou
    Title: Authorized Signatory


**BROOKSTONE INTERNATIONAL HOLDINGS, INC.**

By: _/s/ Greg Tribou_
    Name: Greg Tribou
    Title: Authorized Signatory


**BIG BLUE AUDIO LLC**

By: _/s/ Greg Tribou_
    Name: Greg Tribou
    Title: Authorized Signatory

Prepared by:

**YOUNG CONAWAY STARGATT &
TAYLOR, LLP**
Michael R. Nestor (No. 3526)
Sean M. Beach (No. 4070)
Andrew L. Magaziner (No. 5426)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:     (302) 571-6600
Fax:     (302) 571-1253
Email:  mnestor@ycst.com
           sbeach@ycst.com
           amagaziner@ycst.com

-and-

**GIBSON, DUNN & CRUTCHER LLP**
Matthew J. Williams
Matthew K. Kelsey
Keith R. Martorana
Jason Zachary Goldstein
200 Park Avenue
New York, New York 10166
Tel:     (212) 351-4000
Fax:     (212) 351-4035
Email:  mjwilliams@gibsondunn.com
           mkelsey@gibsondunn.com
           kmartorana@gibsondunn.com
           jgoldstein@gibsondunn.com

*Counsel to the Debtors and
Debtors in Possession*

**BAYARD, P.A.**
Justin Alberto (No. 5126)
Erin R. Fay (No. 5268)
600 North King Street, Suite 400
Wilmington, Delaware 19801
Tel:     (302) 655-5000
Fax:     (302) 658-6395
Email:  jalberto@bayardlaw.com
           efay@bayardlaw.com

- and -

**COOLEY LLP**
Seth Van Aalten
Cathy Hershcopf
Robert Winning
1114 Avenue of the Americas
New York, New York 10036
Tel:     (212) 479-6000
Fax:     (212) 479-6275
Email:  svanaalten@cooley.com
           chershcopf@cooley.com
           rwinning@cooley.com

*Counsel to the Official Committee of
Unsecured Creditors of Brookstone Holdings
Corp., et al.*

THIS PAGE INTENTIONALLY LEFT BLANK

**EXHIBIT A**

**PLAN**

NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, OR A LEGALLY BINDING OBLIGATION OF THE PLAN PROPONENTS OR ANY OTHER PARTY IN INTEREST. THIS PLAN IS SUBJECT TO APPROVAL OF THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS. THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES. YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE (INCLUDING IN CONNECTION WITH THE PURCHASE OR SALE OF THE DEBTORS' SECURITIES) BEFORE THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BROOKSTONE HOLDINGS CORP., *et al.*,[1] | Case No. 18-11780 (BLS) |
| Debtors. | (Jointly Administered) |

### JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF BROOKSTONE HOLDINGS CORP., *ET AL.*, SUBMITTED BY THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AS CO-PROPONENTS

**GIBSON, DUNN & CRUTCHER LLP**
Matthew J. Williams
Matthew K. Kelsey
Keith R. Martorana
Jason Zachary Goldstein
200 Park Avenue
New York, New York 10166
Tel:     (212) 351-4000
Fax:     (212) 351-4035
Email:   mjwilliams@gibsondunn.com
         mkelsey@gibsondunn.com
         kmartorana@gibsondunn.com
         jgoldstein@gibsondunn.com

**COOLEY LLP**
Seth Van Aalten
Cathy Hershcopf
Robert Winning
1114 Avenue of the Americas
New York, New York 10036
Tel:     (212) 479-6000
Fax:     (212) 479-6275
Email:   svanaalten@cooley.com
         chershcopf@cooley.com
         rwinning@cooley.com

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Michael R. Nestor (No. 3526)
Sean M. Beach (No. 4070)
Andrew L. Magaziner (No. 5426)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:     (302) 571-6600
Fax:     (302) 571-1253
Email:  mnestor@ycst.com
        sbeach@ycst.com
        amagaziner@ycst.com

**BAYARD, P.A.**
Justin Alberto (No. 5126)
Erin R. Fay (No. 5268)
600 North King Street, Suite 400
Wilmington, Delaware 19801
Tel:     (302) 655-5000
Fax:     (302) 658-6395
Email:  jalberto@bayardlaw.com
        efay@bayardlaw.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

*Co-Counsel to the Official Committee of Unsecured*
*Creditors of Brookstone Holdings Corp., et al.*

Dated: January 2, 2019

---

[1] The Debtors, along with the last four digits of each Debtor's tax identification number, are: Brookstone Holdings Corp. (4638), Brookstone, Inc. (2895), Brookstone Company, Inc. (3478), Brookstone Retail Puerto Rico, Inc. (5552), Brookstone International Holdings, Inc. (8382), Brookstone Purchasing, Inc. (2514), Brookstone Stores, Inc. (2513), Big Blue Audio LLC (N/A), Brookstone Holdings, Inc. (2515), and Brookstone Properties, Inc. (2517). The Debtors' corporate headquarters and the mailing address for each Debtor is One Innovation Way, Merrimack, NH 03054.

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
GOVERNING LAW ................................................................................................... 1

    A.    Defined Terms. ...................................................................................................... 1
    B.    Rules of Interpretation. .......................................................................................... 9
    C.    Computation of Time. .......................................................................................... 10
    D.    Reference to Monetary Figures. ........................................................................... 10

ARTICLE II. ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, AND PROFESSIONAL
FEE CLAIMS ........................................................................................................... 10

    A.    Administrative Claims. ........................................................................................ 10
    B.    Priority Tax Claims. ............................................................................................. 10
    C.    Professional Fee Claims. ...................................................................................... 11

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ................... 11

    A.    Classification of Claims and Interests. ................................................................ 11
    B.    Treatment of Claims and Interests. ...................................................................... 11
    C.    Special Provision Governing Unimpaired Claims. .............................................. 13
    D.    Acceptance or Rejection of the Plan. ................................................................... 13
    E.    Elimination of Vacant Classes. ............................................................................ 14
    F.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ................. 14
    G.    Controversy Concerning Impairment. .................................................................. 14
    H.    Subordinated Claims. ........................................................................................... 14
    I.    Provision Governing Allowance and Defenses to Claims. ................................... 14

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ................................................... 14

    A.    Substantive Consolidation. ................................................................................... 14
    B.    Plan Transactions. ................................................................................................. 15
    C.    The Liquidating Trust. .......................................................................................... 16
    D.    Reserve Accounts. ................................................................................................ 20
    E.    Governance, Directors and Officers; Employment-Related Agreements and
        Compensation Programs; Other Agreements. ..................................................... 20
    F.    Cancellation of Existing Securities and Agreements. .......................................... 21
    G.    Corporate Action. ................................................................................................. 21
    H.    Effectuating Documents; Further Transactions. ................................................... 21
    I.    Securities Law Matters. ........................................................................................ 22
    J.    Section 1146 Exemption. ..................................................................................... 22
    K.    Administration of Taxes. ...................................................................................... 22
    L.    Employee Benefits ............................................................................................... 23
    M.    Preservation of Causes of Action. ........................................................................ 23

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............. 24

    A.    Assumption, Assumption and Assignment, and Rejection of Executory Contracts and
        Unexpired Leases. ................................................................................................ 24
    B.    Claims Based on Rejection of Executory Contracts and Unexpired Leases. ....... 24
    C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ...... 25
    D.    Insurance Policies. ................................................................................................ 25
    E.    Modifications, Amendments, Supplements, Restatements, or Other Agreements. ....... 25
    F.    Reservation of Rights. .......................................................................................... 26
    G.    Nonoccurrence of Effective Date. ........................................................................ 26

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ......................................................... 26

    A.    Distribution Record Date. ..................................................................................... 26
    B.    Method of Distribution Under the Plan. ............................................................... 26

|     | C. | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 27 |
|     | D. | Compliance with Tax Requirements. | 27 |
|     | E. | Time Bar to Cash Payments. | 27 |
|     | F. | Setoffs and Recoupment. | 28 |

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS ..... 28

|     | A. | Disputed Claims. | 28 |
|     | B. | Objections to Claims and Interests. | 28 |
|     | C. | Prosecution, Compromise, and Settlement. | 28 |
|     | D. | No Distributions Pending Allowance. | 29 |
|     | E. | Distributions After Allowance. | 29 |

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ..... 29

|     | A. | No Discharge of Claims. | 29 |
|     | B. | Releases. | 29 |
|     | C. | Exculpation. | 30 |
|     | D. | Injunction. | 31 |
|     | E. | Setoffs. | 31 |
|     | F. | Recoupment. | 31 |
|     | G. | Subordination Rights. | 32 |

ARTICLE IX. EFFECT OF CONFIRMATION OF THE PLAN ..... 32

ARTICLE X. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ..... 32

|     | A. | Conditions Precedent to the Confirmation Date. | 32 |
|     | B. | Conditions Precedent to the Effective Date. | 32 |
|     | C. | Waiver of Conditions. | 33 |
|     | D. | Effect of Failure of Conditions. | 33 |

ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ..... 33

|     | A. | Modification and Amendments. | 33 |
|     | B. | Effect of Confirmation on Modifications. | 33 |
|     | C. | Revocation or Withdrawal of Plan. | 33 |

ARTICLE XII. RETENTION OF JURISDICTION ..... 34

ARTICLE XIII. MISCELLANEOUS PROVISIONS ..... 35

|     | A. | Immediate Binding Effect. | 35 |
|     | B. | Dissolution of Committee | 35 |
|     | C. | Additional Documents. | 35 |
|     | D. | Payment of Statutory Fees. | 35 |
|     | E. | Reservation of Rights. | 36 |
|     | F. | Successors and Assigns. | 36 |
|     | G. | Disallowed Claims. | 36 |
|     | H. | Notices. | 36 |
|     | I. | Automatic Closure of Certain Chapter 11 Cases; Final Decree for Remaining Chapter 11 Case. | 37 |
|     | J. | Term of Injunctions or Stays. | 38 |
|     | K. | Entire Agreement. | 38 |
|     | L. | Exhibits. | 38 |
|     | M. | Nonseverability of Plan Provisions. | 38 |
|     | N. | Votes Solicited in Good Faith. | 38 |
|     | O. | Waiver or Estoppel. | 39 |
|     | P. | Conflicts. | 39 |
|     | Q. | No Stay of Confirmation Order. | 39 |

Brookstone Holdings Corp. and its affiliated debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors") in the above-captioned chapter 11 cases propose this joint plan of liquidation for the resolution of the outstanding claims against and interests in the Debtors pursuant to chapter 11 of title 11 of the United States Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A. of the Plan. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses and assets, the Chapter 11 Cases, risk factors, a summary and description of the Plan, and certain related matters. The Debtors and the Committee are co-proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan provides for the liquidation and distribution of the remaining assets of the Estates by a liquidating trust to be formed pursuant to the Plan and related liquidating trust agreement.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY, PARTICULARLY HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. NO SOLICITATION MATERIALS, OTHER THAN THE DISCLOSURE STATEMENT AND RELATED MATERIALS TRANSMITTED THEREWITH AND APPROVED BY THE BANKRUPTCY COURT HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THE PLAN.**

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.      *Defined Terms.*

As used in the Plan, capitalized terms have the meanings set forth below.

1.      "Administrative Claim" means any Claim pursuant to section 503(b) or 507(a)(2) of the Bankruptcy Code for costs and expenses of administration of the Estates or compensation and reimbursement in making a substantial contribution in the Chapter 11 Cases, other than a Professional Fee Claim.

2.      "Administrative Claim Bar Date" means the last date by which an Entity must File a request for payment of an Administrative Claim (other than a Section 503(b)(9) Claim, which was subject to a separate bar date of December 5, 2018), which shall be the date that is 45 days after the Effective Date.

3.      "Administrative/Priority Claim" means any Administrative Claim, Professional Fee Claim, Priority Tax Claim, and Other Priority Claim.

4.      "Administrative/Priority Claims Reserve Account" shall have the meaning ascribed to it in Article IV.D.1 of the Plan.

5.      "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.

6.      "Affiliate Receivables" means the receivable Claims of any of the Debtors against any of the Non-Debtor Affiliates.

7.      "Allowed" means with respect to any Claim, except as otherwise provided herein: (i) a Claim that either is not a Disputed Claim or has been allowed by a Final Order, (ii) a Claim that is allowed (a) pursuant to the terms of the Plan, (b) in any stipulation that is approved by the Bankruptcy Court, or (c) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith, (iii) a Rejection Claim that either (a) is not a Disputed Claim or (b) has been allowed by a Final

Order, (iv) a Claim as to which a Proof of Claim has been timely Filed and as to which no objection has been Filed by the deadline established in Article VII.B, or (v) any Administrative Claim or Professional Fee Claim (a) request for payment of which is/was Filed on or before the Administrative Claim Bar Date or Professional Fee Claim Bar Date, as applicable (and that either (y) is not a Disputed Claim or (z) has been allowed by a Final Order) or (b) which is for fees payable pursuant to section 1930(a) of the Judicial Code.

8.      "<u>Assumed Executory Contract and Unexpired Lease List</u>" means the list of Executory Contracts and Unexpired Leases that will be assumed by the Debtors pursuant to Article V of the Plan, which shall be included in the Plan Supplement.

9.      "<u>Assumed Insurance Policies</u>" means those insurance policies set forth on the Assumed Executory Contract and Unexpired Lease List.

10.     "<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101−1532.

11.     "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware, or such other court exercising jurisdiction over all or any part of the Chapter 11 Cases, as applicable.

12.     "<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

13.     "<u>Bar Date</u>" means the deadline for filing Proofs of Claim, which unless established otherwise by Final Order of the Bankruptcy Court or Debtor (or Liquidating Trustee) consent for a particular Claim, shall be (i) December 5, 2018 at 5:00 p.m. prevailing Eastern Time for all Entities other than Governmental Units or (ii) 180 days after the Petition Date for Governmental Units.

14.     "<u>Brookstone Parent</u>" means the Debtor Brookstone Holdings Corp.

15.     "<u>Brookstone Subsidiary</u>" means any Debtor other than Brookstone Parent.

16.     "<u>Business Day</u>" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

17.     "<u>Cash</u>" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

18.     "<u>Causes of Action</u>" means any claims, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Causes of Action also include: (i) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law, (ii) the right to object to or otherwise contest Claims or Interests, (iii) causes of action or claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code, and (iv) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

19.     "<u>Certificate</u>" means any instrument evidencing a Claim or an Interest.

20.     "<u>Chapter 11 Cases</u>" means (i) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (ii) when

used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

21.    "<u>Claim</u>" means any "claim" (as defined in section 101(5) of the Bankruptcy Code) against a Debtor.

22.    "<u>Claim Objection Deadline</u>" means the date that is 180 days after the Effective Date, subject to extension by the Bankruptcy Court.

23.    "<u>Claims and Balloting Agent</u>" means Omni Management Group, LLC, located at 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367.

24.    "<u>Class</u>" means a class of Claims or Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

25.    "<u>Closed Case Debtors</u>" shall have the meaning ascribed to it in Article XII.I of the Plan.

26.    "<u>Closed Chapter 11 Cases</u>" shall have the meaning ascribed to it in Article XII.I of the Plan.

27.    "<u>Committee</u>" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases, as constituted from time to time, in its official capacity and as representative of holders of Unsecured Claims with respect to all other matters in the Chapter 11 Cases, but does not mean the members of the Committee in their individual capacities.

28.    "<u>Confirmation</u>" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

29.    "<u>Confirmation Date</u>" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

30.    "<u>Confirmation Hearing</u>" means, collectively, the hearing or hearings held by the Bankruptcy Court to consider confirmation of the Plan, pursuant to section 1129 of the Bankruptcy Code, as such hearing or hearings may be adjourned or continued from time to time.

31.    "<u>Confirmation Order</u>" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

32.    "<u>Consummation</u>" means the occurrence of the Effective Date.

33.    "<u>Cure Notice and Schedule</u>" means the *Notice of Possible Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with Sale* [Docket No. 345].

34.    "<u>Debtors</u>" has the meaning ascribed to it in the preamble to the Plan.

35.    "<u>Disallowed Claim</u>" means any Claim which has (i) not been scheduled by the Debtors in a liquidated, non-contingent and undisputed amount in the Schedules filed by the Debtors in the Chapter 11 Cases pursuant to Bankruptcy Rule 1007, (ii) not been evidenced by a Proof of Claim filed in the Chapter 11 Cases by the applicable Bar Date, or (iii) been disallowed by a Final Order of the Bankruptcy Court.

36.    "<u>Disclosure Statement</u>" means the disclosure statement filed with the Bankruptcy Court by the Plan Proponents pursuant to section 1125 of the Code with respect to the Plan, including all exhibits

and schedules thereto, which was approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as it may be amended, supplemented, or modified from time to time.

37.     "Disputed" means (i) in relation to Claims, such Claim if a Proof of Claim is required to be filed and (a) no Proof of Claim has been timely filed, (b) an objection has been timely interposed, or (c) the time for filing an objection to such Claim has not expired and no order of the Bankruptcy Court allowing such Claim has been entered or (ii) in relation to any Claim or Interest, any Claim or Interest against any Debtor that is not an Allowed Claim or Allowed Interest.

38.     "Distribution Record Date" means the record date for purposes of making distributions under the Plan on account of Allowed Claims and Allowed Interests, which date shall be the later of (i) the Confirmation Date or (ii) with respect to Claims for which the applicable Bar Date has not expired as of such date, the earlier of (a) such applicable Bar Date or (b) the date on which a Proof of Claim evidencing such Claim is Filed.

39.     "Effective Date" means, with respect to the Plan, the date that is a Business Day selected jointly by the Plan Proponents on which (i) no stay of the Confirmation Order is in effect, (ii) all conditions precedent specified in Article X of the Plan have been satisfied or waived (in accordance with Article X of the Plan), (iii) the Plan is jointly declared effective by the Plan Proponents, and (iv) the Plan Proponents shall have Filed notice of the Effective Date with the Bankruptcy Court.

40.     "Entity" means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

41.     "Equity Security" means any "equity security" (as defined in section 101(16) of the Bankruptcy Code) in a Debtor.

42.     "Estate" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

43.     "Exculpated Claim" means any claim or Cause of Action related to any act or omission in connection with, relating to, or arising out of the Plan or Plan Transactions, the formulation, preparation, dissemination, negotiation of any document in connection with the Plan, the Plan Documents, the Plan Supplement or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Plan Supplement, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property pursuant to the Plan.

44.     "Exculpated Party" means each of the following in its respective capacity as such: (i) the Debtors, (ii) the Committee, (iii) the present and former members of the Committee (including ex officio members), (iv) with respect to each of the Entities in clauses (i) and (ii), each such Entity's current and former Affiliates and subsidiaries and each such Entity's, Affiliate's, and subsidiary's respective current and former officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

45.     "Executory Contract" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

46.     "Existing Equity Interests" means the existing Interests in the Debtors.

47.     "File" or "Filed" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

48. "<u>Final Decree</u>" means the Order entered pursuant to section 350 of the Bankruptcy Code, Bankruptcy Rule 3022, and Local Rule 3022-1 closing a Chapter 11 Case.

49. "<u>Final Order</u>" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided however*, that the filing of a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, relating to such order shall not cause such order to not be a "Final Order."

50. "<u>General Unsecured Claim</u>" means any Unsecured Claim other than any (i) Intercompany Claim and (ii) Administrative/Priority Claim.

51. "<u>Governmental Unit</u>" means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

52. "<u>Holder</u>" means an Entity holding a Claim or an Interest, as applicable.

53. "<u>Impaired</u>" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

54. "<u>Implementation Memorandum</u>" means the memorandum describing the sequencing of the actions, transfers, and other corporate transactions making up or otherwise contemplated by the Plan Transactions that are to be effectuated pursuant to the Plan in compliance with the Bankruptcy Code and other applicable United States law, in a tax efficient manner, and in accordance with the procedures to be followed in connection therewith. The Plan Supplement will include a substantially final form of the Implementation Memorandum.

55. "<u>Insider</u>" has the meaning set forth in section 101(31) of the Bankruptcy Code.

56. "<u>Intercompany Claim</u>" means all Claims of one Debtor against another Debtor. For the avoidance of doubt, Intercompany Claims shall not include any Affiliate Receivables or any other Claims of any or all of the Debtors against any or all of the Non-Debtor Affiliates.

57. "<u>Interest</u>" means any (i) Equity Security or (ii) issued, unissued, authorized, or outstanding shares of capital stock, partnership and limited liability company interests, or similar interests in the Debtors together with any warrants, options, or contractual rights to purchase or acquire such capital stock or interests at any time, and all rights arising with respect thereto.

58. "<u>Judicial Code</u>" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

59. "<u>Lien</u>" means a "lien" as defined in section 101(37) of the Bankruptcy Code.

60. "<u>Liquidating Trust</u>" means the trust created pursuant to Article IV of the Plan and the Liquidating Trust Agreement, which trust shall contain the Liquidating Trust Assets, which shall be administered by the Liquidating Trustee and governed by the Liquidating Trust Oversight Committee.

61.  "Liquidating Trust Administrative Fund" means Cash set aside by the Liquidating Trustee, with the consent of the Liquidating Trust Oversight Committee, to be held and maintained by the Liquidating Trust, in an amount sufficient to fund, and for the purpose of, paying the expenses incurred by the Liquidating Trustee (including fees and expenses for professionals retained by the Liquidating Trust) in connection with the Liquidating Trust and any obligations imposed on the Liquidating Trustee or the Liquidating Trust, including expenses relating to the performance of the Liquidating Trustee's obligations under the Liquidating Trust Agreement and the Plan (including any taxes imposed on the Liquidating Trust or in respect of the Liquidating Trust Assets). Additional funds may be set aside from the Liquidating Trust Assets for the purposes of increasing the Liquidating Trust Administrative Fund, upon application to the Bankruptcy Court.

62.  "Liquidating Trust Agreement" means the agreement to be dated as of the Effective Date establishing and setting forth the provisions of the Liquidating Trust, substantially in the form contained in the Plan Supplement.

63.  "Liquidating Trust Assets" means (i) all remaining assets of each of the Debtors which have not been abandoned prior to the Effective Date (including, without limitation, the Affiliate Receivables), (ii) all Cash owned by each of the Debtors on the Effective Date, other than Cash to fund the Administrative/Priority Claims Reserve Account and the Other Secured Claims Reserve Account, (iii) all assets recovered by the Liquidating Trustee on behalf of the Liquidating Trust on or after the Effective Date through enforcement, resolution, settlement, collection, return, or otherwise, (iv) all Causes of Action, other than Released Causes of Action, owned by the Debtors on the Effective Date, (v) any proceeds resulting from the Liquidating Trustee's investment of the Liquidating Trust Assets on or after the Effective Date, (vi) immediately prior to the dissolution of the Debtors, any remaining portion of the Tail Fund, (vii) the Debtors' books and records, including, without limitation, all documents, communications, and information of the Debtors, including, without limitation, such documents, communications and information protected by the attorney-client privilege, the work-product privilege, and any other applicable evidentiary privileges, and (viii) the Liquidating Trust Administrative Fund.

64.  "Liquidating Trust Beneficiaries" means Holders of Allowed Class 3 Claims.

65.  "Liquidating Trust Interests" means the beneficial interests in the Liquidating Trust to be issued to the Liquidating Trust Beneficiaries pursuant to the Plan and the Liquidating Trust Agreement.

66.  "Liquidating Trust Oversight Committee" shall have the meaning ascribed to it in Article IV.C.7 of the Plan.

67.  "Liquidating Trustee" shall have the meaning ascribed to it in Article IV.C.6 of the Plan and the initial Liquidating Trustee shall be identified in the Plan Supplement.

68.  "Net Proceeds" means the proceeds of the Liquidating Trust Assets, minus the funds set aside for the Liquidating Trust Administrative Fund.

69.  "Non-Debtor Affiliates" means the Entities listed on Schedule 1 hereto.

70.  "OPEB Plan" means, collectively, any and all Debtor other post-employment benefits obligations.

71.  "Other Priority Claim" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

72.     "Other Secured Claim" means any Claim that is Secured, other than the Pre-Petition Secured Claims.

73.     "Other Secured Claims Reserve Account" shall have the meaning ascribed to it in Article IV.D.2 of the Plan.

74.     "Person" has the meaning set forth in section 101(41) of the Bankruptcy Code

75.     "Petition Date" means August 2, 2018, the date on which the Debtors commenced the Chapter 11 Cases.

76.     "Plan" means this *Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code of Brookstone Holding Corp., et al., Submitted by the Debtors and the Official Committee of Unsecured Creditors as Co-Proponents*, as may be amended and supplemented, including the Plan Supplement which is incorporated herein by reference.

77.     "Plan Documents" means the Plan, Disclosure Statement, Plan Supplement, the Liquidating Trust Agreement, the Implementation Memorandum, and the other agreements and documentation effectuating the Plan.

78.     "Plan Proponents" means the Debtors and the Committee in their capacity as proponents of the Plan.

79.     "Plan Supplement" means the compilation of documents and forms of documents, schedules, and exhibits, each of which shall be mutually acceptable to the Plan Proponents to be Filed by the Plan Proponents no later than ten Business Days prior to the Confirmation Hearing, including (i) the Liquidating Trust Agreement, (ii) the Implementation Memorandum, and (iii) the Assumed Executory Contract and Unexpired Lease List. Any reference to the Plan Supplement in the Plan shall include each of the documents identified above. The Plan Proponents shall have the right to jointly amend the documents contained in the Plan Supplement through and including the Effective Date in accordance with Article XI.A of the Plan.

80.     "Plan Transactions" means the series of transactions intended to minimize out of pocket costs, fees, and taxes associated with the dissolution of the Debtors, all of which steps shall be set forth in the Implementation Memorandum.

81.     "Priority Tax Claim" means the Claims of Governmental Units of the type specified in section 507(a)(8) of the Bankruptcy Code.

82.     "Pro Rata" means the proportion that a Claim or Interest in a particular Class bears to the aggregate amount of the Claims or Interests in that Class, or to the aggregate amount of the Claims or Interests in a particular Class and other Classes entitled to share in the same recovery as such Claim or Interest, under the Plan.

83.     "Professional Fee Claims" means Claims against the Debtors of Professional Persons or any other Person for compensation and/or reimbursement of expenses pursuant to section 327, 328, 330, 331, 363, 503(b), or 1103 of the Code.

84.     "Professional Fee Claims Bar Date" means 4:00 p.m. prevailing Eastern Time on the date that is 60 days after the Effective Date.

85. "<u>Professional Persons</u>" means all attorneys, accountants, financial advisors, investment bankers, appraisers, consultants, and other professionals retained or to be compensated pursuant to an order of the Bankruptcy Court entered under section 327, 328, 330, 331, 363, 503(b), or 1103 of the Code.

86. "<u>Proof of Claim</u>" means a proof of Claim Filed by a Holder on account of such Claim.

87. "<u>Rejection Claim</u>" means any Claim for damages as a result of the rejection of an Executory Contract or Unexpired Lease.

88. "<u>Release Opt-Out</u>" means the item set forth in the ballot, due by the Voting Deadline, pursuant to which Holders of Claims in Class 3 that vote to reject the Plan may opt out of the releases set forth in Article VIII.B.1 of the Plan.

89. "<u>Released Causes of Action</u>" means all Causes of Action (i) released prior to the Effective Date, by Order of the Bankruptcy Court, during the Chapter 11 Cases and (ii) released pursuant to the Plan or any Plan Document.

90. "<u>Released Party</u>" means each of the following in its respective capacity as such: (i) the Committee, (ii) the Debtors, and (iii) with respect to each of the Entities in <u>clauses (i)</u> and <u>(ii)</u>, each such Entity's current and former Affiliates and subsidiaries and each such Entity's, Affiliate's, and subsidiary's respective current and former officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided*, *however*, that nothing in Article VIII of the Plan shall release or otherwise limit or impact the Affiliate Receivables of any Debtor against any Non-Debtor Affiliate; *provided*, *further*, *however*, that nothing in Article VIII of the Plan shall release or otherwise limit or impact the Pension Benefit Guaranty Corporation's ability to assert claims against the non-Debtor members of the Debtors' controlled group for unfunded benefit liabilities, missed minimum funding contributions, and unpaid insurance premiums related to the Debtors' pension plan.

91. "<u>Releasing Party</u>" means (i) the Debtors, (ii) the Estates, (iii) any Entity seeking to exercise the rights of the Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, (iv) each Holder of a Claim deemed hereunder to have accepted the Plan (i.e., Holders of Claims in Unimpaired Classes of Claims under the Plan), and (v) all Holders of Claims in Class 3 that (a) vote to accept the Plan, or (b) vote to reject the Plan and do not timely submit a Release Opt-Out indicating such Holder's decision to not participate in the releases set forth in Article VIII.B.1 of the Plan.

92. "<u>Retained Professionals</u>" means the Persons set forth on Exhibit B to the Disclosure Statement to be retained, on the Effective Date, on behalf of the Liquidating Trust, on the general terms set forth on Exhibit B to the Disclosure Statement.

93. "<u>Schedules</u>" means the Schedules of Assets and Liabilities filed with the Bankruptcy Court in each of the Chapter 11 Cases, as amended from time to time in accordance with Bankruptcy Rule 1009.

94. "<u>Secured</u>" means when referring to a Claim: (i) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (ii) Allowed as such pursuant to the Plan.

95.     "Securities Act" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder.

96.     "Security" means a "security" as defined in section 2(a)(1) of the Securities Act.

97.     "Tail Fund" means Cash set aside and held by the Debtors for purposes of payment of reasonable administrative costs (including but not limited to the salaries of the Debtors' board members and officers) prior to dissolution of the Debtors in accordance with the Plan and the Implementation Memorandum, which shall be topped up from the Liquidating Trust Assets as, and to the extent, needed. The Debtors shall provide the Liquidating Trustee with a report of Tail Fund expenditures monthly. Immediately prior to the dissolution of the Debtors, any remaining portion of the Tail Fund shall be transferred to the Liquidating Trust and become part of the Liquidating Trust Assets.

98.     "Unexpired Lease" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

99.     "Unimpaired" means, solely with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

100.    "Unsecured Claim" means any Claim that is not an Other Priority Claim or an Other Secured Claim.

101.    "U.S. Trustee" means the Office of the United States Trustee for the District of Delaware.

102.    "Voting Deadline" means the date and time by which all ballots to accept or reject the Plan must be received in order to be counted under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information, pursuant to section 1125(a) of the Bankruptcy Code, and authorizing the Debtors to solicit acceptances of the Plan.

B.      *Rules of Interpretation.*

For purposes of the Plan: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender, (ii) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions, (iii) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented from time to time, (iv) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns, (v) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan hereto, (vi) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement, (vii) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan, (viii) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules, (ix) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan, (x) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code (other than section 102(5) of the Bankruptcy Code) shall apply, (xi) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the

Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be, (xii) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's Case Management and Electronic Case Filing system, (xiii) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended, modified, or supplemented from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated, (xiv) any immaterial effectuating provisions may be interpreted jointly by the Plan Proponents or by the Liquidating Trustee, as applicable, in such a manner that is consistent with the overall purpose and intent of the Plan, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and (xv) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation."

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan or any Plan Document shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, AND PROFESSIONAL FEE CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A.      *Administrative Claims.*

Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment of its Allowed Administrative Claim, each Holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either (i) on the Effective Date, or as soon as practicable thereafter or (ii) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which such Administrative Claim is Allowed by a Final Order, or as soon as reasonably practicable thereafter, or All requests for payment of an Administrative Claim must be Filed with the Bankruptcy Court and served on counsel to the Liquidating Trustee, counsel to the Debtors, and the U.S. Trustee no later than the Administrative Claim Bar Date**.**

B.      *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, the Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

*C.*     *Professional Fee Claims.*

All final applications for payment of Professional Fee Claims shall be filed with the Bankruptcy Court and served on the Plan Proponents and the Liquidating Trustee on or before the Professional Fee Claims Bar Date or such later date as may be agreed to by the Liquidating Trustee. Each holder of an Allowed Professional Fee Claim shall be paid in Cash from the Liquidating Trust in an amount equal to such Allowed Professional Fee Claim on or as soon as reasonably practicable after the first Business Day following the date upon which such Claim becomes Allowed, unless such holder shall agree to a different treatment of such Claim.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

*A.*     *Classification of Claims and Interests.*

Claims and Interests, except for Administrative Claims, Priority Tax Claims, and Professional Fee Claims, are classified in the Classes set forth in Article III of the Plan. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 4 | Existing Equity Interests in the Brookstone Subsidiaries | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 5 | Existing Equity Interests in Brookstone Parent | Impaired | Not Entitled to Vote (Deemed to Reject) |

*B.*     *Treatment of Claims and Interests.*

Class 1—Other Priority Claims.

> (a)     *Classification*: Class 1 consists of all Other Priority Claims.

> (b)     *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Other Priority Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive payment in full in Cash of the amount of such Holder's Allowed Other Priority Claim either: (i) on the Effective Date, or as soon as reasonably practicable thereafter or (ii) if the Other Priority Claim is not Allowed as of the Effective Date, no later than 30 days

11

after the date on which such Other Priority Claim is Allowed by Final Order, or as soon as reasonably practicable thereafter.

(c) *Voting*: **Class 1 is Unimpaired under the Plan. Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan**.

Class 2—Other Secured Claims.

(a) *Classification*: Class 2 consists of all Other Secured Claims.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment of its Allowed Other Secured Claim, on the Effective Date or as soon as reasonably practicable thereafter or, if the Other Secured Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which such Other Secured Claim is Allowed by Final Order, or as soon as reasonably practicable thereafter, each Holder of an Allowed Other Secured Claim shall receive the following treatment at the option of the Debtors: (i) payment in full (in Cash) of such Allowed Other Secured Claim, (ii) satisfaction of such Allowed Other Secured Claim by delivering the collateral securing such Allowed Other Secured Claim and paying any interest required to be paid under section 506(b) of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

(c) *Voting*: **Class 2 is Unimpaired under the Plan. Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan**.

Class 3—General Unsecured Claims.

(a) *Classification*: Class 3 consists of all General Unsecured Claims.

(b) *Treatment*: Each Holder of an Allowed Class 3 Claim shall receive its Pro Rata share of the Liquidating Trust Interests in accordance with Article IV.C.2 of the Plan on account of such Holder's General Unsecured Claim(s) against the Debtors, which shall entitle such holder to distributions from the Liquidating Trust as and to the extent set forth in the Plan and the Liquidating Trust Agreement.

(c) *Voting*: **Class 3 is Impaired under the Plan. Therefore, Holders of Allowed Claims in Class 3 are entitled to vote to accept or reject the Plan**.

Class 4—Existing Equity Interests in the Brookstone Subsidiaries.

(a) *Classification*: Class 4 consists of all Existing Equity Interests in the Brookstone Subsidiaries.

(b) *Treatment*: On the Effective Date or as soon as reasonably practicable thereafter, as provided in the Implementation Memorandum, all Existing Equity Interests shall be cancelled and extinguished. Holders of Existing Equity Interests in the

Brookstone Subsidiaries shall not receive any distribution or retain any property pursuant to the Plan.

(c) *Voting*: **Class 4 is Impaired under the Plan. Each Holder of an Allowed Interest in Class 4 is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan**.

Class 5—Existing Equity Interests in Brookstone Parent.

(a) *Classification*: Class 5 consists of all Existing Equity Interests in Brookstone Parent.

(b) *Treatment*: On the Effective Date or as soon as reasonably practicable thereafter, as provided in the Implementation Memorandum, all Existing Equity Interests in Brookstone Parent shall be cancelled and extinguished. Holders of Existing Equity Interests in Brookstone Parent shall not receive any distribution or retain any property pursuant to the Plan.

(c) *Voting*: **Class 5 is Impaired under the Plan. Each Holder of an Allowed Interest in Class 5 is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan**.

C. *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

D. *Acceptance or Rejection of the Plan.*

1. Voting Classes.

Class 3 is Impaired under the Plan. The Holders of Claims in Class 3 are entitled to vote to accept or reject the Plan.

2. Presumed Acceptance of the Plan.

Classes 1 and 2 are Unimpaired under the Plan. The Holders of Claims in such Classes are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

3. Deemed Rejection of the Plan.

Classes 4 and 5 are Impaired under the Plan. The Holders of Interests in Classes 4 and 5 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

*E.      Elimination of Vacant Classes.*

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

*F.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Provided Class 3 votes to accept the Plan, the Plan Proponents jointly request Confirmation pursuant to section 1129(b) of the Bankruptcy Code.

*G.      Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy at or before the hearing conducted by the Bankruptcy Court to consider confirmation of the Plan. Any dispute with respect to Impairment that is not raised in sufficient time to enable the Bankruptcy Court to determine such dispute on or prior to the Confirmation Date shall be deemed waived.

*H.      Subordinated Claims.*

Pursuant to section 510 of the Bankruptcy Code, the Plan Proponents reserve the right to jointly reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

*I.      Provision Governing Allowance and Defenses to Claims.*

On and after the Effective Date, the Liquidating Trust shall have all of the Debtors' and the Estates' rights under section 558 of the Bankruptcy Code. Nothing under the Plan shall affect the rights and defenses of the Debtors, the Estates, and the Liquidating Trust in respect of any Claim not allowed by Final Order, including all rights in respect of legal and equitable objections, defenses, setoffs, or recoupment against such Claims. The Liquidating Trust may, but shall not be required to, setoff against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made) any claims of any nature whatsoever that the Estates or the Liquidating Trust may have against the Claim Holder, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Liquidating Trust of any such Claim it may have against such Claim Holder. The Liquidating Trustee may (i) designate any Claim as Allowed at any time from and after the Effective Date and (ii) may designate any Claim disputed and not Allowed at any time from and after the Effective Date until the Claim Objection Deadline, other than Claims that have already become Allowed by Final Order.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

*A.      Substantive Consolidation.*

1.      The Debtors, in consultation with the Committee, analyzed, *inter alia*, the Debtors' books and records, intercompany accounting practices, corporate structure, shared staff and services, financial reporting, and cash management practices. Based on that analysis, the Plan contemplates and is predicated upon entry of an Order substantively consolidating the Debtors' Estates and the Chapter 11 Cases as set forth below. Entry of the Confirmation Order shall constitute the approval, pursuant to section 105(a) of

the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Debtors for voting, confirmation, and distribution purposes under the Plan. Solely for such purposes, on and after the Effective Date, (i) all assets and all liabilities of the Debtors shall be deemed merged into Brookstone Parent, (ii) all guaranties of any Debtor of the payment, performance, or collection of obligations of another Debtor shall be eliminated and cancelled, (iii) any obligation of any Debtor and all guaranties thereof executed by one or more of the other Debtors shall be treated as a single obligation, and such guaranties shall be deemed a single Claim against the consolidated Debtors, (iv) all joint obligations of two or more Debtors and all multiple Claims against such entities on account of such joint obligations shall be treated and allowed only as a single Claim against the consolidated Debtors, and (v) each Claim filed in the Chapter 11 Case of any Debtor shall be deemed filed against the consolidated Debtors and a single obligation of the consolidated Debtors on and after the Effective Date. Upon the Effective Date, all Intercompany Claims shall be cancelled and extinguished. Holders of Intercompany Claims shall not receive any distribution or retain any property pursuant to the Plan.

2.     The substantive consolidation effected pursuant to Article IV.A of the Plan shall not affect (other than for purposes related to funding distributions under the Plan and as set forth in Article IV.A of the Plan), among other things, (i) the legal and organizational structure of the Debtors, (ii) any Causes of Action, (iii) defenses to any Causes of Action or requirements for any third party to establish mutuality to assert a right of setoff, or (iv) distributions out of any insurance policies or proceeds of such policies. The Plan and Disclosure Statement, jointly, shall serve as, and shall be deemed to be, a motion for entry of an Order of the Bankruptcy Court approving the substantive consolidation of the Debtors' Estates and Chapter 11 Cases. If no objection to the Plan is timely filed and served by any Holder of an Impaired Claim affected by the Plan as provided herein on or before the Voting Deadline or such other date as may be established by the Bankruptcy Court, the Plan, including the substantive consolidation of the Debtors' Estates and Chapter 11 Cases, may be approved by the Bankruptcy Court as part of the Confirmation Order. If any such objections are timely filed and served, the Plan and the objections thereto shall be considered by the Bankruptcy Court at the Confirmation Hearing.

B.     *Plan Transactions.*

On the Effective Date or as soon as practicable thereafter, as provided in the Implementation Memorandum, the Debtors shall effect the Plan Transactions. Notwithstanding anything to the contrary in the Plan, the means and timing for implementation of the Plan Transactions are set forth in the Implementation Memorandum.

Without limiting the foregoing, unless otherwise provided by the Implementation Memorandum, all such Plan Transactions will be deemed to occur on the Effective Date or as soon as practicable thereafter and may include one or more mergers, conversions, consolidations, dispositions, liquidations or dissolutions, as may be determined by the Debtors to be necessary or appropriate. Subject to the immediately preceding sentence, the actions to effect these transactions may include (i) the execution and delivery of appropriate agreements or other documents of merger, conversion, consolidation, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable state law and such other terms to which the applicable Entities may agree, (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable Entities may agree, (iii) the filing of appropriate certificates or articles of merger, conversion, consolidation, dissolution or change in corporate form pursuant to applicable state law, and (iv) the taking of all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions. Any such transactions may be effected on or subsequent to the Effective Date without any further action by the Debtors. All documents, agreements, and instruments entered into and delivered on or as of the Effective Date, or as soon as practicable thereafter, contemplated

by or in furtherance of the Plan shall become and shall remain effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

C.    *The Liquidating Trust.*

1.    Execution of the Liquidating Trust Agreement

On or before the Effective Date, the Liquidating Trust Agreement, in form jointly acceptable to the Plan Proponents, shall be executed, and all other necessary steps shall be taken to establish the Liquidating Trust and the Liquidating Trust Interests, which shall be for the benefit of the Liquidating Trust Beneficiaries. Article IV.C of the Plan sets forth certain of the rights, duties, and obligations of the Liquidating Trustee and the Liquidating Trust Oversight Committee. In the event of any conflict between the terms of Article IV.C of the Plan and the terms of the Liquidating Trust Agreement, unless otherwise specified in the Plan, the terms of the Liquidating Trust Agreement shall govern.

2.    Interests in the Liquidating Trust

There shall be one class of interests in the Liquidating Trust. The Liquidating Trust shall issue the Liquidating Trust Interests to the Holders of Allowed General Unsecured Claims in accordance with Article III.B.3 of the Plan so that each Holder of an Allowed General Unsecured Claim shall receive a percentage of the Liquidating Trust Interests equal to such Holder's Allowed General Unsecured Claim divided by the sum of all Allowed General Unsecured Claims *plus* all Disputed General Unsecured Claims; *provided*, *however*, that (i) if a Disputed General Unsecured Claim is subsequently Disallowed, (a) the amount of such Disputed General Unsecured Claim shall no longer be included in the calculation set forth above and (b) the Liquidating Trust shall issue additional Liquidating Trust Interests to the Holders of Allowed General Unsecured Claims in accordance with the calculation set forth above and (ii) if a Disputed General Unsecured Claim subsequently becomes an Allowed General Unsecured Claim, the Liquidating Trust shall make subsequent distributions of Liquidating Trust Interests to such Holder on account of such Allowed General Unsecured Claim. Liquidating Trust Interests shall be uncertificated. The Liquidating Trust Beneficiaries shall be bound by the Liquidating Trust Agreement.

3.    Purpose of the Liquidating Trust

The Liquidating Trust shall be established to administer certain post-Effective Date responsibilities under the Plan, including, but not limited to, (i) resolving outstanding Disputed General Unsecured Claims to determine the amount of Allowed General Unsecured Claims, (ii) resolving all Disputed Administrative/Priority Claims and Disputed Other Secured Claims, (iii) prosecuting, settling, and resolving Causes of Action (other than the Released Causes of Action), (iv) recovering, through enforcement, resolution, settlement, collection, or otherwise, assets on behalf of the Liquidating Trust (which assets shall become part of the Liquidating Trust Assets), (v) abandoning, liquidating, and reducing to Cash the Liquidating Trust Assets, as necessary, and (vi) distributing the Liquidating Trust Assets. The Liquidating Trust has no objective to continue or engage in the conduct of a trade or business.

4.    Liquidating Trust Assets

The Liquidating Trust shall consist of the Liquidating Trust Assets. On the Effective Date, as provided in the Implementation Memorandum, the Debtors shall transfer all of the Liquidating Trust Assets then held by the Debtors to the Liquidating Trust free and clear of all liens, claims, and encumbrances, except to the extent otherwise provided herein. The transfer of the Liquidating Trust Assets to the

Liquidating Trust shall not affect any attorney-client privilege, the work-product privilege, and any other applicable evidentiary privileges of the Debtors.

5. Governance of the Liquidating Trust

The Liquidating Trust shall be governed by the Liquidating Trustee and the Liquidating Trust Oversight Committee.

6. Role of the Liquidating Trustee

On the Effective Date, the Plan Proponents shall jointly appoint a trustee to oversee the Liquidating Trust (the "Liquidating Trustee"). In furtherance of and consistent with the purposes of the Liquidating Trust and the Plan, the Liquidating Trustee shall have the power and authority to, among other things, (i) hold, manage, sell, invest, and distribute to the Liquidating Trust Beneficiaries the Net Proceeds of the Liquidating Trust Assets, (ii) hold the Liquidating Trust Assets for the benefit of the Liquidating Trust Beneficiaries, (iii) prosecute and resolve (a) objections to General Unsecured Claims and (b) subject to obtaining necessary approval of the Bankruptcy Court, any claims for equitable subordination and recharacterization in connection with such objections, (iv) prosecute, resolve, and satisfy Administrative/Priority Claims and Other Secured Claims, (v) prosecute, settle, and resolve Causes of Action (other than the Released Causes of Action), (vi) recover assets through enforcement, resolution, settlement, collection, or otherwise on behalf of the Liquidating Trust, (vii) abandon, liquidate, and reduce to Cash the Liquidating Trust Assets, as necessary, in consultation with the Liquidating Trust Oversight Committee, (viii) perform such other functions as are provided in the Plan and the Liquidating Trust Agreement, and (ix) administer the closure of the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules. The Liquidating Trustee shall be responsible for all decisions and duties with respect to the Liquidating Trust and the Liquidating Trust Assets and shall file periodic public reports on the status of claims reconciliation and distributions, which reports may be included in the quarterly reporting required by the U.S. Trustee. In all circumstances, the Liquidating Trustee shall act in the best interests of all Liquidating Trust Beneficiaries and in furtherance of the purpose of the Liquidating Trust, and in accordance with the Liquidating Trust Agreement and not in its own best interest.

7. Role of the Liquidating Trust Oversight Committee

On the Effective Date, the Plan Proponents shall jointly appoint one or more Persons or Entities that shall serve as a committee to oversee the activities of the Liquidating Trustee (the "Liquidating Trust Oversight Committee"). In furtherance of and consistent with the purpose of the Liquidating Trust and the Plan, the Liquidating Trust Oversight Committee shall oversee the activities of the Liquidating Trustee as set forth in the Liquidating Trust Agreement. The Liquidating Trustee shall report material matters to, and seek approval for material decisions from, the Liquidating Trust Oversight Committee, as and to the extent set forth in the Liquidating Trust Agreement and consistent with Article VII.C.2 of the Plan. In all circumstances, the Liquidating Trust Oversight Committee shall act in the best interests of all Liquidating Trust Beneficiaries and in furtherance of the purpose of the Liquidating Trust, and in accordance with the Liquidating Trust Agreement and not in its own best interest.

8. Transferability of Liquidating Trust Interests

Liquidating Trust Interests shall be transferable only (i) as permitted by the Liquidating Trust Agreement and (ii) to the extent that the transferability thereof would not require the Liquidating Trust to register the beneficial interests under Section 12(g) of the Securities Exchange Act of 1934, as amended.

9. Investment of Liquidating Trust Assets

The Liquidating Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by the Liquidating Trust Agreement or as otherwise permitted by an order of the Bankruptcy Court, subject to the oversight of the Liquidating Trust Oversight Committee.

10. Costs and Expenses of Liquidating Trustee and Liquidating Trust Oversight Committee

The costs and expenses of the Liquidating Trust, including the fees and expenses of the Liquidating Trustee and the Liquidating Trust Oversight Committee, their professionals, and other professionals retained on behalf of the Liquidating Trust (including the Retained Professionals), shall be paid out of the Liquidating Trust Administrative Fund, subject to the terms of the Liquidating Trust Agreement and subject to the oversight of the Liquidating Trust Oversight Committee.

11. Compensation of Liquidating Trustee and Liquidating Trust Oversight Committee

The Liquidating Trustee and Liquidating Trust Oversight Committee shall each be entitled to reasonable compensation, subject to the terms of the Liquidating Trust Agreement, in an amount consistent with that of similar functionaries in similar types of bankruptcy cases. Such compensation shall be payable from the Liquidating Trust Administrative Fund, subject to the terms of the Liquidating Trust Agreement.

12. Distribution of Liquidating Trust Assets

Subject to Article VI of the Plan, the Liquidating Trustee shall distribute (to the extent there are sufficient Liquidating Trust Assets available for distribution in accordance with the Liquidating Trust Agreement), beginning on the first Business Day following the Effective Date, or as soon thereafter as is reasonably practicable, the appropriate Net Proceeds of the Liquidating Trust Assets to the Liquidating Trust Beneficiaries in proportion to the Liquidating Trust Interests held by such Liquidating Trust Beneficiary; *provided* that, if a Disputed General Unsecured Claim subsequently becomes an Allowed General Unsecured Claim after a distribution(s) has been made, the Liquidating Trustee shall make one or more catch-up distributions to such Holder on account of its Liquidating Trust Interests, as applicable. The Liquidating Trustee shall utilize, in accordance with the Liquidating Trust Agreement and the Plan, Cash from the Liquidating Trust Administrative Fund in amounts sufficient to fund (i) costs and expenses of the Liquidating Trust, including, without limitation, the fees and expenses of the Liquidating Trustee and the Liquidating Trust Oversight Committee, their respective professionals, and the Retained Professionals, (ii) compensate the Liquidating Trustee and the Liquidating Trust Oversight Committee, and (iii) satisfy other liabilities incurred by the Liquidating Trust in accordance with the Plan or the Liquidating Trust Agreement (including any taxes imposed on the Liquidating Trust or in respect of the Liquidating Trust Assets).

13. Retention of Professionals by Liquidating Trustee and Liquidating Trust

The Liquidating Trustee and the Liquidating Trust Oversight Committee may retain and reasonably compensate counsel and other professionals to assist in their duties as Liquidating Trustee and Liquidating Trust Oversight Committee or to assist on behalf of the Liquidating Trust on such terms as the Liquidating Trustee and the Liquidating Trust Oversight Committee deem appropriate without Bankruptcy Court approval, subject to the provisions of the Liquidating Trust Agreement. The Liquidating Trustee and the Liquidating Trust Oversight Committee may retain any professional who represented parties in interest, including the Debtors or the Committee, in the Chapter 11 Cases. All fees and expenses incurred in connection with the foregoing shall be payable from the Liquidating Trust Administrative Fund subject to the terms of the Liquidating Trust Agreement. Notwithstanding anything herein to the contrary or in the

Liquidating Trust Agreement, on the Effective Date, the Retained Professionals shall be retained on behalf of the Liquidating Trust.

14. U.S. Federal Income Tax Treatment and Reporting of Liquidating Trust

For all U.S. federal and applicable state and local income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, Liquidating Trust Oversight Committee, and the Liquidating Trust Beneficiaries) shall treat the Liquidating Trust, other than any portion thereof in respect of Disputed Claims (the "Disputed Claims Reserve"), as a liquidating trust under Treasury Regulation Section 301.7701-4 and that the trust be owned by the Liquidating Trust Beneficiaries. Accordingly, for federal income tax purposes, it is intended that the Liquidating Trust Beneficiaries be treated as if they had received a distribution from the Estates of an undivided interest in the Liquidating Trust Assets (to the extent of the value of their respective share in the applicable Assets) and then contributed such interests to the Liquidating Trust, and the Liquidating Trust's Beneficiaries will be treated as the grantors and owners thereof.

For all U.S. federal and applicable state and local income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, Liquidating Trust Oversight Committee, and the Liquidating Trust Beneficiaries) shall treat the Disputed Claims Reserve as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9. Following the funding of the Liquidating Trust, Brookstone Parent shall provide a "§ 1.468B-9 Statement" in respect of the Disputed Claims Reserve to the Liquidating Trustee in accordance with Treasury Regulation section 1.468B-9(g).

The Liquidating Trustee shall be responsible for filing all federal, state, and local tax returns for the Liquidating Trust and for the Debtors. The Liquidating Trustee shall be responsible for payment, out of the Liquidating Trust Assets, of any taxes imposed on the Liquidating Trust or the Liquidating Trust Assets. The Liquidating Trustee may request an expedited determination of taxes of the Liquidating Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

The Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements. The Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements including, without limitation, requiring that, as a condition to the receipt of a Distribution, the Holder of an Allowed Claim complete the appropriate IRS Form W-8 or IRS Form W-9, as applicable to each Holder. Notwithstanding any other provision of the Plan, (i) each Holder of an Allowed Claim that is to receive a Distribution from a Liquidating Trust shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income and other tax obligations, on account of such Distribution and (ii) no Distribution shall be made to or on behalf of such Holder under the Plan unless and until such Holder has made arrangements satisfactory to the Liquidating Trustee to allow it to comply with its tax withholding and reporting requirements. Any property to be distributed by the Liquidating Trust shall, pending the implementation of such arrangements, be treated as an undeliverable Distribution to be held by the Liquidating Trustee, as the case may be, until such time as Liquidating Trustee is satisfied with the Holder's arrangements for any withholding tax obligations.

15. Indemnification of Liquidating Trustee and Liquidating Trust Oversight Committee

The Liquidating Trustee and the Liquidating Trust Oversight Committee (and their agents and professionals) shall not be liable for actions taken or omitted in its or their capacity as, or on behalf of, the Liquidating Trustee, the Liquidating Trust Oversight Committee, or the Liquidating Trust, except those acts

arising out of its or their willful misconduct (including, but not limited to, conduct that results in a personal profit at the expense of the Liquidating Trust), gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty (to the extent applicable), or ultra vires acts, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its or their actions or inactions in its or their capacity as, or on behalf of, the Liquidating Trustee, the Liquidating Trust Oversight Committee, or the Liquidating Trust, except for any actions or inactions involving willful misconduct (including, but not limited to, conduct that results in a personal profit at the expense of the Liquidating Trust), gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty (to the extent applicable), or ultra vires acts. Any indemnification claim of the Liquidating Trustee, the Liquidating Trust Oversight Committee, and the other parties entitled to indemnification under this subsection shall be satisfied (i) first from the Liquidating Trust Administrative Fund and (ii) second from the Liquidating Trust Assets, as provided in the Liquidating Trust Agreement. The Liquidating Trustee and the Liquidating Trust Oversight Committee shall be entitled to rely, in good faith, on the advice of their professionals.

D.      *Reserve Accounts*

1.      Administrative/Priority Claims Reserve Account

Prior to the Effective Date, the Debtors shall establish a reserve account (the "Administrative/Priority Claims Reserve Account") in an amount equal to the estimated Administrative/Priority Claims. The Administrative/Priority Claims Reserve Account shall be funded with Cash. The funds in the Administrative/Priority Claims Reserve Account shall be used solely for the payment of Allowed Administrative/Priority Claims in accordance with Articles II or III (as applicable) and VI.B of the Plan. To the extent funds held in the Administrative/Priority Claims Reserve Account relate to Administrative/Priority Claims that (i) have been Disallowed by the Bankruptcy Court, (ii) are no longer claimed as evidenced by a written release of such Claim, or (iii) have been satisfied by a means other than Cash in accordance with Articles II or III (as applicable) of the Plan, then such funds shall become Liquidating Trust Assets pursuant to the Plan. The Administrative/Priority Claims Reserve Account shall be closed once all required payments have been made. Any funds remaining in the Administrative/Priority Claims Reserve Account after all required payments have been made shall become Liquidating Trust Assets pursuant to the Plan.

2.      Other Secured Claims Reserve Account

Prior to the Effective Date, the Debtors shall establish a reserve account (the "Other Secured Claims Reserve Account") in an amount equal to the estimated Other Secured Claims. The Other Secured Claims Reserve Account shall be funded with Cash. The funds in the Other Secured Claims Reserve Account shall be used solely for the payment of Allowed Other Secured Claims in accordance with Articles III.B.2 and VI.B of the Plan. To the extent funds held in the Other Secured Claims Reserve Account relate to Other Secured Claims that (i) have been Disallowed by the Bankruptcy Court, (ii) are no longer claimed as evidenced by a written release of such Claim, or (iii) have been satisfied by a means other than Cash in accordance with Article III.B.2 the Plan, then such funds shall become Liquidating Trust Assets pursuant to the Plan. The Other Secured Claims Reserve Account shall be closed once all required payments have been made. Any funds remaining in the Other Secured Claims Reserve Account after all required payments have been made shall become Liquidating Trust Assets pursuant to the Plan.

E.      *Governance, Directors and Officers; Employment-Related Agreements and Compensation Programs; Other Agreements.*

1.      Directors and Officers of the Debtors

On and after the Effective Date, the boards of directors and officers of the Debtors shall stay in place until such time as the Debtors are dissolved, as provided in the Implementation Memorandum. On

the Effective Date, the Tail Fund shall be funded for purposes of payment of administrative costs (including, but not limited to, the salaries of the Debtors' board members and officers) of the Debtors prior to such dissolution. Immediately prior to the dissolution of the Debtors, any remaining portion of the Tail Fund shall be transferred to the Liquidating Trust and become part of the Liquidating Trust Assets.

2. Transactions Effective as of the Effective Date

Pursuant to section 1142 of the Bankruptcy Code, the following shall occur and be effective as of the Effective Date, if no such other date is specified in such other documents, including the Implementation Memorandum, and shall be authorized and approved in all respects and for all purposes without any requirement of further action by the stockholders, members, managers or directors of the Debtors or the Committee: (i) the Plan Transactions, (ii) the adoption, execution, delivery and implementation of all contracts, leases, instruments, releases and other agreements or documents related to any of the foregoing, (iii) appointment of the Liquidating Trustee, as provided in the Plan, (iv) appointment of the Liquidating Trust Oversight Committee, as provided in the Plan, (v) all actions necessary to effectuate the Liquidating Trust Agreement and the Liquidating Trust, and (vi) any other matters provided for under the Plan or described in the Implementation Memorandum or any Plan Document involving the Liquidating Trust, the corporate structure of the Debtors, or any action to be taken by or required of a Plan Proponent.

F.    *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except to the extent otherwise provided in the Plan or the Implementation Memorandum, all notes, instruments, certificates, and other documents evidencing Claims or Interests, shall be deemed cancelled and surrendered without any need for a Holder to take further action with respect thereto and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged; *provided*, *however*, that notwithstanding Confirmation or Consummation, any such agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of allowing Holders to receive distributions under the Plan; *provided further*, *however*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors.

G.    *Corporate Action.*

Upon the Effective Date, the Debtors or the Plan Proponents, as applicable, shall perform each of the actions and effect each of the transfers required by the terms of the Plan, in the time period allocated therefor, and all matters provided for under the Plan that would otherwise require approval of the stockholders, partners, members, directors, or comparable governing bodies of the Debtors shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to the applicable general corporation law (or other applicable governing law) of the states in which the Debtors are incorporated or organized, without any requirement of further action by the stockholders, partners, members, directors, or comparable governing bodies of the Debtors. Each of the Debtors shall be authorized and directed, following the completion of all disbursements, other transfers, and other actions required of the Debtors by the Plan and Implementation Memorandum, to file its certificate of cancellation or dissolution as provided in the Plan and the Implementation Memorandum. The filing of such certificates of cancellation or dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including, without express or implied limitation, any action by the stockholders, partners, members, directors, or comparable governing bodies of the Debtors.

H.    *Effectuating Documents; Further Transactions.*

Each of the officers of each of the Debtors is authorized and directed to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such

actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

I.  *Securities Law Matters.*

The offering, issuance, or distribution of the Liquidating Trust Interests or any units or other beneficial interests in the Liquidating Trust in accordance with the Plan is exempt from the provisions of Section 5 of the Securities Act and any state or local law requiring registration for the offer, issuance, or distribution of a security by reason of section 1145(a) of the Bankruptcy Code. The Liquidating Trust Interests shall be transferable to the extent provided in Article IV.C.8 of the Plan.

J.  *Section 1146 Exemption.*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property or interests pursuant to the Plan, including the recording of any amendments to such transfers, or any new mortgages or liens placed on the property in connection with such transfers, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

K.  *Administration of Taxes.*

Subject to the Implementation Memorandum and the Liquidating Trust Agreement, Brookstone Parent shall be responsible for all of the Debtors' tax matters until a certificate of cancellation or dissolution for Brookstone Parent shall have been filed in accordance with the Plan and Implementation Memorandum.

Following the filing of a certificate of cancellation or dissolution for Brookstone Parent, subject to the Plan, the Implementation Memorandum, and the Liquidating Trust Agreement, the Liquidating Trustee shall prepare and file (or cause to be prepared and filed) on behalf of the Debtors, all tax returns, reports, certificates, forms, or similar statements or documents (collectively, "Tax Returns") required to be filed or that the Liquidating Trustee otherwise deems appropriate, including the filing of amended Tax Returns or requests for refunds, for all taxable periods ending on, prior to, or after the Effective Date.

Each of the Debtors and the Liquidating Trustee shall cooperate fully with each other regarding the implementation of Article IV.K of the Plan (including the execution of appropriate powers of attorney) and shall make available to the other as reasonably requested all information, records, and documents relating to taxes governed by Article IV.K of the Plan until the expiration of the applicable statute of limitations or extension thereof or at the conclusion of all audits, appeals, or litigation with respect to such taxes. Without limiting the generality of the foregoing, the Debtors shall execute on or prior to the filing of a certificate of cancellation or dissolution for Brookstone Parent a power of attorney authorizing the Liquidating Trustee to correspond, sign, collect, negotiate, settle, and administer tax payments and Tax Returns for the taxable periods described in Article IV.K of the Plan.

The Debtors and the Liquidating Trustee shall have the right to request an expedited determination of the tax liability of the Debtors, if any, under section 505(b) of the Bankruptcy Code with respect to any tax returns filed, or to be filed, for any and all taxable periods ending on or before the filing of a certificate of cancellation or dissolution for Brookstone Parent.

Following the filing of a certificate of cancellation or dissolution for Brookstone Parent, subject to Liquidating Trust Agreement, the Liquidating Trustee shall have the sole right, at its expense, to control, conduct, compromise, and settle any tax contest, audit, or administrative or court proceeding relating to any liability for taxes of the Debtors and shall be authorized to respond to any tax inquiries relating to the Debtors.

L.    *Employee Benefits.*

On the Effective Date, the Debtors shall retain the OPEB Plan or, with the consent of the Liquidating Trustee, shall transfer the OPEB Plan to the Liquidating Trust and, in each case, shall preserve all rights thereunder. The Plan fully complies with sections 1114 and 1129(a)(13) of the Bankruptcy Code. The Debtors reserve all rights of the Debtors, the Liquidating Trust, and/or the Liquidating Trustee to terminate the OPEB Plan at any time on or after the Effective Date.

M.    *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Debtors shall retain and transfer to the Liquidating Trust all rights to enforce, commence, and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, including, without limitation the right to commence, prosecute, or settle such Causes of Action, which shall be preserved notwithstanding the occurrence of the Effective Date. The Liquidating Trustee, on behalf of the Liquidating Trust, may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Liquidating Trust. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Liquidating Trust will not pursue any and all available Causes of Action against it and all rights associate therewith are expressly reserved, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled pursuant to the Plan or a Final Order, all rights with respect to Causes of Action are expressly reserved for later adjudication and no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Debtors reserve and shall retain the Causes of Action and shall transfer such Causes of Action to the Liquidating Trust notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3)(B) of the Bankruptcy Code, any Causes of Action that a Debtor or its Estate may hold against any Entity shall vest in the Liquidating Trust, pursuant to the terms of the Plan and Implementation Memorandum. The Liquidating Trust, through its respective authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. On or after the Effective Date, the Liquidating Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.*    *Assumption, Assumption and Assignment, and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, each of the Debtors' Executory Contracts and Unexpired Leases not previously assumed or rejected pursuant to an order of the Bankruptcy Court shall be deemed rejected as of the Effective Date in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code except any Executory Contract or Unexpired Lease (i) identified on the Assumed Executory Contract and Unexpired Lease List (which shall be included in the Plan Supplement) as an Executory Contract or Unexpired Lease designated for assumption, (ii) which is the subject of a separate motion or notice to assume or reject Filed by the Debtors and pending as of the Confirmation Hearing, (iii) that previously expired or terminated pursuant to its own terms, or (iv) that was previously assumed or rejected by any of the Debtors. Any objection to the assumption, assumption and assignment, or rejection of an Executory Contract or Unexpired Lease, as applicable, must be Filed, served, and actually received by the counsel to the Debtors, the clerk of the Bankruptcy Court, and the U.S. Trustee on or before the Plan Objection Deadline (as set forth in the Disclosure Statement Order). The Bankruptcy Court shall rule on any such objection at the time of the Confirmation Hearing or such other date and time agreed by the parties or ordered by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or rejection will be deemed to have assented to such assumption, assumption and assignment, or rejection, as applicable.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumption of Executory Contracts and Unexpired Leases identified on the Assumed Executory Contract and Unexpired Lease List and rejection of all other Executory Contracts and Unexpired Leases, subject to the exceptions noted above, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party on or prior to the Effective Date, shall be transferred to the Liquidating Trust and be deemed a Liquidating Trust Asset. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the counterparty thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Plan Proponents reserve the right to jointly alter, amend, modify, or supplement the Assumed Executory Contract and Unexpired Lease List prior to the Confirmation Date on no less than five days' notice to any counterparty to an Executory Contract or Unexpired Lease affected thereby.

*B.*    *Claims Based on Rejection of Executory Contracts and Unexpired Leases.*

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Rejection Claims pursuant to the Plan or otherwise must be Filed with the Claims and Balloting Agent no later than the later of 35 days after the Effective Date or 35 days after the effective date of rejection. Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with Article III, as applicable. Any Rejection Claims that are not timely Filed pursuant to Article V.B of the Plan shall be forever disallowed and barred.

*C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned, as applicable, pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount specified on the Cure Notice and Schedule in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree and no cure no objection to the cure amount specified on the Cure Notice and Schedule shall be permitted; *provided*, *however*, that any objection to a proposed cure amount filed pursuant to the terms of the Cure Notice and Schedule will be permitted.

The Bankruptcy Court shall rule on any disputed cure amount(s) or objection to assumption of an Executory Contract or Unexpired Lease at the time of the Confirmation Hearing or such other date and time agreed by the parties or ordered by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that failed to object to the cure amount applicable to an Executory Contract or Unexpired Lease to be assumed or assumed and assigned pursuant to the terms set forth in the Cure Notice and Schedule is deemed to have assented to such cure amount. **Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

In the event of a permitted dispute regarding (i) the amount of any payments to cure a default in connection with a proposed assumption or assumption and assignment of an Executory Contract or Unexpired Lease, (ii) the ability of the Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or to be assumed and assigned, or (iii) any other matter pertaining to assumption or assumption and assignment, as applicable, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or Final Orders resolving the dispute and approving the assumption or assumption and assignment, as applicable.

Assumption, rejection, or assumption and assignment, as applicable, of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assumed and assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

*D.    Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan or Plan Documents, on the Effective Date, the Debtors shall be deemed to have rejected all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims; *provided*, *however*, that the Assumed Insurance Policies shall be assumed pursuant to the Plan and assigned to the Liquidating Trust.

*E.    Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned, as applicable, shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses,

permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to pre-petition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the pre-petition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

*F.*      *Reservation of Rights.*

Nothing contained in the Plan, including identification in the Assumed Executory Contract and Unexpired Lease List, shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease subject to assumption or rejection pursuant to section 365(a) of the Bankruptcy Code, or that any Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, if necessary.

*G.*      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

### ARTICLE VI.
### PROVISIONS GOVERNING DISTRIBUTIONS

*A.*      *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors, or their agents, shall be deemed closed, (ii) there shall be no further changes in the record holders of any of such Claims or Interests, and the Plan Proponents shall have no obligation to recognize any transfer of such Claims or Interests occurring on or after the Distribution Record Date, and (iii) the Plan Proponents shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable; *provided*, *however*, that if the Liquidating Trust Interests are transferable as set forth in Article IV.C.8 of the Plan, then the Liquidating Trustee may set additional record dates for subsequent distributions to holders of Liquidating Trust Interests, in accordance with the Liquidating Trust Agreement.

*B.*      *Method of Distribution Under the Plan.*

On the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors or the Liquidating Trustee, as applicable, shall (i) remit to holders of Allowed Administrative/Priority Claims and Allowed Other Secured Claims (in each case except as otherwise provided herein) Cash equal to the Allowed amount of such Claims from the Administrative/Priority Claims Reserve Account and Other Secured Claims Reserve Account respectively and (ii) transfer the Liquidating Trust Assets then held by the Debtors to the Liquidating Trust free and clear of all liens, claims, and encumbrances, but subject to any obligations imposed by the Plan and the Liquidating Trust Agreement, on behalf of the Liquidating Trust Beneficiaries. At the option of the Debtors or the Liquidating Trustee, as applicable, any Cash payment to be made under the Plan, the Liquidating Trust, or the Liquidating Trust Agreement, as

applicable, may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

C.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.    Delivery of Distributions in General.

Except as otherwise provided in the Plan or the Liquidating Trust Agreement, all distributions to any holder of an Allowed Claim shall be made (i) at the address for each such Holder as indicated on such Holder's Proof of Claim, (ii) to a different address and to another party if the Debtors or Liquidating Trustee, as applicable, are so directed in writing by a Holder of an Allowed Claim, or (iii) if no Proof of Claim has been filed, as reflected in the Debtors' books and records as of the date of any such distribution.

2.    Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Debtors or the Liquidating Trustee, as applicable, have determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that 90 days after the date such undeliverable distribution was initially made, all such unclaimed property or interests in property shall irrevocably revert to the Liquidating Trust automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

D.    *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, any party issuing any instrument or making any distribution under the Plan or Liquidating Trust Agreement shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions under the Plan and all Plan Documents shall be subject to any such withholding or reporting requirements. In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax. Notwithstanding the foregoing, each holder of an Allowed Claim or Interest that receives a distribution under the Plan shall have responsibility for any taxes imposed by any governmental unit, including income, withholding, and other taxes, on account of such distribution. Notwithstanding any provision in the Plan to the contrary, the Debtors and the Liquidating Trustee, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary or appropriate to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.

E.    *Time Bar to Cash Payments.*

Checks issued by the Debtors or the Liquidating Trustee, as applicable, in respect of Allowed Claims shall be null and void if not negotiated within 60 days after the date of issuance thereof. Requests for re-issuance of any check shall be made to the Debtors or the Liquidating Trustee, as applicable, by the holder of the Allowed Claim to whom such check originally was issued. Any Claim in respect of such a voided check shall be made on or before 30 days after the expiration of the 60 day period following the date of issuance of such check. Thereafter, the amount represented by such voided check shall irrevocably revert to the Liquidating Trust, and any Claim in respect of such voided check shall be discharged and forever barred.

*F.*     *Setoffs and Recoupment.*

The Debtors and the Liquidating Trustee, as applicable, may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors or the Liquidating Trust may have against the Holder of any such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Liquidating Trustee, as applicable, of any such Claim it may have against the Holder of such Claim.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS

*A.*     *Disputed Claims.*

On and after the Effective Date, except as otherwise provided in the Plan, all Allowed Claims shall be paid in accordance with the terms of the Plan and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced. Nothing in this paragraph shall in any way limit the Debtors' or Liquidating Trustee's rights to contest the validity, amount, or enforceability of any Claim regardless of whether a Proof of Claim is required for such Claim.

*B.*     *Objections to Claims and Interests.*

Unless a different time is set by an order of the Bankruptcy Court or otherwise established pursuant to the Plan, all objections to Claims and Interests must be Filed by the Claim Objection Deadline; *provided*, that no such objection may be Filed with respect to any Claim or Interest after a Final Order has been entered Allowing such Claim or Interest.

*C.*     *Prosecution, Compromise, and Settlement.*

1.     Prosecution of Disputed Claims

Except as otherwise provided herein, the Liquidating Trust shall have the right to object to all Claims on any basis. Subject to further extension by the Bankruptcy Court with or without notice, the Liquidating Trustee may object to the allowance of all Claims on or before the Claim Objection Deadline. From and after the Effective Date, the Liquidating Trust shall succeed to all of the rights, defenses, offsets, and counterclaims of the Debtors, the Estates, and the Committee in respect of all Claims, and in that capacity shall have the exclusive power to prosecute, defend, compromise, settle, and otherwise deal with all such objections.

2.     Compromise and Settlement of Claims

Pursuant to Bankruptcy Rule 9019(b), the Liquidating Trustee may settle any Disputed Claims (or aggregate of Claims if held by a single creditor), without notice, a hearing or Bankruptcy Court approval; *provided* that if such Disputed Claim is to be Allowed pursuant to the settlement in an amount which is two hundred and fifty thousand (250,000) dollars or more, the procedures in the following paragraph shall apply.

The Liquidating Trustee shall give notice to the Liquidating Trust Oversight Committee of a settlement of any Disputed Administrative/Priority Claim, Disputed Other Secured Claim, or Class 3 Claim (or aggregate of Claims if held by a single creditor) that results in such Disputed Claim(s) being Allowed in an amount which is two hundred and fifty thousand (250,000) dollars or more. The Liquidating Trust Oversight Committee shall have 10 days to object to such settlement. Any such objection shall be in writing and sent to the Liquidating Trustee and the settling party. If no written objection is received by the

Liquidating Trustee and the settling party prior to the expiration of such 10 day period, the Liquidating Trustee and the settling party shall be authorized to enter into the proposed settlement without a hearing or Bankruptcy Court approval. If a written objection from the Liquidating Trust Oversight Committee is timely received, the Liquidating Trustee, the settling party and the Liquidating Trust Oversight Committee shall use good faith efforts to consensually resolve the objection. If the objection is consensually resolved, the Liquidating Trustee and the settling party may enter into the proposed settlement (as and to the extent modified by the resolution of the objection) without further notice or Bankruptcy Court approval. Alternatively, the Liquidating Trustee may seek Bankruptcy Court approval of the proposed settlement upon expedited notice and a hearing.

D.     *No Distributions Pending Allowance.*

If a Claim or Interest, or any portion of a Claim or Interest, is Disputed, no payment or distribution provided hereunder shall be made on account of such Disputed Claim or Interest, unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

E.     *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Debtors or the Liquidating Trustee, as applicable, shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.     *No Discharge of Claims.*

**In accordance with section 1141(d)(3) of the Bankruptcy Code, the Plan does not discharge the Debtors. Section 1141(c) of the Bankruptcy Code nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors. As such, no Entity holding a Claim against the Debtors may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Entity under the Plan. As of the Confirmation Date, all parties are precluded from asserting against any property to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.**

B.     *Releases.*

1.     Releases

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Releasing Parties will be deemed to release and forever waive and discharge the Released Parties from and against all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating to the Debtors, the Chapter 11 Cases, the Plan, the Disclosure**

Statement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, including, without limitation, the administration of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, or related agreements, instruments, or other documents, or any other act, omission, transaction, agreement, event, or other occurrence taking place before the Effective Date and that could have been asserted by or on behalf of the Debtors or their Estates at any time on or prior to the Effective Date against the Released Parties, except that the Debtors will not be deemed to release, waive, or discharge the Released Parties from and against any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Executory Contract or Unexpired Lease assumed during the Chapter 11 Cases or under the Plan.

Each Holder of a Claim in Class 3 shall be a Releasing Party and, as such, provides the releases set forth in Article VIII.B.1 of the Plan, unless such Holder votes to reject the Plan or does not vote on the Plan and timely submits a Release Opt-Out indicating such Holder's decision to not participate in the releases set forth in Article VIII.B.1 of the Plan. For the avoidance of doubt, each Holder of a Claim in Class 3 that votes to accept the Plan is a Releasing Party and any Release Opt-Out that might be submitted by any such Holder that voted to accept the Plan shall be void and of no effect.

2.     Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors and their Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Debtors and their successors and assigns, including the Liquidating Trust, in accordance with the Plan.

C.     *Exculpation.*

Except as otherwise specifically provided in the Plan, each Debtor, each Estate, and each Exculpated Party is hereby released and exculpated from any claim, obligation, Cause of Action, or liability for any Exculpated Claim, except to the extent such claim, obligation, Cause of Action, or liability arises from willful misconduct or gross negligence, but in all respects such released Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors, the Estates, and the Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with applicable law with regard to the transactions and treatment of Claims and Interests in the Chapter 11 Cases and in connection with the Plan Transactions, the negotiation, formulation, or preparation of the Plan Documents or related agreements, instruments, or other documents in connection with the Plan, and the distribution of and the solicitation of votes on the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Without limiting the generality of the foregoing, each Debtor, each Estate, and each Exculpated Party shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code. Notwithstanding anything to the

contrary in the foregoing, the releases and exculpations set forth above do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed or deemed executed to implement the Plan, or any Executory Contract or Unexpired Lease assumed during the Chapter 11 Cases or under the Plan.

D.     *Injunction.*

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Parties and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Interest, from taking any of the following actions against, as applicable, any Debtor, any Estate, any Released Party, the Liquidating Trust, their respective successors and assigns, and any of their respective assets and properties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, Causes of Action or interests, (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtors or the Released Parties on account of or in connection with or with respect to any such claims, Causes of Action or interests, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Released Parties, or their respective property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests, (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtors or the Released Parties or against their respective property or estates on account of or in connection with or with respect to any such claims, Causes of Action or interests unless such Entity has timely asserted such setoff right before Confirmation in a Proof of Claim or document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim, Cause of Action or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise, and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, Causes of Action or interests released or settled pursuant to the Plan.

E.     *Setoffs.*

Except as otherwise expressly provided for in the Plan, the Liquidating Trust or any Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, as applicable, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or the Liquidating Trust may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or Liquidating Trust of any such claims, rights, and Causes of Action that such Debtor or Liquidating Trust may possess against such Holder.

F.     *Recoupment.*

In no event shall any Holder of a Claim be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors or the Liquidating Trust, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors or the Liquidating Trustee on or before the Confirmation Date.

*G.     Subordination Rights.*

The classification and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and, subject to the provisions of Article III.H. of the Plan, any such subordination rights shall be settled, compromised, and released pursuant to the Plan.

## ARTICLE IX.
## EFFECT OF CONFIRMATION OF THE PLAN

Upon entry of the Confirmation Order, the Bankruptcy Court shall be deemed to have made and issued pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014, the Confirmation Order Findings of Fact and Conclusions of Law. Upon entry of the Confirmation Order, the Confirmation Order Findings of Fact and Conclusions of Law shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law in the Plan shall constitute conclusions of law even if they are stated as findings of fact.

## ARTICLE X.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

*A.     Conditions Precedent to the Confirmation Date.*

It shall be a condition to the Confirmation Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X.C of the Plan:

1.   The Disclosure Statement Order shall have been entered by the Bankruptcy Court in form and substance jointly acceptable to the Plan Proponents;

2.   All Plan Documents are in form and substance jointly acceptable to the Plan Proponents and have been filed with the Bankruptcy Court; and

3.   The Bankruptcy Court shall have entered the Confirmation Order in form and substance jointly acceptable to the Plan Proponents which, among other things, approves the Plan Documents.

*B.     Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X.C of the Plan:

1.   The Confirmation Order shall have been entered by the Bankruptcy Court in form and substance jointly acceptable to the Plan Proponents, in full force and effect, and not be subject to any stay or injunction, and shall have become a Final Order;

2.   All actions, documents, Certificates, and agreements necessary or appropriate to implement the Plan shall have been effected or executed or deemed executed and delivered, as the case may be, to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws;

3.   All authorizations, consents, regulatory approvals, rulings, or documents that are necessary or appropriate to implement and effectuate the Plan shall have been received; and

4.   The Administrative/Priority Claims Reserve Account and the Other Secured Claims Reserve Account have each been funded as required pursuant to the Plan.

C.    *Waiver of Conditions.*

The conditions set forth in Article X.A. and X.B of the Plan may be waived only by joint written consent of the Plan Proponents. Such waiver may be effectuated without notice to or entry of an order of the Bankruptcy Court and without notice to any other parties in interest.

D.    *Effect of Failure of Conditions.*

If Consummation does not occur on or prior to September 30, 2019 (or such date which may be jointly extended further by the Plan Proponents), the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement shall (i) constitute a waiver or release of any claims by the Debtors, Holders of Claims, or Holders of Interests or any Causes of Action, (ii) prejudice in any manner the rights of the Debtors, the Committee, or any other Entity, or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, the Committee, or any other Entity in any respect, including with respect to substantive consolidation and similar arguments.

## ARTICLE XI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.    *Modification and Amendments.*

Except as otherwise provided in the Plan, the Plan Proponents jointly reserve the right to modify the Plan and any Plan Document (including, without limitation, any Plan Supplement document) and seek Confirmation consistent with the Bankruptcy Code. Such modification may be material or immaterial, and may include material modifications to the economic terms of the Plan. Further, subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Plan Proponents jointly expressly reserve the right to exercise reasonable discretion to revoke or withdraw, or to alter, amend, or modify the Plan with respect to any Debtor, one or more times, after Confirmation, and, to the extent necessary or appropriate, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Plan Documents, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary or appropriate to carry out the purposes and intent of the Plan. Any such revocation, withdrawal, alteration, amendment, modification, or supplement contemplated by this paragraph shall be in form and substance jointly acceptable to the Plan Proponents. Additionally, any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XI of the Plan.

B.    *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof made in accordance with Article XI of the Plan are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of Plan.*

The Plan Proponents reserve the right to jointly revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of liquidation or reorganization. If the Plan Proponents jointly revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (i) the Plan

shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan, assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed or deemed executed pursuant to the Plan, shall be deemed null and void, and (iii) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims, Interests or Causes of Action, (ii) prejudice in any manner the rights of such Debtor or any other Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity, including with respect to substantive consolidation and similar arguments.

## ARTICLE XII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code to the extent provided under applicable law, including jurisdiction to:

1. Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative/Priority Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including cure amount pursuant to section 365 of the Bankruptcy Code, (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned, and (iii) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and the Liquidating Trust Agreement;

5. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

6. issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

7. determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

8. enter an order or Final Decree concluding or closing the Chapter 11 Cases;

9. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

10. determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

11. hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed or deemed executed in connection with the Plan;

12. hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan, including under Article VIII of the Plan, regardless of whether such termination occurred prior to or after the Effective Date;

13. enforce all orders previously entered by the Bankruptcy Court; and

14. hear any other matter not inconsistent with the Bankruptcy Code.

### ARTICLE XIII.
### MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect.*

Subject to Article X.B of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, as of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Plan Proponents, the Liquidating Trustee, and any and all Holders of Claims or Interests (irrespective of whether the Holders of such Claims or Interests, as applicable, have, or are deemed to have, accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.      *Dissolution of Committee*

On the Effective Date, the Committee shall dissolve; *provided*, *however*, that, following the Effective Date, the Committee shall continue to have standing and a right to be heard with respect to (i) Claims and/or applications for compensation by professionals and requests for allowance of Administrative Expenses for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code, (ii) any appeals of the Confirmation Order that remain pending as of the Effective Date to which the Committee is a party, and (iii) responding to creditor inquiries for 180 days following the Effective Date.

C.      *Additional Documents.*

On or before the Effective Date, the Plan Proponents may jointly file with the Bankruptcy Court such agreements and other documents, which agreements and other documents shall be in form and substance jointly acceptable to the Plan Proponents, as may be necessary to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Liquidating Trust, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

D.      *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Debtors

or the Liquidating Trustee on behalf of each of the Debtors, on the Effective Date, and following the Effective Date, the Debtors, or the Liquidating Trustee on behalf of each of the Debtors, shall pay such fees as they are assessed and come due for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

E.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Plan Proponent with respect to the Plan, the Disclosure Statement, or the Plan Documents shall be or shall be deemed to be an admission or waiver of any rights of any of the Plan Proponents with respect to the Holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Disallowed Claims.*

No distribution shall be made under the Plan on account of or in relation to Disallowed Claims.

H.      *Notices.*

All notices, requests, and demands to or upon the Plan Proponents to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

if to the Debtors, to:

> c/o Brookstone
> One Innovation Way
> Merrimack, NH 03054
> Attn:    Stephen Gould and Greg Tribou
> Email:  SGould@brookstone.com; GTribou@brookstone.com
>
> with copies to:
>
> **GIBSON, DUNN & CRUTCHER LLP**
> Matthew J. Williams
> Matthew K. Kelsey
> Keith R. Martorana
> Jason Zachary Goldstein
> 200 Park Avenue
> New York, New York 10166
> Tel:     (212) 351-4000
> Fax:     (212) 351-4035
> Email:  mjwilliams@gibsondunn.com
>          mkelsey@gibsondunn.com

kmartorana@gibsondunn.com
jgoldstein@gibsondunn.com

if to the Committee, to:

**COOLEY LLP**
Seth Van Aalten
Cathy Hershcopf
Robert Winning
1114 Avenue of the Americas
New York, New York 10036
Tel:     (212) 479-6000
Fax:    (212) 479-6275
Email:  svanaalten@cooley.com
            chershcopf@cooley.com
            rwinning@cooley.com

After the Effective Date, the Debtors and the Liquidating Trustee, as applicable, shall have authority to send a notice to Entities providing that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors and the Liquidating Trustee, as applicable, are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

I.        *Automatic Closure of Certain Chapter 11 Cases; Final Decree for Remaining Chapter 11 Case*

Upon the date that is 30 days after the Effective Date, without the need to obtain further approval from the Bankruptcy Court, the Chapter 11 Cases (collectively, the "Closed Chapter 11 Cases") of all of the Debtors (collectively, the "Closed Case Debtors") except for Brookstone Parent shall be deemed closed as of the date that is 30 days after the Effective Date without prejudice to the rights of any party in interest to seek to reopen the Closed Chapter 11 Cases, and (i) all motions, contested matters, adversary proceedings and other matters with respect to the Closed Chapter 11 Cases and the Closed Case Debtors shall be administered in the Chapter 11 Case of Brookstone Parent without prejudice to the rights of any party in interest, (ii) the caption of the Remaining Chapter 11 Case shall be amended as necessary to reflect the closure of the Closed Chapter 11 Cases, and (iii) a docket entry shall be made by the Clerk of the Bankruptcy Court in each of the Closed Chapter 11 Cases that reflects the closure of those cases pursuant hereto.  Upon the Liquidating Trustee's determination that all Claims have been Allowed, Disallowed, expunged, or withdrawn, and that all Causes of Action held by the Liquidating Trust have either been finally resolved or abandoned, the Liquidating Trustee shall move for the entry of a Final Decree for the Remaining Chapter 11 Case pursuant to section 350 of the Bankruptcy Code.  On entry of the Final Decree, the members of the Liquidating Trust Oversight Committee, the Liquidating Trustee, and the Liquidating Trust's professionals and agents shall be deemed discharged pursuant to the Liquidating Trust Agreement and the Liquidating Trust shall be dissolved.

If at any time the Liquidating Trustee determines that the expense of administering the Liquidating Trust so as to make a final distribution to the Liquidating Trust Beneficiaries is likely to exceed the value of the Liquidating Trust Assets remaining in the Liquidating Trust, the Liquidating Trustee shall apply to the Bankruptcy Court for authority to (i) distribute to each Liquidating Trust Beneficiary its Pro Rata share of Cash remaining in the Liquidating Trust Administrative Fund (after reserving for administrative cost associated therewith) and (ii) close the Chapter 11 Case of Brookstone Parent in accordance with the Bankruptcy Code and Bankruptcy Rules. Notice of such application shall be given electronically, to the

extent practicable, to those parties who have filed requests for notices and whose electronic addresses remain current and operating.

### J.  Term of Injunctions or Stays.

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### K.  Entire Agreement.

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Plan Supplement.

### L.  Exhibits.

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' or Committees' counsel at the address above or by downloading such exhibits and documents from the Claims and Balloting Agent website at http://omnimgt.com/BKST or the Bankruptcy Court's website at http://www.deb.uscourts.gov/. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

### M.  Nonseverability of Plan Provisions.

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. To the extent that one of the individual Debtor's chapter 11 plans is found to be unconfirmable, the Plan Proponents may jointly sever such Debtor from the Plan and seek confirmation of the Plan. Notwithstanding any such holding, alteration, interpretation or severance, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, interpretation or severance. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms, (ii) integral to the Plan and may not be deleted or modified without the Plan Proponents' joint consent, and (iii) nonseverable and mutually dependent.

### N.  Votes Solicited in Good Faith.

Upon entry of the Confirmation Order, the Plan Proponents will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Plan Proponents and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and,

therefore, neither any of such parties or individuals or the Liquidating Trustee or Liquidating Trust Oversight Committee will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

O.      *Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors, the Plan Proponents or their respective counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

P.      *Conflicts.*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement (other than the Liquidating Trust Agreement), or any other order (other than Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control. In the event of a conflict between the terms of the Plan, the Disclosure Statement, the Plan Supplement and, in each case, all documents, attachments, and exhibits thereto, on the one hand, and the terms of the Confirmation Order, on the other hand, the terms of the Confirmation Order shall control.

Q.      *No Stay of Confirmation Order.*

The Plan Proponents will request that the Bankruptcy Court waive any stay of enforcement of the Confirmation Order otherwise applicable, including, without limitation, pursuant to Bankruptcy Rules 3020(e), 6004(h) and 7062.

Dated: January 2, 2019

Respectfully submitted,

**BROOKSTONE HOLDINGS CORP.**

By: _/s/ Greg Tribou_
    Name: Greg Tribou
    Title: Authorized Signatory

**BROOKSTONE, INC.**

By: _/s/ Greg Tribou_
    Name: Greg Tribou
    Title: Authorized Signatory

**BROOKSTONE COMPANY, INC.**

By: _/s/ Greg Tribou_
    Name: Greg Tribou
    Title: Authorized Signatory

**BROOKSTONE PURCHASING, INC.**

By: _/s/ Greg Tribou_
    Name: Greg Tribou
    Title: Authorized Signatory

**BROOKSTONE STORES, INC.**

By: _/s/ Greg Tribou_
    Name: Greg Tribou
    Title: Authorized Signatory

**BROOKSTONE HOLDINGS, INC.**

By: _/s/ Greg Tribou_
    Name: Greg Tribou
    Title: Authorized Signatory

**BROOKSTONE PROPERTIES, INC.**

By: */s/ Greg Tribou*
    Name: Greg Tribou
    Title: Authorized Signatory


**BROOKSTONE RETAIL PUERTO RICO, INC.**

By: */s/ Greg Tribou*
    Name: Greg Tribou
    Title: Authorized Signatory


**BROOKSTONE INTERNATIONAL HOLDINGS, INC.**

By: */s/ Greg Tribou*
    Name: Greg Tribou
    Title: Authorized Signatory


**BIG BLUE AUDIO LLC**

By: */s/ Greg Tribou*
    Name: Greg Tribou
    Title: Authorized Signatory

Prepared by:

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Michael R. Nestor (No. 3526)
Sean M. Beach (No. 4070)
Andrew L. Magaziner (No. 5426)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:     (302) 571-6600
Fax:     (302) 571-1253
Email:  mnestor@ycst.com
          sbeach@ycst.com
          amagaziner@ycst.com

-and-

**GIBSON, DUNN & CRUTCHER LLP**
Matthew J. Williams
Matthew K. Kelsey
Keith R. Martorana
Jason Zachary Goldstein
200 Park Avenue
New York, New York 10166
Tel:     (212) 351-4000
Fax:     (212) 351-4035
Email:  mjwilliams@gibsondunn.com
          mkelsey@gibsondunn.com
          kmartorana@gibsondunn.com
          jgoldstein@gibsondunn.com

*Counsel to the Debtors and
Debtors in Possession*

**BAYARD, P.A.**
Justin Alberto (No. 5126)
Erin R. Fay (No. 5268)
600 North King Street, Suite 400
Wilmington, Delaware 19801
Tel:     (302) 655-5000
Fax:     (302) 658-6395
Email:  jalberto@bayardlaw.com
          efay@bayardlaw.com

- and -

**COOLEY LLP**
Seth Van Aalten
Cathy Hershcopf
Robert Winning
1114 Avenue of the Americas
New York, New York 10036
Tel:     (212) 479-6000
Fax:     (212) 479-6275
Email:  svanaalten@cooley.com
          chershcopf@cooley.com
          rwinning@cooley.com

*Counsel to the Official Committee of
Unsecured Creditors of Brookstone Holdings
Corp., et al.*

## Schedule 1

### Non-Debtor Affiliates

Areas Brookstone Atlanta JV, LLC

Brookstone Charlotte, LLC

Brookstone Stores DTW, LLC

Brookstone Dallas Fort Worth, LLC

Carry On SLC T-2, LLC

Carry On DTW, LLC

Brookstone Stores SAT, LLC

Brookstone O'Hare, LLC

Brookstone O'Hare II, LLC

Brookstone O'Hare T-5, LLC

National Concessions Management/Brookstone Stores Georgia, LLC

National Concessions Management/Brookstone Stores Georgia II, LLC

Brookstone IAD T-B, LLC

Brookstone DEN T-B, LLC

Brookstone IAH T-A, LLC

Brookstone IAH T-E, LLC

Brookstone LAX T-6 LLC

Brookstone Houston T-B, LLC

Brookstone SFO T-2, LLC

# EXHIBIT B

# RETAINED PROFESSIONALS

Participants and Terms

| Retained Employee | Role | Salary[1] | Term of Employment | Potential Incentive Amount |
|---|---|---|---|---|
| Gregory Tribou | Vice President, Chief Financial Officer | $354,200 | Through 12/31/2019 | $418,600 |
| Stephen Gould | Senior Vice President, General Counsel | $477,400 | Through 12/31/2019 | $564,200 |
| Susan McGrath | Vice President Human Resources | $338,800 | Through 06/30/2019 | $130,000 |

Incentive Milestone Descriptions

| Incentive[2] | % of Incentive Amount | 65.0% Payout | 85.0% Payout | 100.0% Payout |
|---|---|---|---|---|
| Distribution to Holders of General Unsecured Claims Equal to or Greater Than: | 90.0% | $4.9 million | $6.4 million | $7.5 million |
| Substantial Completion of Wind-Down[3] | 10.0% | 12/31/2019 | 1/31/2020 | 2/29/2020 |

---

[1] Represents annualized salary. Benefits substantially similar to the Retained Employees' benefits immediately prior to the Effective Date also to be provided during the term of employment. On December 19, 2018, the Debtors' boards voted to increase the base salary of each of the Retained Employees in the ordinary course by 10%, effective January 1, 2019.

[2] Incentive amounts will be paid at the time each applicable metric is satisfied.

[3] "Substantial Completion" means the disbursement of 80% of the cash held collectively by the Debtors immediately prior to the Effective Date of the Plan. Incentive payout is not impacted if target date is missed as a result of additional time needed or delay related to the Bankruptcy Court's calendar or scheduling issues.

**EXHIBIT C**

**LIQUIDATION ANALYSIS**

# LIQUIDATION ANALYSIS

## General Assumptions

Hypothetical chapter 7 recoveries set forth in this analysis (the "Liquidation Analysis") were determined through multiple steps, as set forth below. The basis of the Liquidation Analysis is the Debtors' projected cash balance and assets as of March 31, 2019 (the "Conversion Date") and the net costs to execute the administration of the wind down of the Estates. The Liquidation Analysis assumes that the Debtors would commence a chapter 7 liquidation on or about the Conversion Date under the supervision of a court-appointed chapter 7 trustee. The Liquidation Analysis reflects the wind down and liquidation of substantially all of the Debtors' remaining assets and the distribution of available proceeds to Holders of Allowed Claims during the period after the Conversion Date.

THE DEBTORS BELIEVE THAT ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE. THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR A CHAPTER 7 TRUSTEE. NEITHER THE LIQUIDATION ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WOULD NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE LIQUIDATION ANALYSIS.

FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE LIQUIDATION ANALYSIS WAS PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR ANTICIPATED, AND THE OCCURRENCE OF SUCH EVENTS MAY AFFECT THE LIQUIDATION ANALYSIS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. ALTHOUGH THE DEBTORS RESERVE THE RIGHT TO SUPPLEMENT OR MODIFY THE LIQUIDATION ANALYSIS UP TO THE CONFIRMATION HEARING, THE DEBTORS DO NOT INTEND AND DO NOT UNDERTAKE ANY OBLIGATION TO UPDATE OR OTHERWISE REVISE THE LIQUIDATION ANALYSIS (OR ANY OTHER PART OF THE DISCLOSURE STATEMENT) TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE LIQUIDATION ANALYSIS IS CIRCULATED TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE TO UNDERGO LIQUIDATION UNDER CHAPTER 7, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE ESTIMATED HERE. HOLDERS OF CLAIMS AND INTERESTS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE LIQUIDATION ANALYSIS.

## Summary Notes to Liquidation Analysis

1. *Dependence on assumptions*. The Liquidation Analysis depends on a number of estimates and assumptions. Although developed and considered reasonable by the management and the advisors of the Debtors, the assumptions are inherently subject to significant economic, business, regulatory and competitive uncertainties and contingencies beyond the control of the Debtors or their management. The Liquidation Analysis is also based on the Debtors' best judgment of how numerous decisions in the liquidation process would be resolved. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors

were, in fact, to undergo such a liquidation and actual results could vary materially and adversely from those contained herein.

2. *Dependence on a forecasted balance sheet.* This Liquidation Analysis contains numerous estimates that are still under review and it remains subject to further legal and accounting analysis.

3. *Chapter 7 liquidation process.* The Debtors' assets would be liquidated by a court-appointed chapter 7 trustee. That trustee would assume responsibility for the monetization and liquidation of the Debtors' remaining assets and have oversight of administrative activities, such as final creditor distributions needed to complete the wind down of the Estates.

4. *Claims Estimates.* In preparing the Liquidation Analysis, the Debtors have preliminarily estimated an amount of Allowed Claims for each Class based on the filed statements and schedules. Additional Claims were estimated to include certain chapter 7 administrative obligations incurred after the Conversion Date. The estimate of all allowed claims in this Liquidation Analysis is based on the book value of those claims. No order or finding has been entered or made by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in this Liquidation Analysis. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan. The actual amount of Allowed Claims could be materially different from the amount of Claims estimated in this Liquidation Analysis.

## Cash, Accounts Receivable, and Other Current Assets

1. Cash balance reflects bank cash as of the Conversion Date, net of estimated remaining disbursements not reflected elsewhere in the liquidation analysis. Cash balance excludes collections on Accounts Receivable and Other Current Assets and is reflected net of the return of Apex deposit amounts for the airport and e-commerce business transition services agreement.

2. Accounts Receivable are estimated at face value as of the Conversion Date (gross of collections between the date that this analysis was prepared and the Conversion Date). The Debtors have individually analyzed outstanding Accounts Receivable and estimate between approximately $2.5 million and $3.5 million of receipts related to monetization of the outstanding $7.1 million of Accounts Receivable. This reflects a range of recoveries between 35.3% and 49.6%.

3. Other Current Assets consist of cash collateralized letters of credit, utility deposits, credit card holdbacks, any remaining bulk inventory, and other receivables. The assumed recovery on Other Current Assets is 56.4% to 72.2%.

## Liquidation Value of All Other Assets

1. Per the Statement of Financial Affairs for Brookstone Company, Inc. [Docket No. 380], approximately $28.0 million in payments were made to creditors within 90 days before filing the chapter 11 case. For the purposes of this analysis, the assumed recoveries from litigation and preference/avoidance actions is 2.5% to 5.0% of this amount.

## Chapter 7 Case Administration

1. Wind Down expenses reflect operating costs over a nine-month period that consist of three months of operational wind down and a six-month tail period to cover final expenses. The bulk of the wind down budget consists of salaries (including wages) and benefits. Other items included in the wind down budget include, but are not limited to, corporate occupancy, taxes, insurance, and IT costs.

2. Pursuant to section 326 of the Bankruptcy code, the court may allow reasonable compensation for the trustee's services, not to exceed 25% on the first $5,000 or less, 10% on any amount in excess of $5,000 but not in excess of $50,000, 5% on any amount in excess of $50,000 but not in excess of $1.0 million, and reasonable compensation not to exceed 3% of such moneys in excess of $1.0 million, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims. For the purpose of this analysis, the estimate for the Trustee's fees have been simplified to 3% of gross liquidation proceeds.

3. Pursuant to section 327 of the Bankruptcy Code, the Trustee, with court approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the Trustee in carrying out the Trustee's duties. The Liquidation Analysis estimates that professional fees will be approximately $400,000 to $800,000, based on an uncontested wind down of the Estates.

4. Paragraph 39 of the final DIP order [Docket No. 278] provides that certain accrued and unpaid professional fees shall be entitled to priority claims. Professionals consist of advisors to the Debtors and advisors to the Official Committee of Unsecured Creditors. As of the Conversion Date, accrued and unpaid chapter 11 professional fees are estimated at approximately $1.1 million.

5. Pursuant to the Bankruptcy code, goods delivered within 20 days prior to the filing and certain costs incurred postpetition are entitled to administrative priority status. As of the conversion date, it is estimated that there will be $6.1 million in unpaid claims with administrative priority status, including 503(b)(9) claims.

Brookstone
Liquidation Analysis: Plan Recovery vs. Ch. 7 Recovery
*($ in thousands)*

| | Notes (A) | Book Value (B) | Plan Recovery | | Ch. 7 Recovery | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Low (C) | High (D) | Low (E) | High (F) |
| **Gross Liquidation Proceeds** | | | | | | |
| **I. Cash, Accounts Receivable, and Other Current Assets** | | | | | | |
| Cash on Hand (excl. A/R Coll., Other Current Asset Coll.) | 1 | 10,182 | 10,182 | 10,182 | 10,182 | 10,182 |
| Accounts Receivable | 2 | 7,131 | 2,517 | 3,538 | 2,517 | 3,538 |
| Other Current Assets | 3 | 6,155 | 3,469 | 4,445 | 3,469 | 4,445 |
| **Total Cash, Accounts Receivable, and Other Current Assets** | | 23,468 | 16,168 | 18,164 | 16,168 | 18,164 |
| **II. Liquidation Value of All Other Assets** | | | | | | |
| Litigation & Preference / Avoidance Actions | 4 | 1,401 | 700 | 1,401 | 700 | 1,401 |
| **Liquidation Value of All Other Assets** | | 1,401 | 700 | 1,401 | 700 | 1,401 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | **16,868** | **19,565** | **16,868** | **19,565** |
| **Liquidation Costs** | | | | | | |
| **III. Case Administration** | | | | | | |
| Wind Down | 5 | 2,518 | 2,518 | 2,518 | 2,518 | 2,518 |
| Chapter 7 Trustee Fees | 6 | Ch. 7: 506 - 587 | - | - | 506 | 587 |
| Est. Chapter 7 Trustee Professional Fees (Advisors) | 7 | Ch. 7: 400 - 800 | - | - | 400 | 800 |
| Est. Accrued and Unpaid Chapter 11 Professionals | 8 | 1,060 | 1,060 | 1,060 | 1,060 | 1,060 |
| 503(b)(9) and Other Admin Claims | 9 | 6,087 | 6,087 | 6,087 | 6,087 | 6,087 |
| **Total Expense of Case Administration** | | 9,665 - 11,052 | 9,665 | 9,665 | 10,571 | 11,052 |
| **Net Recovery** | | | **7,203** | **9,900** | **6,297** | **8,513** |
| **Estimated GUC Pool** | | | **43,924** | **43,924** | **43,924** | **43,924** |
| **% Recovery** | | | **16.4%** | **22.5%** | **14.3%** | **19.4%** |